# 21-1686-cv(L), 21-1712-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

NMR E-TAILING, LLC,

*Plaintiff,*

– v. –

SHALINI AHMED, I.I. 1, a minor child, by and through his next freinds IFIKAR and SHALINI AHMED, his parents, I.I. 2, a minor child, by and through his next freinds IFTIKAR and SHALANI AHMED, his parents, I.I. 3, a minor child, by and through his next freinds IFTIKAR and SHALINI AHMED, his parents, I-CUBED DOMAINS, LLC, SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST, DIYA HOLDINGS, LLC, DIYA REAL HOLDINGS, LLC, IFTIKAR A. AHMED,

*Defendants-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## BRIEF FOR DEFENDANT-APPELLANT IFTIKAR A. AHMED

VINCENT LEVY
GREGORY DUBINSKY
ANDREW C. INDORF
HOLWELL SHUSTER & GOLDBERG LLP
*Attorneys for Defendant-Appellant
  Iftikar A. Ahmed*
425 Lexington Avenue
New York, New York 10017
(646) 837-5151

IFTIKAR ALI AHMED SOLE PROP,

*Defendants,*

v.

JED HORWITT,

*Receiver-Appellee.*

# **TABLE OF CONTENTS**

Page

Statement of Jurisdiction...........................................................................1

Statement of the Issues.............................................................................1

Statement of the Case...............................................................................2

I.     The Parties-In-Interest .................................................................. 3

II.    The SEC Files This Action ............................................................ 3

III.   The SEC Obtains An Asset-Freeze Order And The Court Denies Mr. Ahmed's Requests To Access Funds To Pay For Counsel ................................ 5

IV.    The Court Blocks Mr. Ahmed From Full Participation In Discovery ............. 6

V.     The Court Enters Summary Judgment on Liability................................. 8

VI.    The Court Enters A Ruling On Remedies......................................... 12

VII.   The Court Amends the Final Judgment, and Mr. Ahmed Appeals ................ 14

VIII.  Congress Enacts The NDAA, This Court Grants A Limited Remand, And The District Court Applies An Extended Limitation Period.................... 15

Standard of Review .................................................................................18

Summary of Argument.............................................................................18

Argument............................................................................................20

I.     This Court Should Reverse The District Court's Retroactive Application Of The NDAA's New, Ten-Year Limitations Period................. 20

       A.     The District Court Lacked Jurisdiction To Enlarge The Judgment Because the SEC Never Cross-Appealed.................................... 20

       B.     The NDAA Did Not Alter These Jurisdictional Rules, And Could Not Constitutionally Do So Under *Plaut v. Spendthrift*........................ 25

i

C.     Regardless, The SEC's Claims Were Time-Barred, And The NDAA Did Not – And Could Not Constitutionally – Revive Them ................ 30

II.     The District Court's Original Disgorgement Order Should Be Set Aside And Its Asset-Freeze Order Should Be Limited ..................................... 37

A.     The SEC's Disgorgement Authority Is Limited ...................................... 38

B.     The District Court's Disgorgement Order Was Erroneous .................. 40

1.     The Disgorgement Order Should Be Reduced By At Least $14.4 Million For Company C ........................................ 40

2.     Mr. Ahmed Should Obtain A Credit Of At Least $35 Million For The "Forfeited" Assets ................................ 43

C.     On Remand, The District Court's Order Should Allow A Credit For Any Further Recoveries By Any Of His Victims ................................... 50

D.     The Interest Award Should Be Reduced Or Eliminated ...................... 51

III.     The Court Should Vacate the Summary-Judgment Ruling .............................. 53

A.     Summary Judgment Was Improper Because Mr. Ahmed Had No Meaningful Opportunity To Obtain Discovery Or Respond ................ 54

B.     The Court's Error Is Compounded By The Fact That Its Discovery Orders Were Unnecessary And Improper ................................. 61

IV.     The District Court Should Reduce The Penalty On Remand ............................ 66

V.     The Court Should Remand With Instructions Limiting The Remedy ............ 66

Conclusion ................................................................................................ 68

ii

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Ackermann v. United States*,
    340 U.S. 193 (1950) ..................................................................23

*Adickes v. S. H. Kress & Co.*,
    398 U.S. 144, 160 (1970) .........................................................60

*Baldwin v. City of Greensboro*,
    714 F.3d 828 (4th Cir. 2013) ...................................................32

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1998) ..................................................................30

*Bowles v. Russell*,
    551 U.S. 205 (2007) ..................................................................25

*Carlson v. Principal Fin. Grp.*,
    320 F.3d 301 (2d Cir. 2003) .....................................................24

*Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*,
    888 F.2d 260 (2d Cir. 1989) .....................................................52

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................60

*Chenault v. U.S. Postal Serv.*,
    37 F.3d 535 (9th Cir. 1994) ......................................................32

*Clark v. Martinez*,
    543 U.S. 371 (2005) ............................................................ 28, 30

*Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*,
    933 F.2d 162 (2d Cir. 1991) .....................................................60

*Cruickshank & Co., Ltd. v. Dutchess Shipping Co., Ltd.*,
    805 F.2d 465 (2d Cir. 1986) .....................................................23

*Degen v. United States*,
    517 U.S. 820 (1996) ...................................................................... 63, 64

*Dep't of Revenue of Montana v. Kurth Ranch*,
    511 U.S. 767 (1994) .............................................................................36

*Disraeli v. SEC*,
    334 F. App'x 334 (D.C. Cir. 2009) ....................................................47

*Doe v. Pataki*,
    120 F.3d 1263 (2d Cir. 1997) ........................................................ 35, 36

*El Paso Natural Gas Co. v. Neztsosie*,
    526 U.S. 473 (1999) ....................................................................... 21, 22

*Empire Blue Cross & Blue Shield v. Finkelstein*,
    111 F.3d 279 (2d Cir. 1997) .............................................................63

*Finkielstain v. Seidel*,
    857 F.2d 893 (2d Cir. 1988) .............................................................24

*Gonzalez v. Thaler*,
    565 U.S. 134 (2012) ..........................................................................22

*Goss v. Lopez*,
    419 U.S. 565 (1975) ..........................................................................53

*Greenlaw v. United States*,
    554 U.S. 237 (2008) .................................................................. *passim*

*Henderson v. Shinseki*,
    562 U.S. 428 (2011) ..........................................................................26

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
    520 U.S. 939 (1997) ....................................................................... 32, 34

*In re Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*,
    391 F.3d 401 (2d Cir. 2004) ..................................................... *passim*

iv

*In re Sherman*,
 491 F.3d 948 (9th Cir. 2007) .................................................................47

*In re Vivendi Universal, S.A. Sec. Litig.*,
 284 F.R.D. 144 (S.D.N.Y. 2012).........................................................52

*ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*,
 892 F.3d 511 (2d. Cir. 2018) .................................................................18

*Int'l Ore & Ferilizer Corp. v. SGS Control Servs.*,
 38 F.3d 1279 (2d Cir. 1994) ......................................................... *passim*

*Joint Anti-Fascist Committee v. McGrath*,
 341 U.S. 123 (1951) ..............................................................................58

*Kan. Pub. Employees Ret. Sys. v. Reimer & Koger Assocs., Inc.*,
 61 F.3d 608 (8th Cir. 1995) .......................................................... 33, 35

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
 40 F. Supp. 3d 332 (S.D.N.Y. 2014) ....................................................48

*Kokesh v. SEC*,
 137 S. Ct. 1635 (2017) ................................................................. *passim*

*Kresberg v. Int'l Paper Co.*,
 149 F.2d 911 (2d Cir. 1945) ..................................................................26

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
 501 U.S. 350 (1991) ..............................................................................30

*Landgraf v. USA Film Prods.*,
 511 U.S. 244 (1994) ..............................................................................32

*Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*,
 714 F.3d 1289 (Fed. Cir. 2013) ............................................................23

*Lee v. Burlington N. Santa Fe Ry. Co.*,
 245 F.3d 1102 (9th Cir. 2001) ..............................................................24

*Lieberman v. Cambridge Partners, L.L.C.*,
 432 F.3d 482 (3d Cir. 2005) ................................................................31

*Lindh v. Murphy*,
 521 U.S. 320 (1997) ..........................................................................32

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
 734 F. Supp. 1071 (S.D.N.Y. 1990) ....................................................48

*Liu v. SEC*,
 140 S. Ct. 1936 (2020) ................................................................ *passim*

*Louis Vuitton S.A. v. Spencer Handbags Corp.*,
 765 F.2d 966 (2d Cir. 1985) ...............................................................37

*Lugosch v. Pyramid Co. of Onondaga*,
 435 F.3d 110 (2d Cir. 2006) ......................................................... 8, 65

*Marshall v. Vicksburg*,
 15 Wall. 146 (1873) ...........................................................................44

*Martin v. Hadix*,
 527 U.S. 343 (1999) ..........................................................................32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ..........................................................................59

*Middleton v. City of Chicago*,
 578 F.3d 655 (7th Cir. 2009) .............................................................32

*N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*,
 266 F.3d 112 (2d Cir. 2001) ....................................................... 51, 52

*New Phone Co., Inc. v. City of New York*,
 498 F.3d 127 (2d Cir. 2007) ..............................................................22

*Plaut v. Spendthrift Farm, Inc.*,
 514 U.S. 211  (1995) ................................................................... *passim*

vi

*Pritchett v. Office Depot, Inc.*,
  420 F.3d 1090 (10th Cir. 2005) ................................................................26

*Purdue Pharma L.P. v. Kentucky*,
  704 F.3d 208 (2d Cir. 2013) ...................................................................26

*Rangolan v. Cty. Of Nassau*,
  370 F.3d 239 (2d Cir. 2004) ...................................................................24

*Root v. Railway Co.*,
  105 U.S. 189 (1882) ..................................................................... 39, 40

*Ruotolo v. I.R.S.*,
  28 F.3d 6 (2d Cir. 1994) ........................................................................60

*SEC v. Cavanaugh*,
  445 F.3d 105 (2d Cir. 2006) ...................................................................39

*SEC v. Commonwealth Chem. Sec., Inc.*,
  574 F.2d 90 (2d Cir. 1978) ....................................................................40

*SEC v. Contorinis*,
  743 F.3d 96 (2d Cir. 2014) ....................................................................39

*SEC v. Drexel Burnham Lambert, Inc.*,
  956 F. Supp. 503 (S.D.N.Y. 1997) .................................................. 48, 50

*SEC v. Fifth Ave. Coach Lines, Inc.*,
  435 F.2d 510 (2d Cir. 1970) ...................................................................23

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ...................................................... 39, 42, 46

*SEC v. Fischbach Corp.*,
  133 F.3d 170 (2d Cir. 1997) ...................................................................36

*SEC v. Levin*,
  849 F.3d 995 (11th Cir. 2017) ...................................................... 47, 49

*SEC v. Lunn*,

vii

2018 WL 317468 (D. Colo. Jan. 8, 2018) ............................................50

*SEC v. Manor Nursing Centers, Inc.*,
  458 F.2d 1082 (2d Cir. 1972) ...............................................52

*SEC v. Palmisano*,
  135 F.3d 860 (2d Cir. 1998) .......................................... 46, 49

*SEC v. Penn Central Co.*,
  425 F. Supp. 593 (E.D. Pa. 1976).........................................48

*SEC v. Penn*,
  2017 WL 5515855 (S.D.N.Y. Aug. 22, 2017) ...................... 48, 49

*SEC v. Rajaratnam*,
  918 F.3d 36 (2d Cir. 2019) .................................................18

*SEC v. Risman*,
  7 F. App'x 30 (2d Cir. 2001) ......................................... 46, 51

*SEC v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990) .............................................61

*Sira v. Morton*,
  380 F.3d 57 (2d Cir. 2004) .................................................54

*Smith v. Conway*,
  582 F. App'x 45 (2d Cir. 2014).............................................57

*Soc'y for the Propagation of the Gospel v. Wheeler*,
  22 F. Cas. 756 (C.C.D.N.H.1814) .........................................34

*Stogner v. California*,
  539 U.S. 607 (2003) .................................................... 35, 36

*Swatch Grp. Mgmt. Serv. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ...................................... 22, 25, 27

*Tilghman v. Proctor*,
  125 U.S. 136 (1888) .................................................... 38, 39

*U.S. v. Technodyne LLC*,
753 F.3d 368 (2d Cir. 2014) ...............................................................64

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) ...........................................................................54

*United States v. Abuhamra*,
389 F.3d 309 (2d Cir. 2004) ........................................................ 54, 56

*United States v. Am. Ry. Express Co.*,
265 U.S. 425 (1924) ...........................................................................21

*Weingarten v. United States*,
865 F.3d 48 (2d Cir. 2017) .......................................................... 31, 36

**Statutes**

15 U.S.C. 78u(d) ............................................................................ passim

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 2462 ....................................................................................6

28 U.S.C. § 2466....................................................................................64

Exchange Act § 21(d) ............................................................................34

U.S. Const., Art. I, § 9 ...........................................................................35

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year
2021, Pub. L. No. 116-283, § 6501(a)................................... 16, 39, 46

**Other Authorities**

6 J. Moore, Fed. Prac. § 56.22(2) (2d ed. 1966) ...................................60

ix

Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2284 (3d ed.) ................................62

Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2727.2 (4th ed.) .........................59

**Rules**

Fed. R. App. P. 3(c) ............................................................................22

Fed. R. App. P. 4(a) ...........................................................................1

Fed. R. Civ. P. 37(b) ...........................................................................62

Fed. R. Civ. P. 56(c).............................................................. 56, 57, 59, 60

## STATEMENT OF JURISDICTION

Defendant-Appellant Iftikar Ahmed was *pro se* in district court and, unassisted by counsel, noticed appeals of various orders. *Inter alia*, notices of appeal were filed within sixty days following (1) the district court's entry of a final judgment on September 27, 2018 (SPA-139, A-147; 2d Cir. Case No. 18-2932); (2) the court's entry of an amended final judgment on December 14, 2018 (SPA-164, A-162; 2d Cir. Case No. 19-3721); (3) the court's December 20, 2018 order appointing a receiver (SPA-173, A-155; 2d Cir. Case No. 19-103); and (4) the court's July 6, 2021 entry of a redetermined final amended judgment (SPA-251; A-264; 2d Cir. Case No. 21-1712).

