# 21-1686-cv(L), 21-1712-cv(CON)

## United States Court of Appeals

*for the*

### Second Circuit

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

NMR E-TAILING, LLC,

*Plaintiff,*

– v. –

SHALINI AHMED, I.I. 1, a minor child, by and through his next freinds IFIKAR and SHALINI AHMED, his parents, I.I. 2, a minor child, by and through his next freinds IFTIKAR and SHALANI AHMED, his parents, I.I. 3, a minor child, by and through his next freinds IFTIKAR and SHALINI AHMED, his parents, I-CUBED DOMAINS, LLC, SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST, DIYA HOLDINGS, LLC, DIYA REAL HOLDINGS, LLC, IFTIKAR A. AHMED,

*Defendants-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## JOINT SPECIAL APPENDIX

ADAM G. UNIKOWSKY
JENNER & BLOCK LLP
*Attorneys for Defendants-Appellants*
  *Shalini Ahmed, I.I. 1, I.I. 2, I.I. 3,*
  *I-Cubed Domains, LLC, Shalini*
  *Ahmed 2014 Grantor Retained*
  *Annuity Trust, Diya Holdings, LLC*
  *and Diya Real Holdings, LLC*
1099 New York Avenue, NW
  Suite 900
Washington, DC 20001
(202) 639-6000

VINCENT LEVY
GREGORY DUBINSKY
ANDREW C. INDORF
HOLWELL SHUSTER & GOLDBERG LLP
*Attorneys for Defendant-Appellant*
  *Iftikar A. Ahmed*
425 Lexington Avenue
New York, New York 10017
(646) 837-5151

*(For Continuation of Appearances See Inside Cover)*

IFTIKAR ALI AHMED SOLE PROP,

*Defendants,*

v.

JED HORWITT,

*Receiver-Appellee.*

CHRISTOPHER H. BLAU
STEPHEN M. KINDSETH
ZEISLER & ZEISLER, P.C.
*Attorneys for Receiver-Appellee*
  *Jed Horwitt*
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
(203) 368-4234

STEPHEN G. YODER
UNITED STATES SECURITIES AND
  EXCHANGE COMMISSION
*Attorney for Plaintiff-Appellee*
  *United States Securities and*
  *Exchange Commission*
100 F Street, NE
Washington, DC 20549
(202) 551-4532

i

## SPECIAL APPENDIX TABLE OF CONTENTS

**Page**

Ruling and Order Granting Preliminary Injunction, dated August 12, 2015 [Dkt. No. 113] ................... SPA-1

Ruling on All Parties' Motions for Summary Judgment on Liability, dated March 29, 2017 [Dkt. No. 835] ...................................................... SPA-24

Ruling on Plaintiff's Motion for Remedies and Judgment, dated September 6, 2018 [Dkt. No. 955] ...................................................................... SPA-93

Ruling Denying Defendant's Motion for Recusal, dated September 27, 2018 [Dkt. No. 977] ............. SPA-125

Final Judgment Against Defendant Iftikar Ahmed, dated September 27, 2018 [Dkt. No. 982] ............. SPA-139

Supplemental Ruling on Remedies, dated December 14, 2018 [Dkt. No. 1051] ...................................... SPA-147

Ruling on Defendant's Rule 60(b) Motion for Relief from Final Judgment and to Stay the Final Judgment, dated December 14, 2018 [Dkt. No. 1052] .................................................................... SPA-152

Ruling on Plaintiff's and Relief Defendants' Motions to Amend and Clarify the Judgment, dated December 14, 2018 [Dkt. No. 1053] ............ SPA-160

Amended Final Judgment Against Defendant and Relief Defendants, dated December 14, 2018 [Dkt. No. 1054] .................................................... SPA-164

Order Appointing Receiver, dated December 20, 2018 [Dkt. No. 1070] ........................................... SPA-173

ii

**Page**

Ruling on Motions to Lift Litigation Stay, dated
May 21, 2018 [Dkt. No. 1167].............................. SPA-190

Ruling Denying Defendant's Motion to Alter Final
Judgment, dated September 4, 2019 [Dkt. No.
1263].................................................... SPA-204

Ruling Granting Receiver's Motion for Fees, dated
January 22, 2020 [Dkt. No. 1415] ........................ SPA-211

Order Directing Payment of Receiver's Approved
Fees and Expenses, dated January 27, 2020 [Dkt.
No. 1419]............................................... SPA-220

Ruling Denying Defendant's Emergency Motion for
Clarification or Reconsideration, dated October
8, 2020 [Dkt. No. 1661]........................ SPA-224

Ruling Denying Defendant's Emergency Motion,
dated October 30, 2020 [Dkt. No. 1675] ............... SPA-229

Ruling Denying Defendant's Motion to Reduce
Disgorgement, dated November 5, 2020 [Dkt.
No. 1680] .............................................. SPA-234

Redetermination of Defendant's Disgorgement
Obligation, dated June 16, 2020 [Dkt. No. 1997].. SPA-237

Redetermined Final Amended Judgment, dated July
6, 2021 [Dkt. No. 2011]......................... SPA-251

Section 6501 of The William M. (Mac) Thornberry
National Defense Authorization Act for Fiscal
Year 2021, Pub. L. No. 116-283 (2021)................. SPA-252

15 U.S.C.A. § 78u (Jan. 1, 2021)............................... SPA-254

SPA-1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff*, *v.* IFTIKAR AHMED, *et al.*, *Defendants.* | Civil No. 3:15cv675 (JBA) August 12, 2015 |

**RULING AND ORDER GRANTING PRELIMINARY INJUNCTION**

Plaintiff the United States Securities and Exchange Commission (the "Commission" or "SEC") moves [Doc. # 29] for a preliminary injunction continuing the temporary restraining order [Doc. # 24] freezing assets of Defendant and Relief Defendants ("Asset Freeze Order"). On July 23 and 30, 2015, the Court conducted a hearing on the Commission's motion for preliminary injunction, during which it heard arguments of counsel and received evidence. For the reasons that follow, the Commission's motion is granted.

**I.     Background**

**A.     Facts Alleged**

As set forth in the record considered by the Court in issuing the Asset Freeze Order, Defendant Ahmed is alleged to have engaged in a decade-long fraud that resulted in the misappropriation of tens of millions of dollars from his former employer Oak Management Corporation ("Oak") and its investors. Among other tactics, Defendant is alleged to have misrepresented the price of an investment he advised Oak to make; fraudulently used invoices purportedly related to Oak's purchase or sale of a company's shares; and engaged in self-dealing by misrepresenting or concealing his personal stake as

the counterparty in various transactions that he entered into on behalf of Oak. In each case, Mr. Ahmed allegedly funneled the illicit proceeds into accounts at Bank of America that he claimed belonged to parties to the deals, but which in fact he opened and secretly controlled. His ill-gotten gains are alleged to have totaled $65 million. (See Am. Compl. [Doc. # 33]; Declarations of Grace Ames ("First Ames Declaration" [Doc. # 4] and "Second Ames Declaration [Doc. # 31]"); Am. Mot. for Prelim. Inj.)

**B.      Procedural Background**

On May 6, 2015, the SEC filed [Doc. # 2] an emergency motion for an ex parte temporary restraining order freezing assets and for a preliminary injunction continuing that asset freeze for the pendency of this litigation. On May 7, 2015, after conducting an ex parte telephonic hearing on the record, the Court issued [Doc. # 9] a temporary restraining order freezing assets, providing for other ancillary relief, and setting this matter for a preliminary injunction hearing. On May 18, 2015, the Commission and Mr. Ahmed entered into a stipulation [Doc. # 21], approved [Doc. # 22] by the Court, providing that all assets held by him or under his direct or indirect control, whether held in his name or for his direct or indirect beneficial interest, would remain frozen until the Court's ruling on the Commission's Motion for a Preliminary Injunction.

Mr. Ahmed is believed to have fled the United States around the same time that he entered into this stipulation.[1] On June 12, 2015, the Commission filed its Amended Complaint and Motion for a Preliminary Injunction based on newly-alleged misconduct

---

[1] The alleged fraud in this case was discovered after Mr. Ahmed was arrested in an unrelated case for insider trading. See Case No. 15-mj-02062-MBB (D. Mass.). Mr. Ahmed posted bail and fled the United States for India where he was subsequently arrested and detained by Indian authorities. (Lipman Decl. [Doc. # 97-1] ¶ 3.)

**SPA-3**

by Defendant Iftikar Ahmed. In its Amended Complaint, the Commission also named several additional relief defendants, including Defendant's wife, Shalini Ahmed. The Court subsequently ordered [Doc. # 34] expedited discovery and set this matter for a preliminary injunction hearing, which took place on July 23 and 30, 2015 with the SEC, Mrs. Ahmed, and certain other relief defendants participating.[2]

On August 3, 2015, Mr. and Mrs. Ahmed were charged in a criminal case—the second for Mr. Ahmed—with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1957 related to the alleged fraud in this case. *See* Case No. 15-mj-2161-MBB (D. Mass.).

### C.      Preliminary Injunction Hearing

The SEC seeks to freeze assets up to $118 million to account for approximately $65 million in illicit profits to be disgorged plus prejudgment interest ($9.3 million) and civil penalties ($44 million). The SEC has located and claimed to be subject to the Court's Asset Freeze Order approximately $47 million dollars in liquid assets, real estate worth approximately $20 million, and "certain other non-liquid assets that are difficult to value." (SEC Post Hr'g Br. [Doc. # 98] at 7 & n.4.)

---

[2] Mr. Ahmed did not answer the SEC's complaint and the SEC has since moved [Doc. # 64] for the entry of default pursuant to Fed. R. Civ. P. 55(a). On August 5, 2015, an attorney entered an appearance in this case for Mr. Ahmed, opposing the SEC's motion for entry of default and moving [Doc. # 95] for an extension of time to respond to the complaint. While Defendant Ahmed seeks an extension of time "to answer or otherwise respond to the Amended Complaint," his briefing does not oppose the entry of a preliminary injunction. (Def.'s Mem. Supp. [Doc. # 97] at 15.) Defendant also seeks the release of money from the Asset Freeze Order to fund his civil and criminal legal expenses. (*Id.* at 7–13.) The SEC has not yet had an opportunity to respond to this motion and it will therefore be addressed in a subsequent ruling.

SPA-4

Of the nineteen transactions alleged to be fraudulent in the Commission's Amended Complaint, Relief Defendants challenged only one at the preliminary injunction hearing: the October 2014 sale of "Company C" shares from I-Cubed to Oak for $7.5 million. Additionally, Relief Defendants argued that additional unfrozen funds in Mr. Ahmed's "carried interest account" at Oak are available to satisfy any judgment against Defendant and that certain assets frozen should be unfrozen.

As to the Company C transaction, the evidence presented at the hearing largely confirmed the record presented to the Court when it issued the temporary restraining order. In October 2013, based on Mr. Ahmed's recommendation, Oak invested $25 million to purchase shares in Company C. Before consummating the investment, Grace Ames, Oak's Chief Operating Officer, asked Mr. Ahmed whether he "invest[ed] in [Company C] prior to Oak's contemplated investment" and Mr. Ahmed responded "I have NO personal investment or any direct beneficial interest of investment in [Company C]." (Hearing Ex. 2 & First Ames Decl. Ex. 18.) Mr. Ahmed did not disclose that a year earlier, in October 2012, he had formed an entity called I-Cubed and shortly thereafter purchased shares in Company C through I-Cubed. (Hearing Ex. 5; First Ames Decl. ¶ 29.b & Ex. 21.) In May 2013, shortly before Oak made its initial investment in Company C, Mr. Ahmed transferred his interest in I-Cubed to his wife. (First Ames Decl. ¶ 29.d.)

In October 2014, Mr. Ahmed recommended that Oak make an additional $7.5 million investment in Company C shares held by I-Cubed, which Mr. Ahmed described as a "family office," but Mr. Ahmed did not disclose that he had transferred his interest in I-Cubed to Mrs. Ahmed. (*Id.* ¶ 26.) Mr. Ahmed signed a Stock Purchase Agreement on behalf of Oak purchasing the $7.5 million of additional shares from I-Cubed. (*Id.* Ex. 19.)

4

SPA-5

Richard N. Kimball, a Boston attorney, signed on behalf of I-Cubed. (*Id.*) However, Mr. Kimball had resigned as I-Cubed's initial manager one month prior. (*Id.* Ex. 22.) The SEC represents that Mr. Kimball has confirmed that his signature was forged in the Stock Purchase Agreement. (SEC Post Hr'g Br. at 12 & n.7.) Mr. Ahmed then directed Oak to wire the $7.5 million payment to a Bank of America account held solely in his name, which he had opened just days prior. (Hearing Ex. 4 & Ames First Decl. Ex. 20 (wiring instructions); Hearing Ex. 6 & Oraker Decl. [Doc. # 68] Ex. 1 at SEC-BOA-00001189-1192 (account opening documents).) Mr. Ahmed then transferred this $7.5 million into the names of certain Relief Defendants by writing checks from the I-Cubed Bank of America account to Mrs. Ahmed and the Shalini Ahmed GRAT.[3] (Oraker Decl. ¶¶ 23, 32 & Exs. 15, 17, 19.)

Mr. Ahmed's private email communications reveal that he had significant concerns about the viability of Company C days before executing the October 2014 purchase on Oak's behalf, emailing another investor about the "flat to down year" Company C was having, saying it was a "non-starter" for Oak to invest additional money in Company C, and stating that he would get his "a** handed to [him]" if he approached Oak about such an investment. (Hearing Ex. K.) Mr. Ahmed did not disclose these concerns to Oak at the time he advised Oak to buy Company C shares from I-Cubed (Hearing Tr. at 283), nor did he disclose that the same shares Oak purchased for $7.5 million had been valued at only $876,193.72 two months earlier. (Hearing Ex. 8 at Shalini Ahmed_00000881 & Hearing Tr. at 304–05.)

---

[3] Mrs. Ahmed's interest in I-Cubed had been transferred to the Shalini Ahmed GRAT.

5

SPA-6

## II.   Discussion

The Securities Act of 1933 and the Securities and Exchange Act of 1934 pursuant to which the SEC has brought this action, authorize it to bring civil actions "to enjoin [unlawful] acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1) (same). Injunctions sought by the SEC "do not require a showing of irreparable harm or the unavailability of remedies at law," but rather "the SEC need only make 'a substantial showing of likelihood of success as to both a current violation and the risk of repetition.'" *Smith v. S.E.C.*, 653 F.3d 121, 127–28 (2d Cir. 2011) (quoting *SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir. 1998)). A less stringent standard applies when the SEC seeks to freeze assets, requiring it only to "show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Id.* (internal quotation marks omitted). This is so because an "asset freeze is a provisional remedy" that serves to preserve the status quo and "to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *S.E.C. v. Byers*, No. 08 CIV.7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009).

To show a violation of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, the SEC must show that Defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999)). Section 17(a) of the Securities Act and Section 206 of the Advisers Act require similar showings although scienter is not required under

SPA-7

Section 17(a)(2). *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation.").

"The plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action," *Smith*, 653 F.3d at 128, but rather extends to a person not accused of wrongdoing "where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds," *Cavanagh*, 155 F.3d at 136. However, this two-part test is not applicable where an asset claimed to belong to a relief defendant "is, in reality, also an asset of a defendant." *S.E.C. v. Heden*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999). Instead, "the freeze sought is" considered to be "against the defendant's assets." *Id.; see also S.E.C. v. McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 208 (N.D.N.Y. 2010) ("Where a defendant treated an asset as his own, the asset should be treated as that of the defendant and the *Cavanagh* test becomes irrelevant.").

In determining ownership courts consider "[1] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever withdrew any funds from the asset." *McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 207–08.

Relief Defendants makes several arguments as to why the Court should not continue the asset freeze at the amount requested by the SEC and should carve out expenses for Mrs. Ahmed's legal fees and personal living expenses.

SPA-8

A.       **Company C Transaction**

First, in their prehearing brief, Relief Defendants contended that the SEC is unlikely to succeed on its claim relating to the Company C transaction because Mr. Ahmed transferred his interest in I-Cubed to his wife shortly before the sale to Oak and Oak's compliance regime only prohibited employees and not their spouses from investing in companies that Oak invested in. (Relief Defs.' Prehr'g Br. [Doc. # 103] at 17–19.) Relief Defendants do not continue to advance this argument in their post-hearing brief and, to the extent that this contention has not been abandoned, the record suggests that the SEC is likely to succeed on the merits of its claim that this transaction was fraudulent. Despite Mr. Ahmed's nominal transfer of his interest in I-Cubed before the October 2014 sale, the evidence shows that he continued to control the company's bank account and flow of funds and Mrs. Ahmed's testimony at the hearing demonstrated that she played little, if any, role in the sale negotiations with Oak and did not learn of the sale until after it took place. (Hearing Tr. at 325.)

Furthermore, Mr. Ahmed did not disclose to Oak that the shares that it paid $7.5 million for were valued at less than $900,000 just two months prior or that Mr. Ahmed had privately expressed concerns about the viability of the company just before recommending that Oak further invest in it. The evidence of Defendant's omissions, misstatements, and conflict of interest suggests that the SEC is likely to succeed on the merits of this claim. *See* 15 U.S.C. § 80b-6(3) ("It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other

8

than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.").

### B.   Disgorgement

Relief Defendants next contend that even if the SEC prevails on the merits of the Company C transaction, the $7.5 million in disgorgement sought by the SEC is unwarranted because the "SEC cannot show a connection between that money" paid by Oak and Mr. Ahmed's "failure to disclose who owned the shares" because Oak "got full value for what it paid" and did not pay an inflated price. (Relief Defs.' Prehr'g Br. at 18–19.) Relief Defendants are incorrect that a remedy of disgorgement is appropriate only where the victim has sustained a loss. Rather, "[d]isgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). As an equitable remedy, it "forc[es] wrongdoers to give back the fruits of their illegal conduct" and thereby "operates to make the illicit action unprofitable for the wrongdoer," but it "need not serve to compensate the victims of the wrongdoing." *Id.; see also Cavanagh*, 445 F.3d at 117 ("A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court, even if it exceeds actual damages to victims.").

Therefore, disgorgement does not have to be causally related to a loss to the victim, but rather the focus is on Defendant's unjust enrichment. The cases cited by Relief Defendants stand only for the proposition that where there is no causal connection

between a defendant's profits and the charged fraud, disgorgement is not warranted. *See,
e.g., Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999)
("A district court may not disgorge profits, unless there is record evidence the defendant
is liable (either directly or indirectly) for fraud."); *see also Sec. & Exch. Comm'n v. Manor
Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (holding that district court
properly ordered disgorgement of proceeds for security fraud but that "the court erred in
ordering appellants to [disgorge] all the profits and income *earned on such proceeds*"). If
the final record evidence supports the SEC's initial showing that Defendant's conduct in
the Company C transaction was fraudulent under the federal securities law, the Court
could order the disgorgement of his profits regardless of the loss to Oak. *See Contorinis*,
743 F.3d at 301 ("Because disgorgement's underlying purpose is to make lawbreaking
unprofitable for the law-breaker, it satisfies its design when the lawbreaker returns the
fruits of his misdeeds, regardless of any other ends it may or may not accomplish.").

C.     **Disputed Assets**

Mrs. Ahmed contends that several assets should be excluded from the Asset
Freeze Order. First, Mrs. Ahmed claims to own $7.5 million in proceeds from the
Company C transaction in the Shalini Ahmed GRAT, but the evidence shows that Mr.
Ahmed funded the single account for this entity with the proceeds of fraudulent
transactions (Oraker Decl. ¶¶ 13, 31–33) and, as discussed above, Mrs. Ahmed's
testimony and the other record evidence suggest that Mrs. Ahmed merely served as a
nominal owner for Mr. Ahmed's funds.

Mrs. Ahmed next contends that she is the manager and beneficial owner of Relief
Defendants DIYA Holdings LLC, an entity that owns a condominium in New York City,

10

530 Park Avenue, Unit 12A, which generates significant rental income, and DIYA Real

Holdings LLC (Unit 12F in the same building), which could generate significant rental

income; and that she is entitled to the rental income from both properties. (Relief Defs.'

Prehr'g Br. at 13.) The SEC, however, has shown a likelihood of success on its claim that

these properties are actually owned by Mr. Ahmed and were purchased with proceeds of

fraud.

As to Unit 12A, the record shows that the purchase money for this property came

directly from Mr. Ahmed and the proceeds of the Company C transaction. Specifically,

Mr. Ahmed transferred the proceeds of the Company C transaction to a joint account and

then wrote a check for $8.7 million to Bank of America with the memo line stating it was

for "530 Park Ave NYC." (Oraker Decl. ¶ 36.) The apartment was subsequently

transferred to DIYA Holdings LLC, which is owned 99% by Mrs. Ahmed and 1% by Mr.

Ahmed, but Mrs. Ahmed testified that she did not provide any goods or perform any

services in exchange for her interest. (S. Ahmed Dep. at 128.) Similarly, the record shows

that Unit 12F was purchased nearly entirely with the proceeds of two allegedly fraudulent

transactions transferred by Mr. Ahmed into an account in Mrs. Ahmed's name. (Oraker

Decl. ¶¶ 13, 40–44.) Therefore, the record supports the SEC's contention that Mr. Ahmed

and not Mrs. Ahmed is in reality the owner of these two properties.

Relief Defendants contend that even if the two properties were purchased with

Mr. Ahmed's proceeds from fraud, "any income or profit that was earned on the proceeds

of the defendant's purported fraud, including the rental revenue generated by the

properties owned by Relief Defendants . . . is untainted and cannot be disgorged." (Relief

Defs.' Post Hr'g Br. [Doc. # 96] at 4.) The Second Circuit has held that while it is a proper

for a court to order a party to refund its profits from an fraudulent transaction, it cannot order a party to account for "all the profits and income *earned on such proceeds*" in part because it would "arbitrarily require[e] those . . . who invested wisely to refund substantially more than other[s]." *Manor Nursing Centers, Inc.*, 458 F.2d at 1104–05. Even if the proceeds from these rental properties are not subject to disgorgement, these funds could still be frozen to ensure sufficient assets are available to pay a judgment and penalties. Furthermore, even if Defendant does not have to disgorge past income earned on this property, it does not mean that he can continue to earn income on a property that is alleged to have been purchased with fraudulent funds and is subject to being disgorged. *Cf. Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) ("The rights and benefits of property ownership are, after all, many . . . . [T]hey include not only the right to actual possession of a thing, but also the right to . . . receive income from its use . . . .").

Mrs. Ahmed also contends that the Asset Freeze Order improperly includes the $1,261,564.87 in net income earned from her job at Goldman Sachs from 2004 to 2011. (Relief Defs.' Prehr'g Br. at 11.) There is no evidence, however, that this income was segregated from Mr. Ahmed's assets. In *S.E.C. v. Rosenthal*, 426 F. App'x 1 (2d Cir. 2011), the Second Circuit held that disgorgement could be ordered against relief defendants not accused of wrongdoing who received distributions from a limited partnership that contained both the defendant's proceeds from insider trading and legitimate assets, because it was "undisputed that the ill-gotten gains of the insider trading were commingled" and the "SEC is not required to trace specific funds to their ultimate recipients in such a situation." The Second Circuit reasoned that "[i]mposing such a tracing requirement would allow an insider trading defendant to escape disgorgement by

12

spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits. Because the balance in the account after the distributions was less than the amount of illicit profits, the distributions must necessarily have contained funds subject to disgorgement. Denying disgorgement in such a situation because of the SEC's inability to trace the funds would be inconsistent with disgorgement's purpose 'to prevent unjust enrichment.'" *Id.* at 3.

Relief Defendants attempt to distinguish *Rosenthal* on the basis that there the primary defendant comingled the funds whereas here the relief defendant comingled her legitimate funds with her husband's illicit gains. (Relief Defs.' Prehr'g Br. at 12 & n.4 & Post Hr'g Br. at 2 n.2.) This attempted distinction is unpersuasive given that both *Rosenthal* and this case involve a claim by a relief defendant not accused of wrongdoing that it is entitled to untainted assets that have been comingled with the defendant's tainted assets.

In the cases cited by Relief Defendant for the proposition that "courts have refused to disgorge money paid to relief defendants for services rendered even where the funds could be directly traced to misconduct by the primary defendant" (Relief Defs.' Prehr'g Br. at 12) the relief defendants' salaries were not comingled but rather had been paid by a defendant who had obtained illicit funds. *See F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009) *aff'd*, 654 F.3d 359 (2d Cir. 2011) ("The monies Sandra Howard received from H & H for services performed on behalf of Bronson were legitimately paid in consideration for her services."); *Janvey v. Adams*, 588 F.3d 831, 835 (5th Cir. 2009) (innocent investors in Ponzi scheme had "legitimate ownership interests in their CD proceeds, and therefore cannot be considered proper relief defendants").

13

Absent any showing that Mrs. Ahmed's salary, last received in 2012, has been segregated from Mr. Ahmed's tainted assets, it cannot be considered a separate asset of hers outside the scope of the Asset Freeze Order.

### D.   Size of Asset Freeze

Relief Defendants next contend that the SEC has already frozen sufficient assets to protect investors such that the Court could provide for Mrs. Ahmed's legal and personal expenses without jeopardizing their recovery. Relief Defendant's argument that sufficient assets have already been frozen depends on (1) including $23 million from Mr. Ahmed's capital account at Oak and (2) excluding funds sought for a civil penalty from the asset freeze.[4]

On the first point, at the preliminary injunction hearing, the SEC and Ms. Ames disputed that the funds in this account are an asset available for freezing and instead contended that Mr. Ahmed's carried interest represented only an expectancy of an entitlement to future income by Mr. Ahmed on Oak's profits but any such interest was (1) still uncertain and (2) forfeited due to his disabling conflict of interest and

---

[4] Mrs. Ahmed also contends that the SEC will be able to realize $9.6 million by selling her primary residence in Greenwich (Relief Defs.' Post Hr'g Br. at 7), but this property was the collateral for Mr. Ahmed's bond in the insider trading case and was forfeited when he fled the United States. The SEC represents only that it is "possible, although not assured" that the United States Attorney's Office will consent to allowing the proceeds on this forfeiture to be used to compensate victims. (SEC Post Hr'g Br. at 7.) Mrs. Ahmed also testified that approximately $2 million in assets, including jewelry and art, are being held by her attorneys for "safekeeping." The SEC represents that Relief Defendants have thus far failed to provide detailed information about such assets. (*Id.*) Thus, in the face of this uncertainty about the Greenwich home and Mrs. Ahmed's personal assets, the Court cannot be assured that they will be available to compensate victims at this point.

SPA-15

termination from Oak. Thus, there is great uncertainty as to whether this carried interest account will materialize into an asset available for victim recovery and in the face of this uncertainty, the Court cannot assume that it will.

Relief Defendants next contend that the Court should not freeze assets for the purpose of satisfying potential civil penalties that are sought by the SEC. However, the Second Circuit has held that it is appropriate for an asset freeze order to "freeze[] funds in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty" as well, reasoning that the purpose of an asset freeze order is to allow the SEC to "preserve its opportunity to collect funds that may yet be ordered disgorged" after a trial on the merits, which includes both illicit profits and a civil penalty. *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990); *see also S.E.C. v. Maillard*, No. 13-CV-5299 VEC, 2014 WL 1660024, at *4 (S.D.N.Y. Apr. 23, 2014) ("[T]he SEC is entitled upon an adequate showing . . . to an asset freeze sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties.").

Relief Defendants cite *S.E.C. v. Heden* for the proposition "that a relief defendant's assets may [not] be frozen to ensure payment of a penalty." 51 F. Supp. 2d at 302. In *Heden*, the relief defendant had $25,000 in legitimate funds in an account and her son subsequently committed insider trading on her behalf with those funds. While the son may have exercised some control over his mother's account, the Court found that "the proof presented is simply inadequate to establish that the funds in the [relief defendant's] account belong to any one other than [the relief defendant]" and because the relief defendant was not herself accused of any wrongdoing, the Court declined to freeze assets

15

SPA-16

to provide for a penalty against her.[5] Here by contrast, the Court has already concluded that the SEC has made a preliminary showing that the frozen assets belong to Defendant, not Relief Defendant, and thus it is appropriate to freeze such funds.

Relief Defendants next suggest that even if the Court were to freeze assets for a civil penalty, "the penalties in this matter are likely to be far lower than $44 million" because the "purpose of civil penalties is to foster deterrence, and in a case in which there is disgorgement of tens of millions of dollars, a significant penalty is simply unnecessary to achieve that goal." (Relief Defs.' Supplemental Br. [Doc. # 86] at 5.) In *S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 433–34 (S.D.N.Y. 2014), cited by Relief Defendants, the court declined to impose civil penalties on the basis that "the disgorgement and prejudgment interest awarded in this proceeding [$300 to $400 million] will be staggering and among the largest awards ever imposed against individual defendants," which was "more than sufficient to deter future violations." As the Court noted in *Whly*, the facts of the case were extreme, and other courts have recognized that since "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud" and therefore civil penalties are required in order to deter and punish fraud. *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R.Rep. No. 101–616, 101st Cong., 2d Sess., *reprinted in* 1990 U.S.Code Cong. & Admin.News 1379, 1384–86).

---

[5] The profits from the insider trading were frozen because they were "ill-gotten gains."

SPA-17

E.      **Legal and Personal Expenses**

Relief Defendants request that the Court release (1) $2.5 million to pay for their attorneys' fees, (2) $20,000 per month from the earnings of DIYA Holdings LLC and DIYA Real Holdings LLC to pay living expenses, (3) order the payment of taxes and maintenance on the properties subject to the freeze, and (4) have an "offset applied for $140,000 of funds belonging to Shalini Ahmed that have been used for paying overdue bills, children's education, and legal fees."[6] (Relief Defs.' Post Hr'g Br. at 12.)

"It is well settled that this Court has authority to freeze personal assets temporarily and the corollary authority to release frozen personal assets, or lower the amount frozen." *S.E.C. v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001). "While the primary purpose of freezing assets is to facilitate compensation of defrauded investors in the event a violation is established at trial, 'the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.'" *Id.* (quoting *Manor Nursing Centers, Inc.*, 458 F.2d at 1105).

The touchstone of the Court's inquiry is "equity" and a party seeking to unfreeze assets "must establish that the funds he seeks to release are untainted and that there are

---

[6] Mrs. Ahmed acknowledges that prior to being named as a Relief Defendant in this action, she "transferred $671,000 to her counsel" from an account in her name that had not been frozen and the funds were used "to pay long overdue bills, school expenses and a modest retainer to her Connecticut counsel" as well as "to fund a [$500,000] bond to somewhat lessen the conditions of her home confinement" in connection with Mr. Ahmed's insider trading case in which Mrs. Ahmed was named as a material witness. (Relief Defs.' Prehr'g Br. at 4–5.) The SEC contends that these funds were held by Mrs. Ahmed as a nominee for Mr. Ahmed and are "traceable to Mr. Iftikar Ahmed and his fraud" and that Mrs. Ahmed's transfer without prior notice to the SEC or approval from the Court was "in violation of this Court's [Asset Freeze] Order," but the SEC has not moved the Court for any relief. (Notice of Dissipation of Assets [Doc. # 80] at 2, 6.)

sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *S.E.C. v. Stein*, No. 07 CIV. 3125GEL, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009). Courts also consider evidence of the moving party's "overall assets or income" and will deny such requests where parties are "found to have other sources of income or were requesting funds for luxuries, not necessities." *S.E.C. v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001).

Mrs. Ahmed's request to unfreeze funds is premature. The SEC has consented to releasing nearly $300,000 in assets that have been shown to belong solely to Mrs. Ahmed and are not connected to the alleged fraud, including stock options and retirement accounts from her former employer. (SEC Post Hr'g Br. at 6 & n.3.) Mrs. Ahmed has not shown that this substantial sum of money is insufficient to meet her immediate needs nor has she made any showing that she does not have access to other sources of assistance or that she is not able to earn sufficient money to support herself.[7] Furthermore, given the SEC's strong showing that the assets that Mrs. Ahmed seeks to unfreeze are ill-gotten gains belonging to Defendant's victims, the equities will not weigh in favor of a substantial easing of the asset freeze and Mrs. Ahmed's initial request is excessive.

## III.   Conclusion

Based on this record, the Court finds:

1.      The Court has jurisdiction over the subject matter of this action and over the Defendant and Relief Defendants.

---

[7] The Order Setting Condition of Release for Mrs. Ahmed in the criminal matter provides that she "may seek employment but not in the financial services industry." *United States v. Ahmed*, 1:15mj2161 (MBB) (Aug. 4, 2015 D. Mass), Doc. # 4.

2.     The Commission has made a sufficient and proper showing in support of the relief granted herein, as required by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)] and Section 209(d) of the Investment Advisor's Act of 1940 ("Advisor's Act") [15 U.S.C. § 80b-9(d)] by establishing a likelihood that the Commission will prevail at trial on the merits and an inference that the Defendant has engaged in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Ac [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

3.     There is good cause to believe that, unless restrained and enjoined by order of this Court, the Defendant and Relief Defendants will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil monetary penalties in this action such that an order freezing the Defendant's and Relief Defendants' assets, as specified infra, is necessary to preserve the status quo and to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from fraud and civil penalties.

Therefore, the SEC's Motion [Doc. # 29] for a Preliminary Injunction is GRANTED; and

IT IS HEREBY ORDERED that, pending trial on the merits or further order of the Court:

SPA-20

A.     The assets, funds, or other property held by or under the direct or indirect control of Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, whether held in any of their names or for their direct or indirect beneficial interests, wherever located, up to the amount of $118,246,186, are frozen.

B.     Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, and their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, up to the amounts identified in paragraph A.

C.     Any bank, financial or brokerage institution or other person or entity holding any funds, securities or other assets of Defendant Iftikar Ahmed or Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, up to the amounts identified in paragraph A, held in

20

SPA-21

the name of, for the benefit of, or under the control of Defendant Iftikar Ahmed or Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, or their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them, and each of them, shall hold and retain within their control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets.

D.      No person or entity, including the Defendant, Relief Defendants, or any creditor or claimant against the Defendant or any of the Relief Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order; provided, however, that any party or non-party may seek leave from this order upon a proper showing.

E.      The Commission may record this Order with relevant land records offices or other relevant institutions on all pieces of real property in which the Defendant or Relief Defendants have an interest. This order applies, without limitation, to the following properties:

i.      Real property located at 530 Park Avenue, Unit 12F, New York, NY 10021, and held in the name of DIYA Real Holdings, LLC;

ii.     Real property located at 530 Park Avenue, Unit 12A, New York, NY 10021, and held in the name of DIYA Holdings LLC;

21

iii.     Real property located at 1820 County Route 7, Ancram, NY 12502 and held in the name of The Essell Farms LLC; and

iv.     Real property located at 505 North Street, Greenwich, CT 06830 and held in the name of Defendant Iftikar Ahmed and Shalini Ahmed.

As to these or any other pieces of real property in which the Defendant or Relief Defendants have an interest, the Defendant and Relief Defendants and their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them are prohibited from encumbering their interests by means of selling, transferring, assigning, or otherwise disposing of the property, pledging the property as collateral for any purpose, or allowing the property to secure any obligation.

IT IS HEREBY FURTHER ORDERED that, pending trial on the merits or further order of this Court, the Defendant and Relief Defendants are prohibited from destroying or altering documents and records. Defendant Iftikar Ahmed and Relief Defendants Iftikar Ali Ahmed Sole Prop; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings LLC; DIYA Real Holdings, LLC; I.I. 1; I.I. 2; and I.I. 3, and their officers, directors, successor corporations, subsidiaries and affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, and each of them, are hereby restrained from destroying, mutilating, concealing, altering, or disposing of any document referring or relating in any manner to any transactions described in the Commission's Amended Complaint in this action, or to

any communications between or among any of the Defendant or Relief Defendants. As used in this order, "document" means the original and all non-identical copies (whether non-identical because of handwritten notation or otherwise) of all written or graphic matter, however produced, and any other tangible record, or electronic data compilation capable of reproduction in tangible form, including, without limitation, computer data, e-mail messages, correspondence, memoranda, minutes, telephone records, reports, studies, telexes, diaries, calendar entries, contracts, letters of agreement, and including any and all existing drafts of all documents.

IT IS HEREBY FURTHER ORDERED that service of this Order may be made by facsimile, mail, e-mail, delivery by commercial courier, or personally by any employee of the Securities and Exchange Commission who is not counsel of record in this matter, or special process server, or any other person, or in any other manner authorized by Rule 5 of the Federal Rules of Civil Procedure and may be made on any registered agent, officer, or director of Defendant or Relief Defendant, or by publication. If alternative service is made, the Commission must thereafter effect formal service in compliance with Fed. R. Civ. P. 5.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of August, 2015.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff*,<br>*v.*<br>IFTIKAR AHMED,<br>*Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br>*Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br><br>March 29, 2017 |

**RULING ON ALL PARTIES' MOTIONS FOR SUMMARY JUDGMENT ON LIABILITY**

I.   Introduction ........................................................................................................... 2

II.  Background ............................................................................................................. 3

   A.  Overarching Facts ............................................................................................ 3

   B.  Procedural History ........................................................................................... 5

   C.  Defendant's Assertion of his Fifth Amendment Right ..................................... 5

   D.  Defendant's Fraudulent Conduct ..................................................................... 6

      1.  *Company A* ................................................................................................ 6

      2.  *Company B* ................................................................................................ 7

      3.  *Company C* ................................................................................................ 8

      4.  *Company D* .............................................................................................. 14

      5.  *Company E* .............................................................................................. 16

SPA-25

6.    *Company F* .................................................................................... 18

7.    *Company G* .................................................................................... 19

8.    *Company H* .................................................................................... 22

9.    *Company I* ..................................................................................... 22

10.   *Company J* ..................................................................................... 23

III.    Discussion ........................................................................................... 24

A.    Standard on Summary Judgment and Effect of Adverse Inference ................... 24

B.    Defendant's Claims he was Treated Unfairly are Without Merit ...................... 26

C.    *Kokesh* Does not Require Dismissal of Claims Against Relief Defendants in the Pending Summary Judgment Proceedings ........................................................... 27

D.    Defendant's Conduct Violated the Advisers Act, Securities Act, and Exchange Act ......... 30

1.    *Fraud Under the Advisers Act* ........................................................... 30

a.    Defendant is an Investment Adviser .......................................... 31

b.    Defendant Violated Sections 206(1), (2), (4), and Rule 206(4)-8 .......... 33

i.    *Defendant's Fraud was Directed Towards Clients and Investors* .......... 34

ii.    *Negligence or Scienter* ................................................... 36

iii.    *Breach of Fiduciary Duties* ............................................. 36

c.    Section 206(3) ..................................................................... 37

2.    *The Exchange Act and Securities Act* ................................................. 39

a.    Material Misrepresentations/use of a Fraudulent Device ................... 41

b.    Scienter ............................................................................ 41

c.    In Connection With a Purchase or Sale of Securities ........................ 41

d.    Territorial Requirements ........................................................ 45

i.    *Morrison and Subsequent Case law* ..................................... 45

ii.    *The Intention of the Parties* .............................................. 51

iii.    *The SEC's Evidence is Sufficient to Establish Domesticity* ........... 53

IV.    Conclusion ......................................................................................... 68

SPA-26

## I. Introduction

Plaintiff, the United States Securities and Exchange Commission ("SEC") alleges that Defendant Iftikar Ahmed ("Mr. Ahmed") violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 (Count One), Section 17(a) of the Securities Act of 1933 ("Securities Act") (Count Two), and Section 206 of the Investment Advisers Act ("Advisers Act") (Counts Three, Four, and Five).[1] (Second Am. Compl. ("SAC") [Doc. # 208].) In Counts Six through Fourteen, the SEC seeks equitable disgorgement against each respective Relief Defendant.

The Court bifurcated summary judgment, with this first stage addressing only liability, and a second stage addressing the appropriate relief, if needed, or in the alternative, a trial on liability will be held. All three parties move for summary judgment.[2] (*See* Def.'s Mot. for Summ. J. [Doc. #616]; Relief Defs.' ("RD") Mot. for Summ. J. [Doc. # 618-2]; Pl.'s Mot. for Summary Judgment [Doc. #622].)  The Court held oral argument on February 28, 2018.

The SEC alleges that Defendant "systematically used fraudulent and deceptive means to divert more than $67 million from funds he advised" while employed by venture capital firm Oak Investment Partners ("Oak") "into his personal bank accounts, before funneling much of his ill-

---

[1] The SEC initially filed this action on May 6, 2015, with allegations arising out of transactions involving Companies A, B, and C and naming as Relief Defendants only Iftikar Ali Ahmed Sole Prop and I-Cubed Domains, LLC. (Compl. [Doc. # 1].) On June 16, 2015, the SEC filed its Amended Complaint [Doc. # 33] in which it added the remaining Relief Defendants as parties and asserted additional claims against Defendant arising out of transactions associated with Companies D, E, F, G, H, and I. Finally, on April 1, 2016, the SEC filed a Second Amended Complaint [Doc. # 208] in which it added claims involving Company J.

[2] Although there are nine Relief Defendants, the Court refers to them throughout as a single party, in light of their uniform and joint defense.

gotten gains into assets and accounts in the name of his wife in order to conceal his fraud and protect the assets from confiscation." (Pl.'s Mot. for Summ. J. at 1.) In response, neither Defendant nor Relief Defendants argue that Defendant did not commit the alleged frauds, instead contending primarily that Defendant should not be held liable because (1) certain fraudulent acts are time-barred by the statute of limitations, (2) the fraud was not sufficiently connected to securities transactions, and (3) the underlying securities transactions are not sufficiently domestic to be within the reach of the United States securities laws.

For the reasons that follow, the SEC's Motion for Summary Judgment is granted. Defendant and Relief Defendants' Motions for Summary Judgment are denied.

## II. Background

### A. Overarching Facts[3]

---

[3] While Defendant purports to deny many of the facts in the SEC's Local Rule 56(a)1 Statement, he fails to support his denials with any evidence, in violation of Local Rule 56(a)(3). See D. Conn. L. Civ. R. 56(a)(3); *Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 127 (D. Conn. 2014). Defendant was specifically made aware of this rule in the Notice to Self-Represented Litigant that the SEC served on him. (*See* Doc. # 626 at 2, 19-20.) Defendant also denies certain facts because certain documents were not shared with him. But the relevant evidence consisted of confidential documents filed under seal that the Court ruled Defendant would not be permitted to receive, having fled the jurisdiction of the United States, because no protective orders could be enforced against him in India, and the documents would only be shared with him in the United States. (*See e.g.*, Doc. # 286.) Since Defendant has submitted no evidence to support his denials, and since the record does not support those denials, the facts set forth in the SEC's Rule 56(a)1 Statement have been established as true for purposes of summary judgment. *See Henderson v. Wells Fargo Bank, N.A.*, 2017 WL 731780, *4 (D. Conn. Feb. 21, 2017). Moreover, Defendant's own Local Rule 56(a)1 Statement offers only unauthenticated exhibits—which he failed to disclose in discovery—as support for his statement of facts, which does not change the Court's assessment of the facts. *See Haughton v. Town of Cromwell*, No. 3:14-CV-1974 (VLB), 2017 WL 2873047, at *4 (D. Conn. July 5, 2017) (declining to consider evidence on summary judgment that was "not disclosed during discovery;" and was not "properly authenticated").

SPA-28

Oak Management Corporation ("OMC") is the investment manager for various venture capital investment funds, which raise money from investors (ranging from state and municipal pension funds to individual investors) and, in turn, invest those monies in various types of securities. (SEC Loc. R. 56(a)1 Statement of Facts ("SOF") at X-4.) Defendant joined Oak in 2004 where he worked as an investment professional and a managing member of entities that serve as general partners of certain Oak funds. (SOF ¶ X-5.) Defendant was responsible for, among other things, identifying companies in which Oak funds might invest ("portfolio companies"), recommending investments, and negotiating the terms of investments with portfolio companies. (*Id.* ¶¶ X-6 to X-9.)

To enter into a securities transaction, Oak entities memorialized an agreement to consummate a purchase or sale in written agreements, typically share purchase agreements ("SPAs"), merger agreements or tender offer agreements. (*Id.* ¶ X-25.) The SEC's allegations focus on a series of such transactions relating to ten companies, described in the Second Amended Complaint as Companies A through J, all of which involved Defendant. In essence, and as described *infra* in detail with respect to each transaction, Defendant opened bank accounts he alone controlled that were deceptively titled in the name of Oak and its portfolio companies, which he then used to divert monies intended for Oak funds or its portfolio companies into his and his wife's personal bank accounts.

---

In Relief Defendants' Local Rule 56(a)2 Statement they do not admit or deny several of the SEC's facts, instead claiming that the "asserted fact is not material to any issue raised in the SEC's motion." (*See, e.g.*, RD LR 56(a)2 [Doc. # 659] ¶ X-14.) The Court considers these facts admitted, and will make its own determination as to whether or not these facts are material.

**B.  Procedural History**

On April 2, 2015, before the SEC initiated this action and unrelated to this action, Defendant was arrested and charged with insider trading. *See United States v. Kanodia*, et al., No. 1:15-cr-10131-NMG-MBB (D. Mass. Apr. 1, 2015) (Docs. ## 3-4). Defendant's bond was set at $9 million and, as a condition of release pending his criminal trial, his travel was restricted to Connecticut, New York, and Massachusetts. *See United States v. Ahmed*, No. 3:15-mj-00052-WIG (D. Conn. Apr. 2, 2015) (ECF 4 & 8 at ¶ 7(f)); *United States v. Kanodia, et al.*, No. 1:15-cr-10131-NMG-MBB (D. Mass. Apr. 21, 2015) (ECF 19).

On May 6, 2015, the SEC filed its Complaint [Doc. # 1] and an emergency motion [Doc. # 2] for a temporary restraining order freezing assets and asking for a preliminary injunction. The following day, the Court entered [Doc. # 9] a temporary restraining order freezing assets of Defendant and certain Relief Defendants up to approximately $55 million, and scheduled a preliminary injunction hearing. At some point in May, prior to the preliminary injunction hearing, Defendant fled from the United States to his native country—India—where he remains to this day.

On August 12, 2015, after a two day evidentiary hearing, the Court granted [Doc. # 113] the SEC's motion for a preliminary injunction. This hearing transcript is posted on the docket, to which Defendant has access.

**C.  Defendant's Assertion of his Fifth Amendment Right**

Defendant answered [Doc. # 218] the SEC's Second Amended Complaint on April 22, while represented by counsel, "assert[ing] his right under the Fifth Amendment to the Constitution of the United States and applicable laws and statutes not to be compelled to be a witness against himself …" in response to the SEC's allegation of fraud. (*See* SEC Ex. 1; SOF ¶ X-1.) In discovery, among other things, the SEC requested "all communications … with any of the

Relief Defendants regarding any of the allegations in the Complaint," "all communications … with any individuals from Companies A-I regarding any of the allegations in the Complaint," and "all communications … with any individual from Oak, and Oak Fund, Oak Funds investors, or an Oak Fund portfolio company regarding any of the allegations in the Complaint." (SEC Ex. 12 at 11-13.) In response to the SEC's Requests for Admission and Interrogatories, Defendant invoked his Fifth Amendment right against self-incrimination. (SOF ¶¶ X-1, X-16.) In response to the SEC's Document Requests, Defendant claimed to have no responsive documents. (*Id.* ¶ X-16.)

### D.  Defendant's Fraudulent Conduct

#### 1.   *Company A*

In August 2014, Defendant proposed via email that Oak Fund XIII purchase 124,378 Series A shares of Company A from Company A's holding company, the "BVI Company," at a price of $28.50 per share, for a total purchase price of $3,544,773. (SOF ¶ A-1.) He buttressed his proposal with favorable comments on Company A's financial condition, but before Oak Fund XIII purchased the shares, Defendant received a copy of Company A's most recent board package, which included lower estimated financial results for Company A than the figures Defendant reported in his proposal to Oak. (*Id.* ¶ A-2.) On August 11, Oak approved Defendant's proposed purchase of Company A shares and executed the stock purchase agreement on behalf of Oak Fund XIII. (*Id.* ¶ A-6.)

Defendant then induced Oak Fund XIII to pay an inflated purchase price by emailing Oak what appeared to be the deal documents already executed by the seller with the purchase price of $3,544,733. (*Id.* ¶ A-7.) However, the versions sent to the seller contained a price of $1.5 million. (*Id.*) Thus, the seller agreed to a purchase price of $1.5 million for the Company A shares, but Defendant's fraud caused Oak Fund XIII to pay $3,544,733 for those same shares.

6

SPA-31

Finally, Defendant provided Oak instructions for Oak Fund XIII to wire the $3,544,773 purchase price to a Bank of America account in the name of "Iftikar Ali Ahmed Sole Prop, DBA [BVI Company]" (the "BOA BVI Company Account"),[4] which the Oak Fund followed. (*Id.* ¶¶ A-6, A-8.) Defendant then wired the $1.5 million actual purchase price from this account to the seller. (*Id.* ¶ A-8.) Rather than returning the excess purchase price to Oak Fund XIII, Defendant transferred the remaining balance of just over $2 million into a joint account he owned with his wife, Relief Defendant Shalini Ahmed. (*Id.*)

### 2. Company B

Company B was a joint venture formed by two parties, denoted here as JV Party 1 and JV Party 2. (SOF ¶ B-1.) JV Party 2 was a subsidiary of the BVI Company from which Oak Fund XIII purchased its Company A shares. (*Id.*) In December 2014, Defendant recommended that Oak Fund XII purchase JV Party 1's shares in Company B for $20 million. (*Id.* ¶ B-2.) Financial documents Defendant received prior to his recommendation, on November 22, 2014, reveal that the projected results for Company B were lower than the projections Defendant included in his presentation recommending the investment. (*Id.* ¶ B-10.) After the investment was approved, Defendant told Oak that the $20 million purchase price should be split between two accounts, with $2 million wired to JV Party 1 and $18 million wired to an account that Defendant claimed belonged to the BVI Company, but was in fact Defendant's BOA BVI Company Account. (*Id* ¶¶ B-3, B-8.)

---

[4] Defendant had opened this account October 10, 2013, in connection with the Company C transactions, discussed *infra*. (SOF ¶ C-11.)

Oak Fund XII wired the payments as Defendant directed. (*Id.* ¶ B-7.) Defendant also forwarded to Oak personnel what he claimed were the final deal documents reflecting a $20 million purchase price. (*Id.* ¶ B-4.) The actual purchase price for the Company B shares was $2 million, not $20 million. (*Id.* ¶ B-5.) Examination of Defendant's personal directory at Oak after his arrest, which is generally inaccessible to other Oak personnel, revealed a Word version of the SPA that is identical to the SPA that Defendant received as a Word document on December 16, with the exception of Section 3.1, which reflects a $20 million purchase price. (*Id.* ¶ B-6.)[5]

After the $18 million was wired by Oak Fund XII into Defendant's BOA BVI Company account, Defendant transferred approximately $18 million into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ B-9.)

   3.   *Company C*[6]

Defendant engaged in deceptive conduct by misrepresenting Company C's financial performance and concealing and misrepresenting his ownership of Company C shares, while he recommended and advised Oak Fund XIII to make two separate investments in Company C.

   $10,896,193.59 Redemption of Company C Shares.

---

[5] Relief Defendant's dispute this fact, arguing that it is not supported by admissible evidence because "[a]lthough [Ms. Ames's Declaration] references a document, the allegation is not supported by documentary evidence attached to either Plaintiff's motion or to the referenced Declaration." (RDs' Loc. R. 56(a)2 [Doc. # 659] ¶ B-6.) Relief Defendants make this same objection with respect to several other of the SEC's asserted facts, but fail to articulate what Rule of Evidence they rely on. In each instance, Ms. Ames, as Oak's witness, testifies to things within Oak's own knowledge, and even absent production of the underlying documents, the Court sees no reason her testimony should be considered inadmissible.

[6] Relief Defendants do not challenge any aspect of this transaction in their Motion for Summary Judgment on Liability or Opposition to the SEC's Motion.

8

In November 2012, Company C—an e-commerce business based in the United States—sold its Series A shares to several investors including I-Cubed Domains, LLC (discussed more fully below), and the BVI Company, an Oak portfolio company.[7] (SOF ¶ C-1.) At the time, Defendant was one of three people on the BVI Company's board of directors and was responsible for identifying and negotiating the transaction involving BVI Company's purchase of Company C Series A Preferred Stock for $150,000. (*Id.* ¶¶ C-2, C-3, C-4.) On November 13, 2013, the BVI Company wired $150,000 from a BVI Company Fidelity account to Company C. (*Id.* ¶ C-5.)

Shortly after the BVI Company's $150,000 investment in Company C, Defendant represented that an additional $2 million investment by the BVI Company was necessary because Defendant was getting pressure from Oak for being on the Board of the Company without a bigger investment. (SEC Ex. 145.) He then requested via email that Company C "lawyers . . . wrap up the incremental $2MM funding," which the Company C representative confirmed would be done "right away." (SEC Ex. 146.) On November 26, 2012, $2,000,000 was wired from the same BVI Company Fidelity account for the purchase of additional Company C shares. (SOF ¶ C-6.) When he was subsequently confronted by the BVI Company about the $2 million that was missing from the BVI Company's Fidelity account, Defendant claimed the $2 million purchase was a mistake on the part of the "finance team." (*Id.* ¶ C-7.) Continuing to conceal that he negotiated the $2 million investment, Defendant told BVI he would "take full responsibility" for the "mistake" and would personally purchase the shares, which he did on or about June 21, 2013. (*Id.* ¶ C-8.)

---

[7] The Court understands this to mean a company in which any Oak Fund holds an investment.

9

SPA-34

Meanwhile, on Defendant's recommendation, in October 2013 Oak Fund XIII invested $25 million into Company C Series B shares, while Defendant simultaneously negotiated with Company C (purportedly on behalf of Oak Fund XIII), an investment by Oak Fund XIII that would be conditioned on Company C redeeming the BVI's Company's Company C shares (now secretly owned by Defendant) for $10,896,193.59. (*Id.* ¶¶ C-9, C-15.) Essentially, Defendant was pretending to act on behalf of Oak Fund XIII in negotiating its investment in Company C, while actually seeking to profit (by more than $8 million) by redeeming the Company C shares he was holding in the name of the BVI Company. Prior to Oak Fund XIII making its $25 million investment into Company C—which triggered Company C's obligation to redeem Defendant's Company C shares held in the name of the BVI Company for $10,896,193.59—Defendant was specifically asked if he had invested in Company C. Defendant falsely stated that he had "no personal investment or any other direct beneficial interest or investment" in Company C. (*Id.* ¶ C-10.)

Ms. Ames, OMC's Chief Operating Officer and designated witness in this case (*id.* ¶ X-3), asked Defendant about any ownership of Company C shares because each Oak Fund is prohibited, absent proper consent, from investing in the securities of any entity in which any of the Managing Members of its general partner (including Defendant) have, or have had within the preceding ninety days, any investment or any other material financial interest. (SOF ¶ C-16.) Oak funds also are prohibited, absent the proper consent, from purchasing or selling securities to or from any Managing Members of the general partner of the Oak Funds (including Defendant) or any of their respective affiliates. (*Id.*)

To further conceal that he was holding Company C shares and would personally profit from their redemption (triggered by Oak Fund XIII's investment in Company C), Defendant opened the BOA BVI Company Account on October 10, 2013, and directed, through an attorney,

10

Company C to wire the redemption proceeds into this account. (*Id.* ¶¶ C-11-13.) After he received the funds in his BOA BVI Company Account, Defendant transferred the funds into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ C-14.)

In sum, Defendant purposefully lied to his fellow BVI Company directors when he told them the $2 million purchase of Company C shares was a mistake, as he had personally negotiated the purchase of those shares in the name of the BVI Company. Defendant then bought the shares, left them in the name of the BVI Company, and negotiated their redemption for a price that was substantially greater than the $2 million originally paid by leveraging the redemption on Oak Fund XIII's $25 million investment in Company C. While recommending that Oak Fund XIII purchase $25 million of Company C's Series B shares, Defendant concealed from Oak Fund XIII and Company C that he (as opposed to the BVI Company, which was an Oak portfolio company) was the seller of those Company C shares and that he would personally profit by more than $8 million upon Oak Fund XIII's $25 million investment. Defendant told Oak that he did not have any personal investment or direct beneficial interest in Company C, which was false because Defendant was: (1) holding the Company C shares in the name of BVI Company that were redeemed upon Oak Fund XIII's investment; and (2) holding Company C shares in the name of I-Cubed, as explained below.

$7,500,000 I-Cubed Sale

I-Cubed is a single member Delaware LLC formed on October 24, 2012 whose sole member (and owner) was Defendant. (*Id.* ¶ C-22.) In November 2012, Defendant, through I-Cubed, invested in Company C. (*Id.* ¶ C-24.)[8]

---

[8] Later on, in May 2013, Defendant transferred his I-Cubed interest to Ms. Ahmed. (SOF C-25.) Although Defendant moved I-Cubed into the name of his wife, she merely served as a

SPA-36

On October 30, 2014 Oak Fund XIII entered into a Stock Purchase Agreement with I-Cubed to purchase its Company C shares for $7.5 million. (SOF ¶ C-18.) That agreement was executed by Defendant on behalf of Oak Fund XIII and was purportedly executed on behalf of I-Cubed by Richard N. Kimball. (*Id.*) Defendant provided wire transfer instructions to Oak and directed that it wire $7.5 million to an account held by I-Cubed at Bank of America ending x8384 ("BOA I-Cubed Account"), which Oak followed.[9] (*Id.* ¶ C-19.) On November 3, 2014 Defendant wrote a $7,425,000 check from the BOA I-Cubed Account to the Shalini Ahmed 2014 Grantor Retained Annuity Trust (the "GRAT"). (SEC Ex. 160 at SEC-BOA-E-1355.)

When presenting this proposed investment to Oak's managing partners at their investment committee meeting held on or about October 27, 2014, Defendant described the seller of the shares, I-Cubed, as a "family office." (SOF ¶ C-17.) Defendant's written presentation included financials for Company C showing, among other things, that Company C's estimated revenues in 2014 were $515.6 million, a 65% increase over 2013 revenues of $311.81 million. (*Id.*) However, on October 8, 2014, Defendant had received Company C's financials showing $178.1 million in revenue for the first eight months of 2014, which was just 11.7% ahead of revenues for the first eight months of 2013. (*Id.* ¶ C-30.)

Defendant had recognized the declining value of Company C stock even before this. In August 2014, two months before I-Cubed sold the Company C stock to Oak Fund XIII for $7.5

_____

nominee. Ms. Ahmed testified that despite being the "owner" of I-Cubed, she played no role in the sale negotiations. (Preliminary Injunction Order [Doc. # 113] at 8.)

[9] Unbeknownst to Ms. Ahmed (I-Cubed's nominal owner by this time), Defendant, representing that he was a member of I-Cubed, had opened this account, listing him as the sole signatory, on October 28. (SOF C-20.)

SPA-37

million, a 99% interest in I-Cubed—which held only the Company C shares—was transferred into the GRAT. (*Id.* ¶¶ C-32–33.) According to the GRAT formation document, which the GRAT's 30(b)(6) witness confirmed was accurate, the market value of the 99% interest in I-Cubed was worth only $876,193.72. (*Id.* ¶ C-32.) Similarly, during the preliminary injunction hearing, Relief Defendant Shalini Ahmed testified that she believed the GRAT formation document was accurate and that I-Cubed's Company C shares were worth $876,193.72 as of August 29, 2014. (*Id.* ¶ C-33.) Thus, while Defendant represented to Oak that I-Cubed's Company C shares had increased in value by 375% (to $7.5 million) since their purchase, Defendant himself had acknowledged the shares had diminished in value by more than 50% to less than $1 million. (*Compare* SOF ¶ C-18 *with* ¶¶ C-32-33.)

Defendant misrepresented that he had no personal investment or any other direct beneficial interest or investment in Company C and did not disclose to Oak or its funds that he or his family owned or had an interest in I-Cubed despite recommending that Oak Fund XIII buy Company C shares directly from I-Cubed. (*Id.* ¶¶ C-10, C-27.) Thus, Defendant concealed that he was on both sides of the transaction, going so far as to forge the signature of Mr. Richard Kimball who had retired as I-Cubed's manager more than one month earlier and had no knowledge of the transaction.[10] (*Id* ¶¶ C-27-29.)

---

[10] On November 6, 2014, less than one week after Oak Fund XIII purchased the Company C shares from I-Cubed, Defendant explained to an investor in Company C—responding to a suggestion that Oak participate in another financing round for Company C—that the company was performing so poorly Oak would not agree to invest: "With a flat to down year it is a non-starter at Oak unfortunately for me to even try and pitch." (*Id.* ¶ C-30.) Company C ceased operations less than two years later and Oak Fund XIII lost its entire investment. (*Id.* ¶ C-31.)

SPA-38

### 4.    Company D

Oak Fund IX purchased and sold Company D shares through a special purpose vehicle based in the Netherlands named A. Bohl Praktijk B.V. ("BPBV"), and Defendant had substantial responsibilities in connection with this investment. (SOF D-1, D-6.) The evidence, discussed below, shows that in connection with these transactions, Defendant misappropriated money from Oak Fund IX four different times by causing money to be transferred to his secret bank accounts and then transferring it to his personal accounts.

The first misappropriation occurred in connection with Oak Fund IX's December 2004, purchase of Company D shares. (*Id.* ¶ D-1.) Defendant negotiated a letter agreement with Company D that replaced the annual dividend provisions in the deal's term sheet with a one-time management fee of $600,000 to be paid to Oak Fund IX by Company D. (*Id.* ¶ D-2.) After receiving instructions from Defendant to wire the money to a Fleet Bank account number x9310 in the name of OIP Advisors, Company D confirmed in a January 5, 2005 email that it would wire $600,000 the following day. (*Id.* ¶ D-3.) On January 7, 2005, Defendant received a revised agreement reflecting a $50,000 increase in the management fee to be paid by Company D.[11] (*Id.* ¶ D-4.) On January 11, 2005, Defendant emailed Company D stating "[s]ame instructions as last time" and, three days later, Company D confirmed that it had wired $50K that day. (*Id.*) In fact, the account that Defendant provided Company D was not an Oak account. (*Id.* ¶ D-5.) Rather, Defendant had previously opened a Fleet Bank account ending in numbers x9310 in the name of "Ifitkar Ali Ahmed dba OIP Advisors," and after the two banks merged, that account became Bank of America account ending in numbers x9310 (the "BOA OIP Advisors Account"). (*Id.*)

---

[11] It is not clear from whom Defendant received this agreement.

SPA-39

The second misappropriation was in relation to Oak Fund IX's sale of a portion of its Company D shares in May 2006. (SOF ¶ D-6.) Defendant had substantial responsibilities in connection with Oak Fund IX's exit from the Company D investment in 2006 and 2007. (*Id.*) Pursuant to the Share Purchase Agreement, Oak Fund IX agreed to pay the broker's (the "Investment Bank") fees and expenses in connection with the transaction. (*Id.* ¶ D-7.)

On June 26, 2006, Defendant received a $1.2 million invoice from the Investment Bank for advisory services related to the sale of the shares. (*Id.* ¶¶ D-8, D-9.) That same day, Defendant opened a Bank of America account number x2349 in the name of Company D (the "BOA Company D Account"), on which he was listed as the sole authorized representative. (*Id.* ¶ D-10.) Company D did not actually have an account at Bank of America. (SOF ¶ D-6.) On July 3, 2006, BPBV wired $3 million to Defendant's BOA Company D Account, believing that to be the amount for advisory fees charged by the Investment Bank. (*Id.* ¶ D-11.) On that same day, $1.2 million was transferred to Defendant's BOA OIP Advisors Account, and $1.8 million was transferred to his joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ D-11.) On July 5, 2006, $1.2 million was transferred from Defendant's BOA OIP Account to an account for the Investment Bank. (*Id.*)

Defendant again misappropriated funds when, in January 2007, he requested that Oak Fund IX make a $6.6 million payment for a Korean tax obligation related to the 2006 sale of Company D shares. (SOF ¶ D-13.) Defendant submitted a wire transfer request with an invoice on Company D letterhead and included that wire transfer instructions for Defendant's BOA Company D Account. (*Id.*) The Company D invoice was not from Company D. (*Id.* ¶ D-6.) On January 26, 2007, Oak Fund IX wired a total of $6.6 million to BPBV which, in turn, on January 29, 2007, wired $6.6 million to Defendant's BOA Company D Account. (*Id.* ¶ D-14.) On that same

15

date, nearly $6.6 million was transferred from Defendant's BOA Company D Account to a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.*) Contrary to Defendant's instructions, Oak is not aware of any document suggesting that Korean capital gains taxes were in fact assessed on the sale of the shares or that there was any legitimate reason for the $6.6 million payment that Defendant directed Oak Fund IX to make in January 2007. (*Id.* ¶ D-15.)

Lastly, on August 21, 2007, Defendant presented Oak Fund IX with a wire transfer request relating to another invoice on Company D letterhead seeking payment of $800,528.81 in "[t]ransaction fees to be paid to the Korean Tax Authority" in connection with Oak Fund IX's January and March 2007 distributions of Company D shares to its investors. (*Id.* ¶ D-16.) The invoice provided wire transfer instructions for payment to Defendant's BOA Company D Account. (*Id.*) Again, the Company D invoice was not from Company D. (*Id.* ¶ D-6.) On August 21, 2007, Oak Fund IX wired a total of $800,528.81 to Defendant's BOA Company D Account. (SOF ¶ D-17.) None of this money was transferred to Company D; rather, the money (minus a $30.00 wire transfer fee) was transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ D-17.) Oak is not aware of any document or other evidence to suggest that Company D paid $800,528.81 (or any other amount) in securities transaction taxes to the Korean tax authorities in connection with Oak Fund IX's March 2007 distribution of Company D shares. (*Id.* ¶ D-18.)

### 5.   *Company E*

Defendant recommended to Oak's Managing Partners that Oak Fund XI purchase Company E shares for 17 million Euros. (SOF ¶ E-1.)[12] In his recommendation, Defendant used

---

[12] Relief Defendants claim the SEC's cited evidence does not show Defendant recommended this purchase because the report (used by Oak for its consideration of projects)

an exchange rate of 1.3 U.S. Dollars to Euros to convert the purchase price to a total of $22.1 million. (*Id.* ¶ E-2.) Company E's bank account appears in the final version of the written agreement for the deal and in an email from Company E to Defendant providing payment instructions, while Defendant's BOA Company E Account[13] appears in neither. (*Id.* ¶ E-3.)

Defendant instructed Oak Fund XI to fund the $22.1 million purchase with two separate transfers: (1) $20.74 million to an account of Company E; and (2) $1.36 million to Defendant's BOA Company E Account. (*Id.*) In the written wiring instructions that Defendant sent Oak Fund XI, Defendant represented the account name as "[Company E] USA" and did not state in any manner that he owned or had a personal interest in the account. (SOF ¶ E-4.) Three days later, on July 29, 2005, Oak Fund XI made the transfers requested by Defendant. (SEC Exs. 44, 45.)

Although Defendant represented to Oak Fund XI that the purchase price of 17 million Euros was equivalent to $22.1 million – an exchange rate of 1.3 dollars to Euros – Defendant knew at the time that the exchange rate was actually closer to 1.2 dollars to Euros. Defendant stated as much in an email to Company E dated August 2, 2005, where he told Company E that the actual exchange rate at the time of Oak Fund XI's transfer "was more like 1.21," and Defendant "did the calculations at 1.22 assuming some maring [sic] for movement" to arrive at the $20.74 million amount transferred by Oak Fund XI to the seller. (SEC Ex. 46 at OAK-SEC-1643.)

---

reflects that Bandel Carano ("BLC") was the manager of the project and Edward Glassmeyer ("EFG") was a "buddy." (RDs' LR 56(a)2 Stmt. ¶ E-1.) They assert that Defendant's name does not appear anywhere on the report, however, at the top of page one it clearly lists Defendant's initials ("IAA") under "Prepared by." (SEC Ex. 40 at OAK-SEC-1630.)

[13] The complete name on the BOA Company E Account was "Iftikar A. Ahmed d/b/a [Company E] USA." SOF E-4.

Thus, Company E agreed to a purchase price of $20.74 million but Oak Fund XI paid $22.1 million and Defendant diverted the difference of $1.36 million to Defendant's BOA "Company E" Account. (SOF ¶ E-6.) Over the next month, Defendant transferred a total of $1,358,188 from the BOA Company E Account to two of his personal accounts. (*Id.* ¶ E-7; SEC Ex. 47 at SEC-BOA-E-2141.)

Soon after the transaction, Company E notified Defendant of a shortfall in the purchase price and then accepted Defendant's suggestion that Oak Fund XI pay the shortfall of €19,486 as a setoff against the amount Company E owed Oak Fund XI for legal expenses under the Investment Agreement. (*Id.* ¶¶ E-5, E-8.) Unbeknownst to Oak Fund XI, Defendant then directed the seller to send the legal expense reimbursement (less the shortfall in the purchase price) to Defendant's BOA OIP Advisors Account. (*Id.* ¶ E-9.) The seller complied with Defendant's direction and transferred $92,285.15 to Defendant's OIP Account on November 11, 2005. (*Id.* ¶ E-10.) Two weeks later, Defendant transferred the funds from the BOA OIP Advisors Account to his personal account. (*Id.*)

6.     *Company F*

In February 2007, Oak Fund XII invested in shares of Company F. (SOF ¶ F-1.) Company F was required to reimburse Oak Fund XII for its legal fees in connection with the share purchase, up to $250,000. (*Id.* ¶ F-2.) Defendant advised Company F to send the legal fees reimbursement to his BOA OIP Advisors Account, which Company F did. (*Id.* ¶¶ F-3 to F-4.) Defendant then wired those funds to a joint bank account that he held with Relief Defendant Shalini Ahmed. (*Id.* ¶ F-4.)

Later in 2007, Oak Fund XII sold its shares in Company F. (*Id.* ¶ F-5.) Similar to the initial share purchase agreement, the sale agreement related to this transaction provided that the acquiring company would pay the seller's transaction expenses, with a cap of $500,000. (*Id.*) Oak

18

Fund XII paid its own legal fees, however, once again Defendant advised Company F to send Oak Fund XII's reimbursement of legal fees to his BOA OIP Advisors Account, which Company F did. (*Id.* ¶¶ F-6 to F-7.) Just as in June 2007, Defendant did not provide the legal fees to Oak Fund XII, but rather wired the $500,000 to a joint bank account that he held with Relief Defendant Shalini Ahmed. (*Id.* ¶ F-8.)

### 7.   *Company G*

Oak Fund XII purchased and sold Company G shares through its affiliated entity Oak Asia Infrastructure, LLC. (SOF ¶ G-1.) Specifically, with respect to these transactions, Defendant recommended and/or signed the agreements on behalf of Oak Fund XII or its affiliate. (*Id.* ¶¶ G-2, G-7, G10.) In connection with these transactions, Defendant misappropriated money from Oak Fund XII five different times, as discussed below.

The first misrepresentation relates to Defendant's 2007 proposal that Oak Fund XII invest 40 billion Korean Won in Company G shares. (SOF ¶ G-2.) After the investment was approved, Defendant presented wire transfer instructions showing that Oak Fund XII was buying 2,348,904 shares for a total price of $47.5 million. (*Id.*) In accordance with Defendant's instructions, on December 18, 2007, Oak Fund XII wired $45 million to a Korea Exchange Bank account and the remaining $2.5 million to a Bank of America account ending in numbers x9887 in the name of "Company G" (the "BOA Company G Account 1"), which Defendant had opened earlier that same day. (*Id.* ¶¶ G-2, G-5.) The $2.5 million was immediately transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ G-5.)

Defendant knew that the purchase price for the Company G shares would be less than $45 million, and he instructed that the excess funds be sent to his BOA OIP Advisors Account. (*Id.* ¶ G-3.) On January 9, 2008, Korea Exchange Bank wired $2,201,070.56 to Defendant's BOA OIP

Advisors Account.[14] (*Id.* ¶ G-4.) Oak has no record of receiving that money or any other amount back from the $45 million Oak Fund XII wired on December 18, 2007. (*Id.*) The next day that money was transferred to a joint bank account that Defendant held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ G-6.)

On four separate occasions from 2009 to 2013, Defendant presented requests for Oak Fund XII to make payments purportedly to Company G with an invoice that appeared to be on Company G letterhead. Each invoice was submitted with a wire request and contained wire transfer instructions directing that payment be remitted to one of two Bank of America accounts in the name of Company G. In each instance, Oak Fund XII made the payments as requested by Defendant. However, Defendant's BOA Company G Accounts did not belong to Company G, and Company G never received the funds mentioned above. (*Id.* ¶¶ G-7-16.)

Defendant's second misrepresentation was in connection with Oak Fund XII's 2009 Tender Offer Agent Engagement Agreement for Company G that resulted in the company being taken private and delisted, which Defendant signed. (*Id.* ¶ G-7.) On October 29, 2009, Defendant submitted a wire request and Company G invoice for Oak Fund XII's payment of 2,490,325,000 Korean Won (or $2,101,185.45) to Company G for purported delisting fees and legal fees with wire instructions for Defendant's BOA Company G Account 1. (SOF ¶ G-8.) Oak Fund XII subsequently wired the $2,101,185.45 to the BOA Company G Account 1, of which $2,099,998 was transferred to a joint bank account Defendant held with his wife the following day. (*Id.* ¶ G-9.)

Defendant's third fraud associated with Company G centers on Oak Fund XII's sale of its Company G shares in October 2011, with a portion of the sales price remaining in escrow until

---

[14] The account received only $2,201,050.56, likely due to a transfer fee. (*See id.* ¶ G-6.)

2013. (*Id.* ¶ G-10.) This agreement was also executed by Defendant. (*Id.*) The transaction was set up so that Oak Fund XII would receive a certain portion of the consideration for its shares at the initial closing and the remainder would be held in escrow until March 31, 2013, upon which time it would be released to Oak Fund XII. (*Id.*)

On November 25, 2011, Defendant submitted a wire request, along with an invoice, for Oak Fund XII's payment of a $3,113,981 "Management Incentive Payment" to Company G. (SOF ¶ G-11.) The wire request directed that $3,113,981 be paid to Company G, and the invoice contained wire transfer instructions for a Bank of America account number x6367 in the name of Company G (the "BOA Company G Account 2"), which Defendant had previously opened on October 17, 2011. (*Id.* ¶¶ G-11-12.) On November 28, 2011, Oak Fund XII wired $3,113,981 to that account, and the next day $3,000,000 was transferred to Defendant and his wife's joint bank account. (*Id.* ¶ G-12.)

Defendant made his fourth misrepresentation on April 10, 2013 when Defendant submitted a wire transfer request, along with an invoice and an email explanation of the fees for Oak Fund XII's payment of a $1,556,990 Management Incentive Payment to Company G, related to the sale of Company G shares. (*Id.* ¶ G-13.) The invoice contained wiring instructions for the BOA Company G Account 2. (*Id.*) On April 11, 2013, Oak Fund XII wired $1,556,990 to the BOA Company G Account 2 and that same day the money was transferred to the joint bank account that Defendant held with his wife. (*Id.* ¶ G-14.)

Finally, on April 29, 2013, Defendant submitted a wire transfer request, along with an invoice, for Oak Fund XII's payment of a $622,796 Investment Banking Advisory Fees reimbursement to Company G, again containing wiring instructions for the BOA Company G Account 2. (*Id.* ¶ G-15.)  On April 30, 2013, Oak Fund XII wired $622,796 to the BOA Company

21

G Account 2, and $622,796 was immediately transferred to Defendant and Ms. Ahmed's joint bank account. (*Id.* ¶ G-16)

### 8.    *Company H*

Oak Fund XII made several investments in Company H and its parent company, incurring fees from two law firms in connection with the investments and other legal matters related to Company H. (SOF ¶¶ H-1, H-2.) Purporting to act pursuant to agreements between Oak and Company H, Defendant directed Company H to transfer nearly 1.5 million British pounds to the BOA OIP Advisors Account as reimbursement for Oak's legal expenses. (*Id.* ¶ H-3.)

On June 17 and 18, 2009, Company H made three separate transfers to Defendant's BOA OIP Advisors Account in the amounts of $1,575,905.94, $118,578.60, and $535,025.04. (*Id.* ¶¶ H-4, H-5.) Shortly after the transfers, Defendant transferred $1,690,932.54 from the BOA OIP Advisors Account into Defendant's personal account. (*Id.* ¶¶ H-4, H-5.) Then, after Defendant had moved the funds paid by Company H for reimbursement of Oak's legal fees into his own personal accounts, on July 7, 2009, Defendant sent Company H a letter on Oak letterhead explaining that Oak requested that Company H "reimburse Oak for legal expenses up to a maximum of UK £1,500,000." (*Id.* ¶ H-6.)

### 9.    *Company I*

In December 2010, Defendant recommended that two Oak funds—Oak Fund XII and Oak Fund XIII—invest 36.5 million British pounds in Company I. (SOF ¶ I-1.) Defendant represented to Oak that this purchase price translated into $3.6084 per share for a total of approximately 59 million U.S. dollars, and that this was based upon a fixed exchange rate of 1.62 dollars to the British pound, which had been reflected in a term sheet signed in November 2010. (*Id.* ¶¶ I-2, I-3.) These representations were not true—the November 2010 term sheet contained no such provision for a

22

fixed exchange rate, and application of the correct exchange rate on the date of Oak Fund XII's investment would have resulted in a per share price of $3.49. (*Id.* ¶¶ I-4, I-5.)

As a result of these misrepresentations the Oak funds overpaid, and on December 17, 2010, shortly after Oak wired the $59 million, Company I contacted Defendant and informed him that it was wiring back to Oak the approximately £1.4 million that had been overpaid. (*Id.* ¶ I-6.) Defendant directed Company I to wire these surplus funds to his secret BOA OIP Advisors Account, which Company I did. (*Id.* ¶¶ I-7, I-8.) The next day, Defendant transferred these funds – which amounted to approximately $2.185 million – into a joint bank account that he held with his wife, Relief Defendant Shalini Ahmed. (*Id.* ¶ I-8.) Oak never received these funds. (*Id.* ¶ I-9.)

### 10.   Company J

Oak Fund XI entered into a Stock Purchase Agreement dated April 7, 2006, in which it agreed to purchase from Company J (a Delaware corporation) 15,000,000 shares of its Series A Preferred Stock. (SEC Ex. 51 at OAK-SEC-5630, 5662.) Defendant worked on Oak Fund XI's purchase of Company J shares. (SOF ¶ J-2.) The Share Purchase Agreement stated that Company J would use the proceeds from the sale of the stock to, among other things, fund the payment of a one-time special dividend to Oak Fund XI in the amount of $0.12 per share, which equates to $1.8 million. (*See* SEC Ex. 53 § C(3)(a) at OAK-SEC-5610.)

On April 19, 2006 Defendant directed Company J to send the dividend to Defendant's BOA OIP Advisors Account. (SOF ¶ J-5.) Company J complied with Defendant's directives and transferred $1.8 million to Defendant's OIP Account on May 1, 2006. (*Id.* ¶ J-6.) Seven weeks later, Defendant transferred the $1.8 million from the BOA OIP Advisors Account to his and his wife's joint bank account. (*Id.* ¶ J-7.)

### III. Discussion

#### A.  Standard on Summary Judgment and Effect of Adverse Inference

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c). The same standard applies to cross-motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). The Court must examine the merits of each motion independently and in each case must consider the facts in the light most favorable to the non-moving party. *Id.* at 121.

In this case, Defendant has invoked the Fifth Amendment instead of responding to the SEC's Complaint, allegations, or discovery requests. (SEC SOF X-1.) It is Defendant's right to assert this privilege in a civil proceeding. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976). However, "[a] court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, because the invocation of the privilege results in a

24

SPA-49

disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y.2010) (citing *Collazos v. United States*, 368 F.3d 190, 203–04 (2d Cir. 2004) (noting that where the defendant "deprives the government of the opportunity to conduct a deposition . . . [that] itself supports an adverse inference")); *see also S.E.C. v. Pittsford Capital Income Partners, L.L.C.*, 2007 WL 2455124, at *14 (W.D.N.Y. Aug. 23, 2007) ("[L]itigants denied discovery based upon an assertion of the privilege may ask the court to draw a negative inference from the invocation of that right.").

"An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *LiButti v. United States ("LiButti II")*, 178 F.3d 114, 120 (2d Cir. 1999). "While the strength and cogency of the adverse inference" must "be tested against the other evidence in the case, 'the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.'" *LiButti v. United States ("LiButti I")*, 107 F.3d 110, 124 (2d Cir. 1997) (quoting *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995)); *see also Suman*, 684 F. Supp. 2d at 386 ("a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist."); *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 432 (E.D.N.Y. 1995) (finding that the moving party "must produce independent corroborative evidence of the matters to be inferred before liability will be imposed" (internal quotation marks omitted)).

**B.  Defendant's Claims That he was Treated Unfairly are Without Merit**

Defendant claims that he has been treated unfairly, inappropriately denied access to evidence, and coerced into asserting his Fifth Amendment right against self-incrimination. (Def.'s Opp.'n at 1-8.)

Defendant chose to flee the United States shortly after this case was filed, in violation of his conditions of release in a criminal matter. (*See* Order Denying Def.'s Mot. for Full Access to the SEC's Investigative File [Doc. # 286] at 2.) It was as a result of this choice that the Court denied Defendant's requests for access to confidential information, reasoning that it could not enforce any protective order while Defendant remained outside of its jurisdiction. (*See, e.g., id* at 3; Order Denying Def.'s Mots. To Compel Oak to Produce Documents [Doc. # 477] at 3.)

Defendant also claims that he has been unfairly deprived of access to counsel, but as this Court has articulated in previous rulings in this case, Defendant has no Sixth Amendment right to counsel in this civil case nor the right to use tainted assets to retain counsel. (*See* Ruling on Defendant's Motion for Release of Funds [Doc. # 191] at 2-3; Ruling Denying Defendant's Motion for Reconsideration to Modify the Asset Freeze Order to Release Funds for Legal Defense [Doc. # 392].) Since he consented to the withdrawal of his counsel, Defendant has actively participated in this litigation, and Relief Defendants, who have been continuously represented by counsel, have also litigated aspects of the merits of Defendant's claimed liability. (*See, e.g.,* RD's Mot. for Summ. J.)

Defendant further argues that he was "forced and coerced" to invoke his Fifth Amendment privilege when the SEC insisted that he appear for his deposition at the U.S. Consulate in India.[15]

---

[15] Defendant ignores that the Court ordered him to appear at either the Consulate in Hyderabad or Kolkata and refused his request for what it deemed "essentially a protective order

26

SPA-51

(Def.'s Opp'n at 6.) The record does not support this claim. Indeed, in initially objecting to his deposition—which was noticed in the United States—Defendant stated that he was "likely to assert his Fifth Amendment privileges," belying his argument that he ever intended to substantively testify. (*See* Def.'s Mot. for a Protective Order and to Quash Notice of Deposition [Doc. # 238] at 3.) And critically, Defendant's Fifth Amendment invocation was not made only at his deposition: Defendant also invoked his Fifth Amendment privilege in his Answer on advice of counsel and later when responding to written discovery. (*Id.*)

Defendant has received the benefit of the Fifth Amendment privilege at every stage of this proceeding, and now he must also bear the consequences of that decision. *See United States v. 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995) ("[A] civil litigant's invocation of the privilege against self-incrimination during the discovery process is far from costless.") Defendant's claims that he has been "muzzled, silenced and rendered deaf, dumb and blind" are simply not accurate. (Def.'s Opp'n at 1.) The Court has afforded Defendant every opportunity to participate in this litigation despite the circumstances he created for himself by leaving its jurisdiction, as evidenced by his prolific filings since the withdrawal of his attorney.

## C. *Kokesh* Does not Require Dismissal of Claims Against Relief Defendants in the Pending Summary Judgment Proceedings

Relief Defendants and Mr. Ahmed respectively move for summary judgment in their favor on all claims arising from alleged frauds involving Companies D, E, F, H, and J, and those involving Company G (other than the frauds alleged to have occurred in November 2011 and April 2013) because each of these transactions took place more than five years prior to the filing of the SEC's

---

preventing his deposition from being conducted in a U.S. Consulate or Embassy in India." (Order Denying Defendant's Motion for Specific Instructions for Deposition [Doc. # 365] at 4.)

SPA-52

claim and is therefore time-barred pursuant to 18 U.S.C. § 2462, as the Supreme Court recently

held in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).[16] The SEC's Motion for Summary Judgment on

liability does not discuss the impact of *Kokesh*, and its Opposition to Defendants' Motion contends

that *Kokesh* does not affect the question of whether Defendant is liable for the alleged violations,

but only the extent of damages. It therefore argues that *Kokesh* should not be addressed until the

next phase of the bifurcated summary judgment proceedings, if there is one.

Nonetheless, Plaintiff makes two arguments against dismissal of the claims arising out of

events which occurred over five years before the SEC filed its Complaint: first, the SEC also seeks

injunctive relief relating to those transactions, which does not carry the same statute of limitations;

and second, even if the SEC could not seek any relief related to Defendant's conduct that occurred

more than five years prior to the filing of this case, that conduct is still relevant to Defendant's

subsequent liability and any ultimate remedies.

The SEC does not dispute that the claims for disgorgement tied to the transactions which

occurred over five years before this case was filed are time-barred, however, it argues that

Defendants' argument—that all relief is barred because some of the SEC's claims are based on pre-

2010 conduct—ignores that the non-disgorgement relief the SEC seeks for these pre-2010

violations includes injunctive relief. (*See* Am. Compl. [Doc # 208] at 53-54.) In fact, Relief

Defendants appear to admit as much, noting that "[t]he only remedy potentially available to the

SEC for misconduct that accrued five years before this case was filed is injunctive relief that would

---

[16] Relief Defendants initially argue—as Defendant does—that *Kokesh* requires dismissal of "each claim relating to a transaction that occurred more than 5 years before the SEC filed claims." (RDs' Mot. for Summary Judgment at 4.) In their Opposition, however, they instead ask the Court to dismiss specific claims against Relief Defendants for equitable disgorgement. (RDs' Opp'n at 3.)

prohibit the Defendant from violating the securities laws." (RDs' Opp'n to Pl.'s Mot. for Summ. J. (citing *S.E.C. v. Collyard,* 861 F.3d 760, 764 (8th Cir. 2017) (injunction barring defendant from violating Securities Exchange Act § 15(a) permitted under *Kokesh* because a properly imposed injunction is designed to protect the public, not to punish, and thus is not a penalty subject to § 2462.)).)[17] Accordingly, the SEC argues that "it would be premature to dismiss any of [its] claims at this stage, since this court's decision whether injunctive relief is appropriate should follow its disposition of the summary judgment motions on liability." (SEC Opp'n at 6.)

The SEC also claims that even if discrete acts fall outside of a statutory time period, those acts are competent background evidence for analyzing timely misconduct. *See e.g., Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112-13 (2002) (quoting *United Airlines, Inc. v. Evans,* 431 U.S. 553, 558 (1977); *Chin v. Port Authority,* 685 F.3d 135, 150 (2d Cir. 2012) ("It is well established . . . that so long as at least 'one alleged [violation] . . . occurred within the applicable filing period[,] . . . evidence of an earlier alleged [violation] may constitute relevant background evidence in support of [that] timely claim.'" (quoting *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 176 (2d Cir. 2005))). Moreover, the SEC argues evidence of Defendant's older conduct—which involved

---

[17] Defendant, however, does not concede this point, and offers an out of circuit district court ruling as support for his argument that the injunction is also punitive. *See S.E.C. v. Gentile,* No. CV 16-1619 (JLL), 2017 WL 6371301 (D.N.J. Dec. 13, 2017). There, the court found that the "obey-the-law" injunction was punitive in nature as it would "stigmatize Defendant in the eyes of the public" where it "simply require[d] Defendant to obey the already established federal laws and regulations relating to securities." *Id.* at *4. It further found there would be no retributive effect from such an order. Additionally, it held that the injunction which would prohibit Defendant from being involved in any "penny stock" offerings would only serve to punish Defendant: "it would merely restrict Defendant's business structure and methodology, in perpetuity, simply because he was alleged to have violated securities laws when he purportedly was involved in the [fraudulent] schemes." *Id.*

SPA-54

similar fraudulent acts as the more recent conduct, including misrepresenting the purchase price of shares and fabricating invoices for purported expenses—tends to prove his motive, opportunity, and intent, for his conduct that is indisputably timely. *See* Fed. R. Evid. 404(b); *see also U.S. v. Vilar*, No. 05 Cr. 621, 2008 WL 4178117, at *2 (S.D.N.Y. Sept. 5, 2008) (noting the Second Circuit has adopted an "inclusionary" approach to Rule 404(b) evidence).

The Court agrees the evidence may be relevant, regardless of whether it forms the basis of an independent claim. The crux of the issue, however, is whether there is any relief which this Court may grant with respect to the pre-2010 conduct alleged in the Complaint. Because this stage of the proceedings deals with liability, and the question of whether injunctive relief is appropriate as it relates to the otherwise time-barred conduct deals with the remedy, this question must be left to be addressed in the next phase of the proceedings. The Court therefore will not dismiss any claims under *Kokesh* at this liability stage, however it earlier modified the Asset Freeze Order [Doc. # 113] to reflect this change in law. (*See* Order on Defendant's Motions for Modification of the Asset Freeze Order to Release Funds for his Legal Defense and for a Stay [Doc. # 829].)

### D. Defendant's Conduct Violated the Advisers Act, Securities Act, and Exchange Act

#### 1. *Fraud Under the Advisers Act*

The Advisers Act "'reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.'" *SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1376 (2d Cir. 1970) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

The SEC alleges violations of all four subsections of Section 206 and Rule 206(4)-8, although not with respect to each transaction.

SPA-55

### a.   Defendant is an Investment Adviser

Subject to certain exceptions not applicable to Defendant, Section 202(a)(11) of the Advisers Act defines "investment adviser" as follows:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C.A. § 80b-2(11). This is a "broad definition," *Financial Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007), and reaches persons who receive compensation for investing funds of their clients or who advise their "customers by exercising control over what purchases and sales are made with their clients' funds." *Abrahamson v. Fleschner*, 568 F.2d 862, 870-871 (2d Cir. 1977) (includes "persons who manage[] the funds of others for compensation.").

As a threshold matter, Defendant argues that he did not "advise anyone on the value of securities or . . . the advisability of investing in, purchasing, or selling any securities," instead claiming he was merely an "assistant" and "support staff." (Def.'s Opp. at 22-23 & n.36.) He further contends that he cannot be an "investment adviser" under the federal securities laws because he did not hold the requisite licenses and certifications and was not registered with any state or federal agency. (*See, e.g.*, Def.'s Mot. for Summ. J. at 44-47.) Lastly, he maintains that an investment adviser must be compensated in certain ways. None of his arguments are availing.[18]

_____

[18] Aside from the fact that Defendant's arguments have no merit, his unsubstantiated assertions cannot create a genuine dispute of material fact. *See Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir. 1994) (no genuine issue of fact where, although non-moving party "pointed to certain issues of fact in his memorandum of law," he "failed to provide evidentiary support for his contentions"). "A party asserting that a fact … [is] genuinely disputed must support the assertion by citing to particular parts of material in the record, including

31

SPA-56

The record indisputably shows that Defendant was not simply some "assistant," but played a central role in the transactions at issue. From 2004 through 2015 he recommended and advised that Oak Funds IX, XI, XII, and XIII purchase or sell securities, and then monitored and managed those investments. (SOF ¶ X-8.) Specifically, Defendant's responsibilities at Oak included identifying, analyzing, and recommending investment opportunities for the various Oak Funds at issue in this case, which were typically investments in the securities of various "portfolio companies." (*Id.* ¶¶ X-6, X-7.) Defendant was also responsible for negotiating the terms of the investments and managing the relationships with the companies in which the Oak Funds invested. (*Id.* ¶ X-6.) Indeed, Defendant signed many of the agreements for the transactions at issue on behalf of Oak.[19] (*See, e.g.*, SEC Ex. 127 at Oak-SEC-747; SEC Ex. 135 at Oak-SEC-26.) Contrary to Defendant's contention, the fact that he was not licensed, certified, or registered with any state or federal agency does not preclude him from being considered an investment adviser under the Adviser's Act, as the Act's definition of an adviser turns on conduct, not certification or registration. *See, e.g., U.S. v. Onsa*, 523 Fed. Appx. 63, 65 (2d Cir. 2013) ("[T]he Act defines

_____

depositions, documents, electronically stored information, affidavits or declarations, stipulations … , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

[19] Thus, Defendant's claim that "[t]here is not one piece of paper that Defendant signed or that Oak issued that made the Defendant responsible for any [securities purchase or sale recommendation] or powers to recommend the purchase or sale of any security to any of the Oak funds …." is demonstrably false. (*See* Def.'s Mot. for Summ. J. at 44.) Defendant's most recent employment agreement with Oak makes clear that one of his duties includes "recommending investment opportunities for one or more of the [Oak] Funds." (SOF ¶ X-7; *see also* SEC Ex. 7 (2014 Employment Agreement) § III(A) at OAK-RD-17513.) Indeed, even Defendant's 2004 employment agreement provided that he was eligible for a bonus plan designed for Oak employees whose employment responsibilities included the "identification of, recommendation of, monitoring of, eventual sale or distribution of stock from a portfolio company" (Ex. B (2004 Employment Agreement) to Oak's Opp'n to Def.'s Mot. for Sanctions [Doc. # 611-2] at B-1.)

investment adviser in a functional way, applying to 'any person' who engages in the specified conduct," and "the structure of the Act demonstrates that individuals need not register, or even be *required* to register, in order to be an 'investment adviser' within the meaning of the Act." (quoting 15 U.S.C. § 80b-2(a)(11))).

In addition, Defendant was clearly compensated for his work at Oak. (SOF ¶ X-9.) There is no requirement that an investment adviser be compensated in any particular way, and Defendant's citation to an SEC Investor Bulletin is unconvincing. (Def.'s Mot. for Summ. J. at 47 & *id.* at n.57.) Even if the bulletin were binding on this Court, it says only that individuals "might" pay a broad range of financial professionals in certain ways. *See* https://www.sec.gov/investor/alerts/ib_top_tips.pdf at 2. It does not purport to exhaustively list the ways investments advisers are compensated. Defendant's misappropriation of investor funds is sufficient, by itself, to meet the "compensation" element of the definition. *See U.S. v. Ogale*, 378 Fed. Appx. 959, 960-61 (11th Cir. 2010).

Because Defendant received compensation to advise the Oak Funds as to the value of securities and recommended that Oak Funds purchase and sell securities at all times relevant to the SEC's claims in this case, Defendant was an "investment adviser" under Section 202(a)(11). *See Abrahamson*, 568 F.2d at 870-871.

> **b.    Defendant Violated Sections 206(1), (2), (4), and Rule 206(4)-8**

Section 206(1) prohibits investment advisers from employing "any device, scheme or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Section 206(2) prohibits an investment advisor from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). Section 206(4) prohibits advisers from engaging in "any act, practice, or course of business which is

33

SPA-58

fraudulent, deceptive, or manipulative" as defined by rules promulgated by the SEC. For conduct after September 10, 2007, Rule 206(4)-8 prohibits advisers to "pooled investment vehicles" from engaging in fraudulent acts or making material misrepresentations to investors or prospective investors.[20] 17 C.F.R. § 275.206(4)-8.

### i. *Defendant's Fraud was Directed Towards Clients and Investors*

Defendant argues that certain of his misconduct related to Companies D, E, F, G, and H did not violate Sections 206(1) or 206(2) of the Advisers Act because he did not direct this fraud to any "clients." (Def.'s Mot. for Summ. J. at 40–41.) However, Defendant's clients were the various Oak Funds, and the record demonstrates without question that Defendant's fraud was directed towards these Funds.

With respect to Company D, Defendant fraudulently informed Company D that it was to pay $650,000 in a "management fee" to an Oak entity in exchange for removing a provision from the Oak Fund's investment agreement that would have required Company D to pay an annual dividend. (SOF ¶¶ D-1–D-2.) In other words, Defendant fraudulently bargained away a provision that would have benefitted his client in exchange for $650,000 that he misappropriated for himself. Similarly, with respect to Companies E, F, and G, Defendant fraudulently caused these companies to pay legal fees that his clients (the Oak funds) were entitled to receive to an account that he personally controlled, and then further misappropriated these funds for his personal use. (*Id.* ¶¶ E-5, E-8–E-10, F-1–F-8, H-1–H-6.) And with respect to Company G, Defendant fraudulently

---

[20] The SEC does not allege that Defendant violated Rule 206(4)-8 with respect to any conduct which occurred prior to September 2007, when the rule became operative. This includes all of the conduct associated with Companies D and E, the Company F June 2007 conduct, or the Company J conduct that occurred in April–June 2006.

induced his client – the Oak fund – to send money that it thought was paying to Company G for "delisting fees" to another account that he personally controlled, and again misappropriated these funds for his personal use. (*Id.* ¶¶ G-8–G-9.)

In each of these instances, Defendant either misappropriated a benefit his client was entitled to receive (Company D), intercepted funds his client was entitled to be paid (Companies E, F, and H), or caused his client to send him money it thought was destined for a portfolio company (Company G). Defendant's misconduct and resultant misappropriation of his clients' money plainly violated his "affirmative duty of utmost good faith, and full and fair disclosure" to his clients, therefore violating Sections 206(1) and (2) of the Advisers Act.

Defendant also argues that his conduct did not violate Advisers Act Section 206(4) and Rule 206(4)-8 because he did not direct any of his fraud to "investors." (Def.'s Mot. for Summ. J. at 42-43.) As discussed above, Rule 206(4)-8 provides that an investment adviser may not, among other things, "engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor . . ." 17 C.F.R. § 275.206(4)-8(a)(2). Misappropriating investor funds plainly violates this provision. *See, e.g., SEC v. Neman*, 2016 WL 6661174, at *6 (C.D. Cal. July 15, 2016) (violation of Rule 206(4)-8 where, "rather than pooling investor funds to purchase securities, [the adviser] pooled investor funds in his personal bank account"); *SEC v. Parrish*, 2012 WL 4378114, at *4–5 (D. Colo. Sept. 25, 2012) (violation of Rule 206(4)-8 where "Defendant pooled funds invested in his Ponzi scheme and transferred the comingled funds to brokerage accounts for trading").

This is precisely what occurred here. The money that the Oak Funds had—and that Defendant misappropriated—came from investors. (*See* SOF X-4.) Thus, even though Defendant

may not have interacted directly with the Oak Funds' investors in connection with his fraud, the result of his fraud was to misappropriate their money.

### ii.    Negligence or Scienter

Scienter is necessary to violate Section 206(1), but is not required to prove violations of Sections 206(2) or (4). *Compare S.E.C. v. Batterman*, No. 00 CIV. 4835 (LAP), 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (Noting that both the D.C and Eleventh Circuits "have held that Section 206(1) requires a finding of fraudulent intent"), *and S.E.C. v. Moran*, 922 F. Supp. 867, 895 (S.D.N.Y. 1996) (scienter is required under Section 206(1)), *with SEC v. Pimco Advisors Fund Mgmt.*, LLC, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004) ("Section 206(2) simply requires proof of negligence"), *and SEC v. Yorkville Advisors, LLC*, Case No. 12 Civ. 7728 (GBD), 2013 WL 3989054, at *3 (S.D.N.Y. Aug. 2, 2013) ("[T]he SEC must establish at least negligence to prove violations of Sections 206(2) and 206(4).").

The record contains ample evidence of Defendant's scienter, making a negligence determination unnecessary. Defendant opened bank accounts controlled solely by him, which he deceptively named such that they appeared to be related to Oak and its portfolio companies. He then instructed Oak and the Companies to wire funds into these accounts, after which he transferred the money into his personal accounts. He made representations that he was aware were false at the time he made them. Neither party contests Defendant's intent, and the Court finds this element is met with respect to each of the transactions in which the SEC alleges violation of Sections 206(1) and (2).

### iii.    Breach of Fiduciary Duties

Both Sections 206(1) and 206(2) impose a fiduciary duty on investment advisors that encompasses an affirmative obligation of good faith and a full and fair disclosure of all material

facts to their clients, as a well as an affirmative obligation to employ reasonable care to avoid

misleading their clients. *Capital Gains Research Bureau, Inc.*, 375 U.S. at 194-95. This fiduciary

duty requires advisors to act for the benefit of their clients, and precludes them from using their

clients' assets to benefit themselves. *SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996).

Defendants do not argue the SEC cannot meet its burden of establishing Defendant

breached his fiduciary duties, and for the same reasons discussed above regarding scienter, this

cannot be reasonably disputed.

c.      **Section 206(3)**

Section 206(3) makes it unlawful for an investment adviser,

> acting as the principal for his own account, knowingly to sell any security to or
> purchase any security from a client, or acting as broker for a person other than such
> client, knowingly to effect any sale or purchase of any security for the account of
> such client, without disclosing to such client in writing before the completion of
> such transaction the capacity in which he is acting and obtaining the consent of the
> client to such transaction.

15 US.C. § 80b-6(3). In other words, an investment advisor is prohibited from engaging in a

"principal transaction"—e.g., a transaction in which the adviser, acting for his own account, sells

securities to a client's account—without disclosing to the client the capacity in which the adviser

is acting and obtaining the client's consent. *See Interpretation of Section 206(3) of the Investment

Adviser's Act of 1940*, Rel. No. 1732, 1998 WL 400409, *1 (July 17, 1998); *see also In re Gintel Asset

Mgmt., Inc. et al.*, Advisers Act Rel. No. 2079, 2002 WL 31499839 (Nov. 8, 2002) (finding

respondent violated 206(3) by executing trades between a fund in which he owned a 1/3 interest

and advisory client accounts). "Unlike Section 206(1) and (2) of the Act, Section 206(3) can be

violated without a showing of fraud." *SEC v. Nadel*, 97 F. Supp. 3d 117, 127 (E.D.N.Y. 2015)

(internal quotation marks omitted).

SPA-62

The SEC only alleges Defendant violated Section 206(3) with respect to the Company C transactions. Because it is evident that Defendant did not disclose his interest in I-Cubed to Oak or Oak Fund XIII when Oak Fund XIII bought Company C shares directly from I-Cubed, Oak Fund XIII did not have the opportunity to—and in fact did not—give its consent to the transaction knowing that, in effect, Defendant was on the other side. (*See* SOF ¶ C-27.)

Defendant argues that SEC's claim under Section 206(3) of the Adviser's Act must fail because Defendant was not "'acting as a principal for his *own account*,'" but rather "traded securities belonging to a company owned by his wife." (Def.'s Memo at 27 (emphasis in original).) Defendant's argument is meritless. As an initial matter, Defendant provides no evidentiary support, or even argument, that his wife in fact controlled I-Cubed and owned the Company C shares. Therefore, there is no basis for the Court to revisit its previous ruling rejecting this very argument. Following the preliminary injunction hearing, the Court explained

> Despite Mr. Ahmed's nominal transfer of this interest in I-Cubed before the October 2014 sale, the evidence shows that he continued to control the company's bank account and flow of funds and Mrs. Ahmed's testimony at the hearing demonstrated that she played little, if any, role in the sale negotiations with Oak and did not learn of the sale until after it took place.

([Doc. # 113] at 8.)

The record establishes that Defendant formed I-Cubed, purchased the Company C shares in the name of I-Cubed, and, despite transferring the entity into the name of his wife, subsequently negotiated the sale of the Company C shares, going so far as to forge the signature of the purported I-Cubed representative on the stock purchase agreement. (*See* SOF ¶¶ C-17–25, C-28–29.) Indeed, it was Defendant who opened the Bank of America account just days before the sale of I-Cubed's Company C shares to the Oak fund, certifying on that account opening document that he was a

38

"member" of I-Cubed. (*Id.* ¶ C-20.) Ms. Ahmed was not even aware of this I-Cubed bank account

until her deposition. (*Id.*) Defendant also wrote checks for the proceeds of the I-Cubed Company

C shares from the Bank of America account to the Shalini Ahmed 2014 GRAT. (*Id.* ¶ C-21.)

Additionally, Ms. Ahmed admitted at the preliminary injunction hearing that while

owning the Company C shares on paper, she played no role in their sale and in fact did not even

learn of the sale until after it took place. (*See* Ruling and Order Granting Preliminary Injunction

at 8; SEC Ex. 11 (Preliminary Injunction Hearing Transcript) at 301:11–304:12, 308:19-23, 314:3-

315:5, 325:9- 326:3.) Indeed, even I-Cubed's Rule 30(b)(6) representative disclaimed knowledge of

this sale, and instead assumed Defendant negotiated this transaction. (SEC Ex. 162 (I-Cubed Depo.

Transcript) at 41:22-42:20.) Mr. Ahmed's nominal transfer of I-Cubed into the name of his wife

does not immunize him from liability under Section 206(3) of the Advisers Act. *See In re Asbell*,

Rel. No. IA-3933, 2014 WL 4726475, *2-*3 (Sept. 24, 2014) (finding violation of 206(3) where

investment adviser caused client to purchase securities "from [the investment adviser], members

of his family, and/or other advisory clients" and failed to provide required disclosures).

### 2.    *The Exchange Act and Securities Act*[21]

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit fraud by "any person" in

connection with the purchase or sale of securities. To establish a violation, the SEC must show that

Defendant (1) made a material misrepresentation or omission as to which he had a duty to speak,

or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

---

[21] The facts discussed herein also support the Court's conclusion that Defendant is liable under Section 206. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation.")..

securities. *Pentagon Capital Management PLC*, 725 F.3d at 285. In addition, the SEC also must establish that the transactions at issue were either listed on domestic exchanges, or that the purchase or sale occurred in the United States. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010).

A violation of Section 17(a)(1) of the Securities Act requires essentially the same elements as Section 10(b) of the Exchange Act but in connection with the *offer* or sale of securities. *Monarch Funding*, 192 F.3d at 308. Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts, and Section 17(a)(3) prohibits any transaction or course of business that operates as a fraud or deceit upon a securities buyer. 15 U.S.C. §§ 77q(a)(2) and (3). Only Section 17(a)(1) requires scienter; negligence is sufficient under Sections 17(a)(2) and 17(a)(3). *Monarch Funding*, 192 F.3d at 308.[22]

The SEC does not allege that Defendant violated Section 17(a) with respect to the Company F June 2007, Company G 2007 and 2009, or Company I conduct.

---

[22] Unlike private litigants, "[t]he SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act." *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002) (collecting cases); *see also SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 239, n.10 (4th Cir. 2009); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money."). Indeed, the Second Circuit has long recognized that the SEC need not prove loss causation because the "Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury." *Berko v. SEC*, 316 F.2d 137, 143 (2d Cir. 1963). It is "legally irrelevant" in an SEC action whether a defendant's conduct results in loss, *id.*, and therefore Defendant's argument that he "is entitled to summary judgment on his affirmative defense of no loss causation to any party regarding all claims pertaining to transactions associated with Company C," is meritless (Def.'s Memo at 13 (internal quotation marks omitted)).

### a.   Material Misrepresentations/use of a Fraudulent Device

The facts, articulated above, make clear that Defendant made numerous misrepresentations and used fraudulent devices to perpetuate his schemes. He provided the companies at issue with fraudulent wiring instructions, provided Oak Fund IX with fraudulent invoices and fraudulent wiring instructions, directed funds to his secret BOA OIP Advisors Account and his secret BOA Company D Account, and transferred the funds to his personal accounts. No party disputes the SEC has established this element of its claims.

### b.   Scienter

Scienter under Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act can be established by Defendant's reckless disregard for the truth, *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998), or by showing that Defendant "did not have a genuine belief that . . . information [he provided] was accurate and complete in all material respects" *SEC v. Young*, No. 09 Civ. 1634, 2011 WL 1376045, at *6 (E.D. Pa. Apr. 12, 2011). *See also SEC v. Rabinovich & Assocs., L.P.*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *3 (S.D.N.Y. Nov. 18, 2008).

For the same reasons discussed *supra* with respect to the Advisers Act, the SEC has met its burden on summary judgment of establishing Defendant acted with the requisite scienter with respect to each act of fraud.

### c.   In Connection With a Purchase or Sale of Securities

In *SEC v. Zandford*, the Supreme Court made clear that Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." 535 U.S. 813, 819 (2002) (citations and quotations omitted). Thus, "[w]hile the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," it is enough that the misconduct and the securities transaction "coincide." *Id.* at 820-

41

SPA-66

21. Courts have given broad reach to this "coincide" requirement, holding that the standard is met "where plaintiff's claims 'necessarily allege,' 'necessarily involve,' or 'rest on' the purchase or sale of securities." *Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (citation omitted).

The analysis "does not pivot on temporal limitations." *See id.* at 523 (misconduct that occurred eighteen months prior to securities transaction still "in connection with" the purchase or sale of securities; "We are persuaded that the time that lapsed is not determinative here because, as defendants argue, 'this was a string of events that were all intertwined.'"). Rather, the "in connection with" requirement is met when the misconduct "'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" *SEC v. Ramoil Management, Ltd.*, 2007 WL 3146943, *8 (S.D.N.Y. Oct. 25, 2007) (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)). Section 17(a)'s requirement that the misconduct occur in the "offer" or "sale" of securities is similarly expansive. *See, e.g., SEC v. Cole*, 2015 WL 5737275, at *7 (S.D.N.Y. Sept. 19, 2015) ("In addressing Section 17(a)'s requirements that fraud occur 'in' the 'offer' or 'sale' of securities, the Supreme Court has explained that 'Congress expressly intended to define [these statutory terms] broadly' and that these terms 'are expansive enough to encompass the entire selling process.'" (quoting *United States v. Naftalin*, 441 U.S. 768, 773, (1979))).

Defendants contend that a portion of Defendant's fraud with respect to Company D was not "in connection with" the purchase or sale of securities.[23] (RDs' Memo at 11-12, 22-23.) Relief

---

[23] For the Companies F, G, and H transactions, Defendant also claims that at least some of his conduct was not in connection with the purchase or sale of securities. (Def.'s Mot. for Summ. J. at 39.) The record does not support his argument. Defendant exploited provisions in the securities transaction agreements to induce Company F to pay him approximately $750,000 in legal fees that, per the transaction agreements, should have been paid to the relevant Oak Fund. (SOF ¶¶ F-1–F-8.) With respect to Company G, Defendant exploited a tender offer agreement in which Oak purchased Company G shares to induce an Oak fund to wire him $2.1 million in

SPA-67

Defendants maintain that aside from the fraudulent management fee included in the agreement, the three other frauds Defendant committed with respect to Company D are not sufficiently "in connection with" the securities transaction to subject them to Section 10(b) and Rule 10b-5.[24] These include: (1) the false representation in July 2006 that Oak Investment Partners IX, L.P. ("Oak IX") was required to pay $3 million to Company D to reimburse it for advisory services that an investment bank provided in connection with the sale of Company D shares; (2) the false representation in January 2007 that Oak IX was required to pay $6.6 million to reimburse Company D for capital gains taxes it paid in connection with the Company D transaction; and (3) the false representation in August 2007 that Oak IX was required to pay $800,528.81 to reimburse Company D for transaction fees owed to a foreign tax authority.

Relief Defendants first assert that these representations did not "relate[] to the nature or value of the securities that were transferred, nor did the purchaser rely on any of these alleged misrepresentations in choosing to purchase the securities," without citing any authority that these are relevant considerations. (RDs' Mot. for Summ. J. at 23.) They then contend that Defendant's misrepresentations occurred months, or even years, after the transaction, and thus the Court

---

purported fees (*id.* ¶¶ G-7–G-9), and later exploited the sale of the Oak Fund's sale of Company G shares to induce the Oak Fund to wire him $3.1 million and $1.56 million, respectively, for purported management incentive payments (*id.* ¶¶ G-10–G-14). Finally, at least a portion of the approximately $2.2 million in legal fees Defendant illicitly caused Company H to send him related directly to the Oak Fund's investments in Company H shares. (*Id.* ¶ H-3.)

[24] Defendant also argues the SEC cannot meet this requirement with respect to the $650,000 management fee. (Def.'s Mot. for Summ. J. at 38.) This fee was directly connected to the December 2004 transaction—Defendant told Company D that Oak was willing to remove a dividend provision from the terms of the deal to purchase Company D securities in exchange for a (fraudulent) one-time management fee. (SOF ¶¶ D-1–D-5.)

should find that the alleged fraudulent misrepresentations did not "coincide" with the securities transaction, as required by *Zandford*, and therefore cannot form the basis for a claim under the federal securities laws. (*Id.*)

Relief Defendants mistakenly claim that Defendant's representations were made eighteen months after the transaction (the $3 million advisory services reimbursement), two years after the transaction (the $6.6 million reimbursement for capital gains taxes), and nearly three years after the transaction (the $800,528.81 reimbursement for Korean tax). Their math reveals they assumed these representations were made in connection with the December 2004 transaction, which none were. Rather, the evidence establishes that just months after the May 2006 securities purchase agreement, in July, Defendant fraudulently obtained $1.8 million by exploiting a provision in the agreement related to advisory fees that the relevant Oak fund was required to pay pursuant to the securities transaction. (SOF ¶¶ D-6–D-12.) Defendant later fraudulently obtained an additional $6.6 million (in January 2007) and $800,000 (in August 2007) by claiming these monies were owed to tax authorities as a result of the May 2006 sale and January/March 2007 distribution of Company D shares. (*Id.* ¶¶ D-6, D13–D-18.)

Thus, it is apparent that all of Defendant's misrepresentations were "in connection" with the Company D securities transactions. And, this is equally true with respect to all of the transactions.

44

SPA-69

d.    **Territorial Requirements**

i.    *Morrison and Subsequent Case law*

In *Morrison*, the Supreme Court limited Section 10(b)[25] to fraud connected to domestic transactions, finding that it "reaches the use of a manipulative or deceptive device or contrivance only in connection with [1] the purchase or sale of a security on an American stock exchange, and [2] the purchase or sale of any other security in the United States." 561 U.S. at 273. There, three Australian plaintiffs brought suit in the United States against an Australian bank for losses they allegedly suffered on stock purchases traded on Australian exchanges. *Id.* at 251. It was what Justice Breyer termed in his concurrence a "foreign-cubed" action, in which "(1) foreign plaintiffs [were] suing (2) a foreign issuer in an American court for violations of American securities laws based on securities transactions in (3) foreign countries." *Id.* at 283 n.11.

In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Second Circuit elaborated on what it means for a purchase or sale of a security to occur "in the United States," as that phrase was used in *Morrison*. Under *Absolute Activist*, if a security is not traded on a United States exchange (as is the case here), the SEC must prove, as to each transaction at issue, any one of three things: (1) "that title to the shares was transferred within the United States"; (2) "that the purchaser incurred irrevocable liability within the United States to take and pay for a

---

[25] Courts have confirmed that the domesticity requirement of *Morrison* applies with equal force to Section 17(a) of the Securities Act of 1933. *See, e.g., SEC v. Tourre*, 2013 WL 2407172, at *4 (S.D.N.Y. June 4, 2013). However, *Morrison* does not apply to the SEC's claims under the Investment Advisers Act ("Advisers Act"). *See SEC v. Gruss*, 859 F. Supp. 2d 653, 662. 664-65 (S.D.N.Y. 2012) ("[T]he Exchange Act focuses upon purchases and sales of securities in the United States[,] whereas the [Advisers Act] focuses on the adviser." (internal quotation marks and citation omitted)); *see also Lay v. United States*, 623 F. App'x 790, 796 (6th Cir. 2015) ("[N]o court has extended Morrison's 'domestic' requirements to include the Investment Advisers Act.").

security," or (3) "that the seller incurred irrevocable liability within the United States to deliver a security." 677 F.3d at 68-69.

In making this determination the Court is directed to look at "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70. However, the Second Circuit noted that the location of the broker-dealer (except to the extent it "carries out tasks that irrevocably bind the parties to buy or sell securities"), the identity of the securities, the identity of the buyer or seller, and the residency or citizenship of the buyer or seller were no longer relevant to the determination of domesticity. *Id.* at 68-70; *see also In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017). The Second Circuit emphasized that "the time when the parties to the transaction are committed to one another . . . in the classic contractual sense, [where] there was a meeting of the minds of the parties . . . marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Absolute Activist* 677 F.3d at 67–68.[26]

The Second Circuit also noted with respect to the passing of title that "a 'sale' is ordinarily defined as '[t]he transfer of property or title for a price.'" Thus, a sale of securities can be understood to take place at the location in which title is transferred. *Id.* at 68 (internal citations omitted). In so finding, it relied upon the Eleventh Circuit's decision in *Quail Cruises Ship*

---

[26] In the modern era, securities transactions are not completed at one time and at one location. *Butler v. United States*, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014) ("The execution of contracts where two parties physically sit in different cities, states, countries, or continents and exchange a document electronically is now a standard way of doing business."). Thus, when locating a transaction that was completed in different locations, it is sufficient that either the purchaser or the seller is located within the United States at the time it incurs irrevocable liability. In *Butler*, for example, the fact that the defendant executed the transaction documents from his New York office was sufficient to establish a domestic transaction. *Id.* at 178.

SPA-71

*Management Limited v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310–11 (11th Cir. 2011), in which that court found that the alleged transfer of title to shares in the United States was sufficient to allege domesticity under *Morrison*. *Id.*

In *Quail Cruises*, the parties to a share purchase agreement signed the agreement in the parties' respective offices located in Spain and Uruguay. *Id.* at 1349. The agreement required notices, consents, and waivers or other communications pursuant to the agreement to be sent and delivered to the parties' respective offices in Spain and Uruguay, *id.*, but the agreement also required the stock transfer documents to be delivered to an office in Miami, and the plaintiff alleged that "[t]he transaction for the acquisition of the Templeton stock closed in Miami, Florida . . . by means of the parties submitting the stock transfer documents by express courier into this District." *Id.* at 1310. The Eleventh Circuit pointed to the plaintiff's allegation "that the closing *actually* occurred in the United States," and noted that the agreement at issue "confirms that it was not until this domestic closing that title to the shares was transferred," thus satisfying *Morrison*. *Id.* (emphasis in original).

Subsequent case law builds upon the foundation laid in *Absolute Activist*. In *Loginovskaya v. Batratchenko*, the Second Circuit distinguished between actions needed to carry out a transaction, and the transaction itself. 764 F.3d 266, 273-74 (2d Cir. 2014). There, the plaintiff resided in Russia, her investment was solicited in Russia, the investment materials were written in Russian and the investment contracts were negotiated and signed there. *Id.* at 274. The Second Circuit held that although the defendant company that negotiated these contracts was incorporated in New York and funds were wired to the company's New York bank account, this did not establish a basis for the application of the federal securities laws. *Id.* at 274-275. Rather, it held that the transfers were merely "actions needed to carry out the transactions, and not the

47

transactions themselves—which were previously entered into when the contracts were executed in Russia." *Id.* at 275. It thus confirmed that the direction to transfer money to the United States alone is insufficient to demonstrate a domestic transaction. *Id.* (citing *United States v. Vilar*, 729 F.3d 62, 77 (2d Cir. 2013)).[27]

In an unpublished decision, the Ninth Circuit classified transactions as domestic because "the actual sales [of the securities] closed in Nevada when [one defendant] received completed stock purchase agreements and payments." *SEC v. Levine*, 462 Fed. Appx. 717, 719 (9th Cir. 2011). The Third Circuit has determined that "territoriality under *Morrison* turns on 'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security.'" *United States v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015).

A Southern District of New York court found in *Arco Capital Corps. Ltd. v. Deutsche Bank AG* that:

> the date beyond which the Issuer no longer had the discretion to revoke acceptance was the Closing Date, when the purchaser was to transmit the funds to HSBC in New York. Thus, the irrevocable sale of the Notes occurred with the parties' performance on the Closing Date, when Gramercy delivered the funds to HSBC in New York and the Issuer assigned the interest to the Trust in New York.

949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013). The court noted that unlike cases where the only domestic activity were allegations that the investors wired money to a United States bank account, the Subscription Agreements at issue in *Arco* specified that "the delivery of funds to HSBC

---

[27] The Second Circuit in *Vilar* also found that irrevocable liability was incurred in the United States with respect to the transactions at issue based upon facts in the record "'concerning the formation of the contracts' and 'the exchange of money.'" *Id.* at 77 (quoting *Absolute Activist*, 677 F.3d at 70). Thus, although it made the point that under *Absolute Activist* the direction to wire funds to the United States alone does not render a transaction domestic, it also recognized the relevance of where the exchange of money took place.

48

automatically terminated or 'consummate[d]' the transaction because that act made the contract irrevocably binding." *Id.* at 543.

Another district court found on a summary judgment record that investors incurred irrevocable liability when they sent the completed, signed, subscription agreements from their foreign countries to the defendant, but that the seller did not incur irrevocable liability under the subscription agreements until the seller accepted the agreements and signed them, which occurred in the United States. *S.E.C. v. Yin Nan Michael Wang*, No. LACV1307553JAKSSX, 2015 WL 12656906, at *12 (C.D. Cal. Aug. 18, 2015). There, the plaintiff maintained that irrevocable liability was incurred when the subscription agreements were accepted by the defendant funds in their offices in the United States, while the defendant claimed that irrevocable liability attached when the foreign investors signed the agreements outside of the United States. *Id.* at 10. The agreements at issue specifically provided that the defendant funds could, at their sole discretion, choose to reject any subscription. *Id.* at 11. Accordingly, the court found that the sale of the securities did not close until the subscription agreements were accepted and signed by the seller in the United States and thus that the seller incurred irrevocable liability to sell the securities upon its acceptance of the executed agreements and the receipt of payment in the United States. *Id.*

Additionally, the court in *SEC v. Gernaio* found that although solicitation of the foreign Investors took place overseas, "the sales were not final until the Investors remitted payment to U.S.-based escrow agents and sent signed subscription agreements to the Issuers directly in the United States." No. CV 12-04257 DMG, 2013 WL 12146516, at *5 (C.D. Cal. Jan. 29, 2013). It therefore held that "the agreements became irrevocable when the Issuers countersigned them in the United States and escrow released the funds." *Id.* (citing *Absolute Activist*, 677 F.3d at 67-68)).

49

A recent district court addressed a situation in which the complaint alleged that the defendant offered and the plaintiff accepted an agreement to purchase shares in a Bahamian corporation at a series of meetings in New York. *See Adderley v. Dingman*, No. 15 CIV. 9935 (NRB), 2017 WL 1319819, at *7 (S.D.N.Y. Mar. 29, 2017). The plaintiff alleged he then wired the money for the shares from his New York bank account to the defendant. *Id.* However, the agreement also required that the Bahamian government approve the issuance of the shares and the plaintiff agreed that "[i]f approval was not forthcoming, [the defendant] was bound to return to . . . all funds paid by" the plaintiff. *Id.* at *8.

The district court found that the approval of the Bahamian government was a condition precedent to the plaintiff's "right and ability to take title to the shares allegedly promised by [the defendant] in exchange for [the plaintiff's] investment." *Id.* Thus, even assuming a contract had been formed between the parties, "the approval of the Bahamian authorities is best viewed as a condition that had to be satisfied before defendants became irrevocably bound to 'deliver' shares . . . to [the plaintiff], and before [the plaintiff] became irrevocably bound to 'take' or 'pay for' the same." *Id.* at *7 (quoting *Absolute Activist*, 677 F.3d at 68); *see also Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299 (2d Cir. 1956) (where stock purchaser was, under purchase agreement, to make best efforts to borrow purchase amount from bank, and where bank's obligation to make the loan was on condition that another company would guaranty it, "irrevocable liability to take and pay for" stock was not incurred, for purposes of Section 16(b) of Exchange Act, until guarantee was executed). The court therefore concluded that the parties could not become irrevocably bound "unless and until" the condition was satisfied and therefore that the complaint did not allege a domestic claim. *Id.* at *7-*9.

The *Adderley* court distinguished its facts from *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part sub nom. Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016).[28] *Id.* at \*9. In *Atlantica Holdings*, the plaintiff corporations were holders of notes issued by a bank, and they subsequently exchanged these notes for new notes issued by the bank as part of a restructuring. 2 F. Supp. 3d at 560. The form the plaintiffs "had to send" in order to purchase the new notes provided that the purchase was irrevocable except if the bank, "in its sole discretion, amends terminates or withdraws the Restructuring Plan . . . in a manner that is materially adverse to affected [holders of the former notes] . . . [then holders of the former notes] shall be permitted . . . to revoke" the agreement. *Id.* The court there concluded that the plaintiffs were bound upon submission because "as a practical matter," the plaintiffs' "liability was irrevocable *by them*." *Id.* at 561. In *Adderley*, the court noted that unlike in *Atlantica Holdings*, where the condition "was one that the bank had almost complete power to satisfy or frustrate unilaterally. . . . neither [the plaintiff] nor defendants appear to have had this level of control over the key condition—approval of the Bahamian regulators." *Adderley*, 2017 WL 1319819, at \*9.

### ii.   *The Intention of the Parties*

Relief Defendants argue that the law is clear that where, as is the case in the contracts at issue here, the parties agree in the contract on the location of the closing, the courts will treat the closing as having occurred at that place, thereby suggesting that where the closing actually occurred is irrelevant. (RDs' Mot. for Summary Judgment at 13.) The SEC distinguishes Relief Defendants'

---

[28] The Second Circuit did not address domesticity on this interlocutory appeal, which focused on a discreet unrelated issue.

SPA-76

cases and argues that although the intent of the parties may have been for the closing to "be deemed to have occurred at the offices of the Company," where irrevocable liability attached and title was *actually* delivered to Oak in the United States, the transaction is domestic. The SEC is correct.

Relief Defendants selectively cite *SEC v. Benger* as standing for the proposition that the question of where the buyer and seller respectively incurred irrevocable liability is "dictated by the terms of the Share Purchase Agreements, which oddly, the SEC ha[d] chosen not to examine." 2013 WL 593952, at *9 (N.D. Ill. Feb. 15, 2013). What Relief Defendants fail to include is that the *Benger* court then went on to observe that "[t]he evidence shows that in fact the sale was consummated in Brazil—where [the seller] became irrevocably bound—or, perhaps, in the investors' home countries where they received their stock certificates." *Id.* at *12.[29] In addition, although the SEC inexplicably fails to highlight it, there exists Second Circuit authority directly on point. *See United States v. Vilar*, 729 F.3d 62, 93 n.12 (2d Cir. 2013) ("When a securities transaction takes place in the United States, it is subject to regulation under Section 10(b), and when a securities transaction takes place abroad, it is not. The parties' intention to engage in foreign transactions is entirely irrelevant.").

---

[29] Neither of the other two cases Relief Defendants cite involve the question of domesticity in the securities context. In the first case, an employment agreement defined a "performance period" by reference to a closing, and the court defined the period by reference to the date "the parties intended to treat the [c]losing as occurring[.]" *Handmaker v. Certusbank, N.A.*, 2016 WL 5660341, at *12-13 (W.D. Ky. Sept. 28, 2016). As the SEC notes, the court did not hold the parties *actually* closed on the date they *intended* to close, but only that the "performance period" had been defined by the parties by reference to the *intended* date. *Id.* The second case, *Leviton Manufacturing Co., Inc. v. Reeve*, involved an instance where the only evidence of the closing location was in the written agreement and neither party disputed the location of the actual closing. 942 F. Supp. 2d 244, 261 (E.D.N.Y. 2013). Thus, it is difficult to see how either of these cases support Defendants' contention that "the law is clear" courts will treat the closing as having occurred in the location specified by the contract, even in the face of evidence that the closing actually occurred elsewhere.

### iii.   *The SEC's Evidence is Sufficient to Establish Domesticity*[30]

Defendants contend that the SEC cannot establish that the alleged frauds in connection

with Companies A, B, D, E, F, G, H and I[31] were "domestic" as set out in *Morrison* and therefore

claim that they are entitled to summary judgment on the SEC's claims relating to those

transactions.[32] The SEC maintains that the evidence demonstrates each transaction was domestic

because in each case Oak both incurred irrevocable liability in the United States and title was

actually delivered to, or sent from, Oak in the United States. As discussed above, under *Absolute*

*Activist* the SEC need only show that either of these events occurred in the United States in order

to establish domesticity.

---

[30] The SEC bears the burden to prove that each transaction was domestic within the meaning of *Morrison*, and to prove that the alleged fraud occurred in connection with a domestic securities transaction. Accordingly, in Defendants' Motions for Summary Judgment, they "need only demonstrate that there is an absence of evidence to support the claims of the nonmoving party" that bears the burden of proof. *SEC v. Wang*, 2015 WL 12656906 at *6 (C.D. Calif. Aug. 18, 2015); *see also SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365, 375 (S.D.N.Y. 2002) (where nonmoving party bears ultimate burden of proof, moving party's burden under Rule 56 "will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim"). The SEC must respond with "evidence on which the jury could reasonably find for" it on the issues in question. *See Gonzalez de Castilla*, 184 F. Supp. 2d at 376 (noting that the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

[31] Neither Relief Defendants nor Defendant challenge the domesticity of transactions relating to Companies C, or J. Relief Defendants do not challenge the domesticity of the Company H transaction, butDefendant does.

[32] The SEC argues that it need only meet the "conducts-or-effects test," codified in the Dodd-Frank Act, which it claims supplants *Morrison's* domesticity requirement for conduct after July 21, 2010, which was five years before the filing of this action. *See, e.g.,* SEC v. Traffic Monsoon, LLC, No. 2:16-CV00832-JNP, 2017 WL 1166333, at *10-12 (D. Utah Mar. 28, 2017). The Court need not address this argument because, as discussed *infra*, it finds that the SEC has met the more stringent *Morrison* test.

The SEC claims the Oak funds formed contracts, incurred closing obligations, and transferred or received money while in the United States, thereby rendering the transactions domestic. (Pl.'s Mot. for Summ. J. at 18.) The SEC supports its claim of domesticity primarily with the testimony of Oak's designated witness, Ms. Grace Ames, bolstered by the adverse inference against Defendant arising from his invocation of his Fifth Amendment rights, and several emails and letters specific to transactions A, B, and E. For their part, Defendants rely entirely on the language of the contracts to argue that the transactions occurred abroad, without offering any extrinsic evidence indicating where in actuality irrevocable liability attached and transfer of title took place.[33]

1. *Oak is a United States Company and Generally Acted from the United States*

While the residency of the buyer or seller is not controlling, it still provides some evidence of the location of that party when it acts. *See Absolute Activist*, 677 F.3d at 69 (recognizing that it "may be more likely for domestic transactions to involve parties residing in the United States"). Here, the Oak funds at issue—Oak Fund IX, XI, XII, and XIII—are all limited partnerships registered in Delaware (SOF ¶ X-19), and the offices of Oak's managing members responsible for approving investments during the relevant time period were all in the United States (Ames Depo. at 282:10-4). All Oak email addresses ended with @OakVC.Com and the Oak servers housing these email addresses are located in the United States. (*Id.* at 296:8-297:5.) In addition, the legal counsel Oak used to help negotiate the stock purchase and other agreements for the transactions at issue,

---

[33] Recognizing that it must determine the domesticity of each transaction individually, the Court finds, as discussed below, that taking the evidence in its totality, the SEC has shown the absence of a material disputed fact as to the domesticity of each transaction.

SPA-79

Finn Dixon & Herling, is also based in Connecticut.[34] (Ames Depo. at 290:5-291:22.) Although not sufficient on its own, the fact that Oak is a United States company which functioned out of United States offices during the relevant time period, lends some support for the SEC's claim that the transactions themselves also occurred domestically.

Moreover, Ms. Ames attested that when an Oak Fund was a purchaser, Oak transferred the purchase payment from its bank in the U.S, and the Oak representatives who directed the Oak Funds' bank to transfer money were similarly based out of the U.S. (*Id.* at 309:3-10.) When an Oak fund was a seller, Oak received the purchase payment in a bank account located in the United States. (*Id.* at 309:25-310:11.) Furthermore, she specifically testified that Oak did not have a practice of traveling outside the United States for the formation of, or to enter into, contracts for the purchase or sale of an investment, nor did it do so to exchange signatures or funds or to obtain share certificates. (Ames. Depo. at 331:3-333:22.) Rather, these actions all generally occurred from the Oak offices. (*Id.*) She also confirmed that Oak followed its general practices with respect to the transactions associated with Companies A through J.[35] (Ames Depo. at 334:16-338:21.)

---

[34] On occasion Oak utilized foreign counsel in connection transactions. (*See e.g.,* RD Ex. 17 at SEC-5137 (defining "Oak's UK Solicitors" as "Simmons & Simmons of CityPoint, . . . London").)

[35] Ms. Ames explained that when she testified at her deposition about the way something "would" happen she was "describing a general practice and not a specific recollection of what actually happened in each of these transactions." (Ames Depo. at 356:14-23.) Relief Defendants argue general practices testimony alone is insufficient for a party to carry its burden on a motion for summary judgment. *See, e.g., Dawson v. Litton Loan Svcg.,* LP, 2017 WL 695910, at *2 (10th Cir. Feb. 22, 2017) (testimony about loan servicing company's general practices, without personal knowledge of company's interaction with plaintiffs, insufficient to carry burden on summary judgment); *Moore v. Firstsource Advantage LLC,* 2011 WL 4345703, at *11 (W.D.N.Y. Sept. 15, 2011) (testimony about company's general practices with respect to obtaining client contact information insufficient to prove prior express consent to call particular telephone number). First, not all of Ms. Ames' testimony was stated in such terms. Second, as discussed below, the SEC offers

SPA-80

### 2. The Court Applies an Adverse Inference

Defendant asserted his Fifth Amendment privilege and declined to answer when the SEC asked him with respect to each Company where the respective investment, purchase, or sale, was "negotiated, approved, and transacted." (*See, e.g.*, SEC Ex. 2 (Def.'s Depo.) at 16:5-8, 22:4-6, 79:7-25.) As a result of Defendant's choice to remain silent on this point, the Court draws an adverse inference against Defendant, meaning that the Court infers that his response to the question would have affirmed the domesticity of the transactions. As discussed *supra*, this inference can be applied at the summary judgment phase, balanced against the other evidence in the record. *See, e.g.*, *LiButti I*, 107 F.3d at 124.

### 3. The Transfer of Title

The focus in *Absolute Activist* is on where title was transferred, i.e.where the buyer was located when it received title to the securities. 677 F.3d at 68. Black's Law Dictionary defines title as "[l]egal evidence of a person's ownership rights in property." TITLE, Black's Law Dictionary (10th ed. 2014). Subsequent cases (discussed *supra*) focus primarily on irrevocable liability and do not expand upon the *Absolute Activist* language, but the Second Circuit's reliance on the Eleventh Circuit's opinion in *Quail Cruises* is telling because there the Eleventh Circuit found that the complaint's allegations that share transfer documents[36] were delivered to the United States was

---

additional evidence of domesticity, and third, Ms. Ames specifically affirmed that Oak had followed its general practices with respect to these transactions.

[36] "Share transfer documents" might refer to forms in which the seller purports to transfer its interest to the Buyer (*see, e.g.* SEC Ex. 135 at SEC-47 (the Seller "for value received, does hereby transfer to Oak . . . the following shares . . . [,]")) stock/share certificates, or both. According to the SEC, "[s]tock certificates are title—the documents prove that Oak owns the shares it purchases. It does not matter whether Oak receives title on or after a closing date—the location of the transaction occurs at the place title is delivered regardless of when it is delivered." (Pl.'s Reply at

SPA-81

sufficient to allege title was transferred domestically. Accordingly, the point at which title is transferred is when it is delivered to the location of the buyer.[37]

The SEC maintains all of the transactions are domestic because either Oak wired funds from the United States to purchase securities, ownership of which it then received while located in the United States, or it received funds and sent title from within the United States when acting as the seller. Defendants urge the court to enforce the language in the parties' contracts, contending that in each transaction title was to be transferred at the closing, and these closings were intended to take place in foreign countries.[38]

---

9.) Given that title is evidence of ownership, an executed document which specifically expresses the buyer's ownership interest would constitute the transfer of title, even where the stock certificates are to be transferred at a later time. In either event, in this case this is a distinction without a difference, for as discussed below, the evidence supports finding that Oak received transfer instrument documents as well as the actual stock certificates in the US.

[37] The Court does not comment on whether and to what extent the location from which funds are transferred is relevant to the transfer of title, for in this case the funds were sent and received from the same location as title. However, it does find that where Oak was the seller and delivered title in the form of the transfer instruments and/or actual stock certificates to a foreign country, title was not transferred domestically. Title can be transferred only once, and the SEC cannot have it both ways—i.e, that when Oak was the buyer it was transferred in the United States upon delivery, but when it was the seller it was transferred when Oak sent it from the United States to a foreign country. Oak was the seller in only three of the contested transactions—the 2006 Company D transaction, the July 2007 Company F transaction, and the 2011 Company G transaction.

[38] In all but three of the agreements (the Company E transaction, the 2007 Company F transaction, and the 2007 Company G transaction) the contracts specifically provided that the parties could agree to close in another location. (*See e.g.*, RD's Ex. 9 § 2.2 at OAK-SEC-00001242 ("The closing of the sale and transfer of the Purchased Shares" was to take place at the offices of the South Korean operations of the U.S. entity named in the agreement in Seoul, Korea "or such other date and time as the parties may agree.").)

Ms. Ames stated that "in this electronic age . . . there's not a case where the Oaks all travel to . . . a location for a closing and people sit around the []table . . . that's just not how our business is done." (298:15-21.) She testified that Oak was "never in a room giving a check in one hand and receiving share certificates in the other hand" (*id.* at 327:20-328:2), nor was it ever in the same room as its counterparty when signatures were exchanged (*id.* at 319:14-25). Original stock certificates representing Oak's ownership in the respective Company would generally be physically mailed to Oak's counsel after the closing took place, and vice versa where Oak was the seller. (*Id.* at 322:13-324:3, 326:19-327:5.) Oak's project managers generally signed and received signed documents from Oak's offices. (*Id.* at 320:2-16.) Moreover, the evidence the SEC puts forth for both transactions A and B demonstrates that although the parties may have agreed in the contract that the closing would take place at a certain foreign location, they did not necessarily act in accordance with that language, undercutting Defendants' argument that title was transferred abroad at closing.

The Share Purchase Agreement involving Company A states that "[t]he closing hereunder, including payment for and delivery of the Shares, shall be deemed to have occurred at the offices of the Company, immediately following the execution of this Agreement, or at such other time and place as Seller and Purchaser may mutually agree . . . ." (Defs.' 56(a)1 Stmt. ¶ 7; RD Ex. 1, at OAK-SEC-00000742; SEC SOF A-7; SEC Ex. 127.) The offices of Company A are located in Shanghai, China. (*See* RD's Ex. 2 at OAK-SEC-00000715; Ames Depo. at 41:11–42:17.) The Agreement further required the Purchaser (an Oak fund) to "deliver [payment for the shares] on the Closing Date to Seller, by wire transfer of immediately available funds . . . ." (RD Ex. 1 §2(b) at OAK-SEC-00000742.) Relief Defendants acknowledge that Oak's designated witness testified that Oak's representatives were not present at Company A's offices at the time of the closing (Defs.' 56(a)1

58

Stmt. ¶ 9; Ex. 3, Ames Depo. 22:15–23:13), but argue that is not significant based upon their contention that the Court "must enforce the words of the parties establishing that the closing—and passing of title—took place in Shanghai, China." (RDs' Mot. for Summ. J. at 14.)

However, the SEC points to the email that Defendant, acting on behalf of Oak, sent the seller, requesting the seller "please send me scanned and signed signature pages as soon as you can. I leave for vacation tomorrow and hence getting these out to you before I leave." (SEC Ex. 124 at SEC-686.) The seller signed the deal documents with a purchase price of $1.5 million and delivered the signature pages and share transfer form to Defendant's Oak email address. (SOF A-5; SEC Exs. 125; 126.) The share transfer form stated that the seller "for value received, does hereby transfer to Oak Investment Partners XIII . . . the . . . Series A Preference Shares." (SEC Ex. 127 at SEC-749.) On behalf of Oak Fund XIII, Defendant signed a copy of the signature page for the Share Purchase Agreement that had already been signed by the seller. (Compare SEC Ex. 127 at OAKSEC-747, with SEC Ex. 125 at OAK-SEC-705.) Subsequently, Defendant sent an e-mail to the purchasers from his U.S.-based email address, saying that "[a]ll signed docs are in. Good to wire and close the purchase." (SEC Ex. 127.)

The Company B Agreement provides that "[c]ompletion shall take place at the offices of the Seller's solicitors (or any other location as agreed by the Seller and the Buyer) on the Completion Date." (RD LR 56 ¶ 11; Ex. 4, at OAK-SEC-00000477.) The Seller's "solicitors" are not identified in the agreement and Oak's designated witness was unable to testify as to the location of the offices of the Seller's solicitors, but other evidence indicates it is in Shanghai, China. (R. Defs.' 56(a)1 Stmt. ¶¶ 13-14; Ex. 3, Ames Depo. 63:3-66:24, 344:22-345:21; Ex. 5, at OAK-SEC-000000008.) According to the agreement, the seller was to provide a written instrument of transfer

SPA-84

and "the original share certificates" to Oak at the closing. (RD.'s Ex. 4 § 5.2 at OAK-SEC-00000477 and Schedule 2, Part 1 at OAK-SEC00000484.)

In contrast with this language, in an email exchange regarding the Company B transaction, Counsel for Oak explicitly stated that "[t]o be clear, the closing will not yet have occurred and requires the completion of the [O]ak wire. Oak can't wire until it is confirmed that the signing of the SPA has occurred." (SEC Ex. 135 at OAK-SEC-8.) The Seller emailed Oak's counsel the signed SPA and "Instrument of Transfer," to be held in escrow until Oak wired the funds, upon which the transaction closed. (*Id.* at OAK-SEC-8.)

The Court is not persuaded by Defendants' argument that it should enforce the language of the contracts, given that both the testimony of Ms. Ames and the emails concerning transactions A and B illustrate that the parties did not act in accordance with those terms. Defendants have therefore offered no evidence of where title was actually transferred.[39]

On the other hand, the emails offered by the SEC establish title was transferred in the United States in both transactions A and B, since in each instance the signed transfer instruments were electronically sent to Oak's United States registered email addresses as part of the closing, rather than at the locations for closing identified in each respective agreement. Additionally, these emails tend to support Ms. Ames' testimony that the parties were never exchanging documents, such as the share transfer forms and stock certificates, while in the same room, but instead Oak

---

[39] Defendant makes the additional argument that the transfer of title took place outside the United States because in accordance with each respective countries' securities laws, title was maintained in book entries in a depository located inside the country. (Def.'s Mot. for Summ. J. at 6-11.) He offers no evidence supporting this argument and therefore the Court affords it no weight.

received these documents in the United States.[40] Thus, where Oak was the purchaser, there is no genuine dispute of fact on this record that it obtained title to the respective securities in the United States, and accordingly no rational jury could find these transactions were entirely foreign.[41]

### 4.  Irrevocable Liability

With respect to irrevocable liability, there are several points at which parties might be bound, and the parties may become bound at two separate times and locations. *See Butler*, 992 F. Supp. 2d at 178. On this record, the Court cannot determine the exact point at which irrevocable liability attached for each respective transaction. Nonetheless, for each potential point at which the parties may have been irrevocably bound, the evidence demonstrates that at least one party (Oak) was acting from the United States, and therefore all of the transactions are domestic under *Morrison*.

### a.  Contract Formation

The first opportunity at which the parties could have incurred an irrevocable obligation to perform was the point at which they formed the agreements—where there was a meeting of the minds. *See Absolute Activist*, 677 F.3d at 68.

---

[40] Extrinsic evidence associated with the Companies B and E transactions establish that original stock certificates were to be mailed to Oak's counsel in the United States following the respective closings. (*See* SEC Ex. 135 at OAK-SEC-7 (Oak's attorney requested in an email that the Seller "kindly mail the original stock certificate to [his] attention as follows," listing Finn, Dixon, & Herling's Stamford, Connecticut address.); RD's Ex. 14 at SEC-1321 (Counsel for Oak indicates in a letter addressed to Defendant's Connecticut address at Oak that "Company [E] counsel" informed him that it would deliver the original stock certificates to Defendant "shortly.").)

[41] By contrast, when Oak was *seller* title passed abroad However, as discussed below, because Oak incurred irrevocable liability to sell the respective shares while located in the United States, the remaining three transactions are also domestic under *Morrison*.

61

SPA-86

According to Oak's designated witness, Oak's partners evaluated and discussed investments at weekly partner meetings held in Oak's United States offices and it was often at these meeting that individuals would both seek and gain approval of investments.[42] (Ames. Depo. at 283:14-285:9.) Ms. Ames confirmed that Oak did not have a practice of traveling outside the US to form contracts for the purchase or sale of investments. (*Id.* at 330:20-331:2.) She further testified that the Oak project manager and Oak's counsel (Finn Dixon & Herling), both based out of the United States, generally worked together to negotiate agreements on behalf of Oak with respect to the purchase, sale or disposition of investments—i.e. to form the contracts. (*Id.* at 291:3-22.) Defendants offer no evidence of where the contracts were formed.

**b.  *Conditions Precedent***

Subsequently, irrevocable liability might be incurred upon completion of the final closing condition, thereby obligating the parties to close the transaction. The SEC argues that "the Oak funds had no obligation to close until they received (as a buyer) or sent (as a seller) the required notice" indicating that necessary closing conditions had been satisfied, which were sent from and received in Connecticut. (Pl.'s Mot. for Summ. J. at 17.) It concludes that "incurring the obligation to close a transaction while located in the United States . . . is sufficient to locate the transactions in the United States under *Absolute Activist* and *Morrison*." (*Id.*) Relief Defendants, for their part, contend that "the SEC must present evidence that the last condition precedent that was satisfied

---

[42] Although rare, approvals were sometimes made at meetings other than the weekly partners meetings, and these discussions took place by telephone from wherever the partners were located at that time. (Ames Depo. at 285:5-23.)

SPA-87

for each transaction occurred in the United States," which they maintain it cannot do. (RDs' Opp'n at 10.)[43]

Relief Defendants' basic contention is that in each of the agreements there were multiple conditions which had to occur before the closing could take place, some of which would have had to occur outside of the United States, and because the SEC has not presented the Court with evidence as to which of the conditions occurred last, it cannot establish each transaction is domestic. For instance, they argue that conditions requiring certain documents and certificates be delivered to investors or the buyer at the closing indicates these conditions were satisfied in the foreign location designated as the closing location in the respective agreements.[44] Relief Defendants also point to conditions in the July Company F agreement requiring that in order for the closing to proceed the buyer was required to have a certain resolution filed and registered by the Target's Register of Parma, Italy. (Defs.' 56(a)1 Stmt. ¶ 64; Ex. 18 § 11.1 at OAK-SEC-00005336-37.)

The Court affords Relief Defendants' first argument little weight, given that as discussed above, Ms. Ames's testimony that closings never occurred with the parties in the same room, and the email exchanges illustrating both the closings for Companies A and B occurred remotely with Oak acting from its United States based email accounts, undermine the language in the contracts

---

[43] Defendant makes an identical argument. (Def.'s Mot. for Summ. J. at 6-11.)

[44] Relief Defendants make this argument with respect to the Companies E, G (2006), and I transactions. (*See* RD's Ex. 14 § 1.11(v) at OAK-SEC-00001335 (requiring that "[a]n officer of the Company . . . deliver to the Series-B Investors at the Closing [in Lugano, Switzerland] a certificate" regarding certain specified matters); (RDs' Ex. 19 §§ 5.4-5.5 at OAK-SEC-1163-64 (the Company "shall deliver to the Investors at the Closing" certain certificates); RD's Ex. 22 at OAK-SEC-00006422 ("At Completion [in London, England] the Sellers shall deliver to the Purchaser" certain documents described in Schedule 2 of the agreement).)

**SPA-88**

providing that closing was to occur in these foreign locations. With respect to Relief Defendants' second argument, there are several flaws.

First, there is no support in existing case law for the proposition that irrevocable liability attaches abroad for a party located in the United States simply because the last condition precedent was completed in a foreign country. Relief Defendants rely upon *Adderley*, discussed *supra*, but there the court merely held that the formation of an agreement to purchase securities did not create irrevocable liability because a necessary condition was never satisfied. No. 15 CIV. 9935 (NRB), 2017 WL 1319819, at *7-8 (S.D.N.Y. Mar. 29, 2017) ("[I]rrevocable liability for purposes of Section 10(b) was not incurred."). The condition required the approval of the Bahamian authorities, but nothing in *Adderley* suggests that the buyer (located in New York) would have incurred irrevocable liability inside of a Bahamian clerk's office without the buyer's knowledge if the deal had received government approval.

Second, and relatedly, the agreements almost uniformly contained a final condition requiring delivery of notice to Oak, and/or that Oak send notice to its counterparty, confirming that all other conditions to closing had been satisfied or waived. (*See, e.g.*, RDs' Ex. 14 § 1.10 at SEC-1334-35 (the investors, including Oak "shall confirm to the Company that the conditions to Closing set forth in Section 1.11 below … have been met or have been waived…."); RD's Ex. 18 §§ 5.1.2 and 5.1.3 at SEC-5296 (requiring both that the Buyer send written evidence of the satisfaction of the conditions precedent referred to in Clause 11 to the Seller and that "[t]he Sellers . . . give to Buyer . . . written evidence of the satisfaction of the conditions precedent . . .").[45] Ms. Ames stated

---

[45] The SEC urges that even if the agreement did not specifically provide the condition that the parties notify their counterparties of completion of all other conditions precedent, a party cannot "incur the obligation to consummate a transaction without even knowing it did so."  (Pl.'s

that the Oak representatives (counsel and project managers) would be notified the closing conditions had been met while located in their Connecticut offices either by email or telephonically. (Ames Depo. at 294:23-296:7; 299:21-300:3.)

Absent any evidence or language in the contracts tying the completion of the final condition precedent to the point at which the parties became bound, the Court cannot determine on this record if this was in fact the point at which the parties were irrevocably obligated to perform. Although it is true that the transactions could not close absent completion of all conditions precedent, nothing in the contracts suggest that was also sufficient to commit the parties to perform. That being said, if indeed this is the point at which irrevocable liability attached, the record demonstrates that in each case Oak sent and received notice that closing conditions had been satisfied while located in the United States, and Defendants again offer nothing outside of the language of the contracts themselves, which is unavailing at the summary judgment stage.

### c.  Execution of the Agreement

Finally, the parties might not become irrevocably bound until they sign the agreement and obligate themselves to either deliver the securities or wire the funds to purchase the securities. *See, e.g., Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) ("Irrevocable liability was incurred when the Merger Agreement was executed….[t]he binding obligation to effectuate the merger and the exchange for … securities occurred" on that date);

---

Opp'n at 9.) Based on the record and facts in this case, the Court agrees. For instance, the Company A agreement provides as a condition to closing that the Seller and Purchaser, respectively, "shall have performed all obligations and conditions herein required to be performed or observed by it on or prior to the Closing Date." (RDs' Ex. 1 §§ 5(a)(iii), 5(b)(iii).) It does not specifically require the parties to notify one another once they have completed all of their obligations, however, absent such notification, a party would have no way of knowing when this occurred.

SPA-90

*Wang*, 2015 WL 12656906, at *12 (investors incurred irrevocable liability abroad when they sent the agreements from their foreign countries, but defendant did not incur irrevocable liability until he accepted the agreements and signed them while located in the United States); *Arco Capital*, 949 F. Supp. 2d at 542-43 (language in the contract indicated that the parties became irrevocably bound to execute the securities sale upon payment of the purchase price).

Ms. Ames stated that, depending on the agreements' terms, signatures would be held in escrow until closing and then at closing those would be released "insofar as, you know . . . Oak has the obligation now to fulfill whatever it had committed to in the document and to proceed with the security transaction." (Ames Depo. at 302:3-18.) She further testified that counterparties' signatures would be sent to Oak offices so the respective project manager could sign the document (*id.* at 320:2-16) and that Oak project managers signed written agreements while located at the Oak offices in the United States (*id* at 292:12-292:4).[46]

*Conclusion*

Defendants' objection that Ms. Ames' testimony is "general practices" evidence that cannot alone satisfy the SEC's burden is unpersuasive here, where Ms. Ames not only testified that Oak followed its general practices with respect to the transactions associated with Companies A through J (Ames Depo. at 334:16-338:21), but also buttresses this evidence with the adverse inference against Defendant, as well as the evidence relating to the Companies A and B transactions, which support Ms. Ames' testimony. In contrast, Defendants proffer only the

---

[46] Relief Defendants assert that Ms. Ames had not reviewed the calendars for any of the Oak partners aside from Mr. Ahmed to confirm whether they were in the United States for the relevant transactions. (*See* Deitch Decl. [Doc. # 660] ¶¶ 2-6.) Even so, Mr. Ahmed signed on behalf of Oak for more than half of the transactions, and Relief Defendants provide no rebuttal evidence to Ms. Ames's testimony that Oak's project managers signed agreements from the Oak offices.

language of the contracts, without identifying a single piece of extrinsic evidence indicating that any of these transactions actually occurred abroad, or even addressing the SEC's evidence establishing that the language of the contracts was ignored. As the Court has noted already, Defendants' reliance on the language of the contracts is insufficient. The mere fact that the parties may have intended for their conduct to occur outside of the United States carries no significance, for the question is not where the parties desired the transaction to take place, but where in fact it did take place. *See Vilar*, 729 F.3d at 93 n.12.[47]

In sum, in all but three of the disputed transactions, Oak was the buyer, and the SEC proffered evidence that title was delivered either electronically to its United States email accounts, or physically to its offices located in the United States. Moreover, in all of the transactions, the SEC established that Oak incurred irrevocable liability in the United States, as the unrebutted testimony of Oak's designated witness was that Oak acted from the United States at all potentially relevant stages of the transaction.[48]

---

[47] Relief Defendants argue it is significant that the SEC did not present any travel records or other documents which would establish conduct took place in the United States or did not take place in a foreign jurisdiction. (RDs' Opp'n at 12.) However, the SEC is not required to make its showing using any particular types of evidence, so long as it has demonstrated an absence of a material dispute of fact. Moreover, Relief Defendants similarly have not offered any such evidence– and given the extent of discovery in this case, they had every opportunity to uncover documents establishing that the transactions occurred outside of the United States. That they presented no such evidence only confirms the Court's conclusion that the transactions took place in the United States consistent with the testimony of Oak's designated witness.

[48] Relief Defendants argue that the Company D transactions are impermissibly foreign under *Parkcentral Global Hub Ltd. V. Porshe Auto Holdings SE*, 763 F.3d 198 (2d Cir. 2014). They contend that the transaction was a purchase and sale of shares in a Korean company from a Dutch company and that to the extent that particular Oak funds were involved, they participated through foreign-based entities in which the Oak funds had investment interests.

67

SPA-92

## IV. Conclusion

For the foregoing reasons, the SEC's Motion for Summary Judgment on Liability is GRANTED. Defendant and Relief Defendants' Motions for Summary Judgment on Liability are DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March 2017.

---

In *Parkcentral* the transaction in question involved "securities-based swap agreements" relating to the stock of Volkswagen AG, a German corporation whose stock was traded on foreign exchanges. *Id.* at 201. There was no question that the swap agreements were concluded domestically, but the Court found that the domination of foreign elements in the transaction made it impermissibly extraterritorial. *Id.* at 216. In doing so, the Second Circuit noted that Morrison held that the existence of a domestic transaction was a necessary predicate to application of the securities laws, but that the *Morrison* court never said that the existence of a domestic transaction would necessarily be sufficient to warrant the application of those laws. *Id.* at 215. The Second Circuit further found that a predominantly foreign transaction poses the risk of conflict with foreign securities laws, and that fact places it outside the scope of domestic securities laws. *Id.* at 216-18. The court in *Parkcentral* explained at length that its holding should have limited application in future cases because of the unique nature of the transaction and claims at issue in the case, and warned that a transaction is not impermissibly foreign because it contains some foreign elements. *Id.* at 216. Here, a United States entity purchased the actual securities not traded on an exchange for the benefit of United States investors and with the intent to hold title to the actual securities in the United States, and Defendant, working from the United States, had direct involvement in the transactions. The fact that Oak engaged foreign service providers to facilitate the deal does not render the transaction impermissibly foreign.

SPA-93

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br> *Plaintiff*, <br> *v.* <br> IFTIKAR AHMED, <br> *Defendant*, and <br><br> IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, <br><br> *Relief Defendants*. | Civil No. 3:15cv675 (JBA) <br><br> September 6, 2018 |

**RULING ON PLAINTIFF'S MOTION FOR REMEDIES AND JUDGMENT**

This Court found [Doc. # 835] on summary judgment that Defendant Iftikar Ahmed was liable for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 206 of the Investment Advisers Act ("Advisers Act"). *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 636– 37 (D. Conn. 2018) (hereinafter "*Ahmed II*"). Plaintiff, the United States Securities and Exchange Commission ("SEC") now moves [Doc. # 886] for Remedies and Judgment against Defendant, seeking: (1) a permanent injunction; (2) disgorgement of Defendant's fraudulent proceeds in the

SPA-94

amount of $43,920,639; (3) disgorgement of prejudgment interest on those proceeds in the amount of $1,520,953 along with interest earned on all frozen assets during the pendency of freeze; (4) civil penalties in the amount of $43,920,639; (5) an Order specifically finding that the assets listed on the Asset Schedule (Ex. 1 [Doc. # 888-1] to Pl.'s Mem. Supp. Mot. for Judgment) belong to Defendant and can be used to satisfy a judgment against him; (6) the appointment of a receiver; (7) the establishment of a Fair Fund; and (8) any other relief that the Court may deem appropriate. (Pl.'s Mem. Supp. Mot. for Judgment [Doc. # 888] at 2.)

For the following reasons, the Court grants the SEC's Motion, with modification.

## I.  Background

The Court assumes the parties' familiarity with the facts and procedural history of this case. A detailed discussion of the facts underlying Defendant's violations can be found in the Court's Ruling granting summary judgment on the issue of Defendant's liability. *See Ahmed II*, 308 F. Supp. 3d 628. A brief summary of relevant facts and findings relating to Relief Defendants' claims of ownership over assets listed in the Asset Schedule follows.

In opposition to the SEC's request for a preliminary injunction freezing assets, Relief Defendant Shalini Ahmed and her children made a claim to only three assets: (1) $7.5 million in proceeds from the Company C transaction that was held by I-Cubed and placed into the 2014 Grantor Retained Annuity Trust (the "GRAT"); (2) income earned from a Park Avenue condominium held in the name of DIYA that was purchased for approximately $9.5 million ("Unit 12A"); and (3) any income earned from a second Park Avenue condominium held in the name of DIYA Real that was purchased for approximately $8.7 million ("Unit 12F"). (*See, e.g.,* [Docs. ## 69, 96].) The Court rejected Ms. Ahmed's request, finding that she was a nominal owner for each requested asset and thus her ownership claims were not credible. *See SEC v. Ahmed*, 123 F.

2

SPA-95

Supp. 3d 301, 313 (D. Conn. 2015) (hereinafter "*Ahmed I*"), *aff'd sub nom. Sec. & Exch. Comm'n v. I-Cubed Domains, LLC*, 664 F. App'x 53 (2d Cir. 2016). However, the Court agreed to "entertain any application to release assets identifiable as [Ms. Ahmed's], and not tainted." *Sec. & Exch. Comm'n v. I-Cubed Domains, LLC*, 664 F. App'x 53, 57 (2d Cir. 2016) (internal quotations omitted)

Relief Defendants chose to take an interlocutory appeal of the Asset Freeze Order, arguing, *inter alia*, that the asset freeze was overbroad as to assets in Ms. Ahmed's name that the Court had not individually analyzed. *See I-Cubed Domains, LLC*, 664 F. App'x at 55. The Second Circuit deemed the argument "meritless" and instructed that, even with assets held in their name, Relief Defendants needed to first "identify any improperly frozen assets" and apply for their release before the SEC would be "required to carry its burden of demonstrating that any such identified assets are either ill-gotten gains to which Relief Defendants do not have a legitimate claim or that Iftikar in fact owns the assets in question." *Id.* at 57 (citing *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011)). "If Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *Id.* at 57 n.3. Relief Defendants subsequently hired an expert "to counter the Commission's argument that the Relief Defendants are mere nominees." ([Doc. # 340] at 7.)

Since the Second Circuit's ruling, Ms. Ahmed has identified only two allegedly improperly frozen assets: 1) $250,000.00 in rental proceeds from Unit 12A that was previously placed in Fidelity x7540; and (2) nine 1-kilogram gold bars discovered in jointly-owned safety deposit boxes. (*See* [Doc. # 442].) The Court rejected these requests, finding that neither asset belonged to her: "Ms. Ahmed is not entitled to proceeds of Unit 12A because she was only a nominal owner of the condominium" and "[e]ven Relief Defendants' Motion does not contain an explicit allegation of Ms. Ahmed's ownership of the Gold Bars, and the SEC has pointed to testimony which

3

demonstrates that Ms. Ahmed had no knowledge of the existence of the bars." ([Doc. # 658] at 3-5.)

Following the Court's Summary Judgment Ruling on Liability, Relief Defendants were ordered to—and agreed to— "provide a list identifying all assets they claim belong to them, and the reasons why they claim such ownership." ([Doc. # 842] at 3.) On April 27, 2018, Relief Defendants filed the required list. (*See* Relief Defendant's Asset List [Doc. # 862]). Despite having made claims to only five frozen assets during the preceding three years of litigation (all of which were rejected), Ms. Ahmed and her young children now claim to own more than $85 million in frozen assets. *Id.* Neither Relief Defendants' Asset List, nor any other submissions to the Court, explain how Relief Defendants controlled the assets or how they were acquired. Nor do they provide any argument that goods or services were provided in exchange for the assets, or any expert analysis demonstrating the SEC's nominee allegations are inaccurate.

## II. Discussion

### A. Plaintiff's Motion is Procedurally Sound

Defendants fault the SEC for filing a Motion for Judgment instead of a motion for summary judgment on damages.[1] The SEC responds that summary judgment is not appropriate given that it is not seeking damages, but rather is requesting that the Court enter judgment against Defendant awarding certain equitable remedies, which cannot be decided at a trial. *See, e.g., Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005). Relief Defendants cry foul, claiming entitlement

---

[1] The Court's April 5, 2018 endorsement order [Doc. # 842], following a discussion on the record with all parties, specifically ordered that the SEC file a Motion for Judgment.

to a jury on the question of whether specific assets belong to them, or are in fact owned by Mr. Ahmed.

Relief Defendants provide no convincing authority supporting their position that ownership of the assets in this context is a question of fact that must be determined by a jury. They attempt to characterize the SEC's theory of recovery against Relief Defendants as one of fraudulent conveyance, a question of common law rather than equity, in order to show entitlement to a jury trial. However, their sole cited case involves a private lawsuit in which the government intervened to enforce tax liens against two defendants by proceeding against a third defendant under the theory that it was a nominee for the first two. *See Iantosca v. Benistar Admin. Svcs., Inc*, 843 F. Supp. 2d 148, 153-54 (D. Mass. 2012). The court reasoned that "suits seeking . . . to compel the defendant to pay a sum of money to the plaintiff are suits for money damages . . . [a]nd money damages are, of course, the classic form of legal relief," therefore finding that the defendants were entitled to a jury trial with respect to the government's nominee claim. *Id.* at 153.

*Iantosca*, which unlike here was a private lawsuit, is not persuasive in light of the overwhelming case law cited by the SEC in which district courts have used their equitable power in the context of securities enforcement actions to order the turnover of assets nominally held by third parties. *See SEC v. Soflpoint, Inc.*, No. 95- CV-2951, 2012 WL 1681167 at* 3 (S.D.N.Y. May 9, 2012) (where the defendant could use corporation's money at will and "attributed the assets to [the corporation] in order to retain their use while fraudulently protecting them from creditors[,]" the court found that the corporation's assets belonged to the defendant); *SEC v. Zubkis*, No. 97 Civ. 8086 (JGK), 2005 WL 1560489 at *4 (S.D.N.Y. June 30, 2005) ("The Court may use [its] broad equitable power to order the turnover of assets nominally held by third parties where the third party lacks a legitimate claim to the assets."); *SEC v. Martino*, 255 F. Supp. 2d 268, 288 (S.D.N.Y.

5

2003) (ordering the sale of a yacht placed in the name of a relief defendant but paid for by the

defendant because "the disgorgement of unjustly retained wealth is a long-standing remed[y] that

[is] within a court's equity powers" and this inherent equitable power "certainly extends to a person

who, although not accused of wrongdoing, received ill-gotten funds and does not have a legitimate

claim to those funds" (internal quotation marks and citations omitted)).[2, 3]

## B. Remedies

### 1. Permanent Injunction

Section 21(d)(l) of the Exchange Act, Section 20(b) of the Securities Act, and Section 209(d)

of the Advisers Act allow the Commission to obtain permanent injunctive relief upon a showing

---

[2] Several Circuits have similarly found that district courts have broad equitable powers which include the ability to determine ownership of assets. *See SEC v. Coello*, 139 F.3d 674, 676 (9th Cir. 1998) ("[A]mple authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong."); *SEC v. Cherif*, 933 F.2d 403, 414 n. 11 (7th Cir. 1991) ("A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them. Courts have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities laws violations.").

[3] Accordingly, Defendant's Motion [Doc. # 884] for Summary Judgment on Damages is denied because the SEC is not seeking damages, but only equitable remedies, and therefore there are no issues which remain for a jury. In his Motion, Defendant makes many of the same arguments he makes in his Opposition [Doc. # 902] to the SEC's Motion for Remedies and Judgment, including that after *Kokesh* the SEC is not authorized to seek disgorgement, that Defendant obtained no ill-gotten gains with regard to the two Company C transactions, that Oak already holds assets belonging to Defendant that must be accounted for, and that no civil penalty or injunction should be imposed. His Motion for Summary Judgment also argues the right to a jury trial to decide the amount of disgorgement. (Def.'s Mot. for Summ. J. at 11-12.) The Court incorporates Defendant's Motion for Summary Judgment into his Opposition to the SEC's Motion for Judgment and thus considers those arguments made in support of summary judgment as part of Defendant's rebuttal to the SEC's Motion.

that the defendant has violated the securities laws and there is a reasonable likelihood that the defendant will violate the securities laws in the future. *See SEC v. Commonwealth Chemical Secs., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (injunction should be granted if the defendant's past conduct indicates "a reasonable likelihood of further violation in the future"); *see also S.E.C. v. Rabinovich & Assocs., LP*, No. 07-cv-10547(GEL), 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008). In evaluating that likelihood, a court may consider such factors as the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the recurrent or isolated nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; and the likelihood, given defendant's occupation, that future violations may occur. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976).

Defendant claims that "[g]iven the very public nature of this case, which has already been widely reported both by the print, television and online media, it is implausible that Defendant will be employed in the securities industry ever again." He further "disavows any interest in ever returning to the securities industry[,]" and complains that an injunction would only serve to stigmatize his current educational, charitable, and non-profit activities. (Def.'s Opp'n at 40.) Despite these noble proclamations, the above factors weigh in favor of issuing an injunction here.

Defendant's violation was not an isolated incident, rather he continuously violated the securities laws for nearly a decade while employed at Oak. Moreover, Defendant committed these violations with the highest degree of scienter—"Defendant opened bank accounts he alone controlled that were deceptively titled in the name of Oak and its portfolio companies, which he then used to divert monies intended for Oak funds or its portfolio companies into his and his wife's personal bank accounts." *Ahmed II*, 308 F. Supp. 3d at 638. Defendant has never admitted his wrongful conduct or accepted any responsibility whatsoever for his fraud, and indeed fled the

SPA-100

country shortly after this case began, prior to the July 2015 Preliminary Injunction hearing. Although his current employment may not at all be related to the securities industry, he nonetheless retains the skills and capacity to work in that field if given the opportunity.

On these facts, the Court finds that there is a "reasonable likelihood" that Defendant will violate the securities laws in the future. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (An "injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted…"). Thus, Defendant is permanently enjoined from violating Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act (15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)) and Rule 206(4)-8 thereunder (17 C.F.R. § 275.206(4)-8).

### 2. *Disgorgement*

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), as amended (Nov. 26, 2013). The equitable remedy of disgorgement "consists of fact finding by a district court to determine the amount of money acquired through wrongdoing – a process sometimes called 'accounting' – and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006) ("*Cavanagh II*") (footnote omitted); *see also SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (Disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched.").

Courts may only order disgorgement for profits which were illegally derived, but given the difficulty in determining exactly which of a defendant's gains resulted from his frauds, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.'" *Razmilovic*, 738 F.3d at 31 (quoting *First Jersey*, 101 F.3d at 1475). Thus, courts have found that "[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (internal quotation marks omitted). Obviously, as discussed above, disgorgement cannot be avoided by transferring ill-gotten gains to third parties. *See, e.g., Cavanagh I*, 155 F.3d at 137 ("Allowing [Defendant's wife] to now claim valid ownership of those proceeds would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives, without even their knowledge.")

*a. The Court's Authority to Order Disgorgement*

Defendants contend that after *Kokesh v. SEC*, 137 S. Ct. 1635, 1644 (2017) the SEC cannot seek disgorgement against any party because it is a penalty for all purposes. However, *Kokesh* made clear it was addressing a narrow issue—whether disgorgement is a "penalty within the meaning" of the statute of limitations in § 2462— and explicitly warned that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings . . ." *Kokesh*, 137 S. Ct. at 1643, 1642 n.3. Since *Kokesh* was decided, courts have declined to endorse similar arguments as here, that the SEC has no authority to seek disgorgement at all. As one district court explained in rejecting that same argument, "*Kokesh* is best seen as a decision clarifying the statutory scope of § 2462, rather than one redefining the essential attributes of disgorgement." *SEC v. Jammin Java Corp.*, 2017 WL 4286180, at *3 (C.D.

9

Cal. Sept. 14, 2017). That is because "at every step of the analysis, the Court reinforce[d] [that] it [was] discussing penalties in the context of a specific provision and for statute of limitations purposes." *SEC v. Brooks*, 2017 WL 3315137, at *6-8 (S.D. Fla. Aug. 3, 2017) (reasoning that "*Kokesh's* holding cannot be plucked from the statutory context that gives it force" and determining that, despite *Kokesh*, disgorgement is an equitable remedy that is remedial for purposes of determining whether a claim survives the defendant's death). Consistent with this view, the Second Circuit has upheld a disgorgement award post-*Kokesh*, holding that courts have "broad discretion" in ordering disgorgement. *SEC v. Metter*, 706 Fed. Appx. 699, 702 (2d Cir. 2017).

Thus, nothing in *Kokesh* disturbed Second Circuit precedent that disgorgement is a proper equitable remedy. *See SEC v. Cope et al.*, No. 14CV7575 (DLC), 2018 WL 3628899, at *4 (S.D.N.Y. July 30, 2018); *see also Cavanagh II*, 445 F.3d at 118 (explaining that disgorgement serves the equitable purpose of "prevent[ing] wrongdoers from unjustly enriching themselves through violations" and that "[t]he emphasis on public protection, as opposed to simple compensatory relief, illustrates the equitable nature of the remedy" (citing *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978))).[4]

---

[4] Relief Defendants argue that the Court cannot order disgorgement of their assets because they are not accused of any wrongdoing and therefore penalties may not be imposed against them. However, the SEC is not seeking disgorgement against Relief Defendants, only against Defendant himself. It is only because the SEC claims Relief Defendants are holding assets that are, in reality, Mr. Ahmed's, that assets in Relief Defendants' possession may be subject to the order of disgorgement against Defendant.

*b. The Total Amount to be Disgorged*

Contrary to Relief Defendants' argument, the SEC has not conflated disgorgement with restitution. The Court's findings in the Summary Judgment Ruling on Liability focused on Defendant's fraudulent gains and did not address Oak's losses from Defendant's conduct. The Court's findings detail the specific sums Defendant diverted into his and his wife's bank accounts, totaling approximately $67 million, $43,920,639.00 of which was acquired within five years of the initiation of this case. *See Ahmed*, 308 F. Supp. 3d at 638-48.

That being said, with respect to the second Company C transaction ("C2"), the Ruling on Summary Judgment, which focused specifically on liability, only calculated gross sales revenues from the sale of Company C shares and did not address Defendant's initial cost of purchasing the Company C shares through I-Cubed, which was $2 million. (*See* Ex. 4 (Ames' Decl.) ¶ 29(b).) Thus, Defendants appropriately dispute the amount that should be disgorged relating to this transaction. Their argument that the first Company C transaction ("C1") similarly was not properly calculated though, is meritless.

Relief Defendants claim that the SEC's overall disgorgement request must be reduced by $8.9 million because Mr. Ahmed had no ill-gotten gains relating to the C1 transaction. (R. Def.'s Opp'n at 8.) As the SEC notes, Defendant's conflict of interest in the transaction, where he concealed from both parties "that he (as opposed to the BVI Company, which was an Oak portfolio company) was the seller of [the] Company C shares and that he would personally profit by more than $8 million upon Oak Fund XIII's $25 million investment" in Company C violates Advisers Act Section 206(3). Accordingly, it is appropriate for the Court to order disgorged "all profits reaped through [t]his securities law violation[]," which is the $8.9 million Defendant made by

11

selling the shares for nearly $11 million after he purchased them for only $2 million, *Ahmed II*, 308 F. Supp. at 640-41. *See SEC v. Cavanaugh*, 445 F.3d 105, 109 (2d Cir. 2006).

The C2 transaction is another instance in which Mr. Ahmed concealed the fact that he was on both sides of the deal—as the sole member of Relief Defendant I-Cubed, Defendant sold shares of Company C (which had previously been purchased by I-Cubed, i.e., Mr. Ahmed) to an Oak Fund. *Ahmed*, 308 F. Supp. 3d at 641-42. In its Ruling, the Court found that the gross revenue from the $7.5 million sale was then distributed into an account on which Mr. Ahmed is listed as the sole signatory, which he had opened by representing that he was a member of I-Cubed. *See id.* at 642 n.9.

Because the Court is authorized to disgorge only "*profits* reaped through [Defendant's] securities law violations," the Court concludes that $5.5 million is the appropriate amount of disgorgement for the C2 transaction. *See Cavanaugh*, 445 F.3d at 109 (emphasis added). Accordingly, the total amount the SEC seeks to have disgorged of $43,920,639.00 must be reduced by $2 million. Defendants have not established with respect to any other transaction that the Court's Ruling on Liability improperly calculated profits Defendant derived from his misconduct, and therefore the Court orders Defendant to disgorge $41,920,639.00, representing his ill-gotten profits.

### 3. *Prejudgment Interest and Interest/Gains Accrued on Frozen Assets*

As with disgorgement, an award of prejudgment interest lies within the discretion of the court. *See First Jersey*, 101 F.3d at 1476. Generally, "an award of prejudgment interest may be needed in order to ensure that the defendant not enjoy a windfall as a result of its wrongdoing." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 54 (2d Cir. 2009). In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the

SPA-105

wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. *First Jersey*, 101 F.3d at 1476 (internal citation omitted). It is within the "discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had use of [its] illegal profits." *Razmilovic*, 738 F.3d at 36.[5]

Here, prejudgment interest on the amount to be disgorged is appropriate for the period prior to the asset freeze, since without it Defendant would be allowed to "obtain[ ] the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F.Supp. 286, 295 (S.D.N.Y. 1996). The SEC represents, and Defendants do not dispute, that this amounts to $1,520,953.00.[6]

What is disputed, however, is the SEC's additional request that the Court order Defendant to turn over all interest and returns from frozen assets from the time this Court entered [Doc. # 9] a Temporary Restraining Order on May 9, 2015. The SEC is not requesting that Mr. Ahmed pay prejudgment interest on frozen assets during the pendency of the asset freeze, but it contends that conversely, he is not entitled to interest or gains on assets while they were frozen, and those moneys should be disgorged and returned to Defendant's victims. Thus, while recognizing that it can be

---

[5] Mr. Ahmed contends that the SEC is not entitled to an award of prejudgment interest after *Kokesh* because, in his view, disgorgement now constitutes a penalty for all purposes and the SEC cannot seek prejudgment interest on any penalty. (Def.'s Opp'n at 9.) Because, as discussed below in footnote 8, the Court disagrees with the basic premise that all disgorgement orders are now penalties, this argument lacks merit.

[6] The SEC is directed to provide a revised calculation for the prejudgment interest based on the revised disgorgement figure, discussed above.

13

SPA-106

improper to collect prejudgment interest on "funds [that] have been frozen in connection with an enforcement action," the SEC claims it is entitled to disgorge the accumulated returns on frozen funds: "[F]rozen funds 'turned over to the government in complete or partial satisfaction of the disgorgement order' should be turned over 'along with any interest that has accrued on them during the freeze period.'" *Tavella*, 77 F. Supp. 3d at 361 (quoting *Razmilovic*, 738 F.3d at 36). "Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal." *Id.*

Defendants have not shown entitlement to interest and gains accrued during the pendency of the asset freeze and therefore the Court, as instructed by the Second Circuit in *Razmilovic*, orders the actual returns on the frozen assets, the amount of which have not yet been determined, must also be disgorged.

### 4. *Civil Penalty*[7]

Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996). The Securities Act and the Exchange Act authorize three tiers of civil penalties. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Third tier penalties are appropriate where "the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or

---

[7] Defendant offers no argument as to how imposing a civil penalty here violates the Eighth Amendment's Excessive Fines Clause, and therefore his citation to *SEC v. Metter* is puzzling. (*See* Def.'s Mot. for Summ. J. at 36 (quoting *SEC v. Metter*, 706 F. App'x 699, 703 (2d Cir. 2017) (The Second Circuit, "assume[d] without deciding that, in light of the Supreme Court's recent decision in *Kokesh* . . . the disgorgement liability imposed in this matter was essentially punitive in nature and thus was a fine within the meaning of the Excessive Fines Clause of the Eighth Amendment.")).)

14

indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Razmilovic*, 738 F.3d at 38 (citation omitted). At each tier, "for each violation, the amount of penalty 'shall not exceed *the greater of* a specified monetary amount or the defendant's 'gross amount of pecuniary gain.'" *Id.* (quoting 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)).

The actual amount of the penalty, within the bounds of the statute, is left to the discretion of the district court. *Id.* When making this determination, courts consider

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

The SEC asks the Court to impose a third-tier penalty equal to the amount of disgorgement, here roughly $41 million, based upon what it considers Defendant's egregious conduct. It argues that "Defendant engaged in premeditated, extensive, and continual fraud . . . that was intended to (and did) inflict harm on those he was entrusted to help, so he could personally profit." (Pl.'s Mot. for Judgment at 16.) Relief Defendants maintain that there is no support in this Circuit for imposition of a penalty that is 100% of the total disgorgement, and instead that the penalty should be restricted to only 10-20%.[8]

---

[8] Defendants do not attempt to persuade the Court not to impose a third-tier penalty, although Relief Defendants maintain that the SEC's request for civil penalty should be denied outright because disgorgement is already a penalty. However, as the Court noted in the context of the asset freeze, since "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud" and therefore civil penalties are required in order to deter and punish fraud. *Ahmed I*, 123 F. Supp. 3d at 313 (quoting *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996)).

SPA-108

Despite Defendants' protestations, there is no dispute that the Court is authorized, should it so choose, to impose a civil penalty equal to the amount ordered disgorged, representing Defendant's gross pecuniary gain. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)). Other district courts have done so. *See, e.g., S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (ordering the "defendants to pay a penalty in the approximate amount of his ill-gotten gains: $15,000,000."); *SEC v. BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *6 (E.D. Cal. May 4, 2017) ("ordering the defendant to pay a penalty of $12,132,370, equal to his profit from wrongdoing"); *SEC v. Zada*, 787 F.3d 375, 383 (6th Cir. 2015) (upholding imposition of civil penalty, equal to the amount of ill-gotten gains, of over $56 million). On the other hand, some courts have declined to impose the maximum penalty. *See, e.g., Sec. & Exch. Comm'n v. Nadel*, No. CV110215WFKAKT, 2016 WL 639063, at *26 (E.D.N.Y. Feb. 11, 2016), *report and recommendation adopted*, 206 F. Supp. 3d 782 (E.D.N.Y. 2016) (imposing third-tier penalty in the amount of $1 million where the disgorgement award was nearly $11 million); *Razmilovic*, 822 F. Supp. 2d at 281-82 (declining to impose maximum civil penalty of over $41 million, and instead imposing civil penalty of over $20 million, equal to one-half of the disgorgement amount).[9]

The Court finds that the circumstances and consequences of Defendant's conduct warrant a significant penalty. Defendant's solo, flagrant, fraudulent conduct took place over many years, it

---

[9] The facts of this case bear a striking resemblance to those in *Razmilovic*, where the defendant similarly perpetuated a pervasive fraudulent scheme spanning a number of years that involved "fraud, deceit, manipulation and deliberate, or at least, reckless disregard of regulatory requirements," which resulted in substantial losses to investors. "Yet instead of responding to the charges against him, the defendant fled the country, continue[d] to refuse to admit any wrongdoing, and . . . never expressed any remorse for his conduct." 822 F. Supp. 2d at 280.

16

was undoubtedly willful, with the sole motivation being to personally profit at the expense of his victims, whose resulting losses were immense. Defendant not only fled the country following his indictment on criminal charges in Massachusetts, but he has consistently and indignantly denied any wrongdoing whatsoever throughout the course of this litigation. There is no doubt Defendant utilized his professional talents and position to commandeer investors' funds purely for personal gain. Additionally, Defendant has not demonstrated that his financial condition warrants any downward adjustment, and his contention that the fine should be reduced based upon his inability to pay deserves little attention given that the SEC has already secured assets which are likely sufficient to satisfy the total award.

The Court is of the view that a civil penalty in the amount of $21 million, representing just over half of the total disgorgement amount, is reasonable and justified on the facts of this case, which is far from a mere slap on the wrist, and is sufficient to effectuate the punitive and deterrent purposes of such penalties, while not being greater than necessary. *See Razmilovic* 822 F. Supp. 2d at 281-82.[10]

### C.  Assets Available to Satisfy the Judgment

The SEC asks the Court to find that the assets listed on the Asset Schedule (Ex. 1 to Pl.'s Mot. for Judgment) belong to Defendant and can be used to satisfy a judgment against him. Relief

---

[10] The SEC also reasons that this civil penalty is appropriate given that the disgorgement award "will be insufficient to fully compensate victims from whom [Defendant] stole approximately $67 million" because Defendant's fraud extended beyond the five-year statute of limitations for the SEC's claims (Pl.'s Mot. for Judgment at 16), leading Relief Defendants to complain that the SEC's civil penalty is simply an attempt to circumvent the holding in *Kokesh* (R. Def.'s Opp'n at 33). However, the SEC has not asked for a penalty in excess of the *Kokesh* limits; it seeks a civil penalty that is limited to the total amount that may be disgorged under *Kokesh*.

SPA-110

Defendants object to the process being used by the Court, arguing that it "would, among other things, improperly shift the burden of proof to Relief Defendants, requiring them to establish ownership over assets held in their names." ([Doc. # 862 at 1.]) According to Relief Defendants, the SEC is asking the Court to find that Relief Defendants are nominal owners of Mr. Ahmed's assets without providing an asset-by-asset analysis, which they claim is required under state law. (R. Def.'s Opp'n at 15 (citing *McMahon v. United States*, No. 3:09-CV-00046 PCD, 2010 WL 4430512, at *4 (D. Conn. Oct. 29, 2010) (requiring an asset-by-asset analysis to determine "whether property is held by a taxpayer's nominee.")).)

However, Relief Defendants made this same argument before the Second Circuit and it was soundly rejected. The Second Circuit noted "Relief Defendants['] argu[ment] that insufficient evidence of nominee status renders the asset freeze overbroad[,]" and held that this "argument fails because Relief Defendants have been unable to point to any improperly frozen assets. . . . Relief Defendants do not allege that the referenced assets—a Fidelity account in Shalini's name and several trust accounts—properly belong to Relief Defendants, much less that they do not include proceeds of Iftikar's fraud." *I-Cubed Domains*, 664 Fed. App'x. at 56-7. Explicitly rejecting Relief Defendants' argument, the Second Circuit explained "[i]f Relief Defendants cannot prove that any frozen assets legitimately belong to them, then necessarily none of their assets are being improperly frozen to satisfy the civil penalties alleged to apply to Iftikar's conduct." *Id*. at 57, n.3.[11]

---

[11] *See also SEC v. Colello*, 139 F.3d 674, 677-8 (9th Cir. 1998) (rejecting relief defendant's argument "that the district court improperly placed the burden on him to show that he had a legitimate claim to the funds" and affirming summary judgment order because Relief Defendant "refused to give information necessary to determine whether he still possessed any of the funds or whether he had a legitimate claim to them."); *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192, n.5 (4th Cir. 2002) ("We have no doubt that the district court will provide the Relief Defendants with an opportunity to demonstrate the existence of a legally

SPA-111

Thereafter, Relief Defendants conceded that "the Second Circuit's ruling on Relief Defendants' interlocutory appeal indicate[s] a significantly expanded task for Relief Defendants' expert in the attempt to trace funds in order to rebut the SEC's argument that the Relief Defendants are mere nominees[,]" which, they recognized, is a burden "[t]he Second Circuit's decision clearly places . . . on the Relief Defendants." ([Doc. # 339 at 6-7].) That Relief Defendants now pivot and attempt to avoid the burden of establishing ownership of frozen assets can only be explained by their inability to put forth any convincing evidence rebutting the SEC's contention that the assets belong to Defendant.[12]

The Court previously detailed the factors it would consider in determining ownership as to assets held in the name of Relief Defendants: "'[1] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever

---

and factually valid ownership interest to some or all of the assets prior to ordering disgorgement." (citing *Cavanagh I* at 136–37)); *U.S. Commodity Futures Trading Comm'n v. EJS Capital Mgmt., LLC*, 2015 WL 5679688, at *4 (S.D.N.Y. Sept. 24, 2015) ("Should [relief defendant] assert some legitimate interest in [disputed] funds, she must offer evidence of her entitlement; more than unsupported, conclusory assertions need to be proffered."); *F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 394 (D. Conn. 2009), *aff'd*, 654 F.3d 359 (2d Cir. 2011) ("Relief defendant . . . met her burden of demonstrating that she provided a legitimate service in exchange for monies paid to her by defendants. Accordingly, [she] is not liable for any portion of the restitution award.").

[12] The Court has given Relief Defendants multiple opportunities to present evidence establishing their ownership of specific assets over the course of this litigation. Not only were Relief Defendants ordered to provide a list of assets to which they claim ownership, with "a fairly detailed analysis of why those identified assets are on a list claimed to be exempt from satisfaction of a judgment either against the Relief Defendants or Mr. Ahmed" (Ex. 12 to SEC's Mot. For Judgment at 17:5-18:14), they also had the opportunity to, and did, present evidence through their Opposition to the SEC's Motion for Judgment.

withdrew any funds from the asset.'" *Ahmed I*, 123 F. Supp. 3d at 308 (quoting *SEC v. McGinn Smith & Co.*, 752 F. Supp. 2d 194, 307-08 (N.D.N.Y. 2010)).

### 1. *Evidence That Relief Defendants are Nominal Owners of Defendant's Assets*

Relief Defendants maintain that the SEC has failed to introduce evidence that Mr. Ahmed "dominated and controlled" any specific asset that a Relief Defendant is allegedly holding as his nominee, or shown that Mr. Ahmed enjoyed any monetary benefit from assets that were titled to the Relief Defendants, such as the UTMA trusts created for the sole benefit of their children. The Court rejects this attempt to avoid the burden of presenting evidence establishing Relief Defendants' ownership.

Relief Defendants have had every opportunity to refute the SEC's claim that Defendant actually owns all of the frozen assets throughout the course of this litigation, and yet have failed to do so. They cannot establish ownership of these assets simply by again complaining that the SEC has to prove that Mr. Ahmed controlled and benefited from assets in Relief Defendants' names, without offering any evidence that Relief Defendants in fact controlled and owned these assets. On the other hand, the SEC does put forth evidence that the seized assets belong to Mr. Ahmed and were placed in the names of Relief Defendants as nominees only, in an effort to protect and hide the fraudulently obtained assets.

Even Relief Defendant's own expert report found that from 2004 through 2014, Ms. Shalini Ahmed earned just over $1.9 million in gross income, and that all other "non-suspect" sources of income, totaling $62,758,960.96, belonged to Mr. Ahmed. (Ex. 15 (R. Def.'s Expert Report [Doc. # 888-15]) to SEC's Mot. for Judgment ¶ 20.) Thus, 98.8% of all funds that the Ahmeds received during the past fourteen years came from Defendant. In light of these facts, it is difficult to see, and neither Defendant nor Relief Defendants provide any argument, much less a credible explanation,

how Ms. Ahmed and her children could own more than $85 million in assets while Defendant

owns less than $6 million in liquid assets. (*See* [Doc. 862-1] at 4.) Furthermore, the Ahmeds' lavish

lifestyle greatly exceeded Ms. Ahmed's earnings over this ten year period, as Ms. Ahmed admitted

her living expenses exceeded $46,000 per month. (*See* [Doc. # 69] at 14.)

Moreover, in her interrogatory responses, Ms. Ahmed claimed only to own a few assets,[13]

and never supplemented this response to assert ownership of anywhere near the $85 million of

assets she now claims belong to her and her children.[14] Further undermining her claim, Ms. Ahmed

was unable to remember receiving more than $25 million in checks from Defendant, money she

now claims to have managed (as discussed below).[15] Both Defendant and Ms. Ahmed refused to

---

[13] Ms. Ahmed asserted an ownership over only Unit 12A, Unit 12F, and the GRAT:

> Notwithstanding these objections, Ms. Ahmed states that the asset freeze is
> inappropriate with respect to compensation she earned over the course of her
> employment, including grants of stock and retirement account contributions; her
> personal contributions to the marital estate; the Shalini Ahmed 2014 Grantor
> Retained Annuity Trust; the assets of DIYA Holdings, LLC; the assets of DIYA Real
> Holdings, LLC; her and her children's reasonable legal expenses; her and her
> children's reasonable living expenses; and any other assets that the Commission
> cannot legally demonstrate should be subject to the asset freeze.

(Ex. 16 (Interrogatory Responses) to Pl.'s Mot. for Judgment at 7.)

[14] Ms. Ahmed also previously admitted it was Defendant who purchased both the 2009
Cadillac Escalade and 2009 Porsche Cayenne and that she did not know how he funded the
purchases. (Ex. 7 (Ms. Ahmed Depo.) at 50:11-22.)

[15] (*See* Ex. 7 (Ms. Ahmed Depo.) at 60:16-18 ("Q. Okay. Why did Iftikar Ahmed write you
a check for $500,000 on January 7th, 2013? A. I don't remember."); *Id.* at 61:24-62:1 ("Q: And why
did your husband write you a $2 million check on August 15, 2014? A: "I don't remember."); *Id.* at
64:16-18 (Q: "Why did your husband write you a $500,000 check on September 23rd, 2014?" A: "I
don't remember."); *Id.* at 69:5-7 (Q: "Why did Ahmed write you a $1.2 million check on November
6th, 2014?" A: "I don't remember."); *Id.* at 70:14-16 (Q: "Why did Iftikar Ahmed write you a $1.5
million check on November 17th, 2014?" A: "I don't remember."); *Id.* at 74:17-19 ("Why did your

testify about the transfer and placement of assets into her name (aside from those that were nominally placed into Ms. Ahmed's name as a contingency plan). Defendant invoked his Fifth Amendment right against self-incrimination,[16] and Ms. Ahmed invoked the marital privilege.[17]

### 2. *Relief Defendants' Claimed Assets*

Relief Defendants now claim to own the vast majority of the frozen assets, yet fail to provide evidence of this ownership or to meaningfully challenge the SEC's evidence that Defendant owned and controlled the currently frozen assets. Rather than explain why the factors above demonstrate that specific assets are indeed Relief Defendants' and should not be used to satisfy any judgment, Relief Defendants' Schedule A [Doc. # 862-1] offers as the basis for ownership only four "additional reasons for Relief Defendants' ownership," three of which the SEC correctly argues, even if taken as true, do not prevent the SEC from using the asset to satisfy a judgment against Defendant.[18]

---

husband write you a $750,000 check on December 15th, 2014? A. I don't remember.); *Id.* at 78:12-14 (Q: Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015? A: I don't know.").

[16] (*See e.g.*, Ex. 17 (Def.'s Depo. [Doc. # 888-17]) to Pl.'s Mot. for Judgment at 21:3-16; 25:13-26:7; 28:18-29:10; 32:3-20; 36:11-37:3; 40:7-25; 43:24-44:19; 47:21-48:14; 52:6-23; 57:1-8; 58:12-59:8; 61:13-62:8; 65:22-66:20; 69:5-70:2; 72:9-73:6; 77:25-78:18; 82:22-83:15; 89:5-90:9; 96:18- 98:1; 102:3-23; 108:22-110:4.)

[17] (*See, e.g.*, Ex. 10 (Ms. Ahmed Depo. [Doc. # 888-10] at 476:13-16).)

[18] Defendant argues only that the contents of the safe deposit boxes belong to his wife and the UTMA accounts belong to his children (discussed below). (Def.'s Opp'n at 24-25.) With respect to the items in the safety deposit boxes, Ms. Ahmed did not even know of their contents until after the boxes were inventoried. (*See, e.g.*, [Doc. # 465-2 ("THE COURT:…Is it still accurate that nobody knows what is in these safe deposit boxes? Mr. Deitch? MR . DEITCH: That's correct, your Honor").)

First, Relief Defendants' contention that the SEC cannot collect any assets acquired more than five-years before the SEC commenced the action is incorrect. Although after *Kokesh* the SEC is no longer able to seek a disgorgement award for fraudulent conduct that occurred more than five years before the initiation of an action, it remains free to collect against all of Defendant's assets, no matter when they were acquired, in order to satisfy a judgment. *See, e.g., SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (recognizing "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset," and that "an order to disgorge establishes a personal liability, which the defendant must satisfy regardless whether he retains the selfsame proceeds of his wrongdoing" (*citing SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974))).

Additionally, Relief Defendants' claims that certain assets were purchased or funded, in whole or in part, with untainted funds are also irrelevant.[19] The SEC is free to collect on any of Defendant's assets, whether or not he used his ill-gotten gains to acquire them. *Id.* As the D.C. Circuit noted, "the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act." *Id.* It went on to explain that "the causal connection required is between the amount by which the defendant was unjustly enriched and the

---

[19] For instance, Ms. Ahmed claims to own Fidelity x7540 (*see* [Doc. # 862-1] at 1, entry 3), which holds more than $13 million (Asset Schedule at 3, entry 75). As noted above, Ms. Ahmed did not recall receiving the $18 million check (the proceeds of Defendant's Company B fraud) that funded this account, and specifically testified the account was opened only so she could access assets "should anything happen to [Defendant]." (Ex. 7 at 80:9-14) (Q: "Why was the Fidelity account in your name opened?" A: "So my husband had a significant illness, and I believe it was opened so that I had some assets where I could take care of the children should anything happen to him.").

23

SPA-116

amount he can be required to disgorge." *Id.* Thus, these reasons would be relevant only if Relief Defendants could show that the asset in question was purchased or funded with *their* untainted funds, as opposed to Mr. Ahmed's.[20]

Accordingly, assets to which Relief Defendants claim ownership on any of these three grounds, and on no other basis, may be collected by the SEC to satisfy the judgment against Defendant.[21]

---

[20] Even if Ms. Ahmed purchased or funded assets with her own untainted funds, where ill-gotten funds are comingled with a relief defendant's legitimately obtained funds, the SEC is not required to trace specific funds to their ultimate recipients. *I-Cubed Domains*, 664 Fed. Appx. at 56. Because, as discussed below, the Court concludes that Relief Defendants are nominal owners of Defendant's assets, there is no need to apply the two part *Cavanagh* test. *See I-Cubed Domains, LLC*, 664 F. App'x at 55 ("the *Cavanagh* standard does not apply where an asset claimed to belong to a relief defendant is actually owned by a defendant, such that the relief defendant is a "nominee" for the defendant.").

[21] Relief Defendants argue that both the Iftikar A. Ahmed Family Trust and the children's Uniform Transfer to Minors Act ("UTMA") accounts cannot be used to satisfy a judgment against Defendant because the beneficiaries are Defendant's descendants and the SEC has not shown they were funded by Defendant's illicit gains. (R. Def.'s Opp'n at 5.) Relatedly, Relief Defendants maintain that the MetLife insurance policy is also exempt from collection because it is owned by the Family Trust for the benefit of the minor children. The SEC counters that the Family Trust was funded with Defendant's money, including approximately $1.577 million from the Company G fraud and approximately $2.0 million from the Company I fraud. (Ex. A) (Defendant writing checks deposited to Family Trust). Because the evidence establishes only that Defendant funded this Trust, and there is no indication that any other Relief Defendant also did so, the Court is satisfied that the Family Trust was funded and created using Defendant's money and therefore can be used to satisfy a judgment against him.

In addition, Relief Defendants contend that the Family Trust is entitled to a significant portion of the Rakitfi Holdings account at Northern Trust ending x5218 because Defendant assigned 99% of his interest in Rakitfi Holdings LLC to the Family Trust in exchange for a promissory note of $1,510,000 at 2.25% annual interest. (R. Def.'s Opp'n at 6.) However, even if the record supported this claim, because the Court finds that Defendant controls the Family Trust, these funds are available for collection in either event.

24

Relief Defendants' final reason for ownership, that an asset was a gift from a non-party, the SEC agrees is grounds for precluding the asset from being used to satisfy a judgment against Defendant. Still, Relief Defendants must offer some evidence that these were indeed gifts received from someone other than Mr. Ahmed, and have failed to do so here.

### 3. Ms. Ahmed's Claim of Managing Assets

In addition to the reasons listed in Relief Defendants' Schedule A, which as discussed above do not preclude a finding that those assets are available to satisfy a judgment against Defendant, Relief Defendants argue that most of the assets belong to them because Ms. Ahmed "contributed materially to developing and enhancing the corpus of marital property[,]" giving "her a cognizable right to that property." (R. Def.'s Opp'n at 19.) The SEC counters that Ms. Ahmed's "sudden management claim" is belied by the evidence and inconsistent with this Court's previous rejections of her claims to specific assets.

According to Relief Defendants, the fact that Mr. and Ms. Ahmed are married is critical because the quantum of proof needed to show that one spouse is the equitable owner of an asset titled to the other is meaningfully higher than where the primary defendant and relief defendant are not married. The sole case they cite in support of this contention, *In re Vebeliunas*, deals with the question of whether the veil of an irrevocable trust could be pierced under New York State law based on the argument that the debtor was the equitable owner of the trust. 332 F.3d 85 (2d Cir. 2003). There, the court found that the trust's equitable owner was the debtor's spouse, who had funded the trust with her own assets earned by investing her inheritance. *Id.* at 92. The court observed that because spouses "routinely share certain financial assets, such as streams of income," and "routinely administer each other's assets and conduct business on behalf of each other," these facts did not evidence control by the debtor over the trust. *Id.* at 92-93. Here, though, Ms. Ahmed

25

has not demonstrated that any of the assets were purchased or funded by her, and in fact the evidence is to the contrary, considering that nearly all of the funds acquired by the Ahmeds were earned or stolen by Defendant.

Specifically, as mentioned above, the Second Circuit held Defendant's salary belongs to him and was properly frozen to preserve his ability to pay an eventual judgment and, in the face of Ms. Ahmed's claims of managing certain assets, found that aside from her stock options and retirement accounts, which were unfrozen, she "failed to identify any other particular contributions to the marital estate." *ICubed Domains, LLC*, 664 Fed. Appx. at 57. To the extent Ms. Ahmed now attempts to argue that she acted as the "family CIO" and that this contribution entitles her to at least a portion of the marital estate, her argument misses the mark.[22]

Even if Ms. Ahmed legitimately managed the family assets, Relief Defendants provide no authority that where a spouse manages assets which were fraudulently acquired by the other spouse, the spouse managing those assets somehow gains an ownership interest in them such that the assets cannot be used to satisfy a judgment against the other spouse. Further, assuming Ms. Ahmed managed assets which were not fraudulently obtained, those jointly controlled assets can nevertheless be used to satisfy Defendant's judgment. *See, e.g., SEC v. Smith*, 646 Fed. Appx. 42, 43 (2d Cir. 2016) (rejecting the relief defendant's argument that the district court erred in applying all assets in a jointly controlled account – held only in the name of relief defendant – to satisfy final judgment against defendant); *Sarasota CCM, Inc. v. Golf Mktg., LLC*, 94 Conn. App. 34, 38, 891

---

[22] Relief Defendants offer emails which they claim demonstrate Ms. Ahmed's management of the family assets. (*See* Exs. 29-34 to R. Def.'s Opp'n.) The SEC vehemently disputes that Ms. Ahmed in fact managed the family's assets, but the Court need not make this determination given its conclusion, discussed below, that the Court can reach jointly owned assets to satisfy a judgment against Defendant.

26

SPA-119

A.2d 72, 74 (2006) (recognizing that Connecticut's "legislature's intent [is] to allow a judgment creditor to execute against all forms of a judgment debtor's assets" and therefore a creditor is "entitled to reach any property in which the judgment debtor had a cognizable interest" including the full amount of funds held in a joint account.)

In sum, Relief Defendants have not established ownership over any of the assets they identified on their Schedule A. Accordingly, the SEC may collect against all of the assets listed on the Asset Schdule.

### 4. *Assets Defendants Claim Oak Already Recovered from Mr. Ahmed*

Relief Defendants maintain that any disgorgement ordered to compensate Mr. Ahmed's alleged victims must be offset by the carried interest, which Oak has already taken, and by other assets belonging to Defendant that Oak holds, including capital contributions and K-1 distributions that Oak has seized or withheld. The SEC disagrees, citing contract provisions which provide that upon being terminated for cause, Defendant forfeited many of his interests relating to the Oak Funds, thus justifying the SEC's listing these assets as having a current value of $0 in the Asset Schedule.

The Ames declaration explains, and the contracts substantiate, that Defendant was forced to forfeit his interests in the General Partners, but retained the portion of his Class B membership interests in each of the Limited Partners that had vested by March 31, 2015 (while forfeiting the unvested portion of such membership interests).[23] (2018 Ames Decl. ¶¶ 7-9, 14-17.) Specifically,

---

[23] The SEC's Asset Schedule accounts for these frozen distributions which it agrees belong to Defendant. (*See* Asset Schedule at 2, entry # 36.) The vested portion of Mr. Ahmed's interests in the Limited Partners totals $683,172.00—$525,297.00 for 2015, $4,769.00 for 2016, and $153,106.00 for 2017. (2018 Ames Decl. [Doc. # 890] ¶ 20.)

Ms. Ames asserts that "in contrast to his interests in the Limited Partners, Mr. Ahmed's interests in the General Partners were not converted into Class B memberships" and "[i]nstead, because Mr. Ahmed was terminated for "Disabling Conduct", he was removed as a member of each of the General Partners and forfeited, for no consideration, the entirety of each of his interests in each of the General Partners." (*Id.* ¶ 15.)

Defendant concedes that the Oak Associates XIII-A, LLC operating agreement stipulated that on removal for cause or disabling conduct, all of a member's membership interest would be forfeited, but insists that this is the only agreement which so stipulated. (Def.'s Opp'n at 23.) However, the contracts support Ms. Ames' declaration—each General Partners contract including amendments thereto, specifies that "any Member who is removed by reason of having engaged in Disabling Conduct shall forfeit for no consideration such Member's entire membership interest, Percentage Interest and Capital Account and shall not become, or shall cease to be, as applicable, a Class B Member." (*See* Ex. J (Amendment to Oak Associates X, LLC Operating Agreement) to Ames' Decl. [Doc. # 890-10] ¶ 14; Ex. L (Amendment to Oak Associates XI, LLC Operating Agreement) to *id.* [Doc. # 890-12] ¶ 14; Ex. N (Amendment to Oak Associates XII, LLC Operating Agreement) to *id.* [Doc. #890-14] ¶ 14; Ex. O (Operating Agreement of Oak Associates XIII, LLC) to *id.* [Doc. #890-15] ¶ 7.4(a).)

Defendants do not dispute that Mr. Ahmed was terminated for "Disabling Conduct." Therefore, based on the language in the contracts, it is clear that Defendant forfeited his rights to any carried interest,[24] capital contributions, or K-1 distributions from Oak Management Corporation, and accordingly they are appropriately assigned no value by the SEC.

_____

[24] Ms. Ames explains that "Mr. Ahmed's ownership interests in the General Partners . . . provided for participation in the performance of the Oak Funds in which such General Partners

Contrary to Relief Defendants' contention, this will not result in a double recovery by the Oak Funds because these forfeited interests are not ill-gotten gains that Oak is recovering from Defendant at all, but rather were sacrificed by Defendants upon his termination for "Disabling Conduct." Thus, Defendants' reliance on *SEC v. Penn*, 2017 WL 5515855, at *4 (S.D.N.Y. Aug. 22, 2017) for the proposition that the amount of disgorgement must be offset by the forfeited carried interest in the fund is misplaced. Because the *Penn* court reasoned that the defendant "is not required to disgorge amounts that he has already repaid [to the fund,]" it ordered an evidentiary hearing to determine what, if any, value was received by the fund from Penn's forfeiture. But, unlike in this case, Penn had a right to this "carried interest" prior to the criminal court forfeiting the asset. *Id.* Consequently, the Oak Funds here have not recovered from Mr. Ahmed by withholding and/or seizing his forfeited interests, and there is no resulting double recovery. *Cf. SEC v. Levin*, 849 F.3d 995, 1007 (11th Cir. 2017) ("[I]f any investor does ultimately recover from Levin, then Levin could petition the court for a reduction in the disgorgement award because the recovery would constitute a partial return of Levin's ill-gotten gains.").

### D.  Appointment of a Receiver and Establishment of a Fair Fund

The authority of the district court to appoint a receiver to marshal, collect, and maintain assets, including judgments, with a view to distribution is well-established and appropriate where necessary to effectuate the purposes of the securities laws. *See, e.g., SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Investors Security Corp., et al.*, 560 F.2d 561, 567 (3d Cir. 1977) (appointment of a receiver is an appropriate exercise of power and discretion of a district

---

invested on a basis comparable to other investors in the Oak Funds, which includes payment to the General Partner of a 'carried interest.'" (2018 Ames Decl. ¶ 13.)

court). The SEC requests that a receiver be appointed to take control of all Defendant's assets, held

in his name and the name of nominees, with the goal of repatriating the assets to victims. Plaintiff

suggests that a receiver is necessary to oversee the sale of illiquid (and difficult to value) assets.

Defendants protest that a receivership is not necessary here, arguing that since there is only one

victim, Oak, there is no need to appoint a receiver to sort through competing claims, and that

appointing a receiver would also result in unneeded costs.[25]

It will likely be necessary to appoint a receiver to hold the currently frozen funds and who

will then effectuate a mechanism for distribution of assets to victims in accordance with this

Ruling. The receiver would then ensure the return of any frozen assets to Defendant in excess of

the amount required to satisfy the judgment against him. The appointment and scope of the

receiver's duties will be determined post judgment. The SEC may submit a proposed receivership

order for consideration by the Court.

Moreover, the SEC requests that the Court place Defendant's assets into a Fair Fund to

compensate the victims of his fraud. A "fair fund for investors" is provided for by law:

> If, in any judicial or administrative action brought by the Commission under the
> securities laws, the Commission obtains a civil penalty against any person for a
> violation of such laws, or such person agrees, in settlement of any such action, to
> such civil penalty, the amount of such civil penalty shall, on the motion or at the
> direction of the Commission, be added to and become part of a disgorgement fund
> or other fund established for the benefit of the victims of such violation.

---

[25] Defendants' argument that the appointment of a receiver is a "drastic remedy" to be imposed "only where no lesser relief will be effective" carries little weight here, since the cases they rely upon deal with appointing a receiver during the pendency of litigation, where liability is still not established, as opposed to here where the receiver's role would be to effectuate collection of a judgment after liability has been found. *See e.g., Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961); *Commodity Futures Trading Comm. v. Comvest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1979).

15 U.S.C. § 7246(a). Thus, a Fair Fund affords "the SEC . . . flexibility by permitting it to distribute civil penalties among defrauded investors by adding the civil penalties to the disgorgement fund." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82 (2d Cir. 2006). The SEC claims that because Defendant's fraud was long-running and concealed, and netted him more than he will be ordered to disgorge, a Fair Fund is especially appropriate.[26]

The Court recognizes that a Fair Fund may be a useful vehicle to make any distributions of civil penalties to victims, if appropriate, but at this juncture is not sufficiently informed such that it can understand how this would function in the context of this case. The parties will be given an opportunity post-judgment to address the propriety and necessity of establishing a Fair Fund under these facts and circumstances.

### III. Conclusion

For the foregoing reasons, the SEC's Motion for Remedy and Judgment is GRANTED with modification, for a total of $62,920,639.00 plus prejudgment interest for the period of time prior to the asset freeze,[27] and all interest and gains returned on the frozen assets during the pendency of the freeze. This total includes disgorgement of $41,920,639.00 and a civil penalty of $21,000,000.00 million. All of the assets listed on the SEC's Asset Schedule, which are currently frozen, are available to satisfy this judgment against Defendant. Moreover, Defendant is permanently enjoined from violating Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)),

---

[26] The only argument regarding the Fair Fund made by Relief Defendants is that one may only be created with assets that fall within Section 2462's five-year statute of limitations, but the regulations to which they cite do not so provide. *See* 17 C.F.R. §§ 201.1100, 201.1102(b).

[27] The SEC's revised calculation, discussed above at footnote 6, shall be provided no later than three days from the date of this Ruling.

SPA-124

Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. §

240.10b-5), and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act (15 U.S.C. §§ 80b-

6(1), 80b-6(2), and 80b-6(3)) and Rule 206(4)-8 thereunder (17 C.F.R. § 275.206(4)-8).[28]

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this ___ day of September 2018.

---

[28] The SEC shall file a proposed Order of Final Judgment within seven days of the date of this Ruling.

32

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>     *Plaintiff*,<br>     *v.*<br>IFTIKAR AHMED,<br>     *Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>     *Relief Defendants*. | Civil No. 3:15cv675 (JBA)<br><br>September 27, 2018 |

**RULING DENYING DEFENDANT'S MOTION FOR RECUSAL**

In this civil enforcement action, Defendant moved for recusal of this Court "on the grounds that the esteemed Court's 'impartiality might be reasonably questioned.'" (Def.'s Mot. for Recusal [Doc. # 961] at 1.) Plaintiff Securities and Exchange Commission opposed [Doc. # 967] that motion, and Defendant replied [Doc. # 973]. For the reasons explained below, Defendant's Motion for Recusal is DENIED.

SPA-126

I.     **Discussion**

A judge must recuse herself "in any proceeding in which [her] impartiality might reasonably be questioned or where she "has a personal bias or prejudice concerning a party." 28 U.S.C. § 455. Recusal is proper only where the alleged bias reflects "a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re Int'l Bus. Machines Corp.*, 45 F.3d 641, 644 (2d Cir. 1995) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Improper bias may arise through the course of litigation even where there is no extrajudicial source of impartiality. *See Liteky*, 510 U.S. at 551(holding that a "favorable or unfavorable predisposition" developed during course of trial may require recusal if "so extreme as to display clear inability to render fair judgment").

Mr. Ahmed's Motion for Recusal focuses on several indicators of alleged bias: (1) the Court's "refus[al] . . . to properly assess the appropriate amount of maximum disgorgement and, hence, the maximum amount of assets to be frozen" (Def.'s Mot. for Recusal at 3-4); (2) the Court's "flagrant[] violat[ion of] established doctrine and misappropriat[ion of] the Fugitive Disentitlement Doctrine in depriving the Defendant of his legal and constitutional rights" by misclassifying Mr. Ahmed as a fugitive (*id.* at 5); (3) the Court's "repeated[] fail[ure] to enforce its Individual Rules of Civil Procedure against the SEC" (*id.* at 5-6); (4) the Court's allowance of "multiple misrepresentations and outright lies under oath both by the SEC representative, Mr. Mark Landers Williams, and also the Oak representative, Ms. Grace Ames" (*id.* at 6); (5) the Court's "affectionate level of over eagerness to sign off on any submission made by the SEC" while it has "sat for many quarters on simple submissions made by the Defendant" (*id.*); (6) the Court's drawing of "negative inferences from the Defendant's constitutional rights to invoke the Fifth Amendment against self-incrimination" after "the Court itself forced the Defendant to first invoke

2

SPA-127

the Fifth Amendment rights and then cunningly held it against him" (*id.* at 7-8); (7) denying "Defendant access to his rightful assets to retain counsel to fight this case while providing for the legal fees and expenses of the Relief Defendants who have nothing to do with this dispute" and later determining that "98.8% of the clean, untainted assets amounting to around $63 million . . . belong to Defendant" (*id.* at 8); (8) the Court's "repeated[] violat[ion of] and ignor[ing] all contracts" (*id.* at 9); and (9) the Court's "outright ignor[ing]" of Defendant's Motion for Summary Judgment on Damages and "penalizing the Defendant . . . for not having provided a rebuttal to the SEC's statement of material undisputed facts" regarding summary judgment on liability (*id.* at 9-10).

## A. Timeliness

A party seeking recusal "must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). In determining the timeliness of a motion for recusal, courts must consider "whether: (1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the movant can demonstrate good cause for delay." *Id* at 334 (internal citations omitted). If a request for recusal is not timely made, it is waived. *See Polizzi v. United States*, 926 F.2d 1311, 1326 (2d Cir. 1991) (holding that defendant "waived" his claim of recusal "when he failed to timely move for such recusal").

The SEC argues that Mr. Ahmed's Motion for Recusal is untimely, citing many of the claims made in Mr. Ahmed's Motion and noting that they "are all issues that were previously (and in many instances, repeatedly) litigated in the months and years before Defendant's instant

SPA-128

disqualification Motion." (Pl.'s Opp'n at 6.) Mr. Ahmed contends that the question of timeliness is "not even germane to the substance of this Motion," arguing that there is no timeliness requirement for motions for recusal because there is "***nothing*** in the statutory scheme and construct" which imposes such a requirement. (Def.'s Reply to SEC's Opp'n [Doc. # 973] at 6 (emphasis in original).) Though Mr. Ahmed notes correctly that the text of 28 U.S.C. § 455 does not impose a timeliness requirement for motions for recusal, the caselaw of the Second Circuit interpreting that statute does impose such a requirement. *See Polizzi*, 926 F.2d at 1326.

In support of his argument that motions for recusal are not subject to a timeliness requirement, Mr. Ahmed cites the Third Circuit's holding in *United States v. Antar* that whether "the judge's motivation came to light only after the conclusion of the trial" is "of no moment" and may still reveal judicial bias present during the trial. 53 F.3d 568, 576 (3rd Cir. 1995). Mr. Ahmed conflates the question of alleged judicial bias *revealed* at a late stage of litigation, at issue in *Antar*, with the question of alleged judicial bias revealed previously but *challenged* much later. The SEC contends that Mr. Ahmed makes his request for recusal too long after the facts giving rise to that request became known to him—not that the facts giving rise to the request for recusal were revealed too late, as in *Antar*.

As the SEC argues, the issues Mr. Ahmed raises in his Motion for Recusal have been previously litigated in this case. Some were initially litigated more than three years ago, (*see, e.g.,* Order Granting SEC's Motion for Preliminary Injunction [Doc. # 113] (addressing Defendant's arguments as to why the Court should not continue the asset freeze in the amount requested by the SEC)), while others have also been addressed more recently (*see, e.g.,* Def.'s Mot. to Preclude [Doc. # 894] SEC filings submitted after deadline, which the Court denied). However, none of Mr. Ahmed's alleged grounds for recusal first arose or were substantively litigated in the period of time

4

closely preceding his Motion for Recusal, suggesting that Mr. Ahmed did not make his request for recusal "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim" as is required. *Apple*, 829 F.2d at 333.

The additional factors relevant to the timeliness of motions for recusal further suggest that Mr. Ahmed's motion was not timely made. First, Mr. Ahmed has "participated in a substantial manner in" these proceedings, *see Polizzi*, 926 F.2d at 1326, as evidenced by the over 180 submissions made by Mr. Ahmed since he assumed *pro se* status in July 2016. Second, given the length of this litigation and that the Court has already granted summary judgment as to both liability and remedies, recusal "would represent a waste of judicial resources." *See id.* Third, Mr. Ahmed's Motion was not "made after the entry of judgment," *see id.*, but it was made after the Court requested and the SEC filed a proposed final judgment, meaning that the Court's issuance of final judgment is clearly imminent. Fourth, Mr. Ahmed has not "demonstrate[d] good cause for delay." *See id.* (*See generally* Def.'s Mot.; Def.'s Reply.)

Mr. Ahmed's motion essentially seeks to re-litigate issues throughout this case, and the four timeliness factors suggest that his motion was not timely filed. However, because Mr. Ahmed's argument is based in part on the cumulative effect of the Court's decisions, coupled with more recent rulings, the Court will nonetheless consider the merits of Defendant's Motion.

**B. Merits**

"Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," though it is possible "in the rarest circumstances" that rulings alone would "evidence the degree of favoritism or antagonism required . . . when no extrajudicial source [of bias] is involved." *Liteky*, 510 U.S. at 555. As Mr. Ahmed's Motion for Recusal is based entirely on the Court's rulings

throughout this litigation, the only question is whether they are among the "rarest circumstances" where judicial rulings constitute a valid basis for recusal.

First, Mr. Ahmed argues that the Court has improperly refused to assess the appropriate amount of maximum possible disgorgement and amount of assets to be frozen. He argues that the Court "refused to undertake the very basic task of determining the maximum possible disgorgement." (Def.'s Mot. at 3.)  Contrary to Defendant's assertion, the Court did not "refuse to undertake" the task of determining the maximum possible disgorgement as Mr. Ahmed claims; it ruled partially in Mr. Ahmed's favor on that very issue, finding that the asset freeze should be "modified to remove disgorgement associated with fraud executed more than five years prior to the filing of the related claims" and ordering that the asset freeze not exceed $89 million—the amount necessary to ensure availability of funds to cover a potential award of $44 million in disgorgement, $1.5 million in prejudgment interest, and $44 million in civil penalties. (Order Granting In Part Def.'s Motion for Modification of the Asset Freeze [Doc. # 829].)

Mr. Ahmed also argues that, "given the now-determination of total disgorgement" of $41.9 million, the Court "in effect froze assets significantly greater than any legally permissible limits." (Def.'s Mot. at 3.) However, the Court explained several years ago that an asset freeze "serves to preserve the status quo and to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." (Order Granting Preliminary Injunction [Doc. # 113] at 6.) The asset freeze therefore necessarily covered the maximum possible amount of a judgment against Mr. Ahmed. That the judgment against Defendant is less than the value of the asset freeze—i.e., that the Court did not order the maximum possible disgorgement and civil penalty against Mr. Ahmed—is not an indication of judicial bias. The appropriate amount of the judgment against Mr. Ahmed was litigated at length, (*see, e.g.,* Docs. ## 884-888, 901-906, 921, 924, 929, 936-939, 943-

6

944), and was not determined until September 5, 2018, (Order Granting SEC's Motion for Judgment and Remedies [Doc. # 955]). The Court could not have tailored an asset freeze three years ago which equaled but did not exceed the amount of the September 2018 judgment against Defendant.

Second, Mr. Ahmed argues that the court "flagrantly violated established doctrine and misappropriated the Fugitive Disentitlement Doctrine" by improperly designating Mr. Ahmed as a fugitive and thereby "denying the Defendant his fundamental rights as enshrined in the US Constitution" by improperly disallowing his use of the "resources of the courts of the United States." (Def.'s Mot. at 5.) Mr. Ahmed misconstrues the Court's characterization of him as a "fugitive." The Court has not prohibited Mr. Ahmed from using the resources of the federal courts, and he has represented himself vigorously throughout this litigation. Instead, the Court has denied Mr. Ahmed access to confidential documents as long as the Court lacks any power to enforce a protective order against him—i.e., while he remains outside the Court's jurisdiction. (*See, e.g.* Order on Sealing [Doc. # 954].) The Court also specifically "decline[d] to issue an advisory opinion resolving th[e] issue" of whether "Defendant is a fugitive, under any definition" because that classification has "no relevance as to whether Defendant violated the securities laws as alleged by the SEC in this case." (Order Denying Def.'s Emergency Mot. for Clarification on Def.'s Status [Doc. # 415] at 2.) Finally, the Court based its denials of Mr. Ahmed's motions for attorney's fees on its analysis of his rights under the Sixth Amendment to the United States Constitution, not on any alleged misclassification of Defendant as a fugitive under the Fugitive Disentitlement Doctrine. (*See* Ruling on Def.'s Mot. for Release of Funds [Doc. # 191]; Ruling Denying Def.'s Mot. for Reconsideration to Modify the Asset Freeze Order to Release Funds for Legal Defense [Doc. # 392].)

Third, Mr. Ahmed argues that the Court has "repeatedly failed to enforce its Individual Rules of Civil Procedure against the SEC when the agency has repeatedly failed to or refused to provide the true computation of monetary reliefs and asset values until the time of their Motion for Remedies and Judgment." (Def.'s Mot. at 5-6.) In fact, the SEC has repeatedly explained the basis for its position that the assets currently frozen do not exceed the $89 million limit or provided updated calculations of the value of the assets currently frozen. (*See, e.g.*, SEC's Opp'n to Def.'s Mot. to Modify Asset Freeze [Doc. # 634] at 4; Ex. 1 to SEC's Opp'n to Rel. Def.'s Mot. to Compel Compliance [Doc. # 872].) Insofar as Mr. Ahmed alleges judicial bias because the Court has not required the SEC to "provide the true computation, " i.e., a computation with which Mr. Ahmed agrees, the Court's resolution of that issue in a manner with which Mr. Ahmed is not satisfied is not an indication of judicial bias. *See Liteky*, 510 U.S. at 556 (holding that "judicial rulings, routine trial administration efforts, and ordinary admonishments" in the course of judicial proceedings which do not "display[] deep-seated and unequivocal antagonism" are not sufficient grounds for recusal).

Fourth, Mr. Ahmed argues that the Court has "allowed multiple misrepresentations and outright lies under oath" by the SEC and by Grace Ames, the Oak representative. (Def.'s Mot. at 6.) He claims that the "lies are too many and too elaborate to restate" in his Motion, but cites the example of the SEC's allegedly untrue claim that Mr. Ahmed "worked in the 'hedge-fund' business and wore [a] 'suit to work every day'." (*Id.*) Defendant's repeated assertions that the SEC's sworn submissions are false again assaults the Court's "judicial rulings" and "routine trial administration efforts" which are not grounds for recusal. *See Liteky*, 510 U.S. at 556.

Fifth, Mr. Ahmed argues that the Court has displayed an "affectionate level of over eagerness to sign off on any submission made by the SEC" while it has "sat for many quarters" on

Defendant's submissions. (Def.'s Mot. at 6; Def.'s Reply at 3, 5.) Again, to the extent that Mr. Ahmed suggests that the Court's rulings in the SEC's favor are grounds for recusal, his argument is unavailing. As Mr. Ahmed notes, the docket in this case is approaching one thousand entries in over three years. As of September 25, 2018, the SEC has filed 63 motions in this case; Mr. Ahmed has filed 90 motions; and the Relief Defendants have filed 123 motions. The Court regrets that it was unable to immediately address each of Mr. Ahmed's many submissions, but any such delays are indicative of the limitations of judicial resources, not judicial bias. *See Qualls v. United States*, No. 07-CR-14 (DLI), 2018 WL 1513625, at *2 (E.D.N.Y. March 27, 2018) ("Delays in entering judgment or rendering a decision are not bases for recusal."(internal citations omitted)).

Mr. Ahmed also protests the Court's "rushed" timeline for considering Defendant's Motion for Recusal. (Def.'s Reply at 5.) Mr. Ahmed requested recusal at a time when the entry of final judgment in this case is imminent, as discussed above. The Court simply seeks to "assess the merits of the recusal motion before taking further action in this case." *In re Int'l Bus. Machines Corp.*, 45 F.3d at 643.

Sixth, Mr. Ahmed argues that the Court "forced" him to invoke his Fifth Amendment rights and then "cunningly held it against him," (*id.* at 7-8), notwithstanding his Answer, in which Mr. Ahmed repeatedly and "on advice of counsel . . . assert[ed] his rights under the Fifth Amendment," (Answer [Doc. # 218]). And on the issue of Defendant's opposition to the location of his deposition in India, the Court considered Defendant's submissions but found, based on a Letter from the Vice Consul of American Citizens in Kolkata, India, that entering a United States Consulate in India "is not in any legal sense leaving India" and would not constitute a departure from the "territorial jurisdiction of India" in violation of the terms of Mr. Ahmed's bail. (Order Denying Def.'s Mot. for Specific Instructions [Doc. # 365] at 2-3.) The Court found Mr. Ahmed able to attend a

9

deposition in a U.S. Consulate without regard to his decision to invoke his Fifth Amendment rights instead of attending that deposition. Again, to the extent that Mr. Ahmed argues that the Court's ruling on his Motion for Specific Instructions for Deposition [Doc. # 312] indicates judicial bias because the matter was not decided in his favor, his argument is unavailing.

Seventh, Mr. Ahmed argues that the Court demonstrated impermissible impartiality by denying him "access to his rightful assets to retain counsel" and incorrectly determining ownership of the frozen assets. (Def.'s Mot. at 8; Def.'s Reply at 3-4.) Mr. Ahmed improperly conflates property ownership with availability of assets to satisfy the judgment against him. (*See* Order Granting SEC's Motion for Judgment and Remedies at 17-27 (discussing Relief Defendants' nominal ownership of assets and the standards for determining availability of assets to satisfy the judgment).) Again, to the extent that Mr. Ahmed argues that the Court's rulings on requests for release of funds for payment of attorney's fees or on the availability of funds to satisfy the judgment against him indicate judicial bias because they were not in his favor, his argument does not succeed.

Eighth, Mr. Ahmed argues that the Court "has repeatedly violated and ignored all contracts" in its decisions regarding asset value and ownership. (Def.'s Mot. at 9.) As the SEC points out, the Court in fact directly considered and cited the Defendant's Oak employment contracts. (*See* Order Granting SEC's Mot. for J. and Remedies at 27 (noting that the "contracts substantiate" the SEC's position regarding forfeiture of assets).) Again, to the extent that Defendant argues that the Court's ruling was incorrect in its interpretation or application of those contracts, that contention is not a valid grounds for recusal.

Ninth, Mr. Ahmed argues that the Court "outright ignore[d]" his Motion for Summary Judgment on Remedies. (Def.'s Mot. at 9-10; Def.'s Reply at 5.) In fact, the Court directly addressed Defendant's Motion for Summary Judgment on Remedies, explaining that it was denied because

SPA-135

the SEC was "not seeking damages, but only equitable remedies, and therefore there are no issues which remain for a jury." (Order Granting SEC's Mot. for J. and Remedies at 6, n.3.) Moreover, the Court "incorporate[d]" his arguments in that Motion for Summary Judgment on Remedies into his Opposition to the SEC's Motion for Judgment and Remedies and "thus consider[ed] those arguments made in support of summary judgment as part of Defendant's rebuttal to the SEC's Motion." (*Id.*) Not only did the Court not "ignore[]" Defendant's Motion, it explained its denial of that motion and incorporated and considered its arguments determining the appropriate judgment against Mr. Ahmed. (*Id.*) Mr. Ahmed's disagreement with the Court's denial of his motion does not reflect judicial bias or grounds for recusal.

In his Reply, Mr. Ahmed argues that the Court's pre-judgment references to "investors' losses" and "assets available for distribution" indicate that the Court had "an improper, preconceived goal all throughout this proceeding" which constitutes judicial bias. (Def.'s Reply at 2-5.) In support of this argument, Defendant analogizes to *Antar*, in which the Third Circuit held that the district court judge's statement at a sentencing hearing that his "object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant" required recusal because of the appearance of partiality. 53 F.3d at 573, 579.

Contrary to Mr. Ahmed's assertions, the Court's references to investor losses and distributing assets are not analogous to the comments of the judge in *Antar*. The purpose of an asset freeze is "to preserve the status quo and to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." (Order Granting Preliminary Injunction at 6 (internal quotations omitted).) To impose an asset freeze, the Court must find that the SEC has a "likelihood of success on the merits, or that an inference can be drawn that the party

11

has violated the federal securities laws." (*Id.*) Disgorgement—part of the judgment in this case for which the asset freeze was intended to ensure availability of funds—is "a method of forcing a defendant to give up the amount by which he was unjustly enriched." *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978). Recognizing the possibility of future "liquidation of assets," (Def.'s Reply at 4), does not indicate judicial bias in a case where the Defendant's assets were already frozen for the purpose of satisfying a possible future judgment. Unlike the judge in *Antar*, this Court has merely recognized the purpose of an asset freeze and acknowledged a possible outcome in this case but has not expressed any "goal" or "object" which would suggest partiality.

Finally, Mr. Ahmed contends that the Court is biased because "Judge Arterton shares a close personal and social relationship with Ms. Annie Huntress Lamont, one of the four managing partners of Oak Management Corporation, the purported victim in this dispute." (Def.'s Reply at 7.) Defendant further alleges that "at one particular lunch in Westport, CT in the summer of 2006 Ms. Lamont herself indeed introduced the Defendant to Judge Arterton in person." (*Id.*) He contends that this "close personal and social relationship" with Ms. Lamont stems from "Judge Arterton['s] . . . close personal friendship with US Representative Ms. Rosa DeLauro" and from this Judge's husband, who has allegedly "worked closely with and counseled" Ms. Lamont's husband, Ned Lamont. (*Id.* at 7-8.)

The Court's calendar does not reflect any lunch in Westport, CT during the summer of 2006. This Judge has no recollection of knowing Ms. Lamont or any lunch at which she spoke with Ms. Lamont or was introduced to the Defendant, and her husband has also never "worked closely with and counseled" Ned Lamont.

12

This Judge has been friendly with and respectful of Representative DeLauro over the many years she has been her congresswoman. Any allegations of a "close personal friendship" with Congresswoman DeLauro which produced a "deep, long and close political and social relationship between the Artertons and the Lamonts" lack any basis in fact.

Moreover, Defendant's allegations about the Court's social relationships are both untimely and procedurally improper. If, as he alleges, Defendant was introduced to this Judge by Ms. Lamont in 2006, then any claims of judicial bias stemming from that interaction should have been raised at the outset of this litigation, more than three years ago. *See Apple*, 829 F.2d at 333 (a party "must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim."). Defendant also first raised this allegation in his Reply. *See Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 142 (2d Cir. 1999) ("We repeatedly have said that we will not consider contentions first advanced at such a late stage," referring to the reply brief.).)

Many of Mr. Ahmed's arguments in support of his Motion for Recusal reflect fundamental misrepresentations of the Court's rulings. He has offered no convincing argument to show why the Court's rulings with which he disagrees represent the "rarest circumstances" in which judicial rulings alone constitute impermissible bias. *See United States v. Colon*, 961 F.2d 41, 44 (2d Cir. 1992) (". . . earlier adverse rulings, without more, do not provide a reasonable basis for questioning a judge's impartiality."). Therefore, to the extent that any of Mr. Ahmed's arguments were timely made, they are not grounds for recusal.

SPA-138

## II.    Conclusion

For the foregoing reasons, Defendant's Motion [Doc. # 961] for Recusal is DENIED.


IT IS SO ORDERED.

_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of September, 2018.

14

SPA-139

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br> *Plaintiff*, <br> *v.* <br> IFTIKAR AHMED, <br> *Defendant*, and <br><br> IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, <br><br> *Relief Defendants.* | Civil No. 3:15cv675 (JBA) <br><br> September 27, 2018 |

**FINAL JUDGMENT AGAINST DEFENDANT IFTIKAR AHMED**

On March 29, 2018, the Court granted [Doc. # 835] the Plaintiff U.S. Securities and Exchange Commission's (the "Commission") Motion for Summary Judgment on Liability finding that Defendant Iftikar Ahmed was liable for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 206 of the Investment Advisers Act ("Advisers Act") for defrauding entities he advised and placing those monies into accounts and assets he controlled; and

On September 6, 2018, the Court granted [Doc. # 955] the Commission's Motion for Remedies and Judgment, with modification, concluding that the Commission is entitled to a final judgment against Defendant that (1) permanently enjoins Defendant from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; (2) orders the Defendant to disgorge $41,920,639 plus prejudgment interest for the period of time prior to the asset freeze, and interest and gains returned on the frozen assets during the pendency of the freeze; and (3) imposes a civil penalty of $21,000,000 against Defendant;

Accordingly, (1) IT IS HEREBY ORDERED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment

by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

(2) IT IS HEREBY FURTHER ORDERED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

(3) IT IS HEREBY FURTHER ORDERED that Defendant is permanently restrained and enjoined from violating Sections 206(1), 206(2), 206(3) and 206(4) of the Investment Advisors Act of 1940 [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b6(4)] and Rule 206(4)-8 thereunder [17

C.F.R. § 275.206(4)-8)] by the use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, (i) to employ any device, scheme, or artifice to defraud any client or prospective client, (ii) to engage in any transaction, practice, or course of business which operates as fraud or deceit upon any client or prospective client, (iii) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction; or (iv) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

IT IS FURTHER ORDERED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

(4) IT IS HEREBY FURTHER ORDERED that Defendant is liable for disgorgement of $41,920,639, representing profits gained as a result of the conduct alleged in the Second Amended Complaint that occurred within five years of the initiation of this case, together with prejudgment interest thereon in the amount of $1,491,064.01.

(5) IT IS HEREBY FURTHER ORDERED that Defendant is liable for a civil penalty in the amount of $21,000,000 pursuant to Section 21A of the Exchange Act.

(6) IT IS HEREBY FURTHER ORDERED that the amount of interest and returns on frozen assets which Defendant must turn over, from the time this Court entered a Temporary Restraining

Order on May 7, 2015, to the time that such assets and returns are released from the asset freeze to

be paid over to a receiver, the SEC, the Court, or distributed to victims, will be determined by a

receiver or such other process that this Court will order.

(7) IT IS FURTHER ORDERED that the following assets are available to satisfy this Final

Judgment against Defendant:

| SEC NO.[1] | BANK AND BROKERAGE ACCOUNTS |
|---|---|
| 1 | E*Trade: x6818 |
| 2 | HSBC: x2984 |
| 3 | Northern Trust: x5218 |
| 4 | Northern Trust: x3911 |
| 5 | Northern Trust: x0901 |
| 6 | Northern Trust: x5226 (50% owned by Iftikar Ahmed) |
| 7 | Northern Trust: x5234 (60% owned by Iftikar Ahmed) |
| 8 | Northern Trust: x3781 |
| 9 | Northern Trust: x7193 |
| 10 | TD Bank: x5279 |
| 11 | TD Bank: x8551 |
| 12 | Fidelity: x8133 (50% owned by Iftikar Ahmed) |
| 13 | Fidelity: x7417 (50% owned by Iftikar Ahmed) |
| 14 | Fidelity: x9637 |
| 15 | Circle Internet Finance Bitcoin Wallet |

| SEC NO. | REAL PROPERTY |
|---|---|
| 18 | Essell Farm (1820 County Route 7, Ancram, NY) (50% owned by Iftikar Ahmed) |

| SEC NO. | PRIVATE COMPANY INVESTMENTS |
|---|---|
| 19 | Ribbit Capital (60% owned by Iftikar Ahmed) |
| 20 | Ribbit Capital II (60% owned by Iftikar Ahmed) |
| 21 | Clues Network Inc. (60% owned by Iftikar Ahmed) |
| 23 | Crypto Currency Partners LP |
| 24 | iMENA |

| SEC NO. | LIFE INSURANCE POLICIES |
|---|---|
| 25 | MetLife Whole Life Insurance Policy (Iftikar Ahmed) |
| 26 | Genworth Life and Annuity Insurance Policy (Iftikar Ahmed) |
| 27 | American General Life Insurance Policy (Iftikar Ahmed) |

5

| SEC NO. | INTERESTS IN ASSETS HELD AT OAK |
|---|---|
| 28 | Oak Management Corp. |
| 36 | Frozen Distributions |

| SEC NO. | AUTOMOBILES & HOUSEHOLD FURNISHINGS |
|---|---|
| 37 | Porsche Cayenne |
| 38 | Cadillac Escalade |
| 39 | Household Furnishings of 505 North Street |

| SEC NO. | BANK AND BROKERAGE ACCOUNTS |
|---|---|
| 40 | Bank of America: x9566 |
| 41 | Bank of America: x0482 |
| 42 | Bank of America: x3754 |
| 43 | Chase Bank: x9065 |
| 44 | Chase Bank: x9001 |
| 45 | Northern Trust Brokerage: x5188 |
| 46 | Northern Trust Brokerage: x3934 |
| 47 | Northern Trust Brokerage: x3935 |
| 48 | Northern Trust Brokerage: x0895 |
| 49 | Northern Trust Brokerage: x8537 |

| SEC NO. | ITEMS HELD IN STORAGE PURSUANT TO COURT ORDER |
|---|---|
| 51 | Painting - M.F. Husain, "Ashoka's Pillar" |

| SEC NO. | CONTENTS OF SAFETY DEPOSIT BOXES 1325, 1332, and 2465 |
|---|---|
| 52 | Harry Winston Diamond Ring |
| 53 | Various gold or silver coins given to minor children |
| 54 | Jewelry received as wedding presents (42 pieces) |
| 55 | Jewelry acquired during marriage (8 pieces) |
| 56 | Jewelry acquired during marriage (2 pieces) |
| 57 | Various gold or silver coins given to minor children (specific weights) |
| 58 | Gold pieces received as wedding presents |
| 59 | 1 kilogram gold bars acquired during marriage (9 pieces) |
| 60 | Remaining contents in safety deposit boxes |

SPA-145

| SEC NO. | DIYA Capital Management LLC |
|---|---|
| 61 | Bank of America: x4199 |

| SEC NO. | DIYA Holdings LLC |
|---|---|
| 62 | Bank of America: x3831 |
| 63 | Apartment (530 Park, 12A, New York, NY) |
| 64 | Bank of America: x6009 |

| SEC NO. | DIYA Real Holdings LLC |
|---|---|
| 65 | Bank of America: x7632 |
| 66 | Apartment (530 Park, 12F, New York, NY) |

| SEC NO. | I-Cubed Domains LLC |
|---|---|
| 67 | Bank of America: x8384 |
| 68 | Blade Networks Investment |
| 69 | Aldrich Capital Investment (liquidated April 2018) |
| 70 | Reserve Media Investment |

| SEC NO. | Iftikar A. Ahmed Family Trust |
|---|---|
| 71 | TD Ameritrade: x7686 |
| 72 | Iftikar A. Ahmed Family Trust interest in Rakitfi Holdings LLC |

| SEC NO. | Iftikar Foundation |
|---|---|
| 73 | Bank Check to the Iftikar Foundation (charitable contribution) |

| SEC NO. | Shalini A. Ahmed 2014 Grantor Retained Trust |
|---|---|
| 74 | Fidelity: x8965 |

| SEC NO. | Shalini A. Ahmed |
|---|---|
| 75 | Fidelity: x7540 |
| 76 | Fidelity: x5070 |
| 77 | Fidelity: x5760 |
| 78 | Pershing/BNY Brokerage: x0166 |
| 79 | TD Bank Checking: x2774 |

| 80 | Cash (Held by HSC LLP) |
|----|------------------------|
| 81 | Cash (Held by Murtha Cullina LLP) |
| 82 | Paintings (2) |
| 83 | Sculpture of hand |
| 84 | Harry Winston Earrings |
| 85 | 13 women's designer handbags |

| SEC NO. | UTMAs |
|---------|-------|
| 86 | Fidelity: x1895 |
| 87 | Fidelity: x8036 |
| 88 | Fidelity: x9441 |
| 89 | TD Ameritrade: x7666 |
| 90 | TD Ameritrade: x7674 |
| 91 | TD Ameritrade: x7700 |
| 92 | Bank of America Trust: x4104 |
| 93 | Bank of America Trust: x0070 |
| 94 | Bank of America Trust: x5699 |

This Final Judgment shall be entered against Defendant Ifitkar Ahmed. The Clerk is requested to close this case. This Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of September, 2018.

8

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>    *Plaintiff,*<br>*v.*<br>IFTIKAR AHMED,<br>    *Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>    *Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br><br>December 14, 2018 |

**SUPPLEMENTAL RULING ON REMEDIES**

The Court's Ruling on Plaintiff's Motion for Remedies and Judgment [Doc. # 955] calculated the value of the disgorgement and civil penalty awards in this case. The parties subsequently dispute whether Mr. Ahmed must turn over any interest or gains on assets used to satisfy that disgorgement award and, if so, whether he must turn over the actual gains on those assets or an amount calculated by applying the "checking account" interest rate to the disgorgement amount.

The SEC argues that 1) Defendant must turn over interest or gains on the disgorged assets under both *SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013), and this Court's remedies ruling; and 2)

the proper measure of that amount owed by Mr. Ahmed is the actual gains or returns on the disgorged assets, in other words, the amount by which the value of the disgorged assets has increased from the outset of the asset freeze until the time the assets are used to satisfy the judgment. Defendant and Relief Defendants argue that 1) Defendant is not obligated to turn over any interest or gains on the disgorged assets; but 2) if he is so obligated, the interest owed should be calculated by applying the "checking account" interest rate to the amount of the disgorgement award. The parties agree that, if any interest or gains are awarded, it shall be only on the disgorged assets, not on assets used to satisfy the civil penalty judgment.

In the earlier remedies ruling, the Court ruled that, "as instructed by the Second Circuit in *Razmilovic*, . . . the actual returns on the frozen assets, the amount of which have not yet been determined, must also be disgorged." ([Doc. # 955] at 14.) The *Razmilovic* court held that where

> the defendant has had some or all of his assets frozen at the behest of the government in connection with the enforcement action, an award of prejudgment interest relating to those funds would be inappropriate with respect to the period covered by the freeze order, for the defendant has already, for that period, been denied use of those assets. In such a case, after a final order of disgorgement, the funds previously frozen would presumably be turned over to the government in complete or partial satisfaction of the disgorgement order, along with any interest that has accrued on them during the freeze period.

738 F.3d at 36. The Second Circuit rejected a percentage-based interest calculation in favor of the actual "interest that has accrued" during the freeze, i.e. the amount by which the value of those assets increased during the freeze. *See id.* (rejecting district court's award of prejudgment interest at IRS underpayment rate as "inappropriate with respect to" disgorged frozen assets). Under *Razmilovic*'s reasoning, Mr. Ahmed is required to turn over the actual gains or returns on disgorged assets accrued during the asset freeze. The primary purpose of disgorgement—to "deprive violators [of securities laws] of their ill-gotten gains, thereby effectuating the deterrence

2

objectives of those laws," *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996)—also supports this result, since permitting violators of securities laws to keep the accrued interest or gains on disgorged assets would not effectively deprive them of all ill-gotten gains.

Another district court in this circuit applied *Razmilovic* and reached a similar conclusion in determining the proper measure of interest owed on disgorged assets which were frozen during an SEC enforcement action. *SEC v. Tavella*, 77 F. Supp. 3d 353 (S.D.N.Y. 2015). That court held that *Razmilovic* required the defendant turn over "any actual return on the frozen assets," reasoning that "otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal." *Id.* at 360-361.

In support of their arguments, Defendant and the Relief Defendants cite *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), in which the Second Circuit declined to order "the disgorging of profits and income earned on" the defendants' ill-gotten gains, finding that such an order would be an improper penalty assessment. However, as discussed below, because the reasons articulated by the Second Circuit in support of that decision do not apply to Mr. Ahmed's circumstances, the Court concludes that *Manor Nursing* does not control here.

First, the Second Circuit reasoned that disgorging more from those defendants who had "invested [their ill-gotten gains] wisely" than from those defendants who had not invested so wisely would be "artibrar[y]" and, "[i]n balance," not necessary to deter future violations of securities laws. *Manor Nursing*, 458 F.2d at 1104-05 ("While compelling the transfer of the profits on the proceeds arguably might add to the deterrent effect of the court's order, this in our view does not justify arbitrarily requiring those appellants who invested wisely to refund substantially more than other appellants."). Unlike the multiple defendants in *Manor Nursing*, Mr. Ahmed is the sole

3

defendant in this case, and thus ordering Mr. Ahmed to turn over gains accrued on disgorged assets during the asset freeze presents no similar issue of arbitrariness.

Second, the *Manor Nursing* court based its decision in part on whether an award of indirect income earned on the defendants' ill-gotten gains would be appropriate to compensate the victims of the defendants' fraud. *Id* at 1104. However, the Second Circuit's current view of disgorgement is as a remedy whose "primary purpose" is to "forc[e] the defendant to give up the amount by which he was unjustly enriched," "not to compensate" victims. *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (rejecting as "immaterial" the argument that the appropriateness of disgorgement depends on whether the unjust enrichment "came from another party to the scheme rather than from the public"); *see also SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (rejecting a victim restitution purpose of disgorgement, explaining that "[w]hether or not any investors may be entitled to money damages is immaterial" because the "paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing"); *Razmilovic*, 738 F.3d at 31 ("Disgorgement 'is a method of forcing a defendant to give up the amount by which he was unjustly enriched.'") (quoting *Commonwealth Chem Secs.*, 573 F.2d at 102).

Given the relevant factual differences between *Manor Nursing* and this case and the Second Circuit's approach to disgorgement, the Court finds the Defendants' analogy to *Manor Nursing* unconvincing.

In support of their argument that Mr. Ahmed should instead pay interest at the "checking account rate," he and the Relief Defendants cite no authority. Instead, they argue that *Razmilovic* and *Tavella* are inapposite because in those cases, the amount of the judgment against the defendants exceeded the value of the frozen assets. However, neither court's reasoning suggests

4

SPA-151

that fact was influential in its holding, and the Court sees no reason why that factual distinction would mandate a different outcome here.

Therefore, in addition to the disgorgement of $41,920,639.00 already awarded, Mr. Ahmed is also liable for any actual interest accrued or gains earned on the frozen assets used to satisfy that disgorgement amount.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of December, 2018.

5

SPA-152

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>　　　*Plaintiff,*<br>　　　　　*v.*<br>IFTIKAR AHMED,<br>　　　*Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>　　　*Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br><br><br>December 14, 2018 |

**RULING ON DEFENDANT'S RULE 60(b) MOTION FOR RELIEF FROM FINAL JUDGMENT AND TO STAY THE FINAL JUDGMENT**

The Court entered final judgment in this case after granting summary judgment in favor of the SEC on both the liability and remedies questions. (Final J. [Doc. # 982]; *see* Ruling on Motions for Summ. J. [Doc. # 835]; Ruling on Plaintiff's Mot. for Remedies and J. [Doc. # 955].) Mr. Ahmed now moves for relief from that judgment under Fed. R. Civ. P. 60(b), or in the alternative for a stay of the enforcement of that judgment while appeals in this case are pending. (Def.'s Rule 60(b) Mot. [Doc. # 1012].)

I.　　**RULE 60(b) RELIEF FROM JUDGMENT**

A court may relieve a party from a final judgment

for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

Mr. Ahmed argues that relief from the judgment under Rule 60(b) is proper under subparts (1), (3), and (6). Under Rule 60(b)(1), relief from judgment may be appropriate where the court has committed a mistake of law or fact, or where a party has committed excusable neglect. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 394 (1993) (discussing factors to determine whether a party's neglect was excusable); *In re 310 Associates*, 346 F.3d 31, 35 (2d Cir. 2003) (Rule 60(b)(1) is "available for a district court to correct legal errors by the court" or to "reopen a judgment based on [the court's] own mistake of fact"). Under Rule 60(b)(3), relief from judgment is available only where the movant provides "clear and convincing evidence of material misrepresentations." *Fleming v. New York University*, 865 F.2d 478, 484 (2d Cir. 1989). Rule 60(b)(6) "is 'properly invoked . . . where the judgment may work an extreme undue hardship'" and where no other subparts apply. *DeWeerth v. Baldinger*, 38 F.3d 1266, 1272 (2d Cir. 1994) (quoting *Matarese v. LeFevre*, 801 F.2d 98, 107 (2d Cir. 1986)).

However, no Rule 60(b) motion shall be granted unless "the moving party demonstrates 'exceptional circumstances.'" *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1142 (2d Cir. 1994)). Importantly, Rule 60(b)

2

motions under any subpart which "seek[] only to relitigate issues already decided" shall not be granted. *Whitaker v. New York University*, 543 Fed. App'x 113, 114 (2d Cir. 2013).

Mr. Ahmed identifies neither a mistake of law or fact by the Court nor any clear and convincing evidence of material misrepresentation. Instead, Defendant seeks to relitigate the proper value and disposition of assets held by Oak. Mr. Ahmed acknowledges that he "put[] in a myriad of motions throughout this litigation" about those assets and that the Court previously "ruled the 'defendant forfeited his rights'" to them. (Def.'s Mot. at 3 (quoting Ruling on Remedies and J. at 28).) Therefore, Mr. Ahmed's assertion that this question nonetheless "has not been subject to any litigation," (*id.*), is unconvincing. Mr. Ahmed also argues that his motion is not an attempt at relitigation because it is in response to the Court's first ruling regarding the status of the Oak assets. (*See* Def.'s Reply [Doc. # 1031] at 1-2 ("the Defendant's Rule 60(b) motion is only triggered by the Court's Rulings for the first time on [this] topic" wherein the "Court had stated for the first time ever that these assets have been forfeited").) This argument is similarly unavailing, since the Court need not have ruled on this question multiple times for it to be an "issue[] already decided" which is not properly subject to a Rule 60(b) motion.

In addition to his efforts to relitigate the status of the Oak assets, Mr. Ahmed also proffers new arguments[1] regarding the judgment against him, claiming violations of his constitutional

---

[1] Defendant styles his argument regarding due process violations as a request for relief under Rule 60(b)(3), which provides for relief from judgment in the event of fraud, misrepresentation, or misconduct by an opposing party. Because Mr. Ahmed makes no allegations of fraud, misrepresentation, or misconduct in relation to his due process arguments, the Court treats those arguments, along with arguments regarding Defendant's right to a jury trial, as requests for relief under Rule 60(b)(6), which provides relief from judgment for "any other reason that justifies relief."

3

rights to due process and jury trial "in the awarding of substantial remedies in law in the guise of equitable remedies." (Def.'s Mot. at 18.)

First, Defendant argues that his due process rights were violated under the *Mathews v. Eldridge* framework, which sets out three factors for courts to balance in determining violations of procedural due process rights. 424 U.S. 319 (1976). But that framework applies to determine "the extent to which due process requires an evidentiary hearing prior to the deprivation of some type of property interest," *id.* at 333, not whether a court's judgment, entered after many hearings and years of litigation, is a substantively proper deprivation of a defendant's property interest.

Second, Mr. Ahmed argues that summary judgment in this case was "constitutionally void" because it "sacrifice[ed] Due Process" by "rel[ying] in whole or in part" on a "negative inference" from the "invocation of [his] constitutional Fifth Amendment rights." (Def.'s Mot. at 19.) To the extent that Mr. Ahmed seeks here to relitigate the propriety of drawing inferences from his invocation of his Fifth Amendment rights, that question has already been litigated and decided by the Court and is not properly subject to a Rule 60(b) motion. (*See* Ruling on All Parties' Mots. for Summ. J. on Liabilty [Doc. # 135] at 24-25 (deciding inference to be drawn from Defendant's invocation of the Fifth Amendment).)

Third, Mr. Ahmed asserts violations of his constitutional right to a jury trial "with respect to the right to have his appeal heard on the merits by the appropriate appellate court based on U.S. Supreme Court precedents." (Def.'s Mot. at 20.) To the extent that Mr. Ahmed claims violation of his right to appeal, his claim is unavailing as his appeals in this case have already been filed are currently pending before the Second Circuit. (*See* Nots. of Appeal [Docs. # 988, 992].) This claim also fails to the extent that Mr. Ahmed argues that his right to a jury trial was violated by the use of summary judgment to adjudicate the claims against him. *See* Fed. R. Civ. P. 56(a) (summary

4

SPA-156

judgment "shall" be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Mr. Ahmed's disagreement with the Court's grant of summary judgment in this case is not a ground for Rule 60(b) relief, nor does it suggest that his constitutional right to jury trial was violated.

Because Mr. Ahmed has not demonstrated that relief from the judgment is appropriate under any subpart of Rule 60(b), his Motion [Doc. # 1012] is DENIED as to its request for relief from judgment under Rule 60(b).

## II.    STAY OF JUDGMENT

In the alternative, Defendant requests a stay of enforcement of the judgment against him pending resolution of his appeals to the Second Circuit. (Def.'s Mot. at 1.) In support of this request, Mr. Ahmed argues that (i) liquidation at this time of assets "belonging to the Defendant that are in the possession of the alleged victim, Oak" would "render the owners of these assets to a significantly and irreversibly worse position in that scenario, and hence is premature"; (ii) "the SEC and Oak have been and continue to be more than excessively protected by this asset freeze"; and (iii) "any liquidation or monetization of any assets prior to the exhaustion of all appellate procedures . . . would result in a misuse of additional money, resources and time" for all parties because "there are various collection efforts that the SEC may use against different parts of the judgement," e.g. the Federal Rules of Civil Procedure with regard to the disgorgement award and the Fair Debt Collection Practices Act with regard to the civil penalty award. (Def.'s Reply at 6-7.) Defendant notes that he "has no issue with the asset freeze remaining on all his assets while the appeal(s) is pending" but then requests "a nominal and appropriate amount of funds to be released so that he can hire qualified counsel to represent him on appeal(s)." (*Id.* at 8.)

5

The SEC opposes Defendant's request for a stay on several grounds. First, the SEC argues that "a Rule 60(b) motion is not the proper vehicle to make such a request." (Pl.'s Opp. [Doc. # 1022] at 3.) However, because "a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), the Court will address the merits of Defendant's request for a stay of judgment.

The SEC argues that no stay of judgment should be granted because the "norm is, even in the face of an appeal," that a judgment is executed while the appeal is pending, and because Mr. Ahmed has not met his "high burden to show why the judgment should [not] be executed." (Tr. from November 28, 2018 hearing [Doc. # 1043] at 102:25-103:22.)

If the Court finds that Defendant has met that burden, the SEC then argues that a stay should be granted only "if Defendant posts a [supersedas] bond or his assets remain frozen" and that no funds should be released "unless and until, at a minimum, a receiver is appointed to value the totality of Defendant's assets to determine whether the requested release will risk that the SEC is not able to fully collect on its judgment." (Pl.'s Opp. at 3.) In the alternative, the SEC requests that the Court "use its discretion to allow the Defendant to put up an alternative security that affords the same protection" as a supersedas bond, i.e. liquidating and freezing a portion of the currently frozen assets sufficient to "guarantee that the SEC is going to be no worse off" when the judgment is executed after the appeal. (Tr. at 103:9-104:9.)

"While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). Requests for a stay of judgment under Rule 62 must be considered in light of four "traditional stay factors": "(1) whether the stay applicant has

SPA-158

made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776-777 (1987).

First, Mr. Ahmed has made no showing as to his appeal's likelihood of success on the merits. (*See generally* Def.'s Mot; Def.'s Reply.) Second, Defendant argues that he would be irreparably injured absent a stay by liquidation of assets to which he claims ownership. (*See* Def.'s Reply at 6.) Third, Mr. Ahmed argues that because his assets would remain frozen if the judgment is stayed, the SEC would not be injured by the stay. (*Id.*) Fourth, Mr. Ahmed makes no argument as to the public interest regarding issuance of a stay of judgment in this case. (*See generally id.* at 5-8.)

To avoid any irreparable harm which might result from distribution of assets while appeals are pending, the Court will stay enforcement of the judgment only as to distribution of assets in satisfaction of the judgment. Defendant's assets will remain frozen during the pendency of the appeal, serving as the functional equivalent of a supersedas bond to ensure that the SEC, should it prevail on appeal, will not be injured by the stay. The process of preparing for any post-appeal distribution of assets to satisfy the judgment, including but not limited to appointment of a receiver or other process for valuing and liquidating frozen assets, the valuation of those assets, and any liquidation of illiquid frozen assets needed to secure the judgment, is not stayed.

SPA-159

### III.    CONCLUSION

For the reasons stated above, Defendant's Motion for Relief from Final Judgment and Order [Doc. # 1012] is DENIED as to his request for relief from the judgment under Rule 60(b), and GRANTED in part as to his request for a stay of judgment insofar as no assets will be distributed to satisfy the judgment while appeals are pending.

IT IS SO ORDERED.

*/s/*

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of December, 2018.

SPA-160

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>   *Plaintiff,*<br>   *v.*<br>IFTIKAR AHMED,<br>   *Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>   *Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br><br><br>December 14, 2018 |

**RULING ON PLAINTIFF'S AND RELIEF DEFENDANTS' MOTIONS TO AMEND AND CLARIFY THE JUDGMENT**

In granting Plaintiff's Motion for Remedies and Judgment, the Court directed the SEC to "file a proposed Order of Final Judgment," (Ruling on Pl.'s Mot. for Remedies and J. [Doc. # 955] at 32 n.28), which the SEC subsequently did, (SEC's Proposed Final J. [Doc. # 960]). Relief Defendants and Defendant submitted their objections to the SEC's proposed judgment, ([Docs. # 962, 963]), to which the SEC replied, ([Doc. # 981]). The Court then entered a Final Judgment against Mr. Ahmed, ([Doc. # 982]), and issued a ruling addressing the disputes identified in the parties' submissions regarding the proposed judgment, ([Doc. # 986]). Both the Relief Defendants

and the SEC now move separately for amendments of the judgment entered by the Court. (Rel. Defs.' Mot. to Alter or Amend J. [Doc. # 1013]; SEC's Mot. for Order Clarifying Final J. [Doc. # 1034].)

## I.    RELIEF DEFENDANTS' MOTION TO AMEND THE JUDGMENT

The Relief Defendants move under Fed. R. Civ. P. 59(e) for an amendment of the Final Judgment "(i) to incorporate the conclusions [the Court] reaches on unresolved issues following the" November 28, 2018, hearing, and "(ii) to expressly state that it is entered against Relief Defendants and fully and finally resolves Counts Seven through Fourteen of the Second Amendment Complaint." (Rel. Defs.' Mot. to Amend at 1.) Relief Defendants argue that these modifications of the judgment are necessary to "avoid questions of multiple, piecemeal appeals which might otherwise arise" and so that appeals by Relief Defendants "may be taken in the normal course." (Rel. Defs.' Mem. Supp. Mot. to Amend [Doc. # 1013-1] at 2-3.)

Mr. Ahmed joins the Relief Defendants in their request to amend the judgment. (Def.'s Resp. to Rel. Defs.' Mot. [Doc. # 1014] at 1.)

The SEC opposed the Relief Defendants' motion, arguing (i) that it is improperly styled as a Rule 59(e) motion because it does not genuinely seek reconsideration of the Court's rulings; (ii) that the Relief Defendants' proposed modifications of the judgment are enforcement questions which cannot be finalized until the judgment is executed or are "proper post-judgment items that do not need to be incorporated into the final judgment"; and (iii) that the judgment is not a final judgment against the Relief Defendants because "there are technically still outstanding claims against Relief Defendants under the traditional *Cavanaugh* analysis" which the SEC argued in the alternative and which the Court did not need to reach in its summary judgment rulings. (SEC's Opp. to Rel. Defs.' Mot. [Doc. # 1023] at 3-4.)

2

During the November 28, 2018 hearing, counsel for the Relief Defendants reiterated their requests to clarify that the judgment is against the Relief Defendants and to include in an amended final judgment the Court's decision regarding whether Mr. Ahmed is also liable for interest or gains on disgorged frozen assets, but acknowledged that the Court's decisions on other enforcement-related questions, e.g. the appointment of a receiver, need not be included in the judgment. Counsel for the SEC represented that its only concern with such an amendment is that, if the Court's ruling regarding the Relief Defendants' liability as nominees is overturned on appeal, the SEC seeks to ensure that it is not precluded from litigating the merits of its alternative theory of the Relief Defendants' liability, i.e. the traditional *Cavanaugh* theory of liability.

Pursuant to this agreement with the parties and in the interest of judicial efficiency to avoid the possibility of piecemeal appeals, the Court will amend the Final Judgment [Doc. # 955] to incorporate its ruling [Doc. # 1051] that Mr. Ahmed is liable for gains accrued on disgorged frozen assets and to indicate that it is a final judgment against both Defendant and the Relief Defendants. Such amendment reflects the Court's holdings in its rulings on summary judgment but does not extinguish the SEC's remaining alternative *Cavanaugh* theory of liability against the Relief Defendants.

## II.    SEC'S MOTION TO CLARIFY THE JUDGMENT

The SEC moves "for an order *nunc pro tunc* clarifying the September 27, 2018 Final Judgment against Iftikar Ahmed [Doc. # 987] was in fact a final judgment," noting that it "would have been prudent for the SEC to include specific Rule 54(b) language in the proposed final judgment." (SEC's Mot. to Clarify J. [Doc. # 1034] at 1.) The SEC seeks this amendment or clarification to "eliminate the risk that Defendant (or Relief Defendants) will attempt to use the

3

**SPA-163**

absence of such language to delay this matter on appeal, and to make clear that the court of appeals

has jurisdiction to consider this Court's judgment." (*Id.* at 1-2.)

Defendant and Relief Defendants have not opposed the SEC's motion. In the interest of

judicial efficiency, the Court will modify the Final Judgment to incorporate the Rule 54(b) language

as requested by the SEC.

## III.   CONCLUSION

For the reasons stated above, the Relief Defendants' Motion to Amend the Judgment [Doc.

# 1013] is GRANTED as modified in open court on November 28, and the SEC's Motion to Clarify

the Judgment [Doc. # 1034] is GRANTED.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of December, 2018.

4

**SPA-164**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>    *Plaintiff*,<br>    *v.*<br>IFTIKAR AHMED,<br>    *Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUNITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>    *Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br>December 14, 2018 |

**AMENDED FINAL JUDGMENT AGAINST DEFENDANT AND RELIEF DEFENDANTS**

On March 29, 2018, the Court granted [Doc. # 835] the Plaintiff U.S. Securities and Exchange Commission's (the "Commission") Motion for Summary Judgment on Liability finding that Defendant Iftikar Ahmed was liable for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 206 of the Investment Advisers Act ("Advisers Act") for defrauding entities he advised and placing those monies into accounts and assets he controlled; and

**SPA-165**

On September 6, 2018, the Court granted [Doc. # 955] the Commission's Motion for Remedies and Judgment, with modification, concluding that the Commission is entitled to a final judgment against Defendant that (1) permanently enjoins Defendant from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; (2) orders the Defendant to disgorge $41,920,639 plus prejudgment interest for the period of time prior to the asset freeze, and interest and gains returned on the frozen assets during the pendency of the freeze; and (3) imposes a civil penalty of $21,000,000 against Defendant;

Accordingly, (1) IT IS HEREBY ORDERED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment

**SPA-166**

by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

(2) IT IS HEREBY FURTHER ORDERED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

(3) IT IS HEREBY FURTHER ORDERED that Defendant is permanently restrained and enjoined from violating Sections 206(1), 206(2), 206(3) and 206(4) of the Investment Advisors Act of 1940 [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(3), and 80b6(4)] and Rule 206(4)-8 thereunder [17

3

C.F.R. § 275.206(4)-8)] by the use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, (i) to employ any device, scheme, or artifice to defraud any client or prospective client, (ii) to engage in any transaction, practice, or course of business which operates as fraud or deceit upon any client or prospective client, (iii) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction; or (iv) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

IT IS FURTHER ORDERED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

(4) IT IS HEREBY FURTHER ORDERED that Defendant is liable for disgorgement of $41,920,639, representing profits gained as a result of the conduct alleged in the Second Amended Complaint that occurred within five years of the initiation of this case, together with prejudgment interest thereon in the amount of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order.

(5) IT IS HEREBY FURTHER ORDERED that Defendant is liable for a civil penalty in the amount of $21,000,000 pursuant to Section 21A of the Exchange Act.

4

(6) IT IS HEREBY FURTHER ORDERED that the amount of interest and returns on frozen assets which Defendant must turn over, from the time this Court entered a Temporary Restraining Order on May 7, 2015, to the time that such assets and returns are released from the asset freeze to be paid over to a receiver, the SEC, the Court, or distributed to victims, will be determined by a receiver or such other process that this Court will order.

(7) IT IS FURTHER ORDERED that the following assets are available to satisfy this Final Judgment against Defendant:

| SEC NO.[1] | BANK AND BROKERAGE ACCOUNTS |
|---|---|
| 1 | E*Trade: x6818 |
| 2 | HSBC: x2984 |
| 3 | Northern Trust: x5218 |
| 4 | Northern Trust: x3911 |
| 5 | Northern Trust: x0901 |
| 6 | Northern Trust: x5226 (50% owned by Iftikar Ahmed) |
| 7 | Northern Trust: x5234 (60% owned by Iftikar Ahmed) |
| 8 | Northern Trust: x3781 |
| 9 | Northern Trust: x7193 |
| 10 | TD Bank: x5279 |
| 11 | TD Bank: x8551 |
| 12 | Fidelity: x8133 (50% owned by Iftikar Ahmed) |
| 13 | Fidelity: x7417 (50% owned by Iftikar Ahmed) |
| 14 | Fidelity: x9637 |
| 15 | Circle Internet Finance Bitcoin Wallet |

SPA-169

| SEC NO. | REAL PROPERTY |
|---|---|
| 18 | Essell Farm (1820 County Route 7, Ancram, NY) (50% owned by Iftikar Ahmed) |

| SEC NO. | PRIVATE COMPANY INVESTMENTS |
|---|---|
| 19 | Ribbit Capital (60% owned by Iftikar Ahmed) |
| 20 | Ribbit Capital II (60% owned by Iftikar Ahmed) |
| 21 | Clues Network Inc. (60% owned by Iftikar Ahmed) |
| 23 | Crypto Currency Partners LP |
| 24 | iMENA |

| SEC NO. | LIFE INSURANCE POLICIES |
|---|---|
| 25 | MetLife Whole Life Insurance Policy (Iftikar Ahmed) |
| 26 | Genworth Life and Annuity Insurance Policy (Iftikar Ahmed) |
| 27 | American General Life Insurance Policy (Iftikar Ahmed) |

| SEC NO. | INTERESTS IN ASSETS HELD AT OAK |
|---|---|
| 28 | Oak Management Corp. |
| 36 | Frozen Distributions |

| SEC NO. | AUTOMOBILES & HOUSEHOLD FURNISHINGS |
|---|---|
| 37 | Porsche Cayenne |
| 38 | Cadillac Escalade |
| 39 | Household Furnishings of 505 North Street |

| SEC NO. | BANK AND BROKERAGE ACCOUNTS |
|---|---|
| 40 | Bank of America: x9566 |
| 41 | Bank of America: x0482 |
| 42 | Bank of America: x3754 |
| 43 | Chase Bank: x9065 |
| 44 | Chase Bank: x9001 |
| 45 | Northern Trust Brokerage: x5188 |
| 46 | Northern Trust Brokerage: x3934 |
| 47 | Northern Trust Brokerage: x3935 |
| 48 | Northern Trust Brokerage: x0895 |
| 49 | Northern Trust Brokerage: x8537 |

| SEC NO. | ITEMS HELD IN STORAGE PURSUANT TO COURT ORDER |
|---|---|
| 51 | Painting - M.F. Husain, "Ashoka's Pillar" |

| SEC NO. | CONTENTS OF SAFETY DEPOSIT BOXES 1325, 1332, and 2465 |
|---|---|
| 52 | Harry Winston Diamond Ring |
| 53 | Various gold or silver coins given to minor children |
| 54 | Jewelry received as wedding presents (42 pieces) |
| 55 | Jewelry acquired during marriage (8 pieces) |
| 56 | Jewelry acquired during marriage (2 pieces) |
| 57 | Various gold or silver coins given to minor children (specific weights) |
| 58 | Gold pieces received as wedding presents |
| 59 | 1 kilogram gold bars acquired during marriage (9 pieces) |
| 60 | Remaining contents in safety deposit boxes |

| SEC NO. | DIYA Capital Management LLC |
|---|---|
| 61 | Bank of America: x4199 |

| SEC NO. | DIYA Holdings LLC |
|---|---|
| 62 | Bank of America: x3831 |
| 63 | Apartment (530 Park, 12A, New York, NY) |
| 64 | Bank of America: x6009 |

| SEC NO. | DIYA Real Holdings LLC |
|---|---|
| 65 | Bank of America: x7632 |
| 66 | Apartment (530 Park, 12F, New York, NY) |

| SEC NO. | I-Cubed Domains LLC |
|---|---|
| 67 | Bank of America: x8384 |
| 68 | Blade Networks Investment |
| 69 | Aldrich Capital Investment (liquidated April 2018) |
| 70 | Reserve Media Investment |

| SEC NO. | Iftikar A. Ahmed Family Trust |
|---|---|
| 71 | TD Ameritrade: x7686 |
| 72 | Iftikar A. Ahmed Family Trust interest in Rakitfi Holdings LLC |

| SEC NO. | Iftikar Foundation |
|---|---|
| 73 | Bank Check to the Iftikar Foundation (charitable contribution) |

| SEC NO. | Shalini A. Ahmed 2014 Grantor Retained Trust |
|---|---|
| 74 | Fidelity: x8965 |

| SEC NO. | Shalini A. Ahmed |
|---|---|
| 75 | Fidelity: x7540 |
| 76 | Fidelity: x5070 |
| 77 | Fidelity: x5760 |
| 78 | Pershing/BNY Brokerage: x0166 |
| 79 | TD Bank Checking: x2774 |

| | |
|---|---|
| 80 | Cash (Held by HSC LLP) |
| 81 | Cash (Held by Murtha Cullina LLP) |
| 82 | Paintings (2) |
| 83 | Sculpture of hand |
| 84 | Harry Winston Earrings |
| 85 | 13 women's designer handbags |

| SEC NO. | UTMAs |
|---|---|
| 86 | Fidelity: x1895 |
| 87 | Fidelity: x8036 |
| 88 | Fidelity: x9441 |
| 89 | TD Ameritrade: x7666 |
| 90 | TD Ameritrade: x7674 |
| 91 | TD Ameritrade: x7700 |
| 92 | Bank of America Trust: x4104 |
| 93 | Bank of America Trust: x0070 |
| 94 | Bank of America Trust: x5699 |

Inasmuch as the Court's rulings on the parties' motions for summary judgment [Doc. # 835] and motions for remedies [Doc. # 955] disposed of all claims against Defendant, and further

found that Relief Defendants were nominal owners of Defendant's assets and thus the Court need not reach the SEC's remaining claims against Relief Defendants, (Ruling on Remedies and J. [Doc. # 955] at 24 n.20), there is no just reason for the delay of entry of final judgment against Defendant and Relief Defendants.

This Final Judgment shall be entered against Defendant Ifitkar Ahmed and Relief Defendants Iftikar Ahmed Sole Prop.; I-Cubed Domains, LLC; Shalini Ahmed; Shalini Ahmed 2014 Grantor Retained Annuity Trust; Diya Holdings, LLC; DIYA Real Holdings, LLC; I.I. 1, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents; I.I. 2, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents; and I.I. 3, a minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents. The Clerk is requested to close this case. This Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment. Distribution of assets in effectuation of this judgment will be stayed during the pendency of appeals in this case. The asset freeze will continue and will effectively serve as Defendant's supersedas bond to secure the judgment while stayed.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of December, 2018.

SPA-173

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil No. 3:15cv675 (JBA) |
| *Plaintiff,* | |
| *v.* | |
| IFTIKAR AHMED, | December 20, 2018 |
| *Defendant*, and | |
| IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, | |
| *Relief Defendants.* | |

**ORDER APPOINTING RECEIVER**

Judgment was entered against the Defendant and Relief Defendants, holding Mr. Ahmed liable for disgorgement of $41,920,639 plus prejudgment interest of $1,491,064.01 and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order, and a civil penalty of $21,000,000. (Amended Final J. [Doc. # 1054] at 4.) The judgment in this case has been stayed only insofar as no assets will be distributed in satisfaction of the judgment while appeals are pending. (*See id.* at 9; Ruling on Def.'s Mot. to Stay the Judgment [Doc. # 1052] at 5-7.) The "process of preparing for any post-appeal distribution of assets to satisfy the judgment, including but not limited to appointment of a receiver or other process for valuing and liquidating frozen

assets, the valuation of those assets, and any liquidation of illiquid frozen assets needed to secure

the judgment, is not stayed." (Ruling on Def.'s Mot. to Stay at 7.)

I.    DISCUSSION

A. BACKGROUND

The parties briefed issues related to enforcement of the judgment, including the possible

appointment of a receiver or other process for valuing, liquidating, and, if necessary, distributing

assets in satisfaction of that judgment. A hearing was held on November 28, 2018 at which the SEC

and the Relief Defendants made proposals as to the proper method of enforcing the judgment and

presented potential receiver candidates. (*See* Tr. of Nov. 28 Hearing [Doc. # 1043]; *see also* Def.'s

Resp. to Hearing [Doc. # 1057]; SEC's Post-Hearing Brief [Doc. # 1059].)

Counsel for the SEC represented that it is "not asking to give these [disgorged] funds to

victims now," but argues that funds sufficient to satisfy the judgment should be liquidated and/or

transferred "in cash . . . into a court-monitored account." (Tr. at 102:21-24.) The SEC asks the

Court to "liquidate sufficient assets to obtain the amount of the judgment" in order to "guarantee

that the SEC is going to be no worse off" if the judgment is affirmed on appeal. (*Id.* at 104:1-9.)

Under the SEC's proposal, "any other funds that remain" after the amount of the judgment is

secured in cash "are released from the asset freeze." (*Id.* at 104:15-18.) The SEC argues that a

receiver should be appointed to (i) "value the [frozen] assets . . . to determine which assets need to

be liquidated to satisfy the judgment," "start[ing] with the most liquid" assets and continuing "until

you get an amount to satisfy the judgment"; (ii) "take control of the assets, especially those that are

subject to risk of decline or need monitoring"; (iii) "determine how to manage these assets"; (iv)

"pay any necessary taxes upon liquidation and wind down the entities holding the assets"; and (v)

to liquidate assets in an amount sufficient to satisfy the judgment and place them in a court-monitored account for holding while appeals are pending. (*Id.* at 110:3-113:6.)

Relief Defendants propose (i) that the judgment be secured by "liquidat[ing] assets to secure cash of $46.4 million" which would "secure the disgorgement and the prejudgment interest amount in full"; (ii) "the New York apartments, the farm, and the assets at Oak would be valued by a mutually-agreed third party . . . and would be used to secure the remainder of the judgment for the SEC"; (iii) $3 million be released from the asset freeze to pay legal expenses for appeals and living expenses; and (iv) because "at that point, the SEC would be secured, the remaining assets would be released." (*Id.* at 117:15-119:3.) Relief Defendants argue that, because assets sufficient to secure the judgment would either be in cash or remain frozen, "we don't need a large receivership at this time." (*Id.* at 119:1-3.) Under the Relief Defendants' proposal, the proper role of any receiver or third party would only be to value the assets used to secure the remainder of the judgment. Any liquidation of assets needed to secure the $46.4 million in cash would be conducted by the Defendant or the Relief Defendants themselves. (*Id.* at 117:20-21.)

Defendant argues that a receiver is not "necessary in this case." (Def.'s Resp. to Hearing at 17.) He suggests that only an "evidentiary hearing on the value of the non-forfeited Oak assets and independent appraisals . . . [of] the two NYC apartments and the farm" are needed at this time, and that "a receiver is not needed for these valuation exercises." (*Id.*) Instead of appointing a receiver to value and liquidate assets to secure the judgment, Mr. Ahmed urges the Court (i) to apply the value of those non-forfeited Oak assets to the disgorgement award, reducing the award by that amount; and (ii) "then [] and only then" to "discuss how to secure the judgment for the SEC, as the rest of the judgment amount depends on this critical determination first." (*Id.* at 6.) Instead of enlisting a receiver or third party to value and liquidate assets, Mr. Ahmed proposes that

3

SPA-176

(i) the asset freeze remain in place to secure the judgment; (ii) a receiver be appointed for the "limited purposes of valuing" the two New York apartments, the farm, and all non-forfeited assets at Oak; (iii) Relief Defendants "will start opportunistically monetizing all stock, bonds, and securities held at the various brokerage houses," which will be completed within 90 days of a court order, and the cash from which sales would "stay in their respective accounts as they are today"; (iv) "the SEC will consent to the immediate release of $500K for the Relief Defendants' appellate counsel of their choice"; (v) there shall be "no distributions pending appeal(s)" but the three properties should be rented out if possible to generate cash flow "to pay the Relief Defendant's living expenses and legal counsel." (*Id.* at 38-39.) Mr. Ahmed also requests that, if his proposal is "not acceptable" to the Court, a mediator be appointed "to try and determine a mutual and consensual agreement . . . between all parties before this esteemed Court rules" on the appropriate next steps to enforce the judgment. (*Id.* at 40.)

### B.  APPOINTMENT OF RECEIVER

Appointment of a receiver in an SEC enforcement action is within the Court's equitable discretion. *See S.E.C. v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) ("Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists . . . where necessary to prevent the dissipation of a defendant's assets pending further action by the court." (internal citation omitted)); *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1065) ("While it is true that the Act does not explicitly provide for appointment of receivers, there is little reason to doubt that equitable power to do so exists.").

A receiver may perform functions like "preserv[ing] the status quo" and avoiding "difficult[y in] implement[ing] the court's order to refund the misappropriated proceeds" to

4

victims. *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972). Moreover, where a defendant has engaged in "fraudulent conduct," it is "not unreasonable for the court to conclude that it could not rely" on the defendant to assist in effectuating the judgment and to instead appoint a receiver to do so. *Id.*

This case involves a substantial collection of currently frozen assets which must be managed, valued, and/or liquidated while appeals are pending, and distributed should the SEC prevail on appeal. The Court recognizes the parties' concerns regarding the potential cost of a receiver and shares their desire to avoid unnecessary or high receivership costs. Nonetheless, given the need to value the frozen assets and avoid over-freezing, to secure the judgment for the SEC, to manage and maximize the value of frozen assets under the guidance of a neutral third party, and to take necessary steps toward effectuating the judgment, the Court will appoint a receiver. In the absence of any authority in support of the Defendants' position that the SEC should pay for the costs of a receiver, all costs of the receivership in this case will be paid from among the assets of the Receivership Estate.

At the November 28 hearing, the SEC presented three receiver candidates: Jed Horwitt of Zeisler & Zeisler, P.C.; Mark Conlan of Gibbons P.C.; and William Edwards of Goldin Associates LLC. The Relief Defendants presented Robert Holzberg, Retired Judge of the Connecticut Superior Court, now of Pullman & Comley LLC. Relief Defendants also acknowledged that the candidates proffered by the SEC were "all capable" and could serve as a "mutually-agreed third party" in this case. (Tr. at 118:9, 121:12-19.) Mr. Ahmed has not proposed any receiver candidates but did express questions and concerns with regard to the SEC's proposed candidates and, "if there were to be a receiver appointed, the Defendant prefers Judge Holzberg." (*See* Def.'s Resp. at 17-27.) The

5

**SPA-178**

Court recognizes that all four proffered candidates are well qualified, as each has relevant experience and spoke knowledgeably about the role of a receiver in this case.

The Court appoints Jed Horwitt of Ziesler & Zeisler, P.C. as receiver in recognition of his breadth of experience in securities, bankruptcy, and insolvency cases; the experience and knowledge of others at his firm; and his longstanding contacts with outside experts and advisers who may be of assistance in carrying out the duties of the receiver in this case. Mr. Horwitt's fee structure was also the most cost-efficient of those proposed by the four receiver candidates. The Court also appoints Zeisler & Zeisler, P.C. as counsel for the Receiver.

### C.  POWERS AND DUTIES OF RECEIVER

#### General Powers and Duties

1. The Receiver shall control the operation of the Receivership Estate.

2. The Receivership Estate includes all assets subject to the Court's asset freeze order [Doc. # 113] as modified throughout this litigation.

3. The Defendant and Relief Defendants shall have no authority with respect to the Receivership Estate's assets, except to the extent such authority existed previously under the Court's asset freeze order or as may be hereafter expressly granted by the Receiver or the Court.

4. The Receiver shall have all powers, authorities, rights, and privileges possessed by the Defendant or Relief Defendants with regard to the assets of the Receivership Estate under applicable state and federal law, by the governing charters, by-laws, articles, and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by 28 U.S.C. §§ 754, 959 and 1692, and Fed. R. Civ. P. 66, to the extent necessary to accomplish the Receiver's duties. Nothing herein shall be construed as a requirement that the

receiver <u>must</u> take possession, custody, or control of any particular asset in the course of executing

his duties as Receiver.

5.   The Receiver shall have the following general powers and duties:

    a.   To use reasonable efforts to determine the nature, location, and value of property interests of the Receivership Estate;

    b.   To take possession, custody, and control of all records and property of the Receivership Estate;

    c.   Upon the submission by the Relief Defendants of a written request accompanied by appropriate documentation, to approve the payment of Relief Defendants' reasonable living expenses consistent with the Orders issued by this Court;

    d.   To manage, in consultation with qualified business advisors, and taking into consideration the wishes of Defendant and Relief Defendants, and with the dual objects of maximizing the realizable value of the assets of the Receivership Estate and minimizing the expense charged thereto, the assets of the Receivership Estate, pending further order of the Court or until such time that the Receivership Estate can be liquidated or modified, including but not limited to management of investments and rental and maintenance of real property;

    e.   To engage and employ persons in his discretion, as reasonably necessary, consistent with the dual objects of maximizing the value of the assets of the Receivership Estate and minimizing the expenses charged thereto, to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial advisers, liquidating agents, real estate agents and forensic experts;

    f.   To use property of the Receivership Estate for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

    g.   To take any action (whether or not in the ordinary course of business) which, prior to the asset freeze in this case, could have been taken by the Defendant or Relief Defendants with regard to the assets of the Receivership Estate;

    h.   To take such action as necessary and appropriate for the preservation of the Receivership Estate, to prevent the dissipation or concealment of assets of the Receivership Estate, and to manage the assets of the Receivership Estate, in

furtherance of the dual objects of maximizing the value of the assets of the Receivership Estate and minimizing the expenses charged thereto;

i.  To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

j.  To take such other action as may be approved by this Court.

k.  The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

l.  Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

m.  The Receiver and his agents, acting within the scope of such agency ("Retained Personnel," as defined below) are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

n.  This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

o.  In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC, the Defendant and the Relief Defendants, through counsel where appropriate, and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

### Access to Information

6.  The Defendant and Relief Defendants and any officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees thereof, as well as those

8

acting in their place, are hereby ordered and directed to turn over to the Receiver promptly upon request and to preserve all paper and electronic information of, and/or relating to, any asset of the Receivership Estate; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers, but shall not include materials which are subject to a valid attorney client privilege, or any other applicable privilege or protection from disclosure, relating to the representation of the Defendants.

7.   Within thirty (30) days of the entry of this order, Defendant and the Relief Defendants shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity and location of all assets of the Receivership Estate; and (b) all employees, other personnel, attorneys, accountants, and any other agents or contractors of the Defendants who may possess information about the assets of the Receivership Estate.

8.   The Defendant and Relief Defendants' past and/or present officers, directors, agents, members, managers, shareholders, employees, accountants, debtors, creditors, general and limited partners, and all other appropriate persons shall answer all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the assets of the Receivership Estate, or any other matter relevant to the operation or administration of the receivership; provided, however, that nothing in the foregoing is intended to require waiver of the attorney client privilege or any other applicable privilege or protection from disclosure. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make its discovery requests in accordance with the Federal Rules of Civil Procedure.

9.   The Receiver shall have authority to issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and applicable Local

Rules, except for the provisions of Fed. R. Civ. P. 26(d)(1), concerning any subject matter within the powers and duties granted by this Order.

10. The Defendant and Relief Defendants are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

**Access to Books, Records, and Accounts**

11. The Receiver is authorized to take possession, custody, and control of all assets, bank accounts or other financial accounts, real property, books and records, and all other documents or instruments relating to the assets of the Receivership Estate. All persons and entities having possession, custody, or control of any property of the Receivership Estate are hereby directed to provide access to the Receiver and to turn such property over to the Receiver at the Receiver's request.

12. The Defendant and Relief Defendants, as well as their agents, servants, employees, attorneys, any persons acting for them or on their behalf, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession, custody or control of the property, business, books, records, accounts or assets of the Receivership Estate are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

13. Upon demonstration of need, the Receiver shall allow reasonable access to the books, records, or other documents necessary for the Defendants to comply with their obligations under this Order and/or to defend themselves in this proceeding under terms and conditions which he determines to be appropriate and under the circumstances which are consistent with his obligations to preserve and protect relevant materials and with prior Court orders.

14. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds of the Receivership Estate that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:

    a. Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts of the Receivership Estate except as approved by the Receiver;

    b. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's possession, custody or control without the permission of this Court;

    c. Within five (5) business days of receipt of that notice, serve on the Receiver and counsel for the parties, including the investors, a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

    d. Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

### Access to Real and Personal Property

15. The Receiver is authorized to take possession, custody, and control of all real property in the Receivership Estate.

### Notice to Third Parties

16. The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, members, general and limited partners, and any other such persons as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

17. All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any of the Receivership Defendants shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such

SPA-184

payments shall have the same force and effect as if the applicable Defendant had received such payment.

18. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

### Injunction Against Interference with Receiver

19. The Defendant, Relief Defendants, and all persons receiving notice of this Order by personal service, facsimile, or otherwise are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

    a. Interfere with the Receiver's efforts to take possession, custody or control of, or to manage, any assets of the Receivership Estate; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any property of the Receivership Estate;

    b. Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

    c. Except with respect to authorized expenditures, dissipate or otherwise diminish the value of any property of the Receivership Estate; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any property of the Receivership Estate, enforcing judgments, assessments or claims against the property of the Receivership Estate, attempting to modify, cancel, terminate, call, extinguish,

12

revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement which affects the Receivership Estate; or,

d.   Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

20. The Defendant and Relief Defendants shall cooperate with and assist the Receiver in the performance of his duties.

21. The Receiver shall promptly notify the Court and counsel for the parties of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

**<u>Stay of Litigation</u>**

22. As set forth below, the following civil proceedings, excluding the instant enforcement action including appeals, and related actions of the SEC are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature: (a) against the Receiver, in his capacity as Receiver; (b) to obtain possession of property of the Receivership Estate, wherever located; (c) against any of the Defendants, including any wholly-owned subsidiaries and partnerships in which a Defendant is a general partner; or, (d) against any of the Defendants' past or present officers, directors, managers, members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

23. The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, unless leave of this Court is obtained, including, but not limited to, the issuance or employment of process. Any applicable statute of limitation is hereby tolled as to any and all such causes of action during the period in which this injunction against commencement of legal proceedings is in effect.

13

24. Further, as to a cause of action accrued or accruing in favor of the Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

### Managing Assets

25. The Receiver may establish one or more custodial accounts at a federally insured bank to receive and hold all cash and cash-equivalent property of the Receivership Estate ("the Receivership Funds") for the Receivership Estate.

26. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Iftikar Ahmed" together with the name of this action.

27. The Receiver may, without further Order of this Court, deposit, transfer, protect, or otherwise manage the assets of the Receivership Estate, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, subject to consultation with the Defendant and Relief Defendants, for the dual objects of maximizing the value of the Receivership Estate and minimizing the expenses relating thereto.

28. If subsequently ordered by this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, and with due regard for the interests of the Defendant and Relief Defendants, the Receiver will be authorized to lease or to sell, and transfer clear title to, all real property and ownership interests in the Receivership Estate. Any proceeds of any such sale shall be joined and held with the Receivership Funds.

### Reports

29. Within ninety (90) days after this Order is entered by the Court, the Receiver shall file and serve a report reflecting (to the best of the Receiver's knowledge as of the date of the report): (i) the

14

existence, value, and location of assets of the Receivership Funds and all other assets of the Receivership Estate which are liquid or could be liquidated with relative ease, including but not limited to publicly traded securities and brokerage accounts; (ii) the Receiver's proposal for securing the judgment using additional assets of the Receivership Estate, including the Receiver's recommendations as to which additional assets should be valued for possible liquidation and placement into a Court Registry Investment System ("CRIS") account and the order in which the Receiver proposes to liquidate such assets; and (iii) the Receiver's estimate regarding the dollar amount which should ultimately be placed into such account to fully secure the judgment, taking into consideration the amount of the judgment in this case, the costs of the receivership and administration of the Receivership Estate, and any other relevant factors.

30. Upon further order of this Court, the Receiver shall file and serve additional reports regarding the valuation of or proposing the liquidation of additional assets needed to secure the judgment.

31. The Receiver shall provide the SEC with any non-privileged documentation that the SEC needs to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

### Fees, Expenses, and Accountings

32. Subject to paragraphs 33–39 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

33. The Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not

engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

34. The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions," posted at https://www.sec.gov/oiea/Article/billinginstructions.pdf). Such compensation shall require the prior approval of the Court and shall be calculated pursuant to the following hourly billing rates:

| | |
|---|---|
| Jed Horwitt (Receiver/Administrative): | $250.00 |
| Jed Horwitt (Legal work): | $396.00 |

All Zeisler & Zeisler, P.C. attorneys: 25% percent discount to standard hourly rates.

35. Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing a finalized Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the parties and Defendant Ahmed a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by the SEC.

36. All Quarterly Fee Applications will be interim and will be subject to cost/benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

37. Quarterly Fee Applications are subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during

16

the course of the receivership may be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

38. Each Quarterly Fee Application shall:

    a.   Comply with the terms of the SEC Billing Instructions; and,

    b.   Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were necessarily incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

39. At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by the SEC, as well as the Receiver's final application for compensation and expense reimbursement.

## II.    CONCLUSION

Until further Order of this Court, Jed Horwitt of Zeisler & Seizler, P.C. is hereby appointed to serve as receiver for the assets subject to the Court's asset freeze order and is subject to the duties and powers set forth above. Zeisler & Zeisler, P.C. is also appointed as counsel for the Receiver.


IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 20th day of December, 2018.

17

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        *Plaintiff*,<br><br>    *v.*<br><br>IFTIKAR AHMED,<br><br>        *Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>        *Relief Defendants*. | Civil No. 3:15cv675 (JBA)<br><br><br><br>May 21, 2019 |

**RULING ON MOTIONS TO LIFT LITIGATION STAY**

Non-party NMR e-tailing, LLC ("NMR") and non-party Oak Management Corporation ("Oak") move separately for orders lifting the litigation stay imposed by the Order Appointing Receiver ([Doc. # 1070]). For the reasons that follow, both NMR's Motion to Intervene and Lift Litigation Stay [Doc. # 1097] and Oak's Motion to Lift Litigation Stay [Doc. # 1132] are granted.

**I.    Background**

On December 20, 2018, Jed Horwitt, Esq. of Zeisler & Zeisler, P.C. was appointed to serve as receiver for the assets subject to the Court's ongoing asset freeze order to "value the frozen assets and avoid over-freezing, to secure the judgment for the SEC, to manage and maximize the value

of frozen assets under the guidance of a neutral third party, and to take necessary steps toward effectuating the judgment." (Order Appointing Rec. [Doc. # 1070] at 5.) In the Order Appointing the Receiver, the Court imposed a stay of "[a]ll civil legal proceedings of any nature . . . to obtain possession of property of the Receivership Estate, wherever located . . . [or] against any of the Defendants, including any wholly-owned owned subsidiaries and partnerships in which a Defendant is a general partner." (*Id.* at 13.)

### A. NMR e-tailing, LLC

Non-party NMR "was formed in 2013 by a group of investors for the purpose of investing in" an entity which is "referred to in this case as 'Company C.'" (Mem. Supp. NMR Mot. [Doc. # 1097] at 1.) "[B]ased on facts and circumstances surrounding NMR's investment in Company C," NMR "filed a lawsuit against Oak Investment Partners and its managing members, Oak Management Corporation, Oak Investment Partners XII, LP, and Oak Associates XIII, LLC (collectively, 'OIP'), and Iftikar Ahmed ('Ahmed') in the Supreme Court of the State of New York, County of New York," on October 18, 2017 (the "New York action"). (*Id.*) NMR seeks damages on claims of fraudulent misrepresentation and concealment, fraudulent inducement, gross negligence, negligent misrepresentation, grossly negligent supervision, and general partnership liability. (*Id.* at 1-2.)

Judgment entered against Mr. Ahmed in that case "on the issue of liability as a result of his failing to answer or otherwise respond to NMR's Complaint," and Mr. Ahmed "has not participated in any way in" the New York action. (*Id.* at 2.) "NMR has not taken any action to liquidate or collect its default against Ahmed at this juncture" but expects to be "involv[ed] in the Fair Funds process as a victim of Ahmed's conduct." (*Id.*) NMR's claims against Mr. Ahmed in the New York action are therefore "isolated from its remaining claims against OIP," which have

2

SPA-192

"proceeded with discovery" and have a trial date of December 2, 2019 set by the New York court. (*Id.*) The parties in that case have "engaged in written discovery, produced thousands of documents, attended several compliance conferences to resolve discovery disputes, and, importantly, negotiated a detailed scheduling order, which was approved by the [New York] Court." (*Id.*)

NMR moves to intervene "in this matter for the limited purpose of lifting the existing litigation stay in order to continue" litigating the New York action "to continue its pursuit of claims against" Oak entities which are not parties to the instant case. (NMR's Mot. to Intervene and Lift Stay [Doc. # 1097] at 1.) NMR intends the New York action to "proceed against OIP" and does not seek leave to litigate against Mr. Ahmed. (Mem. Supp. NMR Mot. at 2-3.)

### B.  Oak Management Corporation

Oak Management Corporation was Mr. Ahmed's employer "from early 2004 through May 18, 2015." (Mem. Supp. Oak Mot. [Doc. # 1133] at 2.) Oak moves to lift the litigation stay "so it may commence an arbitration proceeding against Ahmed to recover the damages it suffered as a result of" his conduct. (*Id.*) Specifically, Oak "intends to bring claims in an AAA arbitration for breach of fiduciary duty, breach of contract and the covenant of good faith and fair dealing, and common law fraud." (*Id.*) Oak represents that the "conduct that serves as the basis of [its] claims is largely the same conduct that" underlies this case. (*Id.* at 2-3.) Oak "seeks compensatory damages in an amount not less than $20 million, plus interest; consequential damages in an amount not less than $15 million, plus interest; punitive damages in the amount to be determined at the arbitration hearing and such other relief as the arbitrator deems just and equitable." (*Id.* at 3.) Oak explains that these "damages were not sought by, or awarded to, the SEC in its action against Ahmed." (*Id.*)

3

## II.   Discussion

"[D]istrict courts may appoint receivers as part of their broad power to remedy violations of federal securities laws," and "[a]n anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership." *S.E.C. v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010). "The modification of a litigation stay is subject to a three-pronged test first articulated by the Ninth Circuit in *Wencke*," which

> identified three factors for determining whether, in a receivership context, an injunction against litigation should be lifted: '(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.'

*S.E.C. v. Illaramendi*, No. 3:11CV78 (JBA), 2012 WL 234016, at *4 (D. Conn. Jan. 25, 2012) (quoting *S.E.C. v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984)). "The first *Wencke* factor balances the interests of the Receiver in preserving the status quo against the interests of the moving party." *Id.* at *5. To satisfy the third factor, the movant need only have a "colorable claim that entitle[s] them to a trial on the merits," and courts should not attempt to "decide the merits" of the movant's claim when considering a motion to lift a litigation stay. *Wencke*, 742 F.2d at 1232. "The burden is on the movant to prove that the balance of the factors weighs in favor of lifting the stay." *Id.* at *4 (internal quotation omitted).

### A.   NMR e-tailing, LLC

NMR argues that all three *Wencke* factors support its motion to lift the litigation stay. (Mem. Supp. NMR Mot. at 4.) The Receiver "takes no position as to" NMR's motion because it does "not impact the Receiver's ability to complete his duties under the Order Appointing Receiver" given that "NMR seeks relief to proceed against parties other than the Defendant and

Relief Defendants." (Stmt. of Rec. re. NMR [Doc. # 1115] at 1-2.) The SEC does not oppose NMR's

motion. (NMR's Mot. at 2.) Defendant and Relief Defendants oppose NMR's motion. (Def.'s Opp.

to NMR [Doc. # 1114]; Rel. Defs.' Opp. to NMR [Doc. # 1116].) Mr. Ahmed asks that NMR's

motion be denied "until (i) the value of the Defendant's *non-forfeited* assets have been properly

determined *via* an evidentiary hearing; and (ii) the Second Circuit Court of Appeals has decided

on the Defendant's appeal with respect to *__all__* of his assets at Oak since before the commencement

of the Asset Freeze, whether deemed *forfeited* by this esteemed Court or not." (Def.'s Opp. to NMR

at 6.) Relief defendants ask that NMR's motion be denied "until such time as the Court and the

Receiver have made a determination as to the assets for securing the judgment and also have

released the excess of what is needed to secure the judgment." (Rel. Defs.' Opp. to NMR at 2.)

First, NMR argues that lifting the stay to permit the New York action to proceed "will not

affect the status quo of the receivership" because "OIP is not a defendant in the instant case and

OIP does not have any assets frozen under the Receiver's control." (Mem. Supp. NMR Mot. at 4.)

"NMR's requested lift of the litigation stay . . . is limited to its pursuit of claims against non-parties,"

(NMR's Reply [Doc. # 1118] at 1), and "NMR's claims, *with respect to OIP*, do not seek to disturb

the frozen assets under the Receiver's control," (Mem. Supp. NMR's Mot. at 4.)

Mr. Ahmed disputes that he is "a proper party" to the New York action because he "has

never been served any papers nor was he made aware of any pending litigation against him in any

state court." (Def.'s Opp. to NMR at 1.) Because the litigation stay applies to actions seeking assets

of the Receivership Estate and actions against the Defendant, Mr. Ahmed's contention, if accurate,

would actually weigh in favor of NMR's motion.

Mr. Ahmed argues next that NMR's position that there is a "clear distinction between

NMR's claims against OIP and the assets controlled by the Receiver," (Mem. Supp. NMR's Mot. at

5), is "entirely false" for several reasons, (Def.'s Opp. to NMR at 2-6). Mr. Ahmed represents that

he "has substantial interests at Oak – by way of significant assets belonging to the Defendant in the

possession of Oak including assets that are deemed *forfeited* and those that are deemed *non-forfeited* by this esteemed Court – that would be directly implicated by [] NMR's request." (*Id.* at

2.) Because these "*non-forfeited* Oak assets are under the Receivership Order and are part of the

Receiver Estate," Mr. Ahmed argues, the Receiver is tasked with "making sure that the[ir] value"

is "managed and maximized." (*Id.* at 3.) Moreover, Defendant argues, "[t]here is a material dispute

of fact surrounding Defendant's Oak *non-forfeited* assets and such value must be determined *via evidentiary hearing*,"[1] which he argues must be decided before any "interference from non-parties." (*Id.* at 3-4.) Mr. Ahmed argues that any "litigation that threatens the determination of this

value impacts the judgment amount rendered against the Defendant (and Relief Defendants)." (*Id.*

at 4). He also argues that "any assets deemed to have been *forfeited* by this Court" including those

held by Oak "are now under the jurisdiction of the Second Circuit Court of Appeals." (*Id.*)

Defendant concludes that "[c]ontrary to NMR's assertions, Oak *has* assets belonging to the

Defendant that are currently frozen and under this Court's Receivership Order." (*Id.* at 5.)

Relief Defendants make a similar argument, noting that the "value of the *non-forfeited* Oak

assets (which this Court has ruled can be used to satisfy judgment) has not yet been clearly

---

[1] Mr. Ahmed misrepresents the Court's position on this issue by stating that the "esteemed
Court explicitly agreed with the Defendant" that an evidentiary hearing is necessary. (*See* Def.'s
Opp. to NMR at 3-4.) Defendant cites the Court's effort to understand Mr. Ahmed's argument,
which does not constitute an "explicit[] agree[ment]" with that argument. (*See* Tr. of Nov. 9, 2018
Hearing at 16:16-19 ("THE COURT: Okay. So the valuation of assets that Oak holds is a disputed
issue that will require an evidentiary hearing; is that what you're saying? THE DEFENDANT: Yes.
Yes, Your Honor."))

determined." (Rel. Defs.' Opp. to NMR at 2.) They suggest it would be a "waste of resources (especially money and time) for the Receiver to have to defend these assets, as they would be impacted by any litigation against Oak." (*Id.*)

Defendant and Relief Defendants fail to explain, however, why assets "belonging to the Defendant" which are held by Oak would be impacted by the continuation of the New York action against Oak or would be in need of defending by the Receiver. Specifically, they do not offer any support for the suggestion that, should NMR prevail against Oak in the New York action, Oak could or would *use* assets which "belong[] to" Mr. Ahmed to pay any judgment against Oak simply because "Oak *has* assets belonging to the Defendant." (*Id.*) Given NMR's explicit representation that it does not seek "assets controlled by the Receiver," (Mem. Supp. NMR Mot. at 5), and the Receiver's position that permitting the New York action to continue would not "impact [his] ability to complete his duties under the Order Appointing Receiver," (Stmt. of Rec. re. NMR at 1-2), which include maintaining the assets of the Receivership Estate, Defendant and Relief Defendants' argument that assets of the Receivership Estate will be impacted by the New York action is unavailing.

NMR argues that it would "suffer substantial injury if the Pending New York Action is prohibited from moving forward" because "considerable time, effort and expense have clearly been invested in the Pending New York Action," and "much of the work required to get [that] litigation into its current advanced posture will be negated" if it is "forced to stop in its tracks." (Mem. Supp. NMR's Mot. at 4.)

Mr. Ahmed responds that he "does not have an opinion on how much 'time, effort, and expense' have been invested in the New York action, it is undisputable that much 'time, effort and expense' have clearly been invested in this instant matter." (Def.'s Opp. to NMR at 5 (internal

7

citation omitted).) "Just as NMR wants 'its day in court,'" Mr. Ahmed argues, "so too does the Defendant want his appeal to be heard at the earliest and **_all_** his Oak assets to be appropriately credited towards any disgorgement award." (*Id.*) But this argument fails to address the critical question under the first *Wencke* factor: whether the movant would suffer substantial injury if the litigation stay is not lifted. He makes no attempt to dispute that NMR would be prejudiced by a lengthy delay in the New York action. (*See generally* Def.'s Opp. to NMR.)

Second, as to the "the time in the course of the receivership at which the motion for relief from the stay is made," NMR explains that "the timing of the instant Motion is inconsequential because . . . there is no concern that [the] Receiver would be forced into court to defend or protect the frozen assets" because NMR does not seek any assets under the Receiver's control. (*Id.*) Neither Mr. Ahmed's nor the Relief Defendants' opposition addresses this second factor. (*See generally* Def.'s Opp. to NMR; Rel. Defs.' Opp. to NMR)

"Where the motion for relief from the stay is made soon after the receiver has assumed control over the estate, the receiver's need to organize and understand the entities under his control may weigh more heavily than the merits of the party's claim." *Superior Motels v. Gould*, 622 F.2d 1363, 1373-74 (2d Cir. 1980). Here, the receivership has been in place since December 2018. The Receiver's Report makes clear that he has had sufficient time to organize and understand the entities now under his control. (Rep. of Rec. [Doc. # 1130].) Moreover, the Receiver does not oppose NMR's motion. (Stmt. of Rec. re. NMR at 1-2.)

Third, according to NMR, the "merits of NMR's claims have been substantiated by the fact that they have survived a motion to dismiss in the pending New York Action." (*Id.*) Defendant "cannot comment on the merits of NMR's pending lawsuit in the NY state litigation." (Def.'s Opp. to NMR at 2.)

All three *Wencke* factors weigh in favor of lifting the litigation stay. First, because NMR does not seek assets of the Receivership Estate and the Receiver does not anticipate that the New York action would impact the performance of his duties, maintaining the stay as to the New York action is not necessary to preserve the status quo of the Receivership Estate. Given the advanced posture of the New York action, NMR would likely suffer injury if that action were now stayed indefinitely. In weighing the interests of the Receiver and the movant, this factor supports lifting the stay. Second, the Receiver has had sufficient time to understand the assets of the Receivership Estate and does not oppose NMR's motion. Third, NMR appears to bring at least a colorable claim in the New York action. The litigation stay imposed in the Order Appointing Receiver is lifted for the limited purpose of permitting the New York action to proceed against the Oak entities named as defendants in that case.

### B.  Oak Management Corporation

Oak argues that all three *Wencke* factors support its motion to lift the litigation stay. (Mem. Supp. Oak Mot. at 3-5.) The Receiver represents that lifting the litigation stay as Oak requests "do[es] not impact the Receiver's ability to complete his duties under the Order Appointing Receiver" because "OMC is not attempting to 'disturb the asset freeze or take priority over the SEC's claim to any of the frozen assets." (Stmt. of Rec. re. Oak [Doc. # 1144] at 2 (quoting Mem. Supp. Oak Mot. at 40.) "Therefore, the Receiver takes no position as to the Motion at this time." (*Id.*) For the same reason, the SEC "does not object to Oak's motion." (SEC's Resp. to Oak's Mot. [Doc. # 1145] at 2.) Mr. Ahmed opposes Oak's motion.[2] (Def.'s Opp. to Oak [Doc. # 1143].) Relief

---

[2] Oak points out that "[m]uch of Mr. Ahmed's response focuses on topics that are not relevant to assessing whether the Court should lift the litigation stay to permit OMC to commence

9

Defendants also oppose Oak's motion, arguing that Oak's arbitration against Mr. Ahmed "should be stayed until the time that the receivership is concluded, the pending appeals are resolved, and the asset freeze is lifted." (Rel. Defs.' Opp. to Oak [Doc. # 1142] at 7.)[3]

First, Oak argues that its "arbitration will not disrupt the status quo of the receivership" because it "does not seek to disturb the asset freeze or take priority over the SEC's claim to any of the frozen assets" and because the arbitration will not "require the Receiver to expend any additional time or money since the arbitration does not involve any issue germane to the Receiver's duties." (Mem. Supp. Oak's Mot. at 3-4.) Oak concludes that its arbitration "can move forward in parallel with the receivership while allowing the Receiver to fulfill its duties without interruption." (*Id.* at 4.)

As in his opposition to NMR's motion, Mr. Ahmed discusses at length the "*non-forfeited and allegedly forfeited assets*" which are held by Oak. (Def.'s Opp. to Oak at 5-8, 10.) Relief Defendants make a similar argument, contending that "Oak has not met its burden of satisfying the" *Wencke* test "especially since the value of non-forfeited Oak assets (which this Court has ruled can be used to satisfy judgment) have not yet been determined and there can be little doubt that

---

an arbitration against him." (Oak's Reply [Doc. # 1154] at 1.) The Court addresses herein only those arguments by Defendant which are relevant under *Wencke*.

[3] Relief Defendants also moved for leave to file a response to the SEC's response to Oak's motion. (*See* Rel. Defs.' Mot. for Leave to File [Doc. # 1158].) That motion is granted to permit Relief Defendants the opportunity to respond to new legal arguments not raised in Oak's motion. However, Relief Defendants' filing focuses entirely on the portion of the SEC's response which indicates that the SEC "has no objection to a process by which third parties may seek to secure any 'residual assets' prior to their release to Defendant or Relief Defendants," (SEC's Resp. to Oak.'s Mot. at 2; *see* Ex. A (Rel. Defs.' Proposed Opp.) [Doc. # 1158-1]), which is not relevant to this ruling on the motions to lift the litigation stay. The Court therefore does not address herein the additional arguments made by Relief Defendants in their response to the SEC.

SPA-200

these assets would most likely be impacted by an arbitration between Oak and Mr. Ahmed." (Rel. Defs.' Opp. at 2.) But as with the New York action, Defendant and the Relief Defendants fail to explain how, when Oak "is not attempting in any way to disturb the asset freeze or take priority over any claim by the SEC to any of the frozen assets," (Oak's Reply at 2), Oak's arbitration could disturb the status quo of any assets of the Receivership Estate, especially in light of the Receiver's position that Oak's arbitration will not impact his ability to perform his duties.

Oak also argues that it "stands to suffer substantial injury if prevented from bringing an action against Ahmed at this time" because it would "face[] the prospect of being unable to satisfy any future award it wins against Ahmed because the frozen assets available to it to secure that award" are the "sole known source of any recovery against Ahmed" and will "likely be dissipated" once the asset freeze in this case is lifted. (*Id.*) Oak explains that "to the extent that there will be an overage," i.e. assets of the Receivership Estate which will not be necessary to satisfy the judgment against Mr. Ahmed, "once the SEC's judgment is satisfied and if the freeze is lifted, the risk of dissipation is a certainty given Ahmed's status as a fugitive from justice." (Oak's Reply at 3.) In order to "have standing to seek prejudgment relief to protect against dissipation," Oak argues, "its arbitration must be filed and pending" before those assets are dissipated. (*Id.*)

Mr. Ahmed responds that all his "assets continue to be frozen," and so "there can be no danger of 'dissipation.'" (Def.'s Opp. to Oak at 3; *see also* Rel. Defs.' Opp. to Oak at 2 (arguing that Oak's concern of dissipation is "belied" by the current asset freeze).) This argument runs contrary to Defendant's and Relief Defendants' repeated requests to this Court to release funds from the asset freeze and to the Court's stated intention to "value the assets and avoid over-freezing" after "secur[ing] the judgment for the SEC." (Order Appointing Rec. at 5.)

11

SPA-201

Second, Oak argues that the time in the course of the receivership also weighs in favor of granting its motion because "the Receiver has been working toward organizing and understanding the assets and entities under his control for months and has now submitted a report outlining its findings and recommendations" and because the arbitration would "in no way distract from the Receiver's continuing efforts . . . since the arbitration will not involve the Receiver in any way." (Mem. Supp. Oak Mot. at 4.)

Mr. Ahmed argues that the "Receivership has recently commenced" and "[a]ny action by Oak, contrary to their statements, *directly distracts* the Receiver from understanding these interests." (Def.'s Opp. to Oak at 6-7.) Similarly, Relief Defendants argue that "because the Receiver was recently appointed a short time ago . . . and has not completed his assigned tasks[,] . . . it would be premature and inappropriate to grant Oak's motion." (Rel. Defs.' Opp. at 5.) The Receiver disagrees, explaining that permitting Oak's arbitration would "not impact [his] ability to complete his duties under the Order Appointing Receiver." (Stmt. of Rec. re Oak at 2.)

Third, Oak argues that its claim is meritorious, or at least sufficiently colorable, because "the conduct underlying" its arbitration claims "is largely the same conduct at issue in this proceeding and for which this Court has found for the SEC on liability, noting that the 'record demonstrates without question that Defendant's fraud was directed towards [the OMC] Funds.'" (Mem. Supp. Oak. Mot. at 5 (quoting Ruling on All Parties' Mots. for Summ. J. on Liability [Doc. # 835] at 34).)

Mr. Ahmed "will not comment on the merits, or lack thereof, of Oak's potential arbitration against him, but to state for the record that the Defendant has submitted to this Court evidence to support that Oak was contributorily negligent and was complicit in all of the allegedly fraudulent transactions." (Defs.' Opp. to Oak at 2.) Relief Defendants argue that to find Oak's claims

12

sufficiently meritorious would "completely ignore[] the pendency of the Defendant's and the Relief Defendants' appeals." (Rel. Defs.' Opp. at 7.) But it is not the role of this Court to decide the merits of Oak's claims against Mr. Ahmed. Rather, the Court need only determine whether Oak has a "colorable claim" to bring against him. *Wencke*, 742 F.2d at 1232. Given this Court's findings on liability in this case, it cannot be said that Oak does not have a colorable claim against Mr. Ahmed.

All three *Wencke* factors weigh in favor of lifting the litigation stay. First, because Oak "is not attempting in any way to disturb the asset freeze or take priority over any claim by the SEC to any of the frozen assets," (Oak's Reply at 2), and the Receiver represents that granting Oak's motion would not impact his ability to perform his duties, maintaining the stay as to Oak's desired arbitration is not necessary to preserve the status quo of the Receivership Estate. Given the possible dissipation of assets if and when the Court releases assets after the SEC's judgment has been secured, Oak would likely suffer injury if unable to timely commence its arbitration against Mr. Ahemd. In weighing the interests of the Receiver and the movant, the first factor supports lifting the stay. Second, the Receiver has had sufficient time to understand the assets of the Receivership Estate and does not oppose Oak's motion. Third, Oak appears to have at least a colorable claim against Mr. Ahmed. Therefore, the litigation stay imposed in the Order Appointing Receiver is lifted for the limited purpose of permitting Oak to pursue the arbitration it seeks to bring against Mr. Ahmed.

III.    **Conclusion**

For the foregoing reasons, NMR's Motion to Intervene and Lift Litigation Stay [Doc. #

1097] and Oak's Motion to Lift Litigation Stay [Doc. # 1132] are GRANTED.

IT IS SO ORDERED.

_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of May 2019.

SPA-204

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br> *Plaintiff,*<br>  *v.*<br>IFTIKAR AHMED,<br> *Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br> *Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br><br>September 4, 2019 |

**RULING DENYING DEFENDANT'S MOTION TO ALTER FINAL JUDGMENT**

Mr. Ahmed moves to alter or amend the Amended Final Judgment ([Doc. # 1054]) under Federal Rule of Civil Procedure 59(e). (Mot. to Amend [Doc. # 1086].) The SEC opposes that motion. (SEC Opp. [Doc. # 1109].) For the reasons that follow, Mr. Ahmed's motion is denied.

**I.    Background**

The Court assumes the parties' familiarity with the history of this case. Pursuant to the Court's Ruling on Remedies and Judgment, ([Doc. # 955]), the SEC filed a proposed final judgment, ([Doc. # 960]), to which Defendant and Relief Defendants objected, ([Docs. # 962, 963]), and the SEC replied ([Doc. # 981]). The Court ruled on those objections, ([Doc. # 986]), and

SPA-205

entered Judgment, ([Doc. # 982]), which incorporated portions of the SEC's proposal and modifications made in response to the Defendant's and Relief Defendants' objections. Mr. Ahmed then moved for relief from that Judgment under Fed. R. Civ. P. 60(b), ([Doc. # 1012]), which was granted in part and denied in part, (Doc. # 1052]). The SEC and the Relief Defendants also moved separately to alter or amend that Judgment ([Docs. # 1013, 1034]). After ruling on those motions, ([Doc. # 1053]), the Court entered an Amended Final Judgment, ([Doc. # 1054]). Mr. Ahmed now moves to further amend that judgment.

## II.    Discussion

Although Fed. R. Civ. P. 59(e) permits motions to alter or amend a judgment, "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) (internal quotation omitted). The principal "grounds for granting a Rule 59(e) motion to alter or amend are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Densberger v. United Technologies Corp.*, 125 F. Supp. 2d 585, 597 (D. Conn. 2000) (quoting *Virgin Atl. Airways, Ltd. V. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "A district court has broad discretion in determining whether to grant a motion to alter or amend the judgment." *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000).

Mr. Ahmed argues that the Amended Final Judgment should be amended further in eight ways, in order to:

> (i) recalculate the judgment amount such that the Defendant's non-forfeited assets already in the hands of the purported victim are first credited against disgorgement; (ii) allow the Defendant to choose which assets used to satisfy different parts of the judgment as it is his right; (iii) determine a method and process to calculate the

2

SPA-206

award of "interest or gains" so that it is not arbitrary in either process or in calculation; (iv) include an offset for losses on the assets used for satisfying disgorgement; (v) correct the statement that should read "(6) that the amount of interest and returns on disgorged frozen assets;" (vi) correct that statement that it is "interest OR gains" and not "interest AND gains;" (vii) correct the insertion of Rule 54(b)'s language as the Defendant intended to oppose such statement and as per Connecticut local rules, had time to do so before this esteemed Court ruled on that issue; and (viii) clarify that the esteemed Court indeed intended to issue rulings and its amended final judgment just hours before the Defendant filed his post-hearing brief, in compliance with the deadline set for such submissions by this esteemed Court itself, which dealt with issues addressed in the rulings and amended final judgment.

(Mot. to Amend at 1-2.) The SEC responds that Defendant's motion "does nothing more than recycle arguments the Court previously considered and rejected" but "points to no new evidence, no change in controlling law, and nothing approaching error or injustice – much less manifest error." (SEC Opp. at 3-4.)

First, Mr. Ahmed argues that the Amended Final Judgment should be amended to reduce the disgorgement award by the amount of "the Defendant's non-forfeited assets already in the hands of the purported victim," Oak. (Mot. to Amend at 1.) He asserts that "[c]ourts routinely award credit against disgorgement for assets that are in the possession of the alleged victim," (*id.* at 3), but he cites no authority in support of that assertion. Defendant "requests that the value of those *non-forfeited* assets be determined first and credited against disgorgement" and that "other aspects of disgorgement (such as pre-judgment interest, civil penalty, interest and gains)" be recalculated thereafter. (*Id.*) Mr. Ahmed has repeatedly raised arguments regarding the status of and claimed need to value assets held by Oak, and the Court has repeatedly rejected those arguments. (*See* Ruling on Def.'s Rule 60(b) Mot. [Doc. # 1052] at 3 (rejecting Mr. Ahmed's "efforts to relitigate the status of the Oak assets," including their "proper value and disposition," because

3

that issue had already been decided by the Court); Reply Supp. Mot. to Amend [Doc. # 1117] ("The Defendant has also already briefed this issue. [Doc. # 959].").) Mr. Ahmed's disagreement with the Court's prior rulings on this topic does not support his request to alter the Amended Final Judgment.

Second, Mr. Ahmed argues that the Amended Final Judgment should be further amended to "include explicit language that the Defendant gets to choose which assets to apply to the different parts of the judgment." (Mot. to Amend at 4.) He argues that "there is no case law in this nation that allows the SEC to 'cherry-pick' their assets in terms of what assets to apply to which part of the judgment" and that "it is the Defendant's right to decide which assets to apply to that judgment." (*Id.*) But Mr. Ahmed offers no argument or authority in support of his position, and he misrepresents the procedure adopted by this Court to satisfy the judgment in this case, which does not permit the SEC to "cherry-pick" assets to apply to different parts of the judgment.

Third, Mr. Ahmed argues that the judgment should be amended to "include some process for the determination of interest or gains." (*Id.*) He contends that the Court "did not take into consideration the Defendant's views on interest or gains" and that the Court must not "simply leave it up to an uninformed third-party who is not vested and who just entered this case," referring presumably to the Receiver. (*Id.*) But contrary to Defendant's assertions, this issue has already been thoroughly litigated and decided. After considering arguments of the SEC, Defendant, and Relief Defendants, the Court concluded that interest or gains are owed only on "the frozen assets used to satisfy th[e] disgorgement amount," not on all frozen assets or on assets used to satisfy the penalty portion of the judgment, and that the interest or gains should be calculated by determining the "actual interest accrued or gains earned" and not by using the "checking account interest rate"

SPA-208

proposed by Defendant and Relief Defendants. (Supplemental Ruling on Remedies [Doc. # 1051] at 2, 5.)

Fourth, Defendant argues that "the Amended Judgment should be amended to include an offset for losses on assets used toward the disgorgement amount." (Mot. to Amend at 5.) He notes that he has "already briefed this issue" but offers no argument to suggest that any law has since changed, new evidence has come to light, or manifest injustice has occurred beyond his disagreement with the Court's decision not to order the offset he seeks.

Fifth, Mr. Ahmed argues that the line in the Amended Final Judgment which reads "IT IS HEREBY FURTHER ORDERED that the amount of interest and returns on frozen assets which Defendant must turn over . . . will be determined by a receiver or such other process that this Court will order," (Amended Final J. ¶ 6), must be amended to indicate that the interest and returns are owed only on "frozen *disgorged* assets." (Mot. to Amend at 5.) But the Judgment itself makes clear elsewhere that the interest and returns are owed "on disgorged frozen assets," (Amended Final J. ¶ 4), and thus amendment of the judgment to include that language as Defendant requests is unnecessary.

Sixth, Defendant argues that the Amended Final Judgment should be further amended because it refers in one paragraph to "interest or gains" and in another paragraph to "interest and returns" "such that [] the two statements are comparable and there is no confusion." (Mot. to Amend at 5.) He argues that both paragraphs should refer to "interest and returns." The Court sees no cause for confusion in using both terms, and Mr. Ahmed has not stated any grounds for relief under Rule 59.

Seventh, Mr. Ahmed argues that "the Amended Judgment should be further amended to correct the insertion of Rule 54(b)'s language" because

5

there are still significant issues to be determined in this esteemed Court that are not
final, contrary to the Rule 54(b) certification: the Defendant's *non-forfeited* assets
at Oak must first be applied to disgorgement and then the rest of the judgment
calculated from that point and a process must be determined for the calculation of
interest or gains and an express statement made that the Defendant chooses such
assets for various parts of the judgment.

(*Id.* at 6.) This argument merely repeats those made elsewhere in Defendant's motion to amend.

Moreover, Defendant's disagreement with the Court's rulings does not render the judgment "not

final," nor is it cause to question the validity of a Rule 54(b) certification in a final judgment.

Eighth and finally, Mr. Ahmed argues that the judgment should be amended to "clarify that

the esteemed Court intended to issue rulings and its amended final judgment just hours before the

Defendant filed his post-hearing brief, in compliance with the deadline set for such submissions

by this esteemed Court itself, which dealt with issues addressed in the rulings and amended final

judgment." (*Id.* at 2.) But the Court invited that post-hearing brief to address issues separate from

those the Court addressed in amending the final judgment: "[the Court will] provide Mr. Ahmed

a transcript of the receiver-related proceedings today and give him two weeks to file any responses

to the substance of the proceeding that he wishes and, thereafter, the Court will make its decision

related to whether to appoint a receiver and, if so, whom to appoint." (Tr. of 11/28/18 Hearing

[Doc. # 1043] at 5:13-18.) Moreover, the Court amended the original final judgment in response

to motions by the SEC and the Relief Defendants, (Ruling on Pl.'s and Rel. Defs.' Mots. to Amend

and Clarify the J. [Doc. # 1053]), which gave Mr. Ahmed the opportunity to respond to those

motions and inform the Court of his position regarding amendment of the judgment.

Mr. Ahmed argues that there are "*at least* three issues that impacted the Final Amended

Judgment [Doc. # 1054] that the Defendant was not heard on: (1) the classification of 'interest and

gains'; (2) the Defendant's assets at Oak; and (3) questioning the potential receiver candidates."

(Reply Supp. Mot. to Amend at 8.) As discussed above, Mr. Ahmed has repeatedly made and the Court has repeatedly considered his arguments on the issues of interest and gains and the assets at Oak. As to the potential receiver candidates, the Amended Final Judgment, entered on December 14, 2018, indicates neither that a receiver will be appointed nor which potential candidate would be chosen. The Receiver was not appointed until December 20, 2018, six days after Mr. Ahmed filed his post-hearing brief, and the Order Appointing Receiver makes clear that the Court considered Defendant's arguments laid out in that brief. ([Doc. # 1070].)

Because Mr. Ahmed seeks to relitigate issues already decided by this Court and offers no evidence or argument which could meet the high standard for Rule 59 motions, he has not demonstrated that the Amended Final Judgment should be further amended as requested.

## III.   Conclusion

For the foregoing reasons, Defendant's Motion to Alter or Amend the Judgment [Doc. # 1086] is DENIED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 4th day of September, 2019.

7

SPA-211

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>　　　*Plaintiff*,<br>　　　*v.*<br>IFTIKAR AHMED,<br>　　　*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>　　　*Relief Defendants*. | Civil No. 3:15cv675 (JBA)<br><br>January 22, 2020 |

**RULING GRANTING RECEIVER'S MOTIONS FOR FEES**

Receiver Jed Horwitt moves for the payment of fees and expenses incurred on behalf of the Receivership Estate. (Mots. for Fees [Docs. # 1160, 1249, 1330].) Defendant opposes, (Def.'s Opps. [Docs. # 1183, 1261, 1354]), and Relief Defendants join that opposition, (Rel. Defs.' Opps. [Docs. # 1185, 1264, 1362]). Plaintiff Securities and Exchange Commission does not oppose the Receiver's motions. For the reasons that follow, the Receiver's Motions for Fees are granted.

I.　　**Background**

The Court assumes the parties' familiarity with the facts and history of this case. Receiver Jed Horwitt was appointed on December 20, 2018. (Appointment Order [Doc. # 1070].) The

Receiver and persons retained to assist in his administration of the Receivership Estate are "entitled to reasonable compensation and expense reimbursement from the Receivership Estate," subject to "prior approval of the Court" and according to predetermined hourly billing rates. (*Id.* at 16.) The Receiver "shall apply to the Court for compensation and expense reimbursement from the Receivership Estate" within forty-five days after the end of each calendar quarter. (*Id.*). All such fee applications are "interim" and "subject to cost/benefit and final reviews at the close of the receivership." (*Id.*) The "Quarterly Fee Applications are subject to a holdback in the amount of 20% of the amount of fees and expenses for each application," but the "total amounts held back during the course of the receivership may be paid out at the discretion of the Court as part of the final fee application." (*Id.* at 15-16.) The Appointment Order set out certain requirements for the content of each fee application. (*Id.* at 17.)

## II.    Discussion

The Receiver moves for the payment of fees for the following periods: 1) December 20, 2018 through March 31, 2019, (First Mot. for Fees [Doc. # 1160]); 2) April 1, 2019 through June 30, 2019, (Second Mot. for Fees [Doc. # 1249]); and 3) July 1, 2019 through September 30, 2019, (Third Mot. for Fees [Doc. # 1330]). The First Motion represents 646.3 hours worked and seeks payment in the amount of $157,547.50 for professional and paraprofessional fees, $5,425.00 for Receiver fees, and $3,307.48 for expenses. The Second Motion represents 441.9 hours worked and seeks payment in the amount of $92,879.20 for professional and paraprofessional fees and $1,798.69 for expenses. The Third Motion represents 165.5 hours worked and seeks payment in the amount of $39,925.45 for professional and paraprofessional fees and $1,1555.33 for expenses.

The "fees assessed reflect the hours worked by the Receiver and [Zeisler & Zeisler, P.C. "(Z&Z)"] attorneys and paraprofessionals, and the hourly rates applicable at the time that they

SPA-213

rendered their services, as modified by the significant discounts provided by the Receiver and Z&Z" for this matter. (First Mot. at 3.[1]) The Receiver represents that the fee applications

> take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessionals working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Z&Z under the Appointment Order.

(*Id.*) The applications include narrative descriptions of the services provided via attached time records and summaries of the Receiver's administration of the Receivership Estate. (*Id.*) The Receiver does not seek "reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime." (*Id.* at 4.) The fee applications reflect the substantial public service discounts determined at the time of the Receiver's appointment, including a 25% discount to regularly applicable hourly rates for all legal professionals and paraprofessionals. (*Id.*) For services provided primarily in his capacity as Receiver (rather than primarily legal services), the Receiver further reduced his hourly rate to $250 per hour. (*Id.*) Pursuant to the SEC Guidelines, the Receiver and Z&Z categorized fees incurred by certain "activity categories." (*Id.* at 6.) The Receiver provided a detailed description of the activities of the Receivership Estate during each billing period. (*Id.* at 11-24; Second Mot. for Fees at 11-24; Third Mot. for Fees at 13-24.)

---

[1] Where the Receiver's motions contain significant overlap in content, the Court cites only to the First Motion for Fees.

3

Defendant offers a variety of objections to the Receiver's motions, all of which are joined by the Relief Defendants. Generally, Defendant argues that the Receiver's fees are "excessive, duplicative, unreasonable, and unjustified" because the Receiver "has not provided any meaningful benefit to the Receivership Estate" and the receivership itself is improper. (Def.'s Opp. to First Mot. [Doc. # 1183] at 1.[2]) The Court will address Defendant's objections in turn.

### A.  General Objections to Receivership

Many of Defendant's objections to the fee motions are best described as general objections to the disposition of this case, the continued existence of the asset freeze and the receivership, and the continued appointment of Mr. Horwitt as Receiver. (*See, e.g.,* Def.'s Opp. to First Mot. at 4-8 (arguing that Receiver was unnecessary or only minimally necessary and has provided no economic benefit to Receivership Estate), 14-15 (arguing that fees should not be paid while appeals of the Appointment Order are pending), 18-22 (arguing that the "Receiver is not a neutral party and cannot be relied on to make any fair and impartial determinations"), 22-26 (arguing that a receivership "is not necessary in this case and thus, the Receivership should be terminated immediately"); Def.'s Opp. to Second Mot. at 3-8 (arguing that excess assets should be released from freeze and receivership does not economically benefit assets of Receivership Estate), 9-12 (arguing that the Receiver is biased against Defendant), 13-14 (arguing that receivership must be terminated); Def.'s Opp. to Third Mot. at 3-8 (arguing that the Receiver is unnecessary, does "nothing," and has not benefitted the Receivership Estate), 10-11 (arguing that the Receiver is biased against Defendant), 12-14 (arguing that receivership should be terminated immediately).)

---

[2] Where Defendant's responses contain significant overlap in content, the Court cites only to his opposition to the First Motion for Fees.

The Court has repeatedly addressed these arguments, (*see, e.g.*, Appointment Order; Ruling Denying Def.'s Mot. to Terminate Receivership [Doc. # 1276]), and Defendant's oppositions to the Receiver's motions for fees are not the proper vehicles for attempting to relitigate those decisions.

## B. General Reduction and Holdback

Defendant argues that despite the 25% hourly rate reduction and 20% holdback provision, the fees charged by the Receiver and his counsel are "excessive, unreasonable, and not justified," and thus, he argues, the Court should impose "a minimum of a 50% discount to the requested fees" and the holdback "must be increased to" 100%. (Def.'s Opp. to First Mot. at 28.) He contends that there would be "no economic hardship on the Receiver's firm, which looks to be a 13-professional firm of which 9 (nine) are partners." (*Id.*) Defendant argues that the 50% reduction and 100% holdback are justified because

> (i) there is no justification for having a Receiver; (ii) the fees requested are excessive and unreasonable; (iii) there has been only marginal benefit to the Estate; (iv) the SEC has no incentive to "police" the Fee Application; (iv) there are more liquid and near-liquid assets than the judgment amount; (v) there are tens of millions of dollars of assets frozen above the judgment amount; (vi) the Defendant has been denied the use of his own legally earned funds for his own defense in this (and other) matters; and (vii) there is an appeal pending, including on the instant issue of Appointment of Receiver (which includes any payment to such Receiver).

(*Id.* at 28-29; *see also* Def.'s Opp. to Second Mot. [Doc. # 1261] at 14-15.)

The Receiver responds that the "complex factual and procedural history" of this case, the need for the Receiver to "tak[e] control of the Receivership Estate and assess[] Receivership Assets" in order to fulfill his duties under the Appointment Order, the complex task of managing the Receivership Estate, and the other tasks required by the Appointment Order all make clear that his and Z&Z's services were necessary and justified and thus should not be further reduced as Defendant argues. (Reply Supp. First Mot. [Doc. # 1218] at 2-10.)

5

The Receiver's fee motions make clear the effort involved in the management of the Receivership Estate and describe in detail the tasks undertaken by the Receiver and Z&Z to comply with the requirements of the Appointment Order. And the Receiver's appointment by the Court was motivated, at least in part, by his fee structure, which was "the most cost-efficient of those proposed by the four receiver candidates." (Appointment Order at 6.) The Court declines to further reduce or holdback the Receiver's fees based on the Defendant's disagreement with the Court's decision to appoint a receiver, the duties and responsibilities assigned to the Receiver, or the Receiver's management of the Receivership Estate.

## C. Specific Objections

Defendant "contests all of the Receiver's bills" but "gives some examples" of specific billing entries to which he is opposed "to support his opposition to the payment of **_any_** fees or expenses to the Receiver." (Def.'s Opp. to First Mot. at 29.) For example, Defendant opposes all "PACER expenses, online research expenses, filing fees, Federal Express expenses, copying expenses, travel charges, expenses to *subpoena* documents, service fees for *subpoenaing* documents, [and] conference call expenses" because "the Receiver does not explain what documents he accessed from PACER and what online research resulted in these invoices," and because "the Receiver does not specify the need for such other services, such as copying." (*Id.* at 30-31; *see also* Def.'s Opp. to Second Mot. at 16; Def.'s Opp. to Third Mot. at 16-17.) Defendant opposes "the breakup and classification of the fees into" the "activity categories" despite that the Receiver engaged in that categorization process in order to comply with SEC guidelines because "the SEC has no incentive to *police* the Application for fees" and because the categorization "is inefficient as the Defendant has to comb through each of these five fee breakups and also go back and forth between the five different fee invoices to make sure that there is no duplicate billing between each of these five

6

categories." (Def.'s Opp. to First Mot. at 31.) Defendant disputes the categorization of certain activities as legal work, as opposed to administrative work, and the subsequent billing of those activities at legal hourly rates, arguing that many activities do not require legal knowledge. (*Id.* at 32-33.) Defendant disputes that "two people were needed" for "any conversation with the Defendant or the Relief Defendants" or for "any communication, meeting, or discussion with any other party," arguing that only one person should have billed for any such activity. (*Id.* at 34; *see also* Def.'s Opp. to Second Mot. at 18-19.) Defendant argues that the Receiver and his counsel should not have "charged at a legal rate for their travel time." (Def.'s Opp. to First Mot. at 35.) Defendant contends that certain entries reflect unnecessary work, (*id.* at 36, 38), while other entries are "vague and lack specificity" or contain errors, (*id.* at 36-37).

In response to Defendant's concern about the billing of travel time, the Receiver explained that there was "an oversight in applying the" billing instruction for travel time "in certain instances." (Reply Supp. First Mot. at 20.) In order to fully comply with the billing instructions regarding travel time, the Receiver agreed to reduce the fees sought in the First Motion by $2094.75, (*id.* at 21), and to reduce the fees sought in the Third Motion by $85.20, (Reply Supp. Third Mot. at 12).

The Receiver responded to each of Defendant's concerns about specific billing entries to provide clarification or explain why each challenged activity was necessary. (*See* Reply Supp. First Mot. at 11-26; Reply Supp. Second Mot. at 4-7, 12-16; Reply Supp. Third Mot. [Doc. # 1378] at 3-12.) After reviewing these responses and the exhibits to the Receiver's three fee motions, the Court agrees with the Receiver that as to the rest of the billing entries, the Receiver and Z&Z provided sufficient detail about the activities conducted and did not engage in excessive billing or unnecessary work.

7

SPA-218

Defendant also argues that the Receiver's fees should be paid from within the judgment amount, not from any additional assets of the Receivership Estate. (*Id.* at 11; Def.'s Opp. to Second Mot. at 8-9.) He argues that in cases where receivership fees are paid from the receivership estate, that estate is valued at *less* than the judgment amount. (Def.'s Opp. to First Mot. at 11.) Where, as here, the value of the Receivership Estate may exceed the judgment amount, Defendant argues that fees of the receivership estate should be paid from the judgment amount. (*Id.*) Defendant argues that "this Court does not have any legal authority or jurisdiction on assets over the amount of judgment" and because receiver fees "necessarily come at the expense of compensating victims of the fraud." (*Id.* (internal quotation omitted).) Defendant contends that he and the Relief Defendants do "not benefit[] from the appointment of the Receiver," that the SEC and the Receiver have no incentive to keep fees low, and that the Court "cannot impose another penalty on the Defendant by requiring him to pay for the Receiver at no benefit to the Defendant." (*Id.* at 13.)

The Receiver responds that this Court has already determined the proper source of funds to pay the Receiver's fees. (Reply Supp. First Mot. at 10-11 (citing Appointment Order at 5 ("In the absence of any authority in support of the Defendants' position that the SEC should pay for the costs of a receiver, all costs of the receivership in this case will be paid from among the assets of the Receivership Estate.")).)

But the Court previously rejected the suggestion by Defendant that *the SEC* should pay for the cost of the receivership, and has not yet directly addressed the question of whether the cost of the receivership should count against the amount of the judgment against Defendant. No party has fully briefed this issue at this time, and the outcome of the Receiver's fee applications do not depend on the resolution of this question, as any fees paid to the Receiver could later be credited toward the judgment against Defendant if he is entitled to such a credit. Any party who wishes to address

SPA-219

the Court on this question may file an indication of its position and supporting memorandum of law within twenty-one days of the date of this ruling.

### III.   Conclusion

For the foregoing reasons, the Receiver's Motions for Fees [Docs. # 1160, 1249, and 1330] are GRANTED as modified by the Receiver's First and Third Replies with regard to the appropriate billing for travel time. Within seven days of the date of this ruling, the Receiver shall submit a proposed order which reflects the final amounts to be distributed to the Receiver and his counsel and identifies the assets of the Receivership Estate from which those amounts will be paid.

IT IS SO ORDERED.

/S/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of January, 2020.

SPA-220

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES SECURITIES AND EXCHANGE )
COMMISSION,                                )
                                           )
              Plaintiff,                    )
                                           )
v.                                         ) Civil Action No.
                                           )   3:15-cv-675-JBA
                                           )
IFTIKAR AHMED                              )
                                           )
              Defendant, and               )
and                                        )
                                           )
IFTIKAR ALI AHMED SOLE PROP; I-CUBED )
DOMAINS, LLC; SHALINI AHMED; SHALINI )
AHMED 2014 GRANTOR RETAINED                )
ANNUITY TRUST; DIYA HOLDINGS LLC;          )
DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, )
by and through his next friends IFTIKAR and )
SHALINI AHMED, his parents; I.I. 2, a minor child, )
by and through his next friends, IFTIKAR and )
SHALINI AHMED, his parents; I.I. 3, a minor child, )
by and through his next friends, IFTIKAR and )
SHALINI AHMED, his parents                 )
                                           )
              Relief Defendants.           )
                                           )

## ORDER DIRECTING PAYMENT OF RECEIVER'S
## <u>APPROVED FEES AND EXPENSES</u>

**WHEREAS**, in its Ruling Granting Receiver's Motions for Fees [Doc. No. 1415] (the "Fee

Ruling"), this Court granted the First Interim Application for Professional Fees and Expenses

Incurred by the Receiver and His Professionals [Doc. No. 1160] (the "First Application"), subject

to a 20% holdback for the Receiver's and Zeisler & Zeisler, P.C.'s ("Z&Z") fees and subject to a

reduction with respect to time billed for travel, and authorized and allowed the following amounts:

| | | |
|---|---|---|
| **Receiver Fees** | $ | 5,425.00 |
| **Z&Z Fees** | | $157,547.50 |
| **Expenses** | $ | 3,307.48 |
| **(Travel)** | | ($2,094.75) |
| **Total (After 20% Holdback)** | | $131,348.18 |

**WHEREAS**, in its Fee Ruling, this Court granted the Second Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1249] (the "Second Application"), subject to a 20% holdback for the Receiver's and Z&Z's fees, and authorized and allowed the following amounts:

| | |
|---|---|
| **Receiver/Z&Z Fees** | $92,879.20 |
| **Expenses** | $ 1,798.69 |
| **Total (After 20% Holdback)** | $75,742.31 |

**WHEREAS**, in its Fee Ruling, this Court granted the Third Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals [Doc. No. 1330] (the "Third Application" and, jointly with the First Application and Second Application, the "Motions for Fees"), subject to a 20% holdback for the Receiver's and Z&Z's fees and subject to a reduction with respect to time billed for travel, and authorized and allowed the following amounts:

| | |
|---|---|
| **Receiver/Z&Z Fees** | $39,925.45 |
| **Mitofsky, Shapiro, Neville & Hazen, LLP Fees** | $ 2,555.00 |
| **Expenses** | $ 1,155.33 |
| **(Travel)** | ($85.20) |
| **Total (After 20% Holdback for Receiver and Z&Z Fees)** | $35,351.46 |

**WHEREAS** the Receiver submits that the funds held in the Receivership Accounts, as the Third Application defines that term, and, specifically, sourced from the E*Trade account ending x6818 (the "x6818 Account") held in such Receivership Accounts, should be used to pay the amounts sought in the Motions for Fees for payment of the Receiver's and Z&Z's fees and expenses; and,

**WHEREAS** the Receiver submits that the funds in the Bank of America account ending x7632 (the "x7632 Account"), held by DIYA Real Holdings, LLC, should be used to pay the amounts sought in the Third Application for payment of Mitofsky, Shapiro, Neville & Hazen, LLP's ("MSNH") fees;

**IT IS HEREBY ORDERED** that:[1]

1.  The Receiver shall transfer $239,886.96 from the Receivership Accounts and, specifically, sourced from the x6818 Account held in such Receivership Accounts, to an account held in the name of Z&Z in partial payment of the portions of the Motions for Fees seeking payment of the Receiver's fees, Z&Z's fees, and reimbursement for expenses;

2.  The Receiver shall transfer $2,555.00 from the x7632 Account to an account held in

---

[1] Defendant objects to the issuance of this order, arguing that because he filed a Notice of Appeal [Doc. # 1416] of the Ruling Granting Receiver's Motions for Fees [Doc. # 1415], jurisdiction over this matter "has shifted to the United States Court of Appeals for the Second Circuit." (Def.'s Obj. [Doc. # 1418] at 2.) But the Ruling Granting Receiver's Motions for Fees is not appealable at this time. It is neither an appealable "final decision[]" under 28 U.S.C. § 1291, because it is not "an order that resolves the entire case," *Ritzen Group, Inc. v. Jackson Masonry, LLC*, __ S.Ct. ___, 2020 WL 201023, at * 2 (Jan. 14, 2020), nor an appealable interlocutory decision regarding receivers under 28 U.S.C. § 1292(a)(2), because it is not an order "appointing [a] receiver[], or refusing orders to wind up [a] receivership[] or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." *See IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1020 (2d Cir. 1975) (holding that order allowing distribution of assets of receivership estate was not appealable under § 1292(a)(2) because that statute "seems to have been properly read as directed only to situations in which an application has been made by an interested party to have the receivership completed by sales or other dispositions and the district court has refused so to order"). Thus, Defendant's objection is overruled.

the name of MSNH in payment of the portion of the Third Application seeking payment for MSNH's fees;

3. Pursuant to the Order Appointing Receiver [Doc. No. 1070], $59,971.74, representing the total amount held back from the amount sought in the Motions for Fees, will be paid out at the discretion of the Court as part of the final fee application submitted at the close of this Receivership;

4. Pursuant to the Ruling Granting Receiver's Motion for Authority to Employ Mitofsky, Shapiro, Neville & Hazen, LLP [Doc. No 1275], the $2,550.00 paid to MSNH under the authority of this Order shall be counted against the "interest and gains" attributable to Apartment 12F if that apartment is liquidated in satisfaction of the disgorgement portion of the judgment in this case; and,

5. The Receiver is authorized and directed to take all reasonable and appropriate actions necessary to effectuate the foregoing.


IT IS SO ORDERED THIS _27__ day of _January_ , 2020.


/S/

Janet Bond Arterton, U.S.D.J.

4

SPA-224

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff,*<br>v.<br>IFTIKAR AHMED,<br>*Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>*Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br>October 8th, 2020 |

**RULING DENYING DEFENDANT'S EMERGENCY MOTION FOR CLARIFICATION OR RECONSIDERATION**

Defendant requests clarification or reconsideration of the Order Directing Payment of Receiver's Approved Fees and Expenses [Doc. # 1419] and requests that the Court "hold any payment of fees and expenses to the Receiver in abeyance, pending Second Circuit appeals." (Def.'s Mot. for Reconsideration [Doc. # 1421].) The Receiver opposes [Doc. # 1455], as does the SEC [Doc. # 1456]. For the reasons that follow, Defendant's motion is denied.

**I.     Background**

The Court assumes the parties' familiarity with the history of this case, but will briefly review the background relevant to this motion. On December 20, 2018, the Court entered its Order Appointing Receiver [Doc. # 1070] which appointed Jed Horwitt to take possession of all property secured in the Receivership Estate and make reasonable efforts to determine

SPA-225

the nature, location, and value of that property. Defendant appealed the Receivership Order [Doc. # 1084] and filed a motion with the Second Circuit to stay the Receivership Order pending appeal. Emergency Motion to Vacate or, Alternatively, Stay Order Appointing Receiver Pending Appeals, Doc. # 66 at 17, *SEC v. Ahmed*, Case No. 18-2903 (2d Cir.). The Second Circuit denied Defendant's Motion to Stay, finding that he "ha[d] not made a showing that he [was] likely to succeed on the merits or that he [would] be irreparably harmed absent a stay." Order, Doc. # 154, *SEC v. Ahmed*, Case No. 18-2903 (2d Cir. Feb. 19, 2019).

Pursuant to the Receivership Order, the Receiver was entitled to reasonable fees and expenses associated with performing his duties. The Receiver submitted several motions for fees and expenses incurred [Docs. ## 1160, 1249, 1330], all of which were opposed by Defendant [Docs. ## 1183, 1261, 1354] and Relief Defendants [Docs. ## 1185, 1264, 1362]. On January 22, 2020, the Court granted the Receiver's applications for fees [Doc. # 1415] and directed the Receiver to submit a proposed order reflecting the amounts to be distributed and identifying the assets in the Receivership Estate from which those fees would be paid. Defendant appealed this order to the Second Circuit [Doc. # 1416] and the appeal is currently pending. In addition, Defendant filed a Motion for Reconsideration [Doc. # 1420] with this Court, arguing that the Second Circuit has pendent appellate jurisdiction "over the issue of payment of fees and expenses to the Receiver" and asks the Court therefore to stay any payment to the Receiver until the Second Circuit has ruled on the issue.

II.    Discussion

Although the Receiver Fee Order [Doc. # 1415] and the Order Directing Payment [Doc. # 1419] are not appealable interlocutory orders, Defendant argues that "[t]he Second Circuit does have jurisdiction over the issue of payment of fees and expenses to the Receiver . . . [and] . . . over the issue of who ultimately bears the Receiver's fees and expenses, if any, and what it gets attributed to." (Def.'s Mot. at 2.) Defendant therefore "humbly asks the Court to hold in abeyance any payment of any fees and expenses to the Receiver until the Second

SPA-226

Circuit has properly addressed this issue, for which it has 'pendant [*sic*] appellate jurisdiction.'" (*Id.*)

Courts of appeals generally only have appellate jurisdiction over final decisions. 28 U.S.C. § 1291; *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 45 (1995). However, there is "a limited set of circumstances under which courts of appeals may take jurisdiction over interlocutory decisions of district courts." *Myers v. Hertz Corp.*, 624 F.3d 537, 552 (2d Cir. 2010) (internal quotation marks omitted); *see also Will v. Hallock*, 546 U.S. 345, 349 (describing the collateral order doctrine). Supplementing these circumstances is the judicially created doctrine of pendent appellate jurisdiction. *Myers*, 624 U.S. at 552. This doctrine gives appellate courts jurisdiction over certain otherwise unappealable interlocutory orders "where such rulings are inextricably intertwined with the order" over which the appellate court has proper appellate jurisdiction or where "review of such rulings is necessary to ensure meaningful review of the appealable order." *Id.* (internal quotations omitted). Appellate courts therefore only exercise pendent jurisdiction in "exceptional circumstances" and its exercise is entirely within the courts' discretion, *Id.*; *Jones v. Parmley*, 465 F.3d 46, 65 (2d Cir. 2006), with the purpose of preventing parties from transforming collateral orders into "multi-issue appeal tickets," *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995).

Defendant asks this Court to "hold any payment of fees and expenses to the Receiver in abeyance, pending Second Circuit appeals" since "[t]he Second Circuit . . . has jurisdiction over the issue of who ultimately bears the Receiver's fees and expenses." (Def.'s Mot. at 1-2). However, he offers no authority supporting the proposition that the mere possibility that an appellate court *could* exercise pendent appellate jurisdiction over an otherwise unappealable order should stay proceedings related to that order or otherwise divest this Court of its jurisdiction.

3

SPA-227

By contrast, the SEC argues that district courts retain jurisdiction while an appellate court contemplates exercising pendent appellate jurisdiction. (SEC's Response at 6.) The SEC cites *McCcy v. Webster* as an example of a district court retaining jurisdiction over a matter where the appellate court declined to exercise pendent appellate jurisdiction. 47 F.3d 404, 406 (11th Cir. 1995). In *McCcy*, two defendants appealed a district court's partial denial of their motion for summary judgment. *Id.* The Eleventh Circuit found that because the court properly had appellate jurisdiction over any denial of summary judgment based on qualified immunity, the court could have exercised "discretionary pendent appellate jurisdiction" over a plaintiff's related negligence claims. *Id.* The Eleventh Circuit, however, declined to exercise pendent appellate jurisdiction and held that the district court "properly retained jurisdiction." *Id.* The SEC argues that this holding stands for the proposition that just because an appellate court may "exercise pendent appellate jurisdiction" over a non-final order does not mean that the district court loses jurisdiction to effectuate that order. (SEC's Response at 7).

Considering that pendent appellate jurisdiction is a doctrine courts of appeals apply "sparingly" and in "exceptional circumstances," it would be unreasonable to require district courts to stay proceedings when any party simply sought review of an otherwise non-reviewable order under a pendent jurisdiction theory. When considering the facts of this case, ordering a stay of district court orders, as Defendant requests, is particularly inappropriate. Here, Defendant already sought a stay of the Order Appointing the Receiver which the Second Circuit denied because Defendant failed to demonstrate a likelihood of success on the merits or a risk of irreparable harm. If the Second Circuit considered and declined to stay the Order Appointing the Receiver, which was immediately appealable, it is highly unlikely that the Court of Appeals would find that a derivative appeal seeking exercise of discretionary pendent appellate jurisdiction related to payments pursuant to this Order would fare any better.

4

SPA-228

### III.    Conclusion

Accordingly, Defendant's Motion for Clarification or Reconsideration is DENIED. The Receiver shall effectuate payments pursuant to the Receiver Fee Order [Doc. # 1419].

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of October 2020.

SPA-229

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>          *Plaintiff,*<br>     v.<br>IFTIKAR AHMED,<br>          *Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>          *Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br><br>October 30, 2020 |

**RULING DENYING DEFENDANT'S EMERGENCY MOTION TO ENJOIN THE ENFORCEMENT OF THE DEFAULT JUDGMENT OBTAINED IN VIOLATION OF THIS COURT'S INJUNCTION AND IMPOSE SANCTIONS ON NMR OR IN THE ALTERNATIVE, TO IMPOSE SANCTIONS ON NMR, RELEASE FEES TO RETAIN COUNSEL IN THE NEW YORK STATE PROCEEDING TO DEFEND AGAINST THE DEFAULT JUDGMENT AND NMR E-TAILING'S ALLEGED CLAIMS TO STAY THE NMR CASE PENDING APPELLATE REVIEW**

Defendant requests that the Court enjoin the enforcement of the default judgment against him obtained by NMR e-tailing LLC ("NMR") in the New York Supreme Court case *NMR e-tailing v. Oak, et al.*, Index No. 656450/2017 ("NMR Case"). In the alternative, Defendant requests that the Court impose sanctions on NMR, release fees to allow Defendant to retain counsel in the NMR Case, and stay the NMR case pending appellate review of the Court's order granting NMR's motion to lift the litigation stay. (Def.'s Mem. in Supp. of Mot. to Enjoin [Doc. # 1324].) Relief Defendants join Defendant's motion. (Relief Defs.' Mem. [Doc. # 1344].) The Securities and Exchange Commission ("SEC") [Doc. # 1366], the Receiver [Doc.

# 1360], non-party Oak Management Corporation [Doc. # 1363], and NMR [Doc. # 1368] all oppose. For the reasons that follow, Defendant's motion is denied.

## I.      Background

The Court assumes the parties' familiarity with the history of this SEC enforcement action, but will briefly review the background relevant to this motion. In 2015, the Court entered a preliminary injunction ("2015 Injunction") prohibiting "any action interfer[ing] with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order; provided, however, that any party or non-party may seek leave from this order upon a proper showing." (2015 Inj. [Doc. # 113] at 21.) On October 18, 2017, NMR filed suit against Oak Investment Partners and its related entities ("Oak") in the New York Supreme Court. (NMR Case, Ex. A to NMR's Mot. to Lift Lit. Stay [Doc. # 1097-1].) On March 14, 2018, the New York Supreme Court entered a default judgment against Ahmed on the issue of liability "as a result of his failing to answer or otherwise respond to NMR's complaint." (NMR's Mem. in Opp. [Doc. # 1368] at 2.) The issue of damages is reserved to trial. (*Id.* at 3.)

On December 12, 2018, the Court appointed a Receiver to manage assets subject to the Court's Asset Freeze Order. (Order Appointing Receiver, [Doc. # 1070].) As a part of that Order, the Court enjoined the parties to related proceedings "from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, unless leave from this Court is obtained." (*Id.* ¶ 23.) NMR filed a motion to lift the litigation stay so as to allow it to continue litigating its action against Oak and Defendant, which the Court granted on May 21, 2019. (Order Lifting Lit. Stay [Doc. # 1167].) Defendant and Relief Defendants appealed this order to the Second Circuit Court of Appeals. (Notice of Appeal [Doc. # 1277].) Defendant now moves to enjoin enforcement of the default judgment entered in the NMR Case, arguing that it violates the 2015 Injunction, and seeks to impose sanctions against NMR for its conduct. (Def.'s Mem. at 3.) "In the alternative," Defendant

2

SPA-231

moves "to impose sanctions on NMR, release fees so Defendant can retain counsel to defend against NMR in the NMR Case, and to stay the case pending appellate review of the ruling allowing the NMR Case to proceed." (*Id.*) On October 29, 2020, Defendant and Relief Defendants withdrew their appeal of this Court's ruling lifting the litigation stay. (USCA Mandate [Doc. # 1674].)

## II.    Discussion

### A.    *Injunction Against Enforcement of the Default Judgment*

Defendant argues that because "NMR did not seek leave from this Court for permission to file that lawsuit," its New York Supreme Court lawsuit violates the 2015 Injunction. (*Id.* (emphasis in original).) He further argues that the appropriate remedy is for the NMR Case to "be dismissed with prejudice as to the Defendant or in the alternative [for] the Court [to] enjoin enforcement of the default judgment against the Defendant." (*Id.*) The SEC asserts that Defendant's claim that the NMR Case violates the 2015 Injunction is "baseless," because the NMR Case has in no way interfered with the Court's asset freeze. (Pl.'s Opp. at 2). NMR similarly asserts that Defendant failed to explain how the NMR Case interfered with the asset freeze. (NMR's Mem. at 5.) In reply, Defendant argues that "[t]here is no doubt whatsoever and the Court's Order is clear that NMR should have sought leave of the Court ***prior*** to filing its lawsuit." (Def.'s Reply [Doc. # 1379] at 2 (emphasis in original).)

Defendant offers no support for his claim that the NMR Case interferes with the asset freeze and thus violates the 2015 Injunction. NMR has not taken steps to liquidate its default judgment against Defendant. Indeed, the Receiver noted in his response that NMR is not seeking to obtain possession of any Receivership Assets and that counsel for NMR fully intends to comply with the Court's order. (Receiver's Mem. at 2.) Moreover, Defendant's position that NMR should have sought leave of court prior to filing the NMR suit is without merit since Defendant offers no evidence that NMR, a non-party, was actually aware of the 2015 Injunction. There is, therefore, no evidence that NMR violated the 2015 Injunction.

3

Absent any showing that NMR's lawsuit interferes with the Asset Freeze Order, Defendant's motion seeking an injunction is DENIED.

### B.   Sanctions on NMR

Defendant argues that the Court should impose sanctions on NMR for violating the 2015 Injunction. (Def.'s Mem. at 4.) Oak opposes any imposition of sanctions "because the assertions underlying that request are completely unfounded and without merit."[1] (Oak's Mem. at 2.) The SEC similarly asserts that any request for sanctions is "baseless" since NMR's action does not interfere with any Receivership Assets. (SEC's Mem. at 2.) Because the Court finds that NMR has not violated the 2015 Injunction, Defendant's request to impose sanctions against NMR lacks merit.

### C.   Release of Fees for Counsel

Defendant also urges the Court to "release fees for the Defendant to retain counsel to defend against the default judgment and NMR's alleged claims" since he believes that NMR will seek Receivership Assets in the future. (Def.'s Mem. at 6-7.) Defendant also argues that he has a right under the Fourteenth Amendment's Due Process Clause to defend against the default judgment. (*Id.* at 7.) Defendant maintains that he is unable to secure counsel because his assets are frozen and he is unable to proceed *pro se* in the NMR Case because the New York Supreme Court requires him to make a physical appearance, which he cannot do as he remains in India. (*Id.*) Defendant therefore requests released funds "up to $350,000 . . . to be paid directly by the Receiver to a counsel representing the Defendant in the NMR Case." (*Id.* at 9.)

---

[1] In a footnote, Defendant also requests that the Court impose sanctions on Oak for failing inform NMR of the 2015 Injunction. (Def.'s Mem. at 5-6, n.3.) Oak maintains that any request for sanctions is "without merit" since "nowhere does the Order impose an obligation on non-parties such as Oak to inform others as to the existence of the Order." (Oak's Mem. at 2.) The Court agrees with Oak, finding no provision of the 2015 Injunction imposing an affirmative duty on non-parties to inform others of the injunction. Moreover, Defendant could have brought the 2015 Injunction to NMR's attention when he learned of the lawsuit instead of waiting a year to do so. Accordingly, Defendant's motion to impose sanctions on Oak is DENIED.

SPA-233

The Receiver objects to the release of such funds, arguing that such a release would compromise his ability to secure the judgment in the instant action. (Receiver's Mem. at 3.) The SEC argues that Defendant is not entitled to any release of funds since Defendant's inability to access frozen funds is a direct result of his opposing liquidation and satisfaction of the SEC's judgment "at every turn." (SEC's Mem. at 3.) The SEC asserts that "Defendant has not established a need for the release of funds to participate in the NMR case" since he has not offered any evidence that he is "unable to leave India," a consequence of his own making, or has made unsuccessful efforts to retain counsel. (*Id.* at 4.) In his response, Defendant merely represents that he "cannot appear in person and must retain counsel to defend." (Def.'s Reply at 6.)

In light of the market risk to the Receivership Estate and Defendant's failure to show his inability to secure counsel, his request for a release of $350,000 is DENIED.

### D. Stay Pending Appeal

Since Defendant and Relief Defendants withdrew their appeal, their request for a stay pending appeal is DENIED AS MOOT.

### III. Conclusion

For the reasons set forth above, Defendant's Emergency Motion to Enjoin [Doc. # 1324] is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of October 2020.

SPA-234

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff,*<br>v.<br>IFTIKAR AHMED,<br>*Defendant*, and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>*Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br>November 5th, 2020 |

**RULING DENYING DEFENDANT'S MOTION TO REDUCE DISGORGEMENT IN THIS CASE FOR THE DEFAULT JUDGMENT ENTERED AGAINST HIM IN THE NMR E-TAILING NEW YORK STATE PROCEEDING**

Defendant requests that the Court reduce the disgorgement awarded in the instant case "by the amount rendered against him (if so determined) in the New York Supreme Court case *NMR e-Tailing v. Oak, et. al*, Index No. 656450/2017 ("NMR Case")." (Def.'s Mot. [Doc. # 1325].) Relief Defendants join Defendant's Motion. ([Doc. # 1343].) The Securities and Exchange Commission ("SEC") opposes, arguing the motion is premature. ([Doc. # 1367].) The Receiver takes no position. ([Doc. # 1358].) For the reasons that follow, Defendant's motion is denied.

**I.      Background**

The Court assumes the parties' familiarity with the history of this SEC enforcement action, but will briefly review the background relevant to this motion. On October 18, 2017, NMR filed suit against Oak Investment Partners and its related entities ("Oak") and Defendant in the

New York Supreme Court. (NMR Case, Ex. A to NMR's Mot. to Lift Lit. Stay [Doc. # 1097-1].) On March 14, 2018, the New York Supreme Court entered a default judgment against Mr. Ahmed on the issue of liability "as a result of his failing to answer or otherwise respond to NMR's complaint." (NMR's Mem. in Opp. [Doc. # 1368] at 2.) The issue of damages in the NMR Case is reserved to trial, which is scheduled for November 2020. (*Id.* at 3.)

## II.    Discussion

The doctrine of ripeness forbids the Court from deciding issues that are "mere hypothetical questions." *AMSAT Cable Ltd. V. Cablevision cf Conn.*, 6 F.3d 867, 872 (2d Cir. 1993). In order for a case or controversy to be ripe, it cannot depend on "contingent future events that may not occur as anticipated." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). "The doctrine's major purpose 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *National Organization for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1977), *overruled on other grounds*). While anticipated future injury generally precludes a finding that a case is ripe for resolution, courts will sometimes recognize disputes as ripe when fear of a future event may have an immediate impact on present affairs. *See, e.g., Pierce v. Society cf Sisters*, 268 U.S. 510 (1925). In such cases, a court may properly hear a dispute if there is no reasonable likelihood that further factual development would "significantly advance [the Court's] ability to deal with the legal issues presented." *Nat'l Park Hospitality Assoc. v. Dep't cf the Interior*, 538 U.S. 803, 812 (2003).

The SEC asserts that Defendant's motion is "plainly not ripe because it depends upon a contingent future event," namely "a monetary judgment in another case that may or may not be imposed." (SEC's Mem. at 2.) The SEC further argues that "whether an offset could even be arguably appropriate would necessarily depend on factors that have yet to be determined, such as exactly how the judgment was styled, whether the judgment in that case does, in fact, recompense the same victims for the same conduct, etc." (*Id.* at 2-3 (citing *SEC v. Penn Central Co.*, 425 F. Supp. 593, 599 (E.D. Pa. 1976)).)

SPA-236

Defendant maintains that the doctrine of ripeness "actually totally supports the Defendant's position as both forms of ripeness, Constitutional Ripeness and Prudential Ripeness (sic) are present here." (Def.'s Reply [Doc. # 1384] at 2.) Defendant argues that since the New York Supreme Court has already rendered a default judgment against him that there is therefore an "actual or imminent" injury that is "not conjectural or hypothetical." (*Id.*)  He contends that "[t]he factual issue of the amount of judgment that will be assessed in the NMR case is not determinative of the legal issue that such amount *must* be offset against the disgorgement in this case." (*Id.* at 3.)

The Court agrees with the SEC and finds this motion to be premature. Defendant's motion specifically requests a reduction of disgorgement by the amount rendered against him in the NMR Case only "if so determined." Damages in the NMR Case have been reserved for trial and the trial has not yet taken place. (NMR.'s Mem. in Opp. at 3.) Although Defendant insists that the actual amount of damages awarded will have no impact on the legal dispute, this is not true. It is possible, as Defendant acknowledges, that the New York Supreme Court could award no damages to NMR in its lawsuit. In such a case, Defendant's motion would be moot. Further factual development in the NMR Case could therefore have a substantial impact on the Court's resolution of the legal issues, and the motion is thus not ripe for judicial resolution.

**III.     Conclusion**

For the reasons set forth above, Defendant's Motion to Reduce the Disgorgement [Doc. # 1325] is DENIED as premature, without prejudice to renew.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 5th day of November 2020.

3

SPA-237

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br> *Plaintiff,* <br> v. <br> IFTIKAR AHMED, <br> *Defendant*, and <br><br> IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, <br><br> *Relief Defendants.* | Civil No. 3:15cv675 (JBA) <br><br> June 16, 2020 |

**REDETERMINATION OF DEFENDANT'S DISGORGEMENT OBLIGATION**

On March 11, 2021, the Second Circuit remanded to this Court determination of Appellant's disgorgement obligation "consistent with § 6501 of the National Defense Authorization Act, and, if appropriate, entry of an amended judgment." (Mandate of USCA [Doc. # 1810] at 2.) After full briefing and oral argument, the Court's determination of Defendant's increased disgorgement obligation is set forth below.

**I.      Background**

On May 6, 2015, the Securities and Exchange Commission (SEC) filed a complaint against Defendant alleging numerous violations of Sections 10(b) and 17(a) of the Securities Exchange Act and Sections 206(1) and 206(2) of the Advisers Act and requested equitable disgorgement of the proceeds from these fraudulent transactions. (Compl. [Doc. # 1] ¶¶ 65-88.) On August 12, 2015, after a hearing, the Court ordered that Defendant and Relief

Defendants' assets be frozen "up to the amount of $118,246,186," accounting for "approximately $65 million in illicit profits to be disgorged plus prejudgment interest ($9.3 million) and civil penalties ($44 million)." (Ruling and Order Granting Preliminary Injunc. [Doc. # 113] at 3.) Under the law at that time, the SEC was authorized to seek the entirety of illegally obtained profits for disgorgement as the applicable statutes did not have temporal limitations.

On June 5, 2017, the U.S. Supreme Court held in *Kokesh v. SEC* that disgorgement sought by the SEC pursuant to the Securities and Exchange Act is subject to the five-year statute of limitations imposed by 28 U.S.C. § 2462 because it constitutes a penalty, but expressly declined to reach the question of "whether courts possess authority to order disgorgement in SEC enforcement proceedings or [] whether courts have properly applied disgorgement principles in this context." *Kokesh v. SEC*, 137 S. Ct. 1635, 1642 n.3 (2017). In response to *Kokesh* and with consent of all parties, this Court reduced the amount of Defendant's assets frozen from $118,246,186 to $89,000,000 to exclude the calculation of illegally obtained profits beyond the newly imposed five-year statute of limitations, but declined to release any funds as it found the judgment to be undersecured because the actual value of the frozen assets amounted to, at best, $87 million. (Order on Def.'s Mot. for Mod. of the Asset Freeze [Doc. # 829] at 3, 5 (representing $44 million in disgorgement, 1.5 million in prejudgment interest, and $44 million in civil penalties).)

On March 29, 2018, the Court granted the SEC's motion for summary judgment, finding Defendant liable for violations of sections 206(1) through (4) of the Advisers Act, section 10(b) of the Exchange Act, and section 17(a)(1) of the Securities Act. (Ruling on All Parties' Mots. for Summ. J. on Liability [Doc. # 835] at 34, 38, 40.)  While Defendant argued for dismissal of all claims stemming from his actions prior to May 6, 2010, the Court held that, because the SEC sought equitable disgorgement *and* injunctive relief as remedies for Defendant's pre-2010 actions, *Kokesh* did not limit the Court's authority to find Defendant

2

*liable* for his earlier actions. (*Id.* at 31 ("Because this stage of the proceedings deals with liability, and the question of whether injunctive relief is appropriate as it relates to the otherwise time-barred conduct deals with the remedy, this question must be left to be addressed in the next phase of the proceedings. The Court therefore will not dismiss any claims under *Kokesh* at this liability stage, however it earlier modified the Asset Freeze Order [Doc. # 113] to reflect this change in law.").) The Court found that "the SEC has met its burden on summary judgment of establishing [that] Defendant acted with the requisite scienter *with respect to each act of fraud*," including those that occurred prior to May 6, 2010. (*Id.* at 42 (emphasis added).)

Thereafter, on December 14, 2018, the Court entered judgment against Defendant

(1) permanently enjoin[ing] Defendant from violating Section 17(a) of the Securities Act [], Section 10(b) of the Securities Exchange Act [], and Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act[]; (2) order[ing] the Defendant to disgorge $41,920,639 plus prejudgment interest for the period of time prior to the asset freeze, and interest and gains returned on the frozen assets during the pendency of the freeze; and (3) impos[ing] a civil penalty of $21,000,000 against Defendant.

(Am.. Final J. Against Def. and Relief Defs. [Doc. # 1054] at 2; *see* Ruling on Pl.'s Mot. for Remedies and J. [Doc. # 955] at 17 (finding that "a civil penalty in the amount of $21 million . . . is reasonable and justified").) As required by *Kokesh*, the Court limited disgorgement to the sum of profits Defendant illegally obtained after 2010. *Kokesh*, 137 S. Ct. at 1645. Both Defendant and Relief Defendants immediately appealed the judgment. (Relief Defs.' Notice of Appeal [Doc. # 1100]; Def.'s Notice of Appeal [Doc. # 1101].)

After the Supreme Court granted certiorari on *Liu v. SEC*, 140 S. Ct. 451 (2019), to decide whether a disgorgement award greater than the net profits from the defendant's wrongdoing was appropriate under the Securities Exchange Act, this Court stayed liquidation of the frozen assets because the "irreparable harm" that could be caused by prematurely liquidating Relief Defendants' and Defendant's unique assets outweighed the "potential harm asserted by the SEC and the Receiver [that] the assets of the Receivership

SPA-240

Estate [could] decline in value to a degree which jeopardizes the security of the judgment." (Ruling on Def.'s Mot. to Stay [Doc. # 1346] at 7.) The Supreme Court ultimately held in *Liu* that § 78u(d)(5) of the Act authorizes courts to order disgorgement that "does not exceed a wrongdoer's net profits and is awarded for victims." *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020).

Once *Liu* was decided, this Court anticipated that "the liquidation of assets will soon proceed such that the judgment will be fully secured and residual assets, if any, will be unfrozen." (Ruling Denying Relief Defs.' Mots. for Funds [Doc. # 1597].) Relief Defendants requested "clarification that the assets under this Court's asset freeze order will stay frozen with no liquidation of assets pending appeals," maintaining that liquidation prior to the resolution of all appeals would be inappropriate. (Mot. for Clarification [Doc. # 1602] at 2-3.) The Court denied Relief Defendants' motion, stating,

> Following the remand by the Second Circuit, the Court will determine Defendant's disgorgement obligation in accordance with § 6501 of the National Defense Authorization Act. Thereafter, a liquidation schedule will be issued. Separately, the asset freeze order remains in effect until appeals are decided.

(Order Denying Clarification [Doc. # 1868].)

Codifying the SEC's disgorgement power, Congress passed the National Defense Authorization Act (NDAA), which modifies the Securities Exchange Act to expressly permit courts to, "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, [] order [] disgorgement." 15 U.S.C. § 78u(d)(7) ("paragraph (7)").[1] The NDAA also requires that the SEC

> bring a claim for disgorgement under paragraph (7) . . . not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates--
> (I) section 10(b);
> (II) section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1));
> (III) section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1))

---

[1] *See also* Avi Weitzman & Tina Samanta, *Congress Codifies SEC Disgorgement Remedy in Military Spending Bill*, 25 WALL ST. LAWYER 1, 1 (Feb. 2021) (noting that § 6501 of the NDAA was intended to codify the rule announced in *Liu*).

    (IV) any other provision of the securities laws for which scienter must be established.

15 U.S.C. § 78u(d)(8)(A). These amendments "apply with respect to any action or proceeding that is pending on, or commenced on or after" January 1, 2021. *William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021*, H.R. 6395, 116th Cong. (2020) (NDAA) § 6501(b), https://www.congress.gov/bill/116th-congress/house-bill/6395.

    Upon passage of the NDAA and because the judgment remained on appeal, the SEC moved the Second Circuit

> to remand the captioned consolidated appeals for the limited purpose of recalculating Defendant-Appellant Iftikar Ahmed's disgorgement obligation consistent with recent amendments to Section 21(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u(d), [because] these recent amendments expand the statute of limitations from five (5) to ten (10) years with respect to disgorgement as a remedy for fraud in the Commission's enforcement actions, and they expressly apply to any action pending as of their date of enactment.

Pl. SEC's Mot. for Limited Remand at 1-2, *SEC v. Ahmed*, No. 18-2903 (2d Cir. Jan. 13, 2021), ECF No. 475. The motion for remand was granted on March 11, 2021, and the Second Circuit directed this Court to "determin[e] Appellant's disgorgement obligation consistent with § 6501 of the National Defense Authorization Act, and, if appropriate, ent[er] an amended judgment." (Mandate by USCA [Doc. # 1810] at 2.)

    The SEC seeks an amended judgment that includes the entirety of illegally obtained profits within the ten-year period prior to May 6, 2015. (Pl. SEC's Mem. Concerning Def.'s Disgorgement Obligation and Request for Entry of an Am. J. [Doc. # 1904] at 2.) Defendant and Relief Defendants oppose increasing the disgorgement amount and further request that the Court stay liquidation of assets pending final determination of the Second Circuit. (Def.'s Mem. of Law Addressing the Impact of § 6501 of the NDAA on the Final Disgorgement J. [Doc. # 1906] at 1, 21; Relief Defs.' Mem. of Law in Opp. to Pl.'s Request to Recalculate

Disgorgement Obligation [Doc. # 1901] at 3.) The Receiver takes no position. (Receiver Mem. Regarding the Def.'s Disgorgement Obligation [Doc. # 1899] at 1-2.)[2]

## II.   Discussion

### a.   Application of Amendments to a "Pending" Case

The modifications authorized by the NDAA apply to "any action or proceeding that is pending on" January 1, 2021. NDAA § 6501(b). Given that a case is pending until "the last court in the hierarchy [of Article III courts] rules," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995),[3] and the Second Circuit had not yet ruled on Defendant Parties' appeals as of January 1, 2021, this case is "pending" and the NDAA and its attendant modifications therefore apply.[4] *See also Landgraf v. USI Film Prod.*, 511 U.S. 244, 273-74 (1994) ("[A] court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit.").

The amendments permit disgorgement to be sought for up to ten years prior to the Government's filing of the complaint for "conduct that violates—(I) section 10(b); (II)

---

[2] The SEC argues that, in remanding the matter to the District Court, the Second Circuit necessarily held that the modifications of the Act applied to Defendant's case and the District Court's only responsibility is to calculate the change in disgorgement obligation. In contrast, Defendant Parties argue that the Second Circuit intended for this Court to determine the applicability of the NDAA, as well as recalculate Defendant's disgorgement obligation. In an abundance of caution, this Court analyzes both the applicability of the NDAA and the scope of Defendant's new disgorgement obligation.

[3] This extended reasoning from the Supreme Court in *Plaut* is instructive:

> [A] distinction between judgments from which all appeals have been forgone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial department composed of "inferior Courts" and "one supreme Court." Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole. It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must decide according to existing laws.

514 U.S. 211, 227 (1995).

[4] The First Circuit recently noted in an analogous pending SEC case that although "[w]hen the district court ruled, a five-year limitation period applied to the SEC's claims[,] . . . [t]he changed statute of limitations [as authorized by the NDAA] does not impact this case." *SEC v. Morrone*, No. 19-2006 at 6 n.3 (1st Cir. 2021). However, because the issue on appeal to the First Circuit does not appear to reach disgorgement, the First Circuit declined to analyze the application of the NDAA beyond that which is quoted above. *Id.* This Court, squarely addressing disgorgement, concludes that the NDAA does apply to this case.

section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)); (III) section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)); and (IV) any other provision of the securities laws for which scienter must be established." 15 U.S.C. § 78u(d)(8)(A). In its Ruling on Liability, the Court found that Defendant "acted with the requisite scienter with respect to each act of fraud" in violating Section 10(b) of the Exchange Act. (Ruling on Liability at 42.) With the exception of $650,000 in illegal profits obtained from Company D in January of 2005, each of Defendant's acts of fraud occurred after May 2005, (*see* Ruling on Liability at 15-24), and thus are subject to disgorgement under § 6401 of the NDAA.  As such, Defendant's new disgorgement obligation is $64,171,646.14. (*Id.*)

> b. *Defendant and Relief Defendant's Arguments*

Defendant Parties offer a number of reasons why the NDAA should not apply to this case, all of which are defeated by the Court's finding that this judgment remains "pending." (*See* Relief Defs.' Mem. at 1-3; Def.'s Mem. at 6-7.)

First, Relief Defendants argue that the Court may not increase the amount of disgorgement because the Second Circuit does not permit "an appellee who has not cross-appealed [to] enlarge the amount of damages or scope of equitable relief," (Relief Defs.' Mem. at 7 (quoting *Int'l Ore & Fertilizer Corp. v. SGS Control Servs.*, 38 F.3d 1279, 1286 (2d Cir. 1994)); *see also* Def.'s Mem. at 6). At the time it moved the Second Circuit for a limited remand in January 2021, the SEC had not entered a cross-appeal in this case. However, "the requirement of a cross-appeal is a rule of practice which is not jurisdictional and in appropriate circumstances may be disregarded." *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir. 1988); *see also Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 309 (2d Cir. 2003) (holding the same); *Rangolan v. Cty. of Nassau*, 370 F.3d 239, 254 (2d Cir. 2004) (noting that the cross-appeal rule is one of practice but also observing that "exercise of the power to disregard the failure to cross-appeal has been rare, requiring a showing of exceptional circumstances") (internal quotations omitted). To decide whether to disregard the cross-appeal requirement,

SPA-244

this Court applies a factor test balancing "(1) the interrelatedness of the issues on appeal and cross-appeal; (2) whether the nature of the district court opinion should have put the appellee on notice of the need to file a cross-appeal; and (3) the extent of any prejudice to the appellant caused by the absence of notice." *Lee v. Burlington N. Santa Fe Ry. Co.,* 245 F.3d 1102, 1107 (9th Cir. 2001). Here, since the amount of the judgment was directly appealed by Defendant Parties, the District Court's opinion could not have put the appellee on notice of any grounds for cross appeal because the NDAA had not yet passed, and no prejudice resulted to the appellant as the Parties had ample opportunity to brief the issue on remand. Thus, the SEC's failure to submit a cross-appeal will not limit the scope of its disgorgement remedy.

Second, Defendant and Relief Defendants argue that expanding disgorgement necessarily would either reopen a final judgment or unconstitutionally attempt to revive time-barred claims as prohibited by the ex post facto clause. (Def.'s Mem. at 10-13, Relief Defs. Mem. at 17-18.)

 Mem. at 11-14, 18-19.) However, as discussed above, the NDAA applies to *pending* cases, the judgments of which are not yet considered final under *Plaut*, but the substance of which have already been brought before the Court. *See Plaut*, 514 U.S. at 227 (noting the constitutionally important "distinction between judgments from which all appeals have been forgone or completed, and judgments that remain on appeal (or subject to being appealed)").[5] Because the SEC does not seek permission to initiate suit against Defendant for previously time-barred claims, but rather intends only to obtain disgorgement of proceeds obtained from violations for which Defendant has already been found liable and the judgment of which is still pending, the ex post facto clause does not apply to this case. The

---

[5] Defendant Parties argue that, because the SEC consented to the five-year limitation and declined to appeal the judgment, the judgment should be viewed as "final" as applied to the SEC; however, no Defendant Parties support this contention with any legal authority or meritorious rationale. (Def.'s Mem. at 10-13; Relief Defs.' Mem. at 12-14.)

Court does not therefore address the punitive nature of the disgorgement and its interaction with the ex post facto clause. (*See* Relief Defs.' Mem. at 18-19; Def.'s Mem. at 17-18); *see also SEC v. Sidoti*, 2021 WL 1593253 at \*6-\*7 (C.D. Cal. Mar. 19, 2021) (holding that the five-year limitation of 28 U.S.C. § 2462 applies to disgorgement sought for non-scienter-based violations of the Securities Exchange Act because of its penal nature).

Third, Relief Defendants and Defendant argue that the amendments do not apply to this case because the NDAA "left § 21(d)(5) unaltered, while creating a new subparagraph – § 21(d)(7)" and thus this action, which they argue granted remedial action only pursuant to § 21(d)(5), is unaffected by the modifications because the new "limitations period [] governs only claims for disgorgement under paragraph (7)" and "'paragraph (7)' did not exist before January 2021." (Relief Defs.' Mem at 3, 19-20; *see also* Def.'s Mem. at 18-19.) However, the Court did not rely solely on § 21(d)(5) of the Act to authorize disgorgement in its initial ruling. (*See* Ruling on Pl.'s Mot. for Remedies and J. at 10 ("Second Circuit precedent [recognizes] that disgorgement is a proper equitable remedy.") (citing *SEC v. Cavanaugh*, 445 F.3d 105, 116 (2d Cir. 2006))). Moreover, the SEC did not, as Defendant claims "ma[k]e it clear that it was bringing its claims for disgorgement, and had authority to do so, only under § 21(d)(5)," (Def.'s Mem. at 19 n.14), but rather relied on the common law injunctive power of the district courts, (Pl. SEC's Opp. to Def.'s Emerg. Mot. to Stay in Light of *Kokesh* [Doc. # 684] at 6-7 ("[D]istrict courts in Commission actions have for decades used their injunctive authority under Section 21(d)(1) of the Exchange Act to order defendants to disgorge profits that they acquired through violations of the securities laws. . . . Disgorgement is *also* authorized by Section 21(d)(5). . . .") (emphasis added)). Thus, Relief Defendants' contention that the amendments do not reach the subsection on which this Court grounded its decision is incorrect. Moreover, as discussed above, even though paragraph (7) did not exist until January 2021, because the litigation was still pending at that time, the Court must apply the

new law to the present case and may therefore order disgorgement in accordance with the newly-minted paragraph (7).[6]

Because the judgment was still pending at the time the NDAA went into effect, disgorgement is properly ordered to be $64,171,646.14.

### c. Prejudgment Interest

In its Amended Final Judgment, the Court awarded $1,491,064.01 of "prejudgment interest [on the disgorgement award] for the period of time prior to the asset freeze." (Am. J. [Doc. # 1054] at 2, 4.) The SEC now seeks an increased prejudgment interest award of $9,755,798.34 to reflect the increased disgorgement amount. (SEC's Mem. at 9; Disgorgement and Prejudgment Interest Summary, Ex. A to SEC's Mem [Doc. # 1904-1] at 1-4.) Relief Defendants request that, to the extent the Court decides to award prejudgment interest on any increased disgorgement award, such interest "not be computed using the IRS underpayment rate or compounded at a quarterly rate" as requested by the SEC, but instead be computed using "the one-year Treasury Bill rate." (Relief Defs.' Mem. at 7, 8.)

The Court has already determined that an award of prejudgment interest on disgorged assets calculated using the SEC's methodology is appropriate, and there is no reason why it should not similarly award prejudgment interest on the increased disgorgement award. (*See* Order Granting Pl.'s Mot. for J. and Remedies at 13.) Although Relief Defendants contend that the SEC's proposed method for calculating prejudgment interest is "punitive" and would overcompensate the SEC, (*id.* at 8-9), no court has found prejudgment interest compounded quarterly based on the same interest rate the IRS uses to be "punitive" or to otherwise result in overcompensation to the plaintiff. To the contrary, numerous courts have affirmed, even after *Liu*, that this method is appropriate because the

---

[6] Defendant and Relief Defendants further argue that "§ 21(d)(8)(A)(ii)'s ten-year limitations period, if it were applicable, can only apply to conduct and transactions occurring after January 2011 given that Congress enacted the NDAA in January 2021. However, the statute itself states that actions must be brought "not later than 10 years *after the latest date of the violation* that gives rise to the action" and thus the argument is without merit. 15 U.S.C. § 78u(d)(8)(A) (emphasis added).

SPA-247

IRS's "rate of interest 'reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.'" *SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *10 (N.D. Tex. Jan. 8, 2021) (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)); *see also SEC v. Skelley*, No. 18cv8803 (LGS) (DF), 2021 WL 863298, at *7-*8 (S.D.N.Y. Feb. 25, 2021) (holding that prejudgment interest calculations should apply the IRS underpayment rate and compound quarterly); *SEC v. Owings Group, LLC*, No. RDB-18-2046, 2021 WL 1909606, at *5-*6 (D. Md. May 12, 2021) (holding that a prejudgment interest award in accordance with "the SEC's prejudgment interest calculator[,] which uses the same rate as the Internal Revenue Service, 26 U.S.C. § 6621(a)(2), and compounds interest quarterly" is appropriate); *SEC v. Dang*, No. 3:20-cv-01353 (JAM), 2021 WL 1550593, at *7 (D. Conn. Apr. 19, 2021) (holding that an award of prejudgment interest calculated in the same manner the IRS uses for tax underpayments is appropriate); *SEC v. Premier Holding Corp.*, No. SACV 18-00813-CJC(KESx), 2021 WL 1048565, at *3 (C.D. Cal. Jan. 20, 2021) (same); *SEC v. Montgomery*, No. SA-20-CA-598-FB, 2021 WL 210749 (W.D. Tex. Jan. 20, 2021) (same); *SEC v. Blockest, LLC*, No. 18CV2287-GPB(MSB), 2020 WL 7488067, at *4 (S.D. Cal. Dec. 15, 2020) (same); *SEC v. Erwin*, No. 13-cv-03363-CMA-KMT, 2020 WL 7310584, at *5 (D. Colo. Dec. 11, 2020) (same); *SEC v. Curatives Biosciences, Inc.*, No. 8:18-cv-00925-SVW, 2020 WL 7345681, at *6 (C.D. Cal. Oct. 22, 2020) (same); *SEC v. Mizrahi*, No. CV 19-2284 PA (JEMx), 2020 WL 6114913, at *4 (C.D. Cal. Oct. 5, 2020) (same).

Consistent with the Court's prior award of prejudgment interest on disgorgement, the judgment is hereby amended to reflect an increased prejudgment interest award of $9,755,798.34.

>  d. *Liquidation*

Despite the fact that the Court had already explained that liquidation would proceed following recalculation of the disgorgement award, (Order Denying Clarification), Defendant

SPA-248

and Relief Defendants elected to argue again in their briefs that a liquidation schedule should not issue, (*see* Relief Defs.' Mem. at 21; Def's Mem. at 29-32). The Court construes Defendant and Relief Defendants' request to stay liquidation pending appeal as a motion for reconsideration. Because Defendant and Relief Defendants filed their briefs twelve days after the Court issued its Order Denying Clarification on April 7, 2021, their motions for reconsideration are untimely and must be denied. *See* D. Conn. L. R. Civ. P. 7(c) (Motions for reconsideration must be filed "within seven days of the filing of the decision or order from which such relief is sought."). Moreover, Defendant and Relief Defendants have not identified any "controlling decisions or data that the court overlooked in the initial decision or order," as the Court issued its prior order after the Second Circuit issued its limited remand in light of the NDAA. *See id.*

Regardless, Defendant and Relief Defendants' arguments that liquidation should be stayed pending appeal are unavailing. Given the enlarged disgorgement award of $64,171,646.14 and the corresponding increased prejudgment interest award of $9,755,798.34, the asset freeze no longer serves the same function as a *supersedeas* bond, which is designed to protect judgment creditors as fully as possible where there is a reasonable likelihood that the judgment debtor will unable or unwilling to satisfy the judgment in full. *See Rand-Whitney Containerboard Ltd. Partnership v. Town of Montville*, 245 F.R.D. 65, 67 (D. Conn. 2007).

The total judgment against Defendant now stands at $94,927,444.40, exclusive of gains on any assets used to satisfy the judgment since the asset freeze order. Although the most recent valuation by the Receiver estimates that the Receivership Estate is worth $123,771,402.92, that amount has fluctuated over the course of the Receivership, initially reflecting a value of $89,377,509.22 on May 5, 2019, (First Mot. for Atty Fees [Doc. # 1160-5] at 6), and decreasing to a low of $84,959,536.01 on May 15, 2020, (Fifth Mot. for Atty Fees [Doc. # 1555-11] at 4), before reaching the present valuation. Given the relatively illiquid

12

SPA-249

nature of some assets in the Receivership Estate and the documented fluctuations in value (the lowest of which would leave the judgment undersecured by approximately $10 million), the unliquidated Receivership Estate does not adequately secure judgment. While Defendant "strongly believes the value of the invested assets will continue to increase" and thereby fully secure the judgment, (Def.'s Mem. at 31), there is no guarantee that this is the case, and the risk of a decrease in value should not be borne by the victims of Defendant's fraudulent scheme.

Defendant and Relief Defendants insist that pre-appeal liquidation will result in irreparable harm since "certain assets are real assets that can never be recovered if monetized," "there will be sizable capital gains taxes on any stock or bond sales," and "actions with respect to any irrevocable trusts and/or UGMAs may not be reversible." (Relief Defs.' Mem. at 22; *see also* Def.'s Mem. at 29.) Although it is possible that irreversible harm could be borne by Defendant and Relief Defendants should any decision by this Court be reversed by the Second Circuit, this risk can be substantially mitigated through a carefully timed liquidation plan that, *inter alia*, liquidates unique assets last and only if necessary to satisfy the judgment.

Liquidation is also favored as it will allow full security of the judgment and permit release of any excess frozen assets to Defendant and Relief Defendants. After excess assets are returned, there will be no further need to continually litigate over the release of frozen assets for Defendant and Relief Defendants' various purposes. Liquidation thus promotes judicial economy.

Accordingly, the Receiver is directed to propose a liquidation schedule upon which all Parties may comment. The Receiver is directed to file this proposed schedule with the Court no later than July 15, 2021. Comments will be received until July 29, 2021.

SPA-250

### III.     Conclusion

For the foregoing reasons and in accordance with the Second Circuit's directive on remand [Doc. # 1801], Defendant's disgorgement obligation is increased to $64,171,646.14 with a prejudgment interest award of $9,755,798.34. The Clerk shall amend the judgment accordingly.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of June 2021.

14

SPA-251

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>　　　*Plaintiff,*<br>　　　v.<br>IFTIKAR AHMED,<br>　　　*Defendant,* and<br><br>IFTIKAR ALI AHMED SOLE PROP; I-CUBED DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST; DIYA HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents; and I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents,<br><br>　　　*Relief Defendants.* | Civil No. 3:15cv675 (JBA)<br><br>July 6, 2021 |

**REDETERMINED FINAL AMENDED JUDGMENT**

It is hereby ordered that the Amended Final Judgment [Doc. # 1054] entered by this

Court in the above-entitled case on December 14, 2018, be amended as follows:

(4) IT IS HEREBY FURTHER ORDERED that Defendant is liable for disgorgement of **$64,171,646.14**, representing profits gained as a result of the conduct alleged in the Second Amended Complaint that occurred within ten years of the initiation of this case, together with an increased prejudgment interest award in the amount of **$9,755,798.34** and any interest or gains accrued on disgorged frozen assets from the date of the Court's freeze order.

In all other respects the Amended Judgment [Doc. # 1054] entered by this Court on

December 14, 2018 remains in effect.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 6th day of July 2021.

**SPA-252**

<u>**The William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 (2021)**</u>

## SEC. 6501. INVESTIGATIONS AND PROSECUTION OF OFFENSES FOR VIOLATIONS OF THE SECURITIES LAWS.

(a) IN GENERAL.—Section 21(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78u(d)) is amended—

(1) in paragraph (3)—

(A) in the paragraph heading—

(i) by inserting ''CIVIL'' before ''MONEY PENALTIES''; and

(ii) by striking ''IN CIVIL ACTIONS'' and inserting ''AND AUTHORITY TO SEEK DISGORGEMENT'';

(B) in subparagraph (A), by striking ''jurisdiction to impose'' and all that follows through the period at the end and inserting the following: ''jurisdiction to—

''(i) impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation; and

''(ii) require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation.''; and

(C) in subparagraph (B)—

(i) in clause (i), in the first sentence, by striking ''the penalty'' and inserting ''a civil penalty imposed under subparagraph (A)(i)'';

(ii) in clause (ii), by striking ''amount of penalty'' and inserting ''amount of a civil penalty imposed under subparagraph (A)(i)''; and

(iii) in clause (iii), in the matter preceding item (aa), by striking ''amount of penalty for each such violation'' and inserting ''amount of a civil penalty imposed under subparagraph (A)(i) for each violation described in that subparagraph'';

(2) in paragraph (4), by inserting ''under paragraph (7)'' after ''funds disgorged''; and

(3) by adding at the end the following:

SPA-253

"(7) DISGORGEMENT.—In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

"(8) LIMITATIONS PERIODS.—

"(A) DISGORGEMENT.—The Commission may bring a claim for disgorgement under paragraph (7)—

"(i) not later than 5 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim occurs; or

"(ii) not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates—

"(I) section 10(b);

"(II) section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1));

"(III) section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–6(1)); or

"(IV) any other provision of the securities laws for which scienter must be established.

"(B) EQUITABLE REMEDIES.—The Commission may seek a claim for any equitable remedy, including for an injunction or for a bar, suspension, or cease and desist order, not later than 10 years after the latest date on which a violation that gives rise to the claim occurs.

"(C) CALCULATION.—For the purposes of calculating any limitations period under this paragraph with respect to an action or claim, any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that period.

"(9) RULE OF CONSTRUCTION.—Nothing in paragraph (7) may be construed as altering any right that any private party may have to maintain a suit for a violation of this Act.''.

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act.

SPA-254



KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78u

§ 78u. Investigations and actions

Effective: January 1, 2021
Currentness

**(a)Authority and discretion of Commission to investigate violations**

**(1)** The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated, or, as to any act or practice, or omission to act, while associated with a member, formerly associated with a member, the rules of a registered clearing agency in which such person is a participant, or, as to any act or practice, or omission to act, while a participant, was a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm, a person associated with such a firm, or, as to any act, practice, or omission to act, while associated with such firm, a person formerly associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, and may require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated. The Commission is authorized in its discretion, to publish information concerning any such violations, and to investigate any facts, conditions, practices, or matters which it may deem necessary or proper to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning the matters to which this chapter relates.

**(2)** On request from a foreign securities authority, the Commission may provide assistance in accordance with this paragraph if the requesting authority states that the requesting authority is conducting an investigation which it deems necessary to determine whether any person has violated, is violating, or is about to violate any laws or rules relating to securities matters that the requesting authority administers or enforces. The Commission may, in its discretion, conduct such investigation as the Commission deems necessary to collect information and evidence pertinent to the request for assistance. Such assistance may be provided without regard to whether the facts stated in the request would also constitute a violation of the laws of the United States. In deciding whether to provide such assistance, the Commission shall consider whether (A) the requesting authority has agreed to provide reciprocal assistance in securities matters to the Commission; and (B) compliance with the request would prejudice the public interest of the United States.

**(b)Attendance of witnesses; production of records**

For the purpose of any such investigation, or any other proceeding under this chapter, any member of the Commission or any officer designated by it is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take

evidence, and require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry. Such attendance of witnesses and the production of any such records may be required from any place in the United States or any State at any designated place of hearing.

**(c)Judicial enforcement of investigative power of Commission; refusal to obey subpena; criminal sanctions**

In case of contumacy by, or refusal to obey a subpena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records. And such court may issue an order requiring such person to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district whereof such person is an inhabitant or wherever he may be found. Any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, and other records, if in his power so to do, in obedience to the subpena of the Commission, shall be guilty of a misdemeanor and, upon conviction, shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year, or both.

**(d)Injunction proceedings; authority of court to prohibit persons from serving as officers and directors; money penalties in civil actions**

**(1)** Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter.

**(2) Authority of court to prohibit persons from serving as officers and directors**

In any proceeding under paragraph (1) of this subsection, the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 78j(b) of this title or the rules or regulations thereunder from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78*l* of this title or that is required to file reports pursuant to section 78*o*(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

**(3)Civil money penalties and authority to seek disgorgement**

**(A)Authority of Commission**

Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, or a cease-and-desist order entered by the Commission pursuant to section 78u-3 of this title, other than by committing a violation subject to a penalty pursuant to section 78u-1 of this title, the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to--

**(i)** impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation; and

**(ii)** require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation.

**(B)Amount of penalty**

**(i)First tier**

The amount of a civil penalty imposed under subparagraph (A)(i) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.

**(ii)Second tier**

Notwithstanding clause (i), the amount of a civil penalty imposed under subparagraph (A)(i) for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

**(iii)Third tier**

Notwithstanding clauses (i) and (ii), the amount of a civil penalty imposed under subparagraph (A)(i) for each violation described in that subparagraph shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if--

**(aa)** the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

**(bb)** such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

**(C)Procedures for collection**

**(i)Payment of penalty to treasury**

A penalty imposed under this section shall be payable into the Treasury of the United States, except as otherwise provided in section 7246 of this title and section 78u-6 of this title.

**(ii)Collection of penalties**

If a person upon whom such a penalty is imposed shall fail to pay such penalty within the time prescribed in the court's order, the Commission may refer the matter to the Attorney General who shall recover such penalty by action in the appropriate United States district court.

**(iii)Remedy not exclusive**

The actions authorized by this paragraph may be brought in addition to any other action that the Commission or the Attorney General is entitled to bring.

**(iv)Jurisdiction and venue**

For purposes of section 78aa of this title, actions under this paragraph shall be actions to enforce a liability or a duty created by this chapter.

**(D)Special provisions relating to a violation of a cease-and-desist order**

In an action to enforce a cease-and-desist order entered by the Commission pursuant to section 78u-3 of this title, each separate violation of such order shall be a separate offense, except that in the case of a violation through a continuing failure to comply with the order, each day of the failure to comply shall be deemed a separate offense.

**(4) Prohibition of attorneys' fees paid from Commission disgorgement funds**

Except as otherwise ordered by the court upon motion by the Commission, or, in the case of an administrative action, as otherwise ordered by the Commission, funds disgorged under paragraph (7) as the result of an action brought by the Commission in Federal court, or as a result of any Commission administrative action, shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds.

**(5) Equitable relief**

In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

**(6) Authority of a court to prohibit persons from participating in an offering of penny stock**

**(A)In general**

In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

**(B)Definition**

For purposes of this paragraph, the term "person participating in an offering of penny stock" includes any person engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock. The Commission may, by rule or regulation, define such term to include other activities, and may, by rule, regulation, or order, exempt any person or class of persons, in whole or in part, conditionally or unconditionally, from inclusion in such term.

**(7)Disgorgement**

In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

**(8)Limitations periods**

**(A)Disgorgement**

The Commission may bring a claim for disgorgement under paragraph (7)--

**(i)** not later than 5 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim occurs; or

**(ii)** not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates--

**(I)**section 78j(b) of this title;

**(II)**section 77q(a)(1) of this title;

**(III)**section 80b-6(1) of this title; or

**(IV)** any other provision of the securities laws for which scienter must be established.

**(B)Equitable remedies**

The Commission may seek a claim for any equitable remedy, including for an injunction or for a bar, suspension, or cease and desist order, not later than 10 years after the latest date on which a violation that gives rise to the claim occurs.

**(C)Calculation**

For the purposes of calculating any limitations period under this paragraph with respect to an action or claim, any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that period.

**(9)Rule of construction**

Nothing in paragraph (7) may be construed as altering any right that any private party may have to maintain a suit for a violation of this chapter.

**(e)Mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, the rules of the Municipal Securities Rulemaking Board, or any undertaking contained in a registration statement as provided in subsection (d) of section 78*o* of this title, (2) any national securities exchange or registered securities association to enforce compliance by its members and persons associated with its members with the provisions of this chapter, the rules, regulations, and orders thereunder, and the rules of such exchange or association, or (3) any registered clearing agency to enforce compliance by its participants with the provisions of the rules of such clearing agency.

**(f)Rules of self-regulatory organizations or Board**

Notwithstanding any other provision of this chapter, the Commission shall not bring any action pursuant to subsection (d) or (e) of this section against any person for violation of, or to command compliance with, the rules of a self-regulatory organization or the Public Company Accounting Oversight Board unless it appears to the Commission that (1) such self-regulatory organization or the Public Company Accounting Oversight Board is unable or unwilling to take appropriate action against such person in the public interest and for the protection of investors, or (2) such action is otherwise necessary or appropriate in the public interest or for the protection of investors.

**(g)Consolidation of actions; consent of Commission**

Notwithstanding the provisions of section 1407(a) of Title 28, or any other provision of law, no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission.

**(h)Access to records**

**(1)** The Right to Financial Privacy Act of 1978 shall apply with respect to the Commission, except as otherwise provided in this subsection.

**(2)** Notwithstanding section 1105 or 1107 of the Right to Financial Privacy Act of 1978, the Commission may have access to and obtain copies of, or the information contained in financial records of a customer from a financial institution without prior notice to the customer upon an ex parte showing to an appropriate United States district court that the Commission seeks such financial records pursuant to a subpena issued in conformity with the requirements of section 19(b) of the Securities Act of 1933, section 21(b) of the Securities Exchange Act of 1934, section 42(b) of the Investment Company Act of 1940, or section 209(b) of the Investment Advisers Act of 1940, and that the Commission has reason to believe that--

**(A)** delay in obtaining access to such financial records, or the required notice, will result in--

**(i)** flight from prosecution;

**(ii)** destruction of or tampering with evidence;

**(iii)** transfer of assets or records outside the territorial limits of the United States;

**(iv)** improper conversion of investor assets; or

**(v)** impeding the ability of the Commission to identify or trace the source or disposition of funds involved in any securities transaction;

**(B)** such financial records are necessary to identify or trace the record or beneficial ownership interest in any security;

**(C)** the acts, practices or course of conduct under investigation involve--

**(i)** the dissemination of materially false or misleading information concerning any security, issuer, or market, or the failure to make disclosures required under the securities laws, which remain uncorrected; or

**(ii)** a financial loss to investors or other persons protected under the securities laws which remains substantially uncompensated; or

**(D)** the acts, practices or course of conduct under investigation--

**(i)** involve significant financial speculation in securities; or

**(ii)** endanger the stability of any financial or investment intermediary.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

§ 78u. Investigations and actions, 15 USCA § 78u

**(3)** Any application under paragraph (2) for a delay in notice shall be made with reasonable specificity.

**(4)(A)** Upon a showing described in paragraph (2), the presiding judge or magistrate judge shall enter an ex parte order granting the requested delay for a period not to exceed ninety days and an order prohibiting the financial institution involved from disclosing that records have been obtained or that a request for records has been made.

**(B)** Extensions of the period of delay of notice provided in subparagraph (A) of up to ninety days each may be granted by the court upon application, but only in accordance with this subsection or section 1109(a), (b)(1), or (b)(2) of the Right to Financial Privacy Act of 1978.

**(C)** Upon expiration of the period of delay of notification ordered under subparagraph (A) or (B), the customer shall be served with or mailed a copy of the subpena insofar as it applies to the customer together with the following notice which shall describe with reasonable specificity the nature of the investigation for which the Commission sought the financial records:

"Records or information concerning your transactions which are held by the financial institution named in the attached subpena were supplied to the Securities and Exchange Commission on (date). Notification was withheld pursuant to a determination by the (title of court so ordering) under section 21(h) of the Securities Exchange Act of 1934 that (state reason). The purpose of the investigation or official proceeding was (state purpose)."

**(5)** Upon application by the Commission, all proceedings pursuant to paragraphs (2) and (4) shall be held in camera and the records thereof sealed until expiration of the period of delay or such other date as the presiding judge or magistrate judge may permit.

**(6)** Repealed. Pub.L. 114-113, Div. O, Title VII, § 708, Dec. 18, 2015, 129 Stat. 3030

**(7)(A)** Following the expiration of the period of delay of notification ordered by the court pursuant to paragraph (4) of this subsection, the customer may, upon motion, reopen the proceeding in the district court which issued the order. If the presiding judge or magistrate judge finds that the movant is the customer to whom the records obtained by the Commission pertain, and that the Commission has obtained financial records or information contained therein in violation of this subsection, other than paragraph (1), it may order that the customer be granted civil penalties against the Commission in an amount equal to the sum of--

**(i)** $100 without regard to the volume of records involved;

**(ii)** any out-of-pocket damages sustained by the customer as a direct result of the disclosure; and

**(iii)** if the violation is found to have been willful, intentional, and without good faith, such punitive damages as the court may allow, together with the costs of the action and reasonable attorney's fees as determined by the court.

**(B)** Upon a finding that the Commission has obtained financial records or information contained therein in violation of this subsection, other than paragraph (1), the court, in its discretion, may also or in the alternative issue injunctive relief to require

the Commission to comply with this subsection with respect to any subpena which the Commission issues in the future for financial records of such customer for purposes of the same investigation.

**(C)** Whenever the court determines that the Commission has failed to comply with this subsection, other than paragraph (1), and the court finds that the circumstances raise questions of whether an officer or employee of the Commission acted in a willful and intentional manner and without good faith with respect to the violation, the Office of Personnel Management shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the agent or employee who was primarily responsible for the violation. After investigating and considering the evidence submitted, the Office of Personnel Management shall submit its findings and recommendations to the Commission and shall send copies of the findings and recommendations to the officer or employee or his representative. The Commission shall take the corrective action that the Office of Personnel Management recommends.

**(8)** The relief described in paragraphs (7) and (10) shall be the only remedies or sanctions available to a customer for a violation of this subsection, other than paragraph (1), and nothing herein or in the Right to Financial Privacy Act of 1978 shall be deemed to prohibit the use in any investigation or proceeding of financial records, or the information contained therein, obtained by a subpena issued by the Commission. In the case of an unsuccessful action under paragraph (7), the court shall award the costs of the action and attorney's fees to the Commission if the presiding judge or magistrate judge finds that the customer's claims were made in bad faith.

**(9)(A)** The Commission may transfer financial records or the information contained therein to any government authority if the Commission proceeds as a transferring agency in accordance with section 1112 of the Right to Financial Privacy Act of 1978, except that the customer notice required under section 1112(b) or (c) of such Act may be delayed upon a showing by the Commission, in accordance with the procedure set forth in paragraphs (4) and (5), that one or more of subparagraphs (A) through (D) of paragraph (2) apply.

**(B)** The Commission may, without notice to the customer pursuant to section 1112 or the Right to Financial Privacy Act of 1978, transfer financial records or the information contained therein to a State securities agency or to the Department of Justice. Financial records or information transferred by the Commission to the Department of Justice or to a State securities agency pursuant to the provisions of this subparagraph may be disclosed or used only in an administrative, civil, or criminal action or investigation by the Department of Justice or the State securities agency which arises out of or relates to the acts, practices, or courses of conduct investigated by the Commission, except that if the Department of Justice or the State securities agency determines that the information should be disclosed or used for any other purpose, it may do so if it notifies the customer, except as otherwise provided in the Right to Financial Privacy Act of 1978, within 30 days of its determination, or complies with the requirements of section 1109 of such Act regarding delay of notice.

**(10)** Any government authority violating paragraph (9) shall be subject to the procedures and penalties applicable to the Commission under paragraph (7)(A) with respect to a violation by the Commission in obtaining financial records.

**(11)** Notwithstanding the provisions of this subsection, the Commission may obtain financial records from a financial institution or transfer such records in accordance with provisions of the Right to Financial Privacy Act of 1978.

**(12)** Nothing in this subsection shall enlarge or restrict any rights of a financial institution to challenge requests for records made by the Commission under existing law. Nothing in this subsection shall entitle a customer to assert any rights of a financial institution.

**(13)** Unless the context otherwise requires, all terms defined in the Right to Financial Privacy Act of 1978 which are common to this subsection shall have the same meaning as in such Act.

**(i) Information to CFTC**

The Commission shall provide the Commodity Futures Trading Commission with notice of the commencement of any proceeding and a copy of any order entered by the Commission against any broker or dealer registered pursuant to section 78*o*(b)(11) of this title, any exchange registered pursuant to section 78f(g) of this title, or any national securities association registered pursuant to section 78*o*-3(k) of this title.

## CREDIT(S)

(June 6, 1934, c. 404, Title I, § 21, 48 Stat. 899; May 27, 1936, c. 462, § 7, 49 Stat. 1379; Pub.L. 91-452, Title II, § 212, Oct. 15, 1970, 84 Stat. 929; Pub.L. 94-29, § 17, June 4, 1975, 89 Stat. 154; Pub.L. 96-433, §§ 3, 4, Oct. 10, 1980, 94 Stat. 1855, 1858; Pub.L. 98-376, § 2, Aug. 10, 1984, 98 Stat. 1264; Pub.L. 100-181, Title III, § 323, Dec. 4, 1987, 101 Stat. 1259; Pub.L. 100-704, §§ 3(a)(1), 6(b), Nov. 19, 1988, 102 Stat. 4677, 4681; Pub.L. 101-429, Title II, § 201, Oct. 15, 1990, 104 Stat. 935; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 104-67, Title I, § 103(b)(2), Dec. 22, 1995, 109 Stat. 756; Pub.L. 106-554, § 1(a)(5) [Title II, § 205(a)(5)], Dec. 21, 2000, 114 Stat. 2763, 2763A-426; Pub.L. 107-204, § 3(b)(2), Title III, §§ 305(a)(1), (b), 308(d)(1), Title VI, § 603(a), July 30, 2002, 116 Stat. 749, 778, 779, 785, 794; Pub.L. 111-203, Title IX, §§ 923(b)(1), 929F(c), (d), (g)(2), 986(a)(3), July 21, 2010, 124 Stat. 1849, 1854, 1855, 1935; Pub.L. 114-113, Div. O, Title VII, § 708, Dec. 18, 2015, 129 Stat. 3030; Pub.L. 116-283, Div. F, Title LXV, § 6501(a), Jan. 1, 2021, 134 Stat. 4625.)

Notes of Decisions (527)

15 U.S.C.A. § 78u, 15 USCA § 78u
Current through PL 117-52.

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.