Given the February 8, 2019 notice of appeal of the December 18, 2018 amended final judgment and the July 8, 2021 notice of appeal of the July 6, 2021 redetermined final amended judgment, 28 U.S.C. § 1291 provides jurisdiction over all issues raised herein. *See* Fed. R. App. P. 4(a)(1)(B) (imposing sixty-day limit on filing notice of appeal in cases in which "a United States agency" is a party).

## STATEMENT OF THE ISSUES

1. Did the district court impermissibly apply on remand a new, ten-year statute of limitations to the SEC's claims where (a) the district court had already entered final judgment and the SEC neither appealed nor cross-appealed, (b) application of the new limitations period reopened a final judgment by

enlarging relief in the SEC's favor, post-judgment, and (c) application of the new limitations period revived time-barred claims despite Congress not specifically allowing that result, subjecting Mr. Ahmed to retroactive penal legislation?

2.      Did the district court exceed the bounds of equity on its original disgorgement and asset-freeze orders against Mr. Ahmed by failing (a) to exclude certain profits not causally linked to any securities-law violation; and (b) to account for $35 million already recouped by Mr. Ahmed's sole alleged victim?

3.      Did the district court err by entering summary judgment as to liability where it barred Mr. Ahmed (proceeding *pro se*) from obtaining discovery and viewing the vast majority of the evidence adduced against him at summary judgment, on the grounds of confidentiality concerns, and where the district court refused to allow frozen assets to be used to retain counsel who could act for him?

## STATEMENT OF THE CASE

This appeal arises out of a civil enforcement action brought by the SEC against Defendant-Appellant Iftikar A. Ahmed ("Ahmed" or "Mr. Ahmed") under the Securities Act of 1933 (the "Securities Act"), the Securities and Exchange Act of 1934 (the "Exchange Act") and the Investment Advisers Act of 1940 (the "Advisers Act"), as well as associated SEC regulations.  The United States District Court for the District of Connecticut (Arterton, *J.*) decided the liability portion of

2

the case on summary judgment in favor of the SEC, and then entered judgment directing Mr. Ahmed to pay significant sums.  This appeal follows.

## I.    The Parties-In-Interest

From 2004 to 2015, Mr. Ahmed was employed by venture-capital firm Oak Management Corporation ("OMC"), an affiliate of Oak Investment Partners (together with OMC and other affiliates, unless the distinction is relevant, "Oak"). Dkt. 624 ¶ X-18.[1]  Mr. Ahmed served as a managing member for certain of Oak's investment funds.  *Id.* ¶ X-8.  While Mr. Ahmed was working for Oak, Oak invested in a number of companies on his advice, including successful investments such as Kayak (the online travel platform) and several companies subsequently taken public or acquired by larger companies for many multiples of Oak's investment valuation.  For his work, and over the years, Mr. Ahmed received tens of millions in compensation that neither Oak nor the SEC claimed to be unlawful.

## II.    The SEC Files This Action

The SEC initiated this action in the United States District Court for the District of Connecticut on May 6, 2015, Dkt. 1, and amended the complaint on June 16, 2015, challenging transactions involving ten companies in which Oak invested (referred to as Companies A through J), Dkt. 33.[2]  The defendants were

---

[1] Citations to "Dkt. _" refer to the docket in the U.S. District Court for the District of Connecticut, Case No. 15-cv-675.

[2] A second amended complaint was filed on April 1, 2016.  Dkt. 208.

Mr. Ahmed and the "Relief Defendants" – Mr. Ahmed's wife, minor children, and entities alleged by the SEC to have acted as Mr. Ahmed's "nominees."

A month before this action – but, as the district court acknowledged, "unrelated to this action" – Mr. Ahmed was charged with insider trading in the United States District Court for the District of Massachusetts. SPA-29; *United States v. Kanodia*, D. Mass. Case No. 15-cr-10131. Mr. Ahmed was released on bond and, in the middle of May 2015, departed the United States for India. SPA-29. Mr. Ahmed was subsequently arrested for allegedly entering India unlawfully, and, he asserted below, restrictions attendant to that arrest prevented (and continue to prevent) him from returning to the United States. Dkt. 97-1 ¶ 3.

After the filing of this action, Oak terminated Mr. Ahmed for "Disabling Conduct" – the same alleged conduct forming the basis for this action. Dkt. 890 ¶¶ 3, 7; *see also* Dkt. 4 ¶¶ 6-7 (explaining Mr. Ahmed was being terminated "for cause in light of the wrongful conduct [Oak] has uncovered" forming the basis for the SEC's suit). At the same time, Oak seized control and asserted ownership over personal assets that Mr. Ahmed held with Oak. Dkt. 890 ¶ 3. Although all of these assets were *lawfully earned* by Mr. Ahmed – and none were traced to claimed illegal activities—Oak unilaterally deemed them to be "forfeited" to Oak as a result of Mr. Ahmed's alleged "Disabling Conduct." Dkt. 890 ¶ 3. Below, record evidence valued these assets at more than $35 million. Dkt. 873-3 at 4.

4

### III. The SEC Obtains An Asset-Freeze Order And The Court Denies Mr. Ahmed's Requests To Access Funds To Pay For Counsel

Immediately following the filing of the action, and on the SEC's motion, the court entered a temporary restraining order that, *inter alia*, froze all of defendants' assets and property. Dkt. 9. On August 12, 2015, the district court converted the TRO into a preliminary injunction. SPA-1. At the SEC's request, the court preliminarily froze "up to $118 million" in assets, "to account for approximately $65 million in illicit profits to be disgorged plus prejudgment interest ($9.3 million) and civil penalties ($44 million)." SPA-3. The court gave Mr. Ahmed no credit for the roughly $35 million of personal assets Oak had seized. SPA-14-15.

Although Mr. Ahmed had been represented by counsel during the early stages of this suit, the asset freeze required Mr. Ahmed's counsel to file a motion to modify the preliminary injunction to permit access to funds to pay "legal fees and costs." On February 18, 2016, the district court denied the motion. Dkt. 191. Mr. Ahmed's counsel then withdrew, citing the "unreasonable financial burden" of continuing to represent Mr. Ahmed. Dkt. 210 at 2; *see also* Dkt. 221.

Mr. Ahmed, then *pro se*, renewed his request for funds to permit him to retain and pay counsel on October 24, 2016. Dkt. 325. The court denied it on January 6, 2017. Dkt. 392.

Following the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017) – which applied to disgorgement orders the five-year limitation period in 28

5

U.S.C. § 2462 – Mr. Ahmed moved to reduce the asset freeze and renewed his request to obtain funds for counsel. Dkt. 589.

In response, the court reduced the frozen amount to $89 million, recognizing that some of the transactions for which the SEC sought disgorgement were outside the five-year limitation period *Kokesh* recognized. Dkt. 829. Nevertheless, the court again refused to permit Mr. Ahmed to access funds to pay for counsel, and also continued to ascribe no value to the substantial assets already seized by Oak.[3] Dkt. 829 at 4; *see also* Dkt. 634 at 4 (SEC response). Mr. Ahmed was thus forced to proceed *pro se* since 2016. He remains unrepresented in district court.

## IV. The Court Blocks Mr. Ahmed From Full Participation In Discovery

Though he was *pro se*, Mr. Ahmed tried to take discovery.

At the outset, Mr. Ahmed moved to access the SEC's investigative file, which the SEC withheld from him. Dkt. 237 & Ex. 1 thereto. The court denied Mr. Ahmed's request, ruling that any order granting Mr. Ahmed the discovery "would necessarily be contingent upon [his] entering into an appropriate protective order," and the court stated it had "no ability to enforce such a protective order, nor

---

[3] Although the court directed the SEC to notify it if the value of the frozen assets exceeded $89 million, Dkt. 829 at 5, and although the receiver's report made clear that, as of April 3, 2019, the frozen assets far exceeded the judgment's value, Dkt. 1130, the SEC never provided this required notice, and the SEC consistently opposed Mr. Ahmed's request for the release of funds, including to pay for counsel in this appeal. *E.g.*, Dkt. 1291.

6

to sanction [Mr. Ahmed] in the event of any misuse of the produced documents," given that he was abroad. Dkt. 286 at 3. The court did not consider any other avenues to enforce a protective order that did not depend upon Mr. Ahmed being within the United States. The court further justified denying discovery as consistent with the fugitive-disentitlement doctrine. *Id.* at 4.

The district court (and a magistrate) reiterated that same reasoning in later orders rebuffing further bids by Mr. Ahmed to take discovery, including from Oak (the alleged victim). Dkts. 477, 515, 530, 538, 678, 833. The magistrate even applied this logic to deny Mr. Ahmed's request to review the deposition transcript of Oak's corporate representative. Dkt. 678.

As a result, Mr. Ahmed could not obtain documents he requested in discovery, review all documents obtained by the SEC in this case, or review all deposition transcripts. Indeed, he was barred even from participating in key depositions: At the deposition of Oak's corporate representative, Oak's lawyer invoked the court's protective order before the very first substantive question was asked in order to exclude Mr. Ahmed, meaning that Mr. Ahmed had no ability to hear or cross-examine Oak's witness, Dkt. 628-6 at 10:22-11:4, and Mr. Ahmed was barred from seeing some of his own emails from his time at Oak – all in the name of "confidentiality." As noted, after the fact, he was also prohibited from reviewing the transcript of the Oak deposition. Dkt. 678.

7

Moreover, because he did not have counsel (and the court rejected Mr.

Ahmed's requests for funds to pay for counsel), Mr. Ahmed also did not have an

attorney who could do these things in his stead. He was thus entirely shut out of

critical parts of the discovery process.

## V. The Court Enters Summary Judgment on Liability

On June 27, 2017, following the one-sided discovery process that the SEC

asked for and obtained from the district court, the parties cross-moved for

summary judgment on liability. Dkts. 616 (Ahmed), 618 (Relief Defendants), 622

(SEC). In light of the protective order entered in the case, most of the deposition

transcript of Oak's representative was filed under seal, as were many of the

documents on which the SEC relied in moving for summary judgment, not to

mention significant portions of the related briefing. Mr. Ahmed only received

these materials in the <u>substantially</u> redacted form that was publicly filed.[4]

---

[4] Even today, much of the SEC's evidence against Mr. Ahmed remains sealed,
despite this Circuit's "precedents indicat[ing] that documents submitted to a court
for its consideration in a summary judgment motion are—as a matter of law—
judicial documents to which a strong presumption of [public] access attaches."
*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006). The
undersigned appellate counsel was only able to obtain copies of the sealed
documents following entry of a further protective order by the district court
permitting appellate counsel (but not Mr. Ahmed) to review the documents, and
appellate counsel was provided only those parts of the discovery record that were
submitted to the district court on motions. Dkt. 1639.

8

On July 18, 2017, the SEC and Relief Defendants filed responses. Dkts. 661 (Relief Defendants); 667 (SEC). Mr. Ahmed attempted to respond. He repeatedly objected in his papers that many of the materials the SEC had filed in support of its application had been filed under seal, and were therefore inaccessible to him, and that he was thus hamstrung in his responses. *E.g.*, Dkt. 666 at ¶ X-3.

On March 29, 2018, the district court entered summary judgment in favor of the SEC on liability. SPA-24. The court's order does not identify clearly the specific theories or statutes on which the SEC prevailed for each specific transaction, but found him liable for transactions involving all ten companies.

Mr. Ahmed disputes the district court's entry of summary judgment for the reasons set out below (see Point III), but, for purposes of this appeal, the SEC's allegations and the district court's conclusions as to one company – Company C – are most relevant. These are summarized here.

**A.** Company C was a U.S.-based e-commerce company. Dkt. 624 ¶ C-1. In November 2012, Company C issued Series A shares to investors. *Id.* "BVI Company," an Oak affiliate, purchased $150,000 worth of shares at Mr. Ahmed's recommendation. *Id.* ¶¶ C-2-C-5. Relief Defendant I-Cubed Domains, LLC ("I-Cubed") also invested in Series A shares at Mr. Ahmed's direction.[5] *Id.* ¶ C-1.

---

[5] As discussed below, I-Cubed purchased its Company C shares for $2 million. *See* SPA-103-04.

Shortly after its initial investment, BVI Company purchased an additional $2 million in Company C's Series A shares. *Id.* ¶ C-5-C-6. The SEC argued this purchase was done without the knowledge of BVI Company directors other than Mr. Ahmed. *Id.*; *see also* Dkt. 623 at 52. When it was discovered by the other directors, Mr. Ahmed told them it was a "mistake." *Id.* ¶ C-7. He then wired $2 million to BVI Company and personally purchased the shares, although they remained nominally held by BVI Company. *Id.* ¶ C-8.

In 2013, as multiple firms sought to invest in Company C, Dkt. 904 ¶ 2, Mr. Ahmed began to negotiate a transaction in which Oak would invest $25 million in exchange for Series B shares. Dkt. 624 ¶ C-15. That investment was to be conditioned on a redemption by Company C of the Series A shares held by BVI Company – including the shares held by BVI Company but owned by Mr. Ahmed. *Id.* ¶ C-9. At the time, Oak asked Mr. Ahmed whether he had "invest[ed]" in Company C. Dkt. 631-69. Mr. Ahmed told Oak he "ha[d] NO personal investment or any direct beneficial interest or investment" in Company C. *Id.*

In October 2013, Oak purchased $25 million of Company C's Series B shares. Dkt. 628-4 ¶ 24. The SEC did <u>not</u> argue that Oak paid an above-market price, or that the value of the shares was inflated, or that Oak did <u>not</u> receive the shares it purchased. Simultaneously, Company C repurchased $10,896,193.59 of its own Series A shares, held in the name of the BVI Company but owned by Mr.

10

Ahmed, <u>also</u> at the market price.  Dkt. 624 ¶¶ C-9, C-12.  Because both aspects of this transaction—Oak's purchase of Series B shares and Company C's repurchase of Series A shares—reflected market prices, there is no allegation that anyone suffered a cent in financial harm owing to this transaction or to Mr. Ahmed's failure to disclose his holdings in Company C.

     **B.**    A year after this first transaction (the "C1 Transaction"), Mr. Ahmed recommended that Oak purchase the Company C shares held by I-Cubed for $7.5 million (the "C2 Transaction").  *Id.* ¶ C-17.  The SEC asserted that Mr. Ahmed did not fully disclose his alleged interest in I-Cubed.  *Id.*  On October 30, 2014, Oak (acting through Oak Fund XIII) purchased the Company C shares held by I-Cubed for $7 million in the C2 Transaction.  *Id.* ¶ C-19.  Oak immediately valued these shares at $10.1 million, substantially more than what it paid.  Dkt. 904 ¶¶ 21, 24.

     Below, the government argued that Oak's $7.5 million purchase came at an inflated price.  Specifically, the SEC argued that Mr. Ahmed knew Company C's revenues for the first eight months of 2014 were $178.1 million, which was below the projected increase in the company's revenues.  Dkt. 624 ¶ C-30; *see also* Dkt. 623 at 56.  This contention overlooked the fact that Company C, a retail company, earned most of its revenue in the fourth quarter due to the holiday season, as the company's finances would have indicated.  Dkt. 666 ¶ C-30.  More to the point, the district court did not make <u>any</u> finding as to the value of the shares – let alone did

it find that the shares were worth less than the $7.5 million purchase price.

Moreover, the record contained varying evidence of their value, including that Oak

assigned the shares a $10.1 million valuation on purchase, Dkt. 905 at 26, and

valued them even higher in 2016 – months after this suit, Dkt. 906-25 at OAK-RD-

00071182.  The record also contains evidence that third parties valued the shares

more highly than Oak did.  Dkt. 904 ¶ 23; Dkt. 906-28.  (Company C ultimately

failed, more than a year and a half after the C-2 Transaction.  Dkt. 666 ¶ C-31.)

## VI.    The Court Enters A Ruling On Remedies

After its summary-judgment ruling, the district court permitted motions for

judgment as to remedies.[6]  Again, Mr. Ahmed attempted to participate in the

briefing process, but many of the exhibits in support of the government's motion

were sealed and inaccessible to him in unredacted form.  *See* Dkt. 902 at 2.

On September 6, 2018, the district court entered an order on remedies,

awarding the SEC injunctive and monetary relief.  SPA-93.  The monetary

components of the court's order are summarized below:

***Disgorgement***.  The district court – acting after *Kokesh* but before *Liu v.*

*SEC*, 140 S. Ct. 1936 (2020) – determined it could order disgorgement as to

---

[6] The SEC styled its motion one for "remedies and judgment," Dkt. 886, while Mr. Ahmed filed a "motion for summary judgment on damages," Dkt. 884.  The district court treated both as motions for judgment (rather than summary judgment) because the SEC sought only equitable relief.  SPA-96-97.

transactions occurring within *Kokesh*'s five-year limitations period – *i.e.*, the five

years preceding the 2015 complaint.  SPA-101-02.  The alleged gains were:

| Year | Company | Short Description of Allegedly Tainted Transaction | Amount |
|------|---------|---------------------------------------------------|--------|
| 2010 | Company I | Exchange rate overpayment | $2,185,946 |
| 2011 | Company G | Management incentive payment | $3,113,981 |
| 2013 | Company G | Management inventive payment | $1,556,990 |
| 2013 | Company G | Investment bank advisory fee | $622,796 |
| 2013 | Company C | C1 – Share redemption | $8,896,193 |
| 2014 | Company C | C2 – I-Cubed share purchase | $7,500,000 |
| 2014 | Company A | Overpayment for shares | $2,044,733 |
| 2014 | Company B | Overpayment for shares | $18,000,000 |

Dkt. 829 at 3 n.3.  The court reduced the total amount of these alleged gains by $2

million, the price I-Cubed paid for the shares sold in the C2 Transaction.  SPA-

103-04.  The court thus directed Mr. Ahmed to "disgorge" $41,920,639.  SPA-167.

The SEC represented that the disgorged assets would be provided in whole or

substantial part to Oak and its investors.  Dkt. 888 at 1 ("The bulk (if not entirety)

of [disgorged] assets will be needed to return stolen funds to Oak investors.").

Despite the SEC's representation that the disgorged assets would be paid *to

Oak*, the court, in ordering disgorgement, again declined to give Mr. Ahmed any

credit for the *assets that Oak had already taken from Mr. Ahmed* on account of his

termination for "Disabling Conduct" – that is, the same conduct that formed the

basis for the SEC's complaint.  SPA-119-20.  Record evidence then valued these

assets at more than $35 million, with <u>no</u> lesser valuation provided by the SEC.  *See*

13

Dkt. 905 at 30; *see also* Dkt. 921 at 17-19 (SEC reply brief). Nonetheless, the district court gave these assets a valuation of zero, stating that they were not "ill-gotten gains," and asserting, without elaboration, that allowing Oak to keep these assets and also to receive the proceeds of a disgorgement award was appropriate and would "not result in a double recovery by the Oak Funds." SPA-121.

*Interest and Gains*. The court ordered Mr. Ahmed to pay prejudgment interest of $1,491,064.01, covering the period ending on the date of the asset freeze. SPA-104-05 & n.6; SPA-167. It also directed Mr. Ahmed to disgorge all "interest and gains" earned on those of the disgorged assets that had been frozen since 2015 on account of market changes or otherwise. SPA-105-06.

*Civil Penalty*. Finally, the Court determined that, of the three tiers of penalty set out in 15 U.S.C. § 78u(d)(3)(B), a "third tier" penalty was warranted. SPA-106-07. It thus imposed a penalty of $21 million, which it described as "just over half the total disgorgement amount." SPA-109.

## VII. The Court Amends the Final Judgment, and Mr. Ahmed Appeals

Following the court's ruling on remedies, the district court entered an amended final judgment on December 14, 2018, setting forth the remedy entered in favor of the SEC. SPA-164. Mr. Ahmed timely filed a notice of appeal on February 8, 2019. A-162. The SEC did not cross-appeal.

14

Simultaneously, Mr. Ahmed moved in district court and in this Court for the release of funds from the seized assets to permit him to pay for appellate counsel. Dkts. 1061, 1288 (renewing the motion, which had not been ruled on). Following these motions, the district court released funds, subject to certain conditions, to permit Mr. Ahmed pay for appellate counsel, Dkt. 1405, but has more recently declined to permit payment from the frozen assets, Dkts. 2040, 2099.

**VIII.  Congress Enacts The NDAA, This Court Grants A Limited Remand, And The District Court Applies An Extended Limitation Period**

**A.**     On January 1, 2021, more than two years after entry of final judgment (which the SEC declined to appeal), Congress enacted the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283 (2021). The NDAA amended certain aspects of the securities laws, including in two respects relevant here. *First*, Section 6501 of the NDAA amended Section 21(d) of the Exchange Act to provide the SEC a specific right to seek "disgorgement." *See* 15 U.S.C. § 78u(d)(7) ("paragraph (7)"). *Second*, the NDAA amended Section 21(d) to provide that the SEC "may bring a claim for disgorgement under paragraph (7)" – *i.e.*, for the new disgorgement remedy – "not later than *10 years* after the latest date of the violation" under certain enumerated provisions of the securities laws or "any other provision of the securities laws for which scienter must be established." *See id.* § 78u(d)(8)(A) (emphasis added). The NDAA stated that the "amendments made by" it to the securities laws "shall

15

apply with respect to any action or proceeding that is pending on, or commended on or after," January 1, 2021.  NDAA § 6501(b).

 **B.** On January 13, 2021, the SEC moved for a limited remand "to permit the district court to recalculate [Mr.] Ahmed's disgorgement based on the new 10-year statute of limitations."  Case No. 19-2903, ECF No. 475 ("SEC Mot.") at 2.  Mr. Ahmed opposed the motion on multiple grounds, including that (1) the SEC's failure to cross-appeal foreclosed relief, (2) the NDAA should not be read to reopen final judgments or revive time-barred claims, and (3) any such reading would violate the Constitution.  The SEC replied that "full rebuttal" of these legal arguments "would require more than the 7 days and 2,600 words permitted for a reply."  Case No. 19-2903, ECF No. 491 at 9.  The SEC urged, "the appropriate course of action here is to remand now so that this Court may better adjudicate [the arguments] later with the benefit of the district court's informed evaluation."  *Id.*

 Shortly thereafter, a motions panel of this Court remanded Mr. Ahmed's appeals for consideration of the NDAA's application – without addressing the merits of any of his legal objections – while permitting the parties to appeal from any determination by the district court on remand.  Case No. 19-2903, ECF No. 535 ("[T]he appeals are REMANDED to the district court for a determination of [Mr. Ahmed's] disgorgement obligation consistent with § 6501 of the National Defense Authorization Act, and, if appropriate, entry of an amended judgment.

Following the district court's new determination, either party may appeal in the normal course.").

    **C.**    On remand, the district court ordered briefing and argument addressing the effect of the NDAA on Mr. Ahmed's disgorgement obligation. Dkt. 1801. Mr. Ahmed filed his brief *pro se* (borrowing from the brief filed by counsel in this Court opposing remand). Then the court, "recognizing the utility of representation," released limited funds to allow the undersigned to represent Mr. Ahmed at argument. Dkt. 1935 at 2. Through counsel, Mr. Ahmed renewed his arguments that the SEC's failure to cross-appeal created a jurisdictional bar to the SEC's requested relief and that, even if it did not, the NDAA should not be read to reopen the district court's judgment or to revive the SEC's time-barred claims.

    Following argument, the district court granted the SEC's motion without addressing the binding authority, discussed *infra*, on which Mr. Ahmed relied. By order dated June 16, 2021, the court applied the new, ten-year limitations period and increased Mr. Ahmed's disgorgement obligation to $64,171,646.14. SPA-250. The district court also increased Mr. Ahmed's obligation to pay prejudgment interest to $9,755,798.34. *Id.*

    The district court entered its redetermined final amended judgment on July 6, 2021. SPA-251. Mr. Ahmed timely noticed his appeal on July 8, 2021. A-264. As before, the SEC did not appeal.

## STANDARD OF REVIEW

A district court's entry of summary judgment is reviewed *de novo*. *See, e.g.*, *ING Bank N.V. v. M/V TEMARA*, 892 F.3d 511, 518 (2d Cir. 2018). This Court reviews the district court's determination on remedies for abuse of discretion, but all questions of law, including with respect to the applicability of the NDAA's statute of limitations and the legal standards governing disgorgement, are reviewed *de novo*. *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019).

## SUMMARY OF ARGUMENT

The district court's judgments on liability and remedies should be reversed.

*First*, this Court should reverse the district court's order on remand applying the new ten-year limitation announced in the 2021 NDAA. As this Court has emphasized, an appellee that fails to cross-appeal from a judgment – like the SEC here – "may *not* seek to enlarge its rights under the judgment *by enlarging the amount of damages or scope of equitable relief*." *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1286 (2d Cir. 1994) (emphasis added). The district court's redetermined final amended judgment bypassed this proscription, notwithstanding this Court's instruction that an appellee's failure to cross-appeal presents a *jurisdictional* bar to augmented relief. Moreover, by applying the new limitations period to the SEC's claims here, the district court ignored Circuit precedent applying the canon against retroactivity, and flouted

18

bedrock constitutional rules prohibiting the reopening of final judgments and the revival of time-barred claims, in violation of the separation of powers and the Ex Post Facto Clause. This unconstitutional result, of course, is inconsistent with Congress's intent, and could and should have been avoided.

*Second*, for transactions within the five-year limitation period, the court's asset-freeze and disgorgement orders were legally defective and amounted to an impermissible penalty. As the Supreme Court confirmed in *Liu v. SEC*, 140 S. Ct. 1936 (2020), the SEC's authority under 15 U.S.C. § 78u(d) – upon which the SEC relied below to seek relief – is bound by traditional notions of equity. Equitable relief, the Supreme Court instructs, cannot constitute a penalty; a wrongdoer can be required to disgorge only net profits causally linked to a securities-law violation, and no more. The district court did not adhere to this rule. First, the district court incorrectly imposed disgorgement for the C1 Transaction where Mr. Ahmed's profits were not causally connected to any charged securities violation. Second, the district court failed to make any finding of net unlawful profits on the C2 Transaction. Third, the court impermissibly refused to reduce the disgorgement amount to account for tens of millions of dollars (all lawfully earned) that Mr. Ahmed had already "forfeited" to his sole alleged victim for precisely the same alleged conduct at issue.

19

*Third*, the district court entered summary judgment on liability even though Mr. Ahmed could neither participate in discovery nor view the substantial majority of the evidence presented against him, and even though the district court denied Mr. Ahmed the opportunity to hire counsel who could do those things for him. This Kafkaesque process did not comport with the basic principles underlying summary judgment or the Anglo-American system of adversarial adjudication. The district court's justifications for this defective procedure – a supposed inability to enforce a protective order and the fugitive-disentitlement doctrine – have no merit. Because the district court had (and has) jurisdiction over more than $110 million in Mr. Ahmed's assets, it was simply wrong to conclude that it could not enforce the protective order against Mr. Ahmed, and it was likewise unnecessary to refuse Mr. Ahmed funds to retain counsel. Likewise, the fugitive-disentitlement doctrine is inapt here, not least because the criminal prosecution against Mr. Ahmed is unrelated to this action (as the district court expressly acknowledged).

## **ARGUMENT**

### I. This Court Should Reverse The District Court's Retroactive Application Of The NDAA's New, Ten-Year Limitations Period

#### A. The District Court Lacked Jurisdiction To Enlarge The Judgment Because the SEC Never Cross-Appealed

First and foremost, this Court should reverse the application of the NDAA's enlarged limitation period because, given the SEC's failure to cross-appeal, the

20

district court had no power to reopen the judgment and expand equitable relief in the SEC's favor.

> **1.** "Although an appellee who has not cross-appealed may urge alternative grounds for affirmance, it may *not* seek to enlarge its rights under the judgment *by enlarging the amount of damages or scope of equitable relief*." *Int'l Ore*, 38 F.3d at 1286 (emphasis added); *see Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (reaffirming "familiar" rule that "an appellee who does not cross-appeal may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary'" (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924))).

The Supreme Court "recognized [this cross-appeal] limitation as early as 1796." *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999). And, "in more than two centuries of repeatedly endorsing the cross-appeal requirement, not a single one of [the Supreme Court's] holdings has ever recognized an exception to the rule." *Id.* at 480. As recently as 2008, the Supreme Court reiterated that the rule was "inveterate and certain" and "firmly entrenched." *Greenlaw v. United States*, 554 U.S. 237, 244-45 (2008) (cleaned up). It held the government could

21

not increase a criminal defendant's sentence, because the government had not

cross-appealed, and the cross-appeal rule was "mandatory." *Id.*

Moreover, although the Supreme Court has thus far declined to decide the

"theoretical" question of whether this rule is not just "mandatory" but also

"jurisdictional," *id.* at 245, the Second Circuit has called this spade a spade:  In this

Circuit, the cross-appeal requirement is "jurisdictional in nature," and courts "have

no jurisdiction to review [a judgment] in the absence of a proper cross-appeal."

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 93 (2d Cir. 2014)

(internal quotation marks omitted).  Indeed, "both a notice [of appeal] and its

contents are jurisdictional prerequisites," *Gonzalez v. Thaler*, 565 U.S. 134, 147

(2012), such that this Court "do[es] not have the authority to waive the

jurisdictional requirements of" Federal Rule of Appellate Procedure 3(c)

(governing notices of appeal), *New Phone Co., Inc. v. City of New York*, 498 F.3d

127, 130 (2d Cir. 2007).  So much less so for the failure to file a cross-appeal.  *See*

*Swatch*, 756 F.3d at 93.[7]

**2.**   The district court's redetermined final amended judgment violates

these prescriptions.  As is undisputed, the SEC did not notice an appeal or cross-

---

[7] The Second Circuit's decision in *Swatch Group* is consistent with the position of
the U.S. Department of Justice in both civil and criminal cases.  *See* Brief for the
United States, *Greenlaw v. United States*, 2008 WL 466092, at *13 (2008)
(arguing that cross-appeal requirement is jurisdictional in criminal cases); *El Paso
Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 480 (1999) (arguing that cross-appeal

appeal from the final amended judgment (or any other judgment). And, by recalculating disgorgement to reach back *five more years*, the district court plainly and improperly "enlarge[d] [the SEC's] rights under the judgment by enlarging the . . . scope of equitable relief." *Int'l Ore*, 38 F.3d at 1286. There was no legal basis or jurisdiction to order that relief, as the cross-appeal rule is mandatory and admits of no exception. *Greenlaw*, 554 U.S. at 244-45; *SEC v. Fifth Ave. Coach Lines, Inc.*, 435 F.2d 510, 516 (2d Cir. 1970) ("The SEC here argues that we should hold Fifth to have been an investment company . . . as early as October, 1966. . . . Since the SEC did not cross-appeal from Judge McLean's order, our power is limited" by the cross-appeal rule.).[8]

Rather than confront *Greenlaw* and *Swatch Group* – which were cited by Mr. Ahmed and at argument below, Dkt. 1906 at 9; A-192-95 – the district court

---

requirement is jurisdictional in civil cases). As noted above, the Supreme Court in both cases declined to resolve "the theoretical status" of the cross-appeal rule, finding it sufficient that the rule was "firmly entrenched" and without any recognized exception. *Greenlaw*, 554 U.S. at 245 (quoting *El Paso*, 526 U.S. at 480).

[8] *See also Ackermann v. United States*, 340 U.S. 193, 198 (1950) ("Petitioner made a considered choice not to appeal . . . . Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong[.]") (affirming denial of Rule 60(b) motion); *Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*, 714 F.3d 1289, 1297 (Fed. Cir. 2013) (rejecting argument that movant "should be excused from failing to appeal because it could not have known the issues to raise in a cross-appeal") (applying Second Circuit law); *Cruickshank & Co., Ltd. v. Dutchess Shipping Co., Ltd.*, 805 F.2d 465, 468 (2d Cir. 1986) ("Having failed to appeal, movants cannot achieve the same result" via Rule 60).

simply ignored them and, citing stale and irrelevant decisions, stated the cross-appeal requirement was "a rule of practice" it could simply "disregard[]." SPA-243 (citing *Rangolan v. Cty. Of Nassau*, 370 F.3d 239, 254 (2d Cir. 2004); *Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 309 (2d Cir. 2003); *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir. 1988)).

That is plainly wrong – and foreclosed by Circuit precedent. To begin, not one of the district court's cited cases is remotely in point. The court in *Rangolan* enforced the cross-appeal rule and declined to give the appellee any relief. 370 F.3d at 254. As explained in *International Ore*, *Finkielstain* "involved multiple parties where only one of several plaintiffs or defendants failed to cross-appeal" and "the court included the non-cross-appellant in the amended judgment so as to preserve 'fairness.'" *Int'l Ore*, 38 F.3d at 1286. That is not the case here. And in *Carlson*, after reversing a summary-judgment dismissal, this Court reinstated a cross-claim that had been dismissed based solely on the erroneous summary-judgment ruling. 320 F.3d at 309. There is nothing like that here.[9]

Regardless, the district court's statement of the law is clearly wrong. Each of the decisions the district court invoked predates the Supreme Court's 2007

---

[9] The court also cited *Lee v. Burlington N. Santa Fe Ry. Co.*, 245 F.3d 1102, 1107 (9th Cir. 2001). There, the court held the appellee "d[id] not seek to enlarge or modify its rights, but simply to defend the judgment entered in its favor" so that "it was not required to cross-appeal"; in the alternative, it excused a failure to cross-appeal based on a change in law. That dictum contravenes this Circuit's law.

24

decision in *Bowles v. Russell*, which held "the timely filing of a notice of appeal in a civil case is a jurisdictional requirement," and overruled cases permitting "equitable exceptions to [such] jurisdictional requirements," 551 U.S. 205, 214 (2007); as well as *Greenlaw*, which held the cross-appeal rule "mandatory" as, "***in more than two centuries of repeatedly endorsing the cross-appeal requirement, not a single one of our holdings has ever recognized an exception to the rule***," 554 U.S. at 245 (emphases added) (internal quotation marks omitted).  The Circuit in *Swatch Group* comes in the wake of these Supreme Court decisions and squarely held that the cross-appeal rule is "jurisdictional."  756 F.3d at 93.  That is dispositive, and the district court had no answer to these cases.  It just ignored them.  Applying the relevant law, this Court should correct the district court's error and hold that the SEC's failure to notice a cross-appeal completely foreclosed enlargement of the judgment in its favor.

### B.     The NDAA Did Not Alter These Jurisdictional Rules, And Could Not Constitutionally Do So Under *Plaut v. Spendthrift*

In light of the SEC's failure to cross-appeal, the redetermined final amended judgment can only be sustained if Congress in the NDAA altered the well-settled

jurisdictional landscape. Congress plainly did not do so, particularly because that construction of the NDAA would render it unconstitutional.

1. This Court and the Supreme Court have routinely required a plain statement to expand or alter federal jurisdiction. As is settled, statutes prescribing rules of decision or providing a remedy do not affect federal jurisdiction. *See, e.g.*, *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) ("We have urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity[.]"). Likewise, because "federal courts are courts of limited jurisdiction and, as such, lack the power to disregard [jurisdictional] limits as have been imposed by the Constitution or Congress," *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (cleaned up), even *jurisdictional* statutes will only be interpreted to expand federal jurisdiction if they expressly say so. *Kresberg v. Int'l Paper Co.*, 149 F.2d 911, 913 (2d Cir. 1945) ("Federal jurisdiction is not to be extended beyond the scope permitted by a strict construction of the statute upon which it rests."); *Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1094-95 (10th Cir. 2005) ("[S]tatutes conferring jurisdiction upon the federal courts . . . are to be narrowly construed in light of our constitutional role as limited tribunals.").

Given this background norm of construction, the NDAA's passing reference to "pending" cases does not come close to altering the "inveterate and certain" cross-appeal rule, *Greenlaw*, 554 U.S. at 244-45, barring courts from enlarging a

26

judgment in the appellee's favor in the absence of a cross-appeal, *Int'l Ore*, 38 F.3d at 1286.  Indeed, although the NDAA creates a remedial right permitting the SEC to seek disgorgement from district courts, the provision governing the applicability of that right says <u>nothing</u> about *<u>jurisdiction</u>*, let alone does it issue a specific statement altering the jurisdictional rules forbidding this Court from expanding a judgment to favor a party that did not appeal.  *Swatch Grp.*, 756 F.3d at 93.  Absent a clear statement by Congress, there is no basis to read the NDAA as expanding jurisdiction or displacing the firmly entrenched cross-appeal rule.

**2.**     Worse, interpreting the NDAA to permit reopening a judgment would violate the separation of powers – and thus any such interpretation should be avoided at all costs.  The Constitution draws bright lines between the power of Congress "to prescribe the rules by which the duties and rights of every citizen are to be regulated" and the power of the judiciary to "*decide* [cases]" and "render dispositive judgments."  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219, 222 (1995) (cleaned up).  The Supreme Court has distinguished legislation that applies new rules of decisions to appealed cases, which *can* be constitutional, from legislation that reopens judgments, which *cannot* be constitutional.  *Id.* at 226-27

Thus, once a court enters a "judgment[] from which all appeals have been foregone," "Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was."

27

*Id.* at 227. In other words, a law of Congress is "unconstitutional to the extent that it requires federal courts to reopen final judgments entered before its enactment." *Id.* at 240. Applying these principles in *Plaut*, the Supreme Court struck down as unconstitutional a statute that extended the limitations period for claims under § 10(b) of the Securities Act because the law expressly allowed federal courts to reopen final judgments already dismissed on timeliness grounds. *Id.* at 218-19.

Here, just as in *Plaut*, the court invoked a federal statute to *reopen* a final judgment that the SEC did not cross-appeal, in order to grant the SEC additional relief – disgorgement beyond *Kokesh*'s five-year limitations period – that the district court had denied as time-barred (SPA-102-03; SPA-52). *Cf. id.* at 227.

That result cannot stand under *Plaut* – or, at minimum, it raises "serious constitutional" questions that should be avoided by statutory construction. *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"). Indeed, unlike the statute in *Plaut*, the 2021 NDAA does not expressly (or impliedly) require the district court's result. *Cf. Plaut*, 514 U.S. at 217 (finding "no reasonable construction" that does not require federal courts to

28

reopen final judgments).[10]  Accordingly, this Court should reject the district court's construction of the NDAA and reverse its decision to reopen the judgment.

**3.**     The district court did not seriously grapple with any of these points. Instead, the court justified its extraordinary reopening of a judgment that the SEC did not appeal with just one sentence of analysis:  The NDAA applies to cases "pending" as of January 1, 2021, the court said, and an appeal remains "pending" until the last court in the hierarchy of Article III courts rules.  SPA-242.

It is true, of course, that Mr. Ahmed appealed the district court's judgment (and thus *his* appeal was not forgone), but this misses the critical point that *the SEC did not appeal*, and the time for the SEC to do so lapsed.  To repeat, the 2018 judgment denying disgorgement beyond the five-year limitations period was *final* as to the SEC, and the SEC could not seek to enlarge the disgorgement remedy. *Greenlaw*, 554 U.S. at 244-45; *Int'l Ore*, 38 F.3d at 1286.

And it plainly makes no difference that the district court's previous denial of disgorgement for pre-2010 conduct rested on a Supreme Court decision interpreting a statute of limitations that Congress wished to supersede by statute, even for pending cases; that's exactly what happened in *Plaut*.  *See* 514 U.S. at 228

---

[10] The statute in *Plaut* stated that any action "dismissed as time barred" that "would have been timely filed under" the new limitation period "shall be reinstated on motion by the plaintiff."  *Id.* at 215.  That is a far cry from the NDAA's mere reference to application of the securities-laws amendments to "pending" cases.

("It is irrelevant as well that the final judgments reopened by § 27A(b) rested on the bar of a statute of limitations" as interpreted by *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991)).

By construing Congress's use of the word "pending" to permit reopening a judgment, and by then proceeding to enlarge it in the SEC's favor, the district court contravened *Plaut*'s rule or, at the least, failed to avoid the "serious constitutional doubts" that resulted from its interpretation of the statute. *Clark*, 543 U.S. at 381.

### C. Regardless, The SEC's Claims Were Time-Barred, And The NDAA Did Not – And Could Not Constitutionally – Revive Them

Even if the district court had jurisdiction to reopen and enlarge the final judgment in the SEC's favor, the district court erred by applying the NDAA to eliminate Mr. Ahmed's vested statute-of-limitations defense. That result flouts settled Circuit law governing retroactivity, and violates the Ex Post Facto Clause.

**1.** Federal statutes, the Supreme Court instructs, "will not be construed to have retroactive effect unless their language *requires* this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1998) (emphasis added). Significantly, when considering the retroactive application of new limitations periods, this Circuit distinguishes two situations: (1) *extending* an *unexpired* limitation period applicable to a timely claim, and (2) *reviving* an already *time-*

*barred* claim.[11]  "[R]etroactively revoking a vested statute of limitations defense is different from retroactively extending the filing period for a still-viable claim." *Weingarten v. United States*, 865 F.3d 48, 57-58 (2d Cir. 2017) (citing cases); *see also Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 488 (3d Cir. 2005) (retroactive statutes that extend still-viable claims are "analytically distinct" from statutes reviving time-barred claims).

When retroactive legislation purports to *revive* a time-barred claim, "special concerns" arise.  *In re Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d 401, 405, 407 (2d Cir. 2004).  This Court has instructed that "resurrecting previously time-barred claim[s]" impermissibly "increases a defendant's liability for past conduct" and "strip[s] them of a complete affirmative defense they previously possessed."  *Id.* at 410.  The Supreme Court has admonished that "extending a statute of limitations after the pre-existing period of limitations has expired *impermissibly* revives a moribund cause of action."  *Hughes Aircraft Co. v.*

---

[11] Suppose, for example, a defendant engaged in conduct that violated a federal statute on January 1, 2010, and a five-year limitation applied.  If, in 2013, Congress enlarged the limitations period to ten years (from five), applying that legislation retroactively would simply *extend* the unexpired limitations period, giving the Government seven more years to sue—until January 1, 2020.  If Congress passed the same legislation in 2017, however, two years after the previous limitations period expired, applying that legislation retroactively to the defendant's conduct would *revive* previously time-barred claims.

*United States ex rel. Schumer*, 520 U.S. 939, 950 (1997) (emphasis added). Other circuits have reached the same conclusion.[12]

Thus, to revive time-barred claims, the statute must contain "unambiguous language" that "explicitly" reflects an "intent to revive time-barred claims." *In re Enter. Mortg.*, 391 F.3d at 407, 408 n.5. Congress's intent in that respect must be "so clear [that] it could sustain *only [that] one interpretation*." *Id.* at 405 (emphasis added) (quoting *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997)).

For example, although the Supreme Court has suggested a reference to "pending" proceedings "*might* qualify as a clear statement that a statute was to apply retroactively," *see Martin v. Hadix*, 527 U.S. 343, 354 (1999) (emphasis added) (discussing *Landgraf v. USA Film Prods.*, 511 U.S. 244, 278 (1994)), that is plainly *not* enough to **revive** time-barred claims. *Compare In re Enter. Mortg.*, 391 F.3d at 407 (statutory language permitting a plaintiff to "bring an action . . .

---

[12] *E.g., Baldwin v. City of Greensboro*, 714 F.3d 828, 836-37 (4th Cir. 2013) (extending limitations period for previously time-barred claims "impermissibly revives a moribund cause of action" (citation omitted)); *Middleton v. City of Chicago*, 578 F.3d 655, 663 (7th Cir. 2009) ("[E]ven if we could interpret § 4327(b) to apply to some USERRA claims filed before October 10, 2008, this would not save Middletown's thirteen-year-old cause of action, which was already time-barred when § 4327(b) took effect."); *Chenault v. U.S. Postal Serv.*, 37 F.3d 535, 539 (9th Cir. 1994) ("[A] newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme because to do so would alter the substantive rights of a party and increase a party's liability." (quotation marks omitted)).

without regard to the expiration of the statute of limitation" sufficed to revive time-barred claims), *with Kan. Pub. Employees Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 61 F.3d 608, 614-15 (8th Cir. 1995) (concluding under analogous state law that statute requiring new limitations "to be construed and applied retroactively" *extended* still-viable claims but did not *revive* expired claims because the text "does not make any mention of intent to revive time-barred actions").

2.      Here, there can be no dispute that, when Congress enacted the NDAA on January 1, 2021, the five-year limitations period governing the SEC's claims against Mr. Ahmed for pre-2010 transactions had long expired.  Before Congress enacted the NDAA on January 1, 2021, the district court actually *applied* the five-year limitation period in its remedial order to bar the SEC from seeking disgorgement based on any of these transactions.  SPA-102-03.  Mr. Ahmed thus had a vested statute-of-limitations defense, and the disgorgement that the SEC obtained post-NDAA was plainly time-barred pre-NDAA.

By retroactively applying the NDAA's new ten-year limitations period to revive the SEC's time-barred disgorgement claims, and to deprive Mr. Ahmed of his previously *vested and adjudicated* limitation defense, the district court imputed to Congress an "impermissible retroactive effect."  *In re Enter. Mortg.*, 391 F.3d at 409, 410 ("[E]very statute, which takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty, or attaches a

33

new disability, in respect to transactions or considerations already past, must be deemed [to have an impermissible retroactive effect]" (alteration in original) (quoting *Soc'y for the Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H.1814) (No. 13,156) (Story, J.))).

Moreover, the NDAA does not contain "unambiguous language" that *required* the district court to read the statute as reviving the SEC's time-barred claims. *See id.* at 407. The NDAA's amendments apply to proceedings "pending" as of January 1, 2021, but that cannot be read to reflect the specific intent to "revive[] a moribund cause of action." *Hughes*, 520 U.S. at 950.

Indeed, the balance of the NDAA underscores an intent at *prospectivity* in this respect. Thus, for instance, the new, ten-year limitations period set forth in Exchange Act § 21(d)(8)(A)(ii) applies expressly and *exclusively* to claims brought under Section 21(d)(7) ("paragraph (7)"). Paragraph (7), of course, is a *new cause of action* that Congress created to permit the SEC to seek disgorgement, a cause of action that did not exist before enactment of the NDAA (and thus did not exist when the SEC brought this action in 2015, or when the district court entered its final judgment against Mr. Ahmed in 2018). *See id.* § 78(u)(d)(7) (providing that the SEC may "seek . . . disgorgement" from persons who are unjustly enriched). As is obvious, the SEC did not sue Mr. Ahmed under Section 21(d)(7)—again, which did not exist at the time of the SEC's suit—but under Section 21(d)(5).

34

Given the statutory text and structure, there is no basis to conclude that the NDAA "explicitly" states Congress's "intent to revive time-barred claims," let alone that the statute is so clear "it could sustain only [this] one interpretation." *In re Enter. Mortg.*, 391 F.3d at 405, 407, 408 n.5. Indeed, even if the statute's reference to "pending" cases invokes *some type* of retroactivity, this Court could (and should) give effect to that provision without construing the phrase to revive time-barred disgorgement claims. *See Kan. Pub. Empls. Retirement Sys.*, 61 F.3d at 615 (refusing to construe statute as reviving time-barred claims in part because "it is possible to effectuate [statute's] retroactivity provision . . . by applying it retroactively to cases that have accrued but have not yet been barred").

**3.**     Finally, the Court should decline to revive the time-barred claims against Mr. Ahmed because doing so would violate the Ex Post Facto Clause.

The Ex Post Facto Clause prohibits Congress from passing any "ex post facto law." U.S. Const., Art. I, § 9. "[A] law enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution." *Stogner v. California*, 539 U.S. 607, 632-33 (2003). That proscription applies not only to criminal proceedings, but also to civil proceedings "imposed for the purposes of punishment – that is, to reprimand the wrongdoer, to deter others, etc." *Doe v. Pataki*, 120 F.3d 1263, 1272-73 (2d Cir. 1997) (cleaned up); *Dep't of Revenue of Montana v.*

35

*Kurth Ranch*, 511 U.S. 767, 777 (1994) ("[T]he legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character.").

There can be no question that SEC disgorgement is punitive, thus bringing it within the ambit of the Ex Post Facto Clause. The Supreme Court has so held. It ruled that SEC disgorgement's "primary purpose . . . is to deter violations of the securities laws," which is "inherently punitive." *Kokesh*, 137 S. Ct. at 1643 (quoting *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997)); *see also id.* at 1639 ("Disgorgement in the securities-enforcement context is a 'penalty[.]'"). And Congress itself recognized this in the NDAA, applying longer limitations to violations committed *with scienter*. This means retroactive imposition of SEC disgorgement violates the Ex Post Facto Clause. *Doe*, 120 F.3d at 1272-73.

As a result, there can be no question that retroactive application of the NDAA's limitation period to Mr. Ahmed, "after [the] expiration of [the] previously applicable limitations period," unconstitutionally "revive[d] a previously time-barred prosecution." *Stogner*, 539 U.S. at 632-33; *Weingarten v. United States*, 865 F.3d 48, 57 (2d Cir. 2017) (reciting "the 'general rule' that 'where a complete defense has arisen under a statute of limitations, it cannot be taken away by a subsequent repeal thereof'") (quoting *Stogner*, 539 U.S. at 618).

The district court did not grapple with any of these points. Instead, it brushed aside "the punitive nature of the disgorgement and its interaction with the

36

Ex Post Facto Clause" on the ground that the SEC was not seeking to litigate "previously time-barred claims." SPA-244-45. That, of course, is patently incorrect. Consider what the district court said in that regard in 2018, *before* the NDAA's enactment: "***The SEC does not dispute that the claims for disgorgement*** tied to the transactions which occurred ***over five years before*** this case was filed ***are time-barred***[.]" SPA-52 (emphasis added); *see* also SPA-102-03 (limiting disgorgement pre-NDAA to five-year period predating suit). And, of course, if there were any question on these points, the avoidance canon required rejection of the SEC's position. *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985) (declining to retroactively apply treble damages provision in civil trademark case as it "would present a potential *ex post facto* problem").

In sum, the Court should reverse the district court's application of the NDA's extended limitation period in this case. The district court lacked the jurisdiction to enlarge the judgment in the SEC's favor, and it lacked the statutory and constitutional authority to divest Mr. Ahmed of his limitations defenses.

## II.     The District Court's Original Disgorgement Order Should Be Set Aside And Its Asset-Freeze Order Should Be Limited

Next, the Court should rule that the remaining amount ordered disgorged ($41,920,639 in alleged profits during *Kokesh*'s five-year limitation period) was erroneous in two respects: *First*, the disgorgement amount should be reduced by at least $14.4 million based on the two Company C transactions, and *second*, Mr.

37

Ahmed should receive a credit for the assets "forfeited" to Oak, valued at more than $35 million. As these amounts exceed the disgorged balance ($41,920,639), this Court should reverse and rule that, on any remand, (1) no disgorgement may be ordered in this case (given that Oak already has the "forfeited" assets), and (2) the asset freeze should be reduced accordingly. *Finally*, if any amount remains to be disgorged, the Court should set aside the district court's approach to calculating pre- and post-judgment interest.

### A.   The SEC's Disgorgement Authority Is Limited

**1.**     The district court predicated its asset-freeze and disgorgement orders on 15 U.S.C. § 78u(d)(5), which allows the Commission to obtain "any equitable relief that may be appropriate or necessary for the benefit of investors." This statute was interpreted, and the SEC's authority cabined, by two Supreme Court decisions – *Kokesh*, 137 S. Ct. at 1639 (five-year limitation applies), and *Liu*, 140 S. Ct. at 1941 (disgorgement must comport with unjust-enrichment principles).

Most relevant here, the Supreme Court held in *Liu* that the SEC could *not* "seek[] an equitable remedy in excess of a defendant's *net* profits *from wrongdoing*." 140 S. Ct. at 1946 (emphasis added). To allow otherwise, the Supreme Court explained, "would be 'inconsistent with the ordinary principles and practice of courts of chancery.'" *Id.* at 1950 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145-46 (1888)); *see also id.* at 1943.

38

In that regard, the Court explained that, although "[i]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong," courts have long "recognized the countervailing equitable principle that the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Id.* at 1943 (quoting *Root v. Railway Co.*, 105 U.S. 189, 207 (1882), and *Tilghman*, 125 U.S. at 145-46).

This principle also means a defendant can be required to disgorge only unlawful gains *causally connected* to a securities-law violation, *Liu*, 140 S. Ct. at 1946,[13] as several of this Court's pre-*Liu* precedents make clear, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996); *also SEC v. Cavanaugh*, 445 F.3d 105, 116 & n.25 (2d Cir. 2006). In short, as *Liu* confirmed, defendants may be ordered to turn over in disgorgement *only* the net amount obtained "through the[ir] wrongdoing." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).

**2.** As discussed above, in January 2021, Congress amended 15 U.S.C. § 78u(d) (Section 21(d) of the Exchange Act) by, among other things, enacting a new provision permitting the SEC (in line with *Liu*) to obtain "disgorgement" of "any unjust enrichment by the person who received such unjust enrichment as a result of" a securities violation. NDAA § 6501(a) (amending 15 U.S.C. § 78u(d)).

---

[13] *See also id.* at 1942 ("[e]quity courts have routinely deprived wrongdoers of their net profits *from* unlawful activity"); *id.* at 1943 (recognizing the historical remedy "tethered to a wrongdoer's net *unlawful* profits") (emphases added)).

To the extent the amendment applies here (and, as discussed in Point I, it does *not* apply here), it does not alter *Liu*'s disgorgement standard.

Indeed, as *Liu* explains in confining disgorgement by equitable principles – while quoting Second Circuit law – "when a court awards '[d]isgorgement of profits in an action brought by the SEC,' it is 'exercising the chancellor's discretion to *prevent unjust enrichment*.'" 140 S. Ct. at 1941 (emphasis added) (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978)); *see also, e.g.*, *id.* at 1943 ("No matter the label, this 'profit-based measure of unjust enrichment,' Restatement (Third) § 51, Comment *a*, at 204, reflected a foundational principle: '[I]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong[.]'" (quoting *Root*, 105 U.S. at 207)).

As a result, when Congress recently enacted a provision expressly permitting the SEC to seek "disgorgement" of "unjust enrichment," it simply codified the core holdings of *Liu* and of this Circuit that the SEC may obtain in disgorgement those net unlawful gains caused by a securities-laws violation, no more and no less.

## B.    The District Court's Disgorgement Order Was Erroneous

### 1.    The Disgorgement Order Should Be Reduced By At Least $14.4 Million For Company C

As noted, the district court ordered Mr. Ahmed to disgorge $8.9 million for the C1 Transaction and $5.5 million for the C2 Transaction. This was error.

40

*First*, there is no connection between the $8.9 million in "profits" Mr. Ahmed made in the C1 Transaction and any alleged securities-law violation – meaning this amount does not reflect any unjust enrichment or "*unlawful* profits." *Liu*, 140 S. Ct. at 1943 (emphasis added).

The district court ordered Mr. Ahmed to turn over the difference between (a) what Mr. Ahmed earned on his Company C stake when he sold it to Company C in the C1 transaction (roughly $10.9 million), and (b) the amount Mr. Ahmed earlier paid for it ($2 million). SPA-103-04. The court correctly excluded Mr. Ahmed's costs of buying Company C stock ($2 million), *id.*, but incorrectly ordered disgorgement of the entire difference between the purchase and sale prices.

That was error. When Company C paid Mr. Ahmed $10.9 million in exchange for his shares, Company C paid the market price. Dkt. 624 ¶¶ C-9, C-12. There was no allegation and no evidence – *zero* – that the $10.9 million sale price was inflated in any respect.[14] And, because the difference between the purchase and sale prices was due to nothing more than an increase in the market price of the shares, that market increase – *not* unlawful activity – was the cause of Mr. Ahmed's profits, which were *lawful*. On this record, therefore, none of Mr.

---

[14] The record also establishes that Mr. Ahmed paid the market price when he bought the $2 million stake sold as part of the C1 Transaction.

Ahmed's $8.9 million profits could be disgorged under *Liu* and this Circuit's consistent caselaw. *See, e.g.*, *First Jersey Sec.*, 101 F.3d at 1474-75.

*Second*, in ordering Mr. Ahmed to disgorge 'profits' on the C2 Transaction, the district court erroneously failed to make a finding as to the value of the Company C shares Oak bought from I-Cubed. SPA-103-04. Without such a finding, the district court could not have discharged its obligation to disgorge *only* the amount of any unjust enrichment or "net profits." *Liu*, 140 S. Ct. at 1946. The court thus ordered $5.5 million disgorged on the unfounded assumption that the entire difference between the sale price to Oak ($7.5 million) and the purchase price by I-Cubed ($2 million) represented unlawful profits. SPA-36; SPA-104. But if the shares were worth more than $2 million when the C2 Transaction occurred, then net *unlawful* profits were less than $5.5 million.

There were conflicting accounts in the record as to how much the Company C shares were worth at the time of the C2 Transaction. Oak purchased the shares at a *discount* to market during the C2 Transaction and, in 2016 (months after this suit commenced), Oak valued them at $10.1 million—well *above* the $7.5 million purchase price. Dkt. 906-25 at -71182. The record also contains evidence that third parties valued the shares even higher than Oak did. Dkt. 904 ¶ 23; Dkt. 906-28. If the value of the shares exchanged in the C2 Transaction exceeded the $7.5 million price Oak paid – as the record allowed and suggests – there can have been

42

no unjust enrichment at all.  The district court's failure to enter any factual finding ensuring it disgorged only net profits is reversible error.

In sum, the district court was permitted to order Mr. Ahmed to disgorge only the difference between the price of the Company C shares and their value.  As the SEC introduced no evidence whatsoever that the value of the Company C shares was inflated in the C1 Transaction, the asset-freeze and disgorgement orders must be reduced by $8.9 million.  Moreover, for the C2 Transaction, given conflicting record evidence in point, it was error for the district court to order $5.5 million disgorged without making <u>any</u> finding as to the value of the shares I-Cubed sold.

### 2. Mr. Ahmed Should Obtain A Credit Of At Least $35 Million For The "Forfeited" Assets

The district court's asset-freeze and disgorgement orders went beyond the limits of its disgorgement authority in another important respect:  ***In ordering disgorgement, the district court refused to give Mr. Ahmed any credit for more than $35 million in assets that Mr. Ahmed already "forfeited" to Oak, the only victim the SEC identified.***  SPA-119-21.  Earlier, in ordering an asset freeze, it also declined to give any credit for these amounts.  SPA-13-14.  These rulings are legally erroneous.  Indeed, focusing on the five-year limitation period recognized by *Kokesh* (and before interest), the district court effectively ordered Mr. Ahmed to disgorge ***more than $75 million*** to Oak even though it held Mr. Ahmed liable for illegally obtaining and causing Oak to suffer a loss of ***only $42 million—roughly***

43

*half that amount*.  That result manifestly contravenes *Liu*'s instructions that equity cannot impose a penalty, and that only "net profits" may be disgorged.

     **a.**     The law plainly instructs that Mr. Ahmed should have received a credit for the amounts Oak recovered from Mr. Ahmed as a "forfeiture."  As *Liu* explains, "equity never 'lends its aid to enforce a forfeiture or penalty,'" 140 S. Ct at 1941 (quoting *Marshall v. Vicksburg*, 15 Wall. 146, 149 (1873)).  Thus, it is improper under *Liu* for an order of disgorgement to charge the wrongdoer twice for the losses he caused, or to provide the victim a double-recovery.  But that is precisely what the district court's order accomplishes.

     When Oak terminated Mr. Ahmed for "Disabling Conduct" (the very conduct at issue in this suit), Oak exercised rights claimed under various contracts with Mr. Ahmed to forfeit, seize, and/or withhold Mr. Ahmed's carried interest in various Oak funds, the balance of his capital accounts, and his K-1 distributions (together, the "Seized Assets").  *See* SPA-120-21; *see also* Dkt. 906-8 ¶ 5 (carried interest); *see also* Dkt. 890 ¶¶ 13-17; Dkt. 890 ¶¶ 6-12 (capital accounts); Dkt. 862-1 (K-1 distributions).  The Seized Assets compensated Oak for the losses it purportedly suffered.  Thus, Mr. Ahmed had already turned over, and Oak has already received, assets with substantial value:  Mr. Ahmed's carried interest alone was once valued at $31 million, with the Seized Assets valued at about $35 million at the time of the first remedial order.  Dkt. 873-3 at 4; *see also* Dkt. 905 at

27; Dkt. 906-8 ¶ 5.[15]  And although Oak told the SEC that the carried interests

were worth at least $17 million in 2016, Dkt. 315 at 5, neither Oak nor the SEC

valued the assets at the preliminary-injunction or remedial stage, instead taking the

view that they should not be included in the pool of frozen assets, Dkt. 98 at 25,[16]

as well as the position, at the remedial stage, that the Seized Assets should be given

*zero* value in calculating amounts to be disgorged, Dkt. 921 at 17-19.

Plainly, the district court should have given Mr. Ahmed a credit for the value

of the Seized Assets in both the asset-freeze and disgorgement orders.  The court's

orders effectively required payment of more than $75 million to compensate for

losses of roughly half of that during the five-year limitation period, plainly

contravening the well-settled "equitable principle," noted above, "that the

wrongdoer should not be punished by pay[ing] more than a fair compensation to

the person wronged."  *Liu*, 140 S. Ct. at 1943.  Said differently, if a defendant

returns his unlawful gains to the victim, he has not been "unjustly enriched" by his

violations, and there is nothing more to turn over to restore the status quo.[17]

---

[15] Oak also seized distributions from carried interest assets, Mr. Ahmed's
ownership of Oak, and vested bonus payments (known as "IPP"), all of which Oak
claims Mr. Ahmed forfeited.  Dkt. 303.  The valuation stated above does not
account for these assets, which would have to be considered on remand.

[16] *See also* Dkt. 86 at 2 (Relief Defendants' contention that the Seized Assets
should be included).

[17] Given the record below, the Court should accept the unrebutted $35 million
valuation offered at the remedial stage; in the alternative, it should remand for
valuation of how much the Seized Assets are worth.

**b.** Nor is *Liu*'s proscription on punitive orders the sole guidance here. Multiple decisions recognize that an SEC disgorgement award imposing an overcharge and providing investors a double recovery is improperly punitive.

In *SEC v. Palmisano*, for example, the Court held that a criminal restitution award must be reduced by amounts already paid in disgorgement. 135 F.3d 860, 863-64 (2d Cir. 1998). This accords with the purpose of disgorgement – "to ensure that the defendant not profit from his illegal acts, a goal that is nonpunitive." *Id.* at 866; NDAA § 6501(a)(1)(B) (focusing on "unjust enrichment").

Likewise, in *SEC v. Risman*, although this Court rejected a defendant's argument that the default judgment obtained against him by the SEC, which included a disgorgement award, would "provide victims with double recovery" in light of the criminal restitution he had already paid, it did so ***only*** because the SEC was ***already*** obliged to avoid double recoveries. 7 F. App'x 30, 31 (2d Cir. 2001) ("In administering the disgorgement award, the SEC will be under obligation to ensure that payments to victims are not made in a manner that would duplicate compensation already received from the restitution award."). Moreover, the Court instructed that if portions of the disgorgement award "remain after full restitution has been made to the victims, ***the remainder must be returned to the defendant***." *Id.* (emphasis added; *see also First Jersey*, 101 F.3d at 1475 ("A settlement

payment may properly . . . be taken into account by the court in calculating the amount to be disgorged[.]").

Decisions from other Circuits are in accord.  In *SEC v. Levin*, for instance, the Eleventh Circuit held that if any investor defrauded by the defendant "does ultimately recover" from the defendant directly – *i.e.*, through a civil claim for damages – the defendant "could petition the court for a reduction in the disgorgement award because the recovery would constitute a partial return of [the defendant's] ill-gotten gains."  849 F.3d 995, 1007 (11th Cir. 2017).  Likewise, in *In re Sherman*, the Ninth Circuit determined the defendant was entitled to an offset equal to the amount paid to the receiver of the estate victimized by his fraud because "the SEC is entitled to seek the disgorgement of ill-gotten gains only for the purpose of preventing unjust enrichment, not as a penalty."  491 F.3d 948, 965 n.19 (9th Cir. 2007).  And, in *Disraeli v. SEC*, the D.C. Circuit recognized that, if the wrongdoer already repaid his victim, "such payments will offset his disgorgement obligation."  334 F. App'x 334, 335 (D.C. Cir. 2009).

District-court decisions within this Circuit also are in accord, hewing to the prohibition on double-charges.  Most in point is *SEC v. Penn*, in which the Southern District of New York allowed a defendant to reduce the disgorgement amount by "the amount of restitution that he has paid, or will pay," to the

investment fund that he defrauded, ***including "the value of his forfeited interest in the Fund***." 2017 WL 5515855, at *3 (S.D.N.Y. Aug. 22, 2017) (emphasis added).

Similarly, in *Kaplan v. S.A.C. Capital Advisors, L.P.*, the Southern District of New York held that although an SEC disgorgement award is not a categorical barrier to a private suit, any damages available in that suit "will be diminished by disgorgement" from the defendant's earlier settlement with the SEC. 40 F. Supp. 3d 332, 338 (S.D.N.Y. 2014). And in *SEC v. Drexel Burnham Lambert, Inc.*, the court applied the principle against double recovery in the opposite direction, forbidding a trustee from sharing in an SEC disgorgement award on "double recovery" grounds because the trustee had previously settled its civil claims against the defendant. 956 F. Supp. 503, 508 (S.D.N.Y. 1997).[18]

**c.** Ascribing a valuation of "zero" to the Seized Assets, the district court justified its order on the theory that the Seized Assets were not "ill-gotten gains that Oak is recovering from Defendant at all, but rather were sacrificed by Defendant[] upon his termination for 'Disabling Conduct.'" SPA-121.

---

[18] *See also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) ("Once ill-gotten profits have been disgorged to the SEC, further disgorgement as damages in a private action is clearly punitive in its effect and would constitute an impermissible penalty assessment."); *SEC v. Penn Central Co.*, 425 F. Supp. 593, 599 (E.D. Pa. 1976) ("To the extent that defendants have made restitution, the amounts paid would serve to offset part or all of a judgment for disgorgement.").

The point, though, is that Mr. Ahmed is being ***charged twice*** for the same loss. Oak took the Seized Assets from Mr. Ahmed based on contracts purportedly giving it a remedy for ***exactly the same conduct*** leading to the disgorgement award. *See* Dkt. 921 at 17 (explaining that "Defendant's removal" was "because of his fraudulent conduct"). The fact that the district court could not trace the Seized Assets to "ill-gotten gains" – and that Mr. Ahmed earned the Seized Assets through his work rather than an allegedly fraudulent scheme – is not only misplaced but indeed highlights the punitive nature of the court's order. When Oak took the Seized Assets, Mr. Ahmed lost (and Oak recovered) more than $35 million in assets, for the same conduct at suit here. But, even though Oak had ***already recovered at least $35 million of its alleged $42 million in losses*** within the limitations period, the district court nonetheless ordered Mr. Ahmed to make a further payment of ***the full $42 million***, which the SEC said it would give to Oak. That is plainly a punitive overcharge.

Indeed, the situation here – wherein Oak deemed assets "forfeited" – is no different than if Oak had filed suit and obtained a judgment finding Mr. Ahmed had engaged in "Disabling Conduct" and requiring turn-over of the Seized Assets. *That* chain of events would clearly require an offset. *Palmisano*, 135 F.3d at 863-64 ("Defendant is only required to give back the proceeds of his securities fraud once."); *Levin*, 849 F.3d at 1006-07; *Penn*, 2017 WL 5515855, at *4; *Drexel*

49

*Burnham Lambert*, 956 F. Supp. at 508 (trustee that had settled civil claims could not share in the disgorgement award); *see also SEC v. Lunn*, 2018 WL 317468, at *3 (D. Colo. Jan. 8, 2018) (finding "authority which supports a reduction of any disgorgement award for amounts an investor recovers" to be "sound").  Here too.

In short, the district court's rulings declining to give Mr. Ahmed a credit for the Seized Assets were erroneous.  Mr. Ahmed paid, and Oak received, assets valued at $35 million on account of the conduct at issue in this case.  Ordering Mr. Ahmed to pay to Oak another $42 million for losses within the five-year limitation without regard to this "forfeiture" is both an improper punishment and exceeds the bounds of any "unjust enrichment" award.  The Seized Assets were obviously not worth zero to Mr. Ahmed before their seizure, nor to Oak thereafter.  If Mr. Ahmed is not provided a credit for the value of these Seized Assets, it will be Oak – and not Mr. Ahmed – that will be unjustly enriched.  That result cannot stand.

### C.     On Remand, The District Court's Order Should Allow A Credit For Any Further Recoveries By Any Of His Victims

Over Mr. Ahmed's objections, the district court permitted Oak to pursue separate arbitration proceedings against Mr. Ahmed to seek further recoveries. Dkt. 1611 (denying stay).  After the district court's first disgorgement order, Oak obtained an award of $57 million against Mr. Ahmed – on top of the $35 million in

Seized Assets and the $42 million[19] SEC disgorgement order (which the SEC has promised to give to Oak). Although Mr. Ahmed is seeking to have that award set aside in Connecticut state court, he was unsuccessful in first-instance court. To the extent disgorgement remains available on any remand, provision must be made to provide Mr. Ahmed a credit for any amount (beyond the forfeited assets) that he must ultimately pay to Oak or any of his other victims as a result of civil litigation, arbitration, settlement, or otherwise, so as to ensure "disgorgement" does not become a double (or triple) recovery. *Risman*, 7 F. App'x at 31 (requiring return of disgorged amounts once investors made whole).

### D.    The Interest Award Should Be Reduced Or Eliminated

In their appellate briefs, Relief Defendants explain why the district court erred in ordering interests and gains, and, in the interest of avoiding repetition, Mr. Ahmed joins their arguments in full by incorporation, summarizing them here:

First, as they explain, the pre-freeze interest rate should be set below the IRS rate, which is punitive. The general rule is that the pre-judgment interest should "generally 'should be measured by interest on short-term, risk-free obligations,'" like Treasury Bills. *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001). And, application of the IRS rate cannot survive *Liu*,

---

[19] As discussed in Part I, above, the district court on remand impermissibly increased this award of disgorgement from $42 million to $64.4 million.

51

because "[t]he IRS rate is intentionally punitive to discourage taxpayers from using the government as an involuntary banker by deferring payment of taxes." *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 163 (S.D.N.Y. 2012).

    <u>Second</u>, it was error to award actual gains on frozen assets after the freeze and before judgment. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), confirms that is so. There, this Circuit held it is legal error to order a defendant to "transfer . . . all the profits and income *earned on . . . proceeds*" of a securities-fraud transaction. *Id.* at 1104. Post-freeze and pre-judgment, the court should have awarded interest at a non-punitive fixed rate, *see N.Y. Marine*, 266 F.3d at 131, and should also have taken into account the fact that neither Mr. Ahmed nor the Relief Defendants could access their frozen assets.

    <u>Third</u>, "from the date of the entry of judgment," which for Mr. Ahmed is September 27, 2018, the interest rate should have adhered to the rate set by statute (for one-year Treasury Bills) under 28 U.S.C. § 1961, as this rate "is mandatory" and the statute "do[es] not permit of the exercise of judicial discretion in its application." *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 269 (2d Cir. 1989). It is plain legal error to award anything more.

    <u>Finally</u>, the district court calculation of interest should also be set aside because the rate was applied to erroneous disgorgement amounts. Indeed, as the district court's award of prejudgment interest and gains was based on its faulty

52

calculation of Mr. Ahmed's net profits, and improper application of the NDAA's limitations period, the award of prejudgment interest and profits was erroneous too.

## III. The Court Should Vacate the Summary-Judgment Ruling

Although Mr. Ahmed was, as a technical matter, permitted to file papers in opposition to the SEC's summary-judgment motion, through a succession of procedural rulings by the district court Mr. Ahmed was denied any practical means of defending himself. Mr. Ahmed (who was *pro se*) could not review approximately 90 percent of the evidence against him (which was sealed) and could not seek countervailing evidence. He could not attend the deposition of the corporate representative of his sole alleged victim or cross-examine her. He could not even review the entirety of the SEC's Rule 56 statement of ***undisputed*** facts. And, to top it all off, the court refused to allow Mr. Ahmed funds to hire counsel who *could* do these things. To justify this Kafkaesque procedure, the district court invoked a purported inability to enforce a protective order against Mr. Ahmed, as well as the fugitive-disentitlement rule. Both rationales are meritless, and it was improper to resolve the case on summary judgment in such a one-sided manner. *Cf. Goss v. Lopez*, 419 U.S. 565, 580 (1975) ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights[.]").

With the disgorgement order set aside and the asset-freeze order modified in line with Points I and II, above, this Court should set aside the summary-judgment

order and remand, so that Mr. Ahmed may mount a defense to the imposition of a penalty (and any remaining disgorgement) with discovery and counsel. Although the Court theoretically can set aside the summary-judgment ruling and remand for further proceedings based on the legal errors set forth in this Point III without addressing the disgorgement order, Mr. Ahmed respectfully submits that the legal errors infecting the disgorgement order should be addressed, because these affect the asset freeze as well. Moreover, if Mr. Ahmed is unsuccessful in his liability defense below, the issues associated with the disgorgement order will be raised again. Mr. Ahmed thus submits that the Court should resolve the legal issues addressed in Points I and II, as well as those set forth in Point III.

### A. Summary Judgment Was Improper Because Mr. Ahmed Had No Meaningful Opportunity To Obtain Discovery Or Respond

**1.** "The plea that evidence of guilt must be secret is abhorrent to free men." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 551 (1950) (Jackson, *J.*, dissenting). "That, of course, is the due process concern raised when a court relies on *ex parte* submissions in resolving an issue that is the subject of an adversarial proceeding." *United States v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004).[20] Thus, "due process demands that the individual and the government each

---

[20] *See Sira v. Morton*, 380 F.3d 57, 78 (2d Cir. 2004) ("Fairness cannot be achieved without some assessment of the reliability of the evidence offered against the accused. In our adversarial system, confrontation and cross-examination are the usual tools used to test credibility.").

be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." *Id.* The district court's entry of summary judgment as to liability in this case contravened these basic principles, because its procedural rulings foreclosed any possibility for Mr. Ahmed, who was *pro se*, to meaningfully respond to the SEC's motion.

On the one hand, the court blocked Mr. Ahmed from personally accessing material the SEC cited in support of summary judgment and from obtaining discovery material that might rebut the SEC's showing. On the other hand, the court prevented him from hiring an attorney who could do this work on his behalf. This double-bind, which made Mr. Ahmed's participation in the litigation a hollow exercise, rendered summary judgment inappropriate.

It cannot be disputed that Mr. Ahmed was unable to even see – much less respond to – huge portions of the evidence the SEC cited on summary judgment. The SEC's papers included 44 exhibits filed entirely under seal, and the SEC applied some redactions to another 108 exhibits, preventing Mr. Ahmed's access to over 90 percent of its evidence. The censor's pen did not spare the important documents, either: the SEC redacted *258 consecutive pages* (and some or all of 335 pages in total) of the 360-page deposition of Grace Ames, Oak's corporate representative. Dkt. 628-6. Remarkably, Mr. Ahmed was barred from seeing entire emails that he had himself *written* or *received* while he was at Oak – all in

the name of Oak's interest in "confidentiality." *E.g.*, Dkt. 628-17 (placeholder; full document filed under seal at Dkt. 629-5).

And even redactions that might appear insubstantial in size – for example, the redaction of an email recipient in Dkt. 628-16 or of an account number in Dkt. 628-30 – made it difficult to fully understand the SEC's charges and produce the showing Rule 56 requires to avoid an adverse ruling. Adding insult to that injury – indeed, introducing further absurdity into the proceeding – the SEC even redacted portions of its Rule 56 Statement of ***Undisputed*** Facts, Dkt. 624, and its summary judgment brief, Dkt. 623.[21]

As is obvious, because he could not fully evaluate the evidence the SEC cited, Mr. Ahmed was deprived of the opportunity to show that this evidence failed to demonstrate the absence of a genuine dispute of material fact or to object to the form in which it was provided. *Contra* Fed. R. Civ. P. 56(c); *Abuhamra*, 389 F.3d at 322. This is borne out, for example, in Mr. Ahmed's response to the SEC's Rule 56(a) statement of undisputed facts, in which Mr. Ahmed states time and again that the SEC's redactions of its evidence against him inhibited his ability to respond. *E.g.*, Dkt. 666 ¶¶ A-7, B-9, C-11, C-21, D-5, F-7, G-1, G-5, G-8, X-11.

---

[21] The SEC likewise redacted portions of its damages motion, Dkt. 888 at 4, the entirety of 17 of its 45 damages exhibits, and portions of 13 more. The government also filed a supporting affidavit from Oak's corporate witness that is inaccessible from the public docket and includes 16 sealed exhibits. Dkt. 890.

And it is not just a question of seeing the evidence and being able to contest the SEC's proof as a *prima facie* matter:  Under basic summary-judgment principles, Mr. Ahmed was <u>required</u> to adduce and cite record evidence to try to demonstrate the *<u>presence</u>* of a genuine fact dispute.  *See* Fed. R. Civ. P. 56(c)(1). But the court had foreclosed that ability, not to mention any ability to "identify any further evidence . . . that he might have adduced" to forestall summary judgment. *Smith v. Conway*, 582 F. App'x 45, 46 (2d Cir. 2014).  Mr. Ahmed's discovery requests were <u>all</u> denied on "confidentiality grounds"; he was foreclosed from accessing the SEC's files; and he could not participate in critical depositions.

Consider in that regard the SEC's most important deposition – of Mr. Ahmed's sole alleged victim, Oak.  The transcript reflects that Mr. Ahmed phoned into the deposition and was present when the witness was sworn in.  Dkt. 628-6 at 2-3.  After introductions and appearances on the record, Oak's designated witness, Grace Ames, was asked to confirm she understood she was appearing as Oak's representative under Rule 30(b)(6), and was prepared to testify about the topics listed on the subpoena.  *Id.* at 6:19-7:15.  After she had done so, and before a single substantive question was asked, Oak's attorney designated the "remainder of this deposition, at least at this time, as confidential," *id.* at 10:22-11:4 – thus requiring Mr. Ahmed to be excluded.  The district court's protective order barred Mr. Ahmed from hearing any of the testimony adduced against him in the 340

transcript pages that followed, and obviously also would make it impossible to cross-examine her (given that he had not heard the testimony). Later, the district court ruled that Mr. Ahmed could not review the transcript of the deposition, which he was unable to attend, because the substantial majority of it was "confidential." Dkt. 678. This was no way to conduct an adversarial proceeding, especially one pitting a *pro se* defendant against a powerful government agency.

In sum, although Mr. Ahmed technically had the opportunity to file responsive briefs on summary judgment (and he did, in a last-ditch effort), he faced the SEC's summary-judgment motion trying to hit an unknown target while blindfolded. He had no ability to address the *prima facie* sufficiency of the SEC's showing, no opportunity to develop a discovery record in his favor, and thus no chance to introduce responsive evidence to try to prove that the SEC's showing (which, again, he could not review) was subject to genuine dispute. The district court, by entering summary judgment in this posture, contravened basic principles at the heart of our system of justice and core principles of due process. *Cf. Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring) ("Secrecy is not congenial to truth-seeking . . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.").

**2.**     The district court's rulings also contravened the basic principles and procedural framework governing summary judgment.  Summary judgment is reserved for cases in which the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "If the summary-judgment movant makes out a prima facie case that would entitle him to a judgment as a matter of law if uncontroverted at trial, summary judgment will be granted unless the opposing party offers some competent evidence that could be presented at trial showing that there is a genuine dispute as to a material fact."  Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2727.2 (4th ed.); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Of course, under Rule 56, to "assert[] that a fact … is genuinely disputed," the non-moving party "must" either "cit[e] to particular parts of materials in the record," or "show[] that the materials cited do not establish the absence … of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  The non-moving party can also "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  And he or she can also oppose summary judgment with an affidavit explaining why he or she cannot "present essential facts."  Fed. R. Civ. P. 56(d).

Given this procedure, the Supreme Court has explained, "[i]t has always been perilous for the opposing party neither to proffer any countering evidentiary materials nor file a [56(d)] affidavit." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970) (quoting 6 J. Moore, Fed. Prac. § 56.22(2) (2d ed. 1966)). In other words, the requirements in Rule 56 were written in line with our adversarial system, and the opportunity to respond is essential to Rule 56's proper functioning. *Accord Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994). As a result, courts can "enter summary judgments *sua sponte*" only if "the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *see also Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (summary judgment may be entered without opportunity to respond only if record is "fully developed").

By cutting off at the knees Mr. Ahmed's ability to evaluate and respond to the evidence adduced against him, and by eliminating his ability to create and adduce a discovery record that would rebut the SEC's showing, the district court barred Mr. Ahmed from any practical possibility of responding to a Rule 56 motion. Given the court's rulings, how could Mr. Ahmed have met Rule 56's demand to "cit[e] to particular parts of materials in the record," or "show[] that the materials cited do not establish the absence … of a genuine dispute"? Fed. R. Civ. P. 56(c)(1). The district court's rulings cannot be squared with the adversarial

60

process set forth in the Federal Rules of Procedure, not to mention the fundamental due process the Rules are intended to secure.

### B. The Court's Error Is Compounded By The Fact That Its Discovery Orders Were Unnecessary And Improper

Although the district court's decision to enter summary judgment without providing Mr. Ahmed a meaningful opportunity to respond is sufficient, standing alone, to require reversal, it bears emphasis that neither its order depriving Mr. Ahmed of counsel nor its orders precluding him from participating in discovery were justified on the facts or the law – particularly given the implications.

*Counsel-Retention Motions.* The district court incorrectly over-froze Mr. Ahmed's liquid assets, and thus improperly deprived him of the ability to use *his money* to hire counsel, including by failing to account for the value of the Seized Assets. *See* Point II, *supra*. The court thus erred in denying Mr. Ahmed's motions to use funds to pay counsel. Indeed, the purpose of an asset freeze is to "[en]sure[] that any funds that may become due can be collected," *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990), *not* to deprive defendants of counsel when, as here, excess funds were plainly available.

*Discovery Motions.* The district court's decision to bar Mr. Ahmed from fully participating in discovery and from reviewing the SEC's filings on the basis of supposed "confidentiality" concerns was likewise clearly erroneous.

**1.**     The district court justified its decision to deny Mr. Ahmed the ability to take discovery and to review the evidence against him because, it said, the court lacked the ability to ensure Mr. Ahmed complied with a protective order.  Dkt. 286 at 3.  This was plainly an inadequate justification to deny Mr. Ahmed the opportunity to participate in discovery, based on the vague interests of third-parties in confidentiality.  It also ignored that the district court had *in rem* jurisdiction over assets worth far more than the value of any possible disgorgement judgment:  the SEC identified at least "$47 million dollars [sic] in liquid assets, real estate worth approximately $20 million," $9.6 million in proceeds from the sale of Mr. Ahmed's house, and "jewelry, artwork, and gold" the SEC declined to value.  Dkt. 98 at 7 & n.4.  This far exceeded the disgorgement judgment *and* civil penalty that could have been imposed – which means the court could easily have imposed and enforced monetary sanctions if Mr. Ahmed violated a protective order.

Moreover, the court ignored the fact that the Federal Rules gave it latitude to fashion *nonmonetary* sanctions, including evidentiary and even (for extreme violations) case-dispositive sanctions.  Fed. R. Civ. P. 37(b); Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2284 (3d ed.) ("Rule 37 is flexible. . . . The sanctions enumerated in the rule [for violations of discovery orders] are not exclusive and arbitrary but flexible, selective, and plural. The district court may, within reason,

62

use as many and as varied sanctions as are necessary to hold the scales of justice even.").

As a result, the district court could have fashioned relief to sanction Mr. Ahmed for breaching discovery orders even though he was outside the territory of the United States, and there was no reason in law or logic to rule otherwise. *See Degen v. United States*, 517 U.S. 820, 827 (1996) ("If [Degen's] unwillingness to appear in person [on account of his being a fugitive] results in non-compliance with a legitimate order of the court respecting pleading, discovery, the presentation of evidence, or other matters, he will be exposed to the same sanctions as any other uncooperative party.  A federal court has at its disposal an array of means to enforce its orders, including dismissal in an appropriate case.").

**2.** The district court also justified its rulings barring Mr. Ahmed from participating in discovery on the basis that it was "consistent with the practice of other courts" applying the fugitive-disentitlement rule.  Dkt. 286 at 3 (barring access to SEC's investigative file); Dkt. 678 (Oak deposition transcript).

But the doctrine is plainly inapplicable.  The fugitive-disentitlement doctrine, it is settled, bars a litigant from contesting a civil proceeding when he is a fugitive from justice in "a ***related*** criminal prosecution." *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 279, 279 (2d Cir. 1997) (emphasis added; citing *Degen*, 517 U.S. at 823); *see also, e.g.*, *U.S. v. Technodyne LLC*, 753 F.3d

63

368, 378 (2d Cir. 2014) (noting that 28 U.S.C. § 2466 requires that the criminal case be "related to the forfeiture action").

As the district court acknowledged, however, Mr. Ahmed's criminal prosecution was "***unrelated*** to this action." SPA-29 (emphasis added). Mr. Ahmed was indicted for insider trading. That criminal complaint, as the district court recognized, had nothing to do with this civil action for disgorgement and penalties arising from allegations that Mr. Ahmed misappropriated Oak's money.

Moreover, the district court's rulings would have been erroneous even if the cases were related and the doctrine applied. In *Degen*, the Supreme Court held it was legal error to enter summary judgment in a forfeiture case for failure to appear in a *related* criminal action. 517 U.S. at 821. The Court explained that "[i]n an ordinary case a citizen has a right to a hearing to contest the forfeiture of his property, a right secured by the Due Process Clause." *Id.* at 822. It reasoned that a fugitive should retain the right to contest a forfeiture even if the criminal and civil cases were related. *Id.* at 825; *see also id.* at 829 ("There was no necessity to justify the rule of disentitlement in this case; to strike Degen's filings and grant judgment against him would be an excessive response to the concerns here advanced."). This case is *a fortiori*, and it was error to let critical phases of the case proceed *ex parte* on the basis of generic "confidentiality" concerns.

*     *     *     *

In short, the district court's rulings were based on errors of law and failed adequately to take into account Mr. Ahmed's due-process and statutory rights to mount a defense. The interests of third-parties in the "confidentiality" of their information plainly could not displace the importance of Mr. Ahmed's ability to defend himself on summary judgment, in a civil suit seeking huge monetary relief. Indeed, even the public has a right to see the summary-judgment evidence against Mr. Ahmed (much of which remains sealed for unclear reasons). *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006). Plainly, Mr. Ahmed's rights as a defendant in a civil suit are much greater.

If the case had proceeded to trial, the SEC's evidence against Mr. Ahmed would have been displayed publicly for the whole world to see – and the witnesses that the SEC would have called against him, including Oak's employees, would have been required to testify in open court. *At trial*, Mr. Ahmed would have had the ability to see the evidence against him and cross-examine the SEC's witnesses. How, then, could the "confidentiality" concerns of third parties possibly justify the entry of a *summary* judgment, without giving Mr. Ahmed a like ability to see the evidence against him and try to adduce contrary evidence, via document requests and depositions, in an effort to show the presence of a genuine dispute of fact? Plainly, they do not. The SEC could have taken the matter to trial. If it wanted a

summary process, it had to permit Mr. Ahmed to both see the evidence against him <u>and</u> to obtain discovery to respond. Rule 56 and due process demand no less.

## IV. The District Court Should Reduce The Penalty On Remand

The district court entered a penalty of $21 million in this case, reasoning that a third-tier penalty "representing just over half the total disgorgement amount, is reasonable and justified on the facts of this case." SPA-109. If this Court vacates the liability ruling (Point III) and/or determines that the district court erred in calculating the disgorgement amount pre-remand (Point II), it will follow that the penalty part of the district court's order should be reduced as well – because the penalty will then be greater than "half of the total disgorgement award." *Id.*

## V. The Court Should Remand With Instructions Limiting The Remedy

For the reasons stated, this Court should hold that the disgorgement and asset-freeze orders were legally erroneous, reverse the entry of summary judgment, and remand for further proceedings allowing Mr. Ahmed to defend himself with the benefit of discovery, an opportunity to respond to the evidence against him, and an opportunity to cross-examine the SEC's witnesses. The Court should also direct the district court to permit Mr. Ahmed to pay for counsel on remand and in any other proceedings using funds subject to the asset-freeze order that exceed the value of any judgment (reduced in line with Points I and II, above).

Moreover, because the district court made errors of law in its asset-freeze and disgorgement orders, and because the government did not appeal or cross-appeal, the following limitations should apply on remand:

*First*, as the SEC did not appeal or cross-appeal, on remand the district court should not be permitted to increase the amount of the penalty awarded, or to order disgorgement of any new sums. As explained in Point I, above, this also means the district court may not order disgorgement for transactions outside the five-year limitations period that applied when the district court first entered judgment. *See Int'l Ore*, 38 F.3d at 1286 ("Although an appellee who has not cross-appealed may urge alternative grounds for affirmance, it may not seek to enlarge its rights under the judgment by enlarging the amount of damages or scope of equitable relief."). Those portions of the judgment not appealed from were final when the NDAA was enacted, and the NDAA does not permit reopening of fully-decided matters.

*Second*, the district court's asset-freeze and disgorgement orders must take account of the value of the shares sold in the Company C transactions. As the SEC did not present any evidence that the Company C shares sold in the C1 Transaction were inflated in value, the disgorgement order will have to be reduced by $8.9 million. It will also have to be reduced by the value of the shares sold in the C2 Transaction (in excess of the $2 million that I-Cubed paid for them), as found by the district court on remand.

*Third*, the asset-freeze and disgorgement orders must give Mr. Ahmed a credit for the value of the Seized Assets and of any related arbitration or civil recoveries against Mr. Ahmed by any of his alleged victims. For the Seized Assets, as the SEC did not offer at the remedial stage a valuation inferior to $35 million, that number should be accepted as a matter of law. In the alternative, the Court should remand with instructions to value those assets as of the date of final judgment.

*Fourth*, the interest component of the asset-freeze and disgorgement orders should be reduced to account for erroneous selection of an interest rate (as Relief Defendants explain) and the application of that rate to an excessive asset pool.

## **CONCLUSION**

The Court should reverse and remand with the instructions set forth above.

Dated: November 15, 2021
New York, NY

Respectfully Submitted,

  */s/* Vincent Levy
Vincent Levy
Gregory Dubinsky
Andrew C. Indorf
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5150
vlevy@hsgllp.com

68

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and this Court's September 8, 2021 Order because this brief contains

16,961 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally-spaced typeface using Microsoft Word

2013, Times New Roman 14-point.

Dated:  November 15, 2021          By:  /s/ Vincent Levy
                                                     Vincent Levy

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2021, I caused the foregoing to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit via the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 15, 2021          By:   /s/ Vincent Levy
                                       Vincent Levy