# 21-1686(L)

**21-1712(CON)**

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
Plaintiff – Appellee,

NMR E-TAILING, LLC,
Plaintiff,

v.

SHALINI AHMED, I.I. 1, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, I.I. 2, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, I.I. 3, a minor child, by and through his next friends IFTIKAR and SHALINI AHMED, his parents, I-CUBED DOMAINS, LLC, SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST, DIYA HOLDINGS, LLC, DIYA REAL HOLDINGS, LLC, IFTIKAR A. AHMED,
Defendants – Appellants,

*(caption continued on inside cover)*

On Appeal from the United States District Court
for the District of Connecticut

CONSOLIDATED BRIEF OF THE
SECURITIES AND EXCHANGE COMMISSION, APPELLEE

DAN M. BERKOVITZ
General Counsel

JOHN W. AVERY
Deputy Solicitor

STEPHEN G. YODER
Senior Litigation Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-4532 (Yoder)

IFTIKAR ALI AHMED SOLE PROP,

Defendant,

v.

JED HORWITT,

Receiver – Appellee.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iv

COUNTERSTATEMENT OF JURISDICTION ...................................... 2

COUNTERSTATEMENT OF THE ISSUES ........................................... 3

COUNTERSTATEMENT OF THE CASE ............................................... 4

    A.    Statement of the Facts ........................................................... 5

    B.    Procedural History ................................................................. 8

        1.    The Commission's action and the district court's preliminary injunction ................................................. 8

        2.    The district court's rulings as to summary judgment and remedies ............................................. 12

STANDARD OF REVIEW ....................................................................... 15

SUMMARY OF ARGUMENT ................................................................. 16

ARGUMENT ............................................................................................ 19

I.    The district court reasonably limited discovery because it could not enforce protective orders against Mr. Ahmed, a fugitive from justice, and reasonably denied his request for the release of frozen family assets to pay for civil counsel. .......... 19

    A.    The fugitive disentitlement doctrine .................................... 20

    B.    Civil counsel ......................................................................... 24

    C.    Prejudice ............................................................................... 26

II.    The district court reasonably awarded disgorgement in the amount of Mr. Ahmed's net profits and determined that he had not met his burden to justify an offset. ................................. 27

i

A.      Net profits ........................................................... 27

B.      Carried interest.................................................... 30

III.    The district court properly rejected Mr. Ahmed's objections
        and followed this Court's instructions to recalculate his
        disgorgement obligation under the ten-year statute of
        limitations recently enacted by Congress......................... 32

A.      The cross-appeal rule ........................................... 34

B.      The *Plaut* decision.................................................. 36

C.      Retroactivity........................................................ 37

D.      The Ex Post Facto Clause ...................................... 39

IV.     The district court reasonably ordered Mr. Ahmed to pay
        prejudgment interest for the period preceding the asset
        freeze and to surrender actual gains that accrued during
        the freeze. ....................................................... 42

A.      Prejudgment interest ........................................... 42

B.      Actual gains and use value .................................. 45

C.      Post-judgment interest......................................... 53

V.      The district court reasonably concluded that Ms. Ahmed
        and the other relief defendants held frozen assets as Mr.
        Ahmed's nominees and, in the alternative, that they shared
        joint control of the frozen assets with Mr. Ahmed. ........... 54

A.      The district court correctly articulated the standard
        for determining nominee ownership..................... 56

B.      The district court reasonably asked the relief
        defendants to put forward any legitimate claim they
        had to the frozen family assets. ........................... 60

ii

C.    The district court's nominee analysis reasonably considered Mr. Ahmed's contributions to the frozen assets as reflecting his control of those assets. ................... 65

D.    The district court correctly determined that joint spousal control of the frozen assets provided an alternative basis for permitting the Commission to collect those assets in full. .................................................... 73

E.    The Commission should be permitted to pursue alternative theories of recovery. ........................................... 75

    1.    The *Cavanagh I* decision.............................................. 76

    2.    The *Liu* decision ........................................................ 79

CONCLUSION ........................................................................... 85

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

C<small>ASES</small>                                                    P<small>AGE(S)</small>

*ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*,
    485 F.3d 85 (2d Cir. 2007) ................................................................. 74

*Am. Cancer Soc'y v. Cook*,
    675 F3d 524 (5th Cir. 2012) ............................................................. 83

*Babitt v. Vebeliunas (In re Vebeliunas)*,
    332 F.3d 85 (2d Cir. 2003) ............................................ 60, 63, 67, 68

*Bar-Levy v. U.S. Dep't of Justice, I.N.S.*,
    990 F.2d 33 (2d Cir. 1993) ............................................................... 22

*Dale v. Barr*,
    967 F.3d 133 (2d Cir. 2020) ............................................................. 79

*CFTC v. Kimberlynn Creek Ranch, Inc.*,
    276 F.3d 187 (4th Cir. 2002) ........................................................... 63

*CFTC v. Walsh*,
    658 F.3d 194 (2d Cir. 2011) (per curiam) ....................................... 82

*Choi v. Tower Research Capital LLC*,
    2 F.4th 10 (2d Cir. 2021) ................................................................. 34

*Comm'r of Envt'l Prot. v. State Five Indus. Park, Inc.*,
    37 A.3d 724 (Conn. 2012) (Zarella, J., concurring)............................ 65

*Davitt v. O'Connor*,
    73 F.2d 43 (2d Cir. 1934) (per curiam) ........................................... 44

*Deckert v. Indep. Shares Corp.*,
    311 U.S. 282 (1940) ........................................................... 77, 78, 80

*Degen v. United States*,
    517 U.S. 820 (1996) ........................................................... 20, 21, 22

iv

*Empire Blue Cross & Blue Shield v. Finkelstein,*
   111 F.3d 278 (2d Cir. 1997) ........................................................ 21-22

*Finkielstain v. Seidel,*
   857 F.2d 893 (2d Cir. 1998) ............................................................ 36

*Fleet Bank Conn., N.A. v. Carillo,*
   691 A.2d 1068 (Conn. 1997) ............................................................ 75

*Fox v. Costco Wholesale Corp.,*
   918 F.3d 65 (2d Cir. 2019) .............................................................. 74

*Freedom Holdings, Inc. v. Cuomo,*
   624 F.3d 38 (2d Cir. 2010) .............................................................. 15

*Gao v. Gonzales,*
   481 F.3d 173 (2d Cir. 2007) ............................................................ 22

*Garcia-Villeda v. Mukasey,*
   531 F.3d 141 (2d Cir. 2008) ............................................................ 26

*Garth v. Cotton,*
   27 Eng. Rep. 1182, 1 Ves. Sen. 524
   (Lord Chancellor's Court 1753)........................................................ 44

*Greene v. United States,*
   13 F.3d 577 (2d Cir. 1994) .............................................................. 55

*Guo v. Deutsche Bank Sec. Inc. (In re Guo),*
   965 F.3d 96 (2d Cir. 2020) .............................................................. 79

*Herbert v. Lando,*
   441 U.S. 153 (1979) ...................................................................... 20

*Higgins v. Smith,*
   308 U.S. 473 (1940) ................................................................. 58, 70

*In re Marriage of Allen,*
   724 P.2d 651 (Colo. 1986) (en banc) ................................................ 82

*Kokesh v. SEC,*
   137 S. Ct. 1635 (2017) .................................................... 13, 35, 39, 40

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
   501 U.S. 350 (1991) .......................................................... 59

*Landgraf v. USI Film Prods.,*
   511 U.S. 244 (1994) .......................................................... 38

*LiButti v. United States,*
   968 F. Supp. 71 (N.D.N.Y. 1997) ....................................... 57

*LiButti v. United States,*
   178 F.3d 114 (2d Cir. 1999) .............................................. 57

*Liu v. SEC,*
   140 S. Ct. 1936 (2020) ............................................... *passim*

*Martin v. Hadix,*
   527 U.S. 343 (1999) .......................................................... 38

*Matsushita Elec. Indus. Co. v. Epstein,*
   516 U.S. 367 (1996) .......................................................... 59

*McMahon v. United States,*
   No. 3:09-cv-00046, 2010 WL 4430512 (D. Conn. Oct. 29, 2010) ....... 57

*Merck & Co. v. Reynolds,*
   559 U.S. 633 (2010) .......................................................... 41

*Miller v. Robertson,*
   266 U.S. 243 (1924) .......................................................... 43

*Morales v. Freund,*
   163 F.3d 763 (2d Cir. 1999) .............................................. 45

*Nat'l Bank v. Case,*
   99 U.S. 628 (1879) ........................................................... 58

vi

*Nat'l Commc'ns Ass'n v. AT&T Corp.*,
    238 F.3d 124 (2d Cir. 2001) .............................................................. 63

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ................................................................... 35, 37

*Root v. Railway Co.*,
    105 U.S. 189 (1882) .......................................................................... 80

*Salman v. United States*,
    137 S. Ct. 420 (2016) ....................................................................... 81

*Sarasota CCM, Inc. v. Golf Mktg., LLC*,
    94 Conn. App. 34, 891 A.2d 72 (2006) ............................................. 73

*SEC v. Ahmed*,
    No. 3:15-cv-00675 (D. Conn.) (Arterton, J.) ....................................... 2

*SEC v. Berkeley Healthcare Dynamics, LLC*,
    No. 20-16754, 2022 WL 42807 (9th Cir. Jan. 5, 2022) ..................... 76

*SEC v. Black*,
    163 F.3d 188 (3d Cir. 1998) ............................................................. 65

*SEC v. Camarco*,
    No. 19-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021) ............... 76

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) ........................................................................... 6

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ..................................................... *passim*

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006) ....................................................... 44, 77

*SEC v. Colello*,
    139 F.3d 674 (9th Cir. 1998) ...................................................... 63, 77

vii

*SEC v. de Maison*,
No. 18-2564 (L), 2021 WL 5936385 (2d Cir. Dec. 16, 2021)
(summary order) ................................................................... 32, 76, 84

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ......................................... 57

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ................................... 15, 42-43

*SEC v. Fowler*,
6 F.4th 255 (2d Cir. 2021) ............................... 27, 43, 63, 76

*SEC v. George*,
426 F.3d 786 (6th Cir. 2005) ................................. 70-71, 81

*SEC v. I-Cubed Domains, LLC*,
664 F. App'x 53 (2d Cir. 2016) (summary order) ................. 12, 68, 85

*SEC v. Kanodia*,
No. 1:15-cv-13042 (D. Mass. July 8, 2019) ........................ 6

*SEC v. Kellen*,
No. CV 20-3861, 2021 WL 4907238 (C.D. Cal. Sept. 14, 2021) ........ 41

*SEC v. Koenig*,
557 F.3d 736 (7th Cir. 2009) (Easterbrook, J.) .......................... 43, 44

*SEC v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972) ............................................ 48, 49, 50, 51

*SEC v. McGinn, Smith & Co.*,
98 F. Supp. 3d 506 (N.D.N.Y. 2010) ................................. 57

*SEC v. Penn*,
No. 14-CV-581, 2017 WL 5515855 (S.D.N.Y. Aug. 22, 2017) ........... 31

*SEC v. Penn*,
No. 14-CV-581, 2018 WL 4378444 (S.D.N.Y. Sept. 14, 2018) .......... 31

*SEC v. Rajaratnam*,

    622 F.3d 159 (2d Cir. 2010) .............................................................. 15

*SEC v. Razmilovic*,

    738 F.3d 14 (2d Cir. 2013), as amended (Nov. 26, 2013) .......... *passim*

*SEC v. Rinfret*,

    No. 19-cv-6037, 2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020)
    (Nathan, J.)........................................................................................ 43

*SEC v. Rust*,

    No. 16 Civ. 3573, 2021 WL 2850615 (S.D.N.Y. July 8, 2021) ........... 43

*SEC v. Smith*,

    646 F. App'x 42 (2d Cir. 2016) (summary order) ................. 57, 73, 75

*SEC v. Tavella*,

    77 F. Supp. 3d 353 (S.D.N.Y. 2015) ................................................. 46

*SEC v. Westport Capital Mkts., LLC*,

    No. 3:17-cv-02064, 2021 WL 2801626 (D. Conn. July 6, 2021) ........ 43

*Small v. Sec'y of Dep't of Health & Human Servs.*,

    892 F.2d 15 (2d Cir. 1989) (per curiam) .......................................... 23

*Smith v. Doe*,

    538 U.S. 84 (2003) ............................................................................ 41

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,

    756 F.3d 73 (2d Cir. 2014) ............................................................... 35

*United States v. Botti*,

    711 F.3d 299 (2d Cir. 2013) ............................................................. 23

*United States v. Everoff*,

    No. 00-CV-06029, 2012 WL 1514860 (E.D.N.Y. Apr. 30, 2012) ....... 57

*United States v. Everoff*,

    528 F. App'x 75 (2d Cir. 2013) (summary order) ............................... 57

*United States v. Kanodia,*
   943 F.3d 499 (1st Cir. 2019) ................................................. 6

*United States v. Mendlowitz,*
   No. 17 Cr. 248, 2019 WL 1017533 (S.D.N.Y. Mar. 2, 2019) ............ 74

*United States v. Nassar,*
   699 F. App'x 46 (2d Cir. 2017) (summary order) .............................. 57

*United States v. Payne,*
   591 F.3d 46 (2d Cir. 2010) ................................................... 78

*United States v. Technodyne LLC,*
   753 F.3d 368 (2d Cir. 2014) ............................................... 15

*Wickham Contracting Co. v. Local Union No. 3,*
   955 F.2d 831 (2d Cir. 1992) ............................................... 45

*Wisconsin Cent. Ltd. v. United States,*
   138 S. Ct. 2067 (2018) ................................................... 84-85

## STATUTES

Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.
   Section 17(a), 15 U.S.C. § 77q(a) .......................................... 8
   Section 17(a)(1), 15 U.S.C. § 77q(a)(1) ............................................. 12
   Section 20(b), 15 U.S.C. § 77t(b).............................................................2
   Section 20(d)(1), 15 U.S.C. § 77t(d)(1),...................................................2
   Section 22(a), 15 U.S.C. § 77v(a),.........................................................2

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq.
   Section 10(b), 15 U.S.C. § 78j(b) ..................................................... 8, 12
   Section 21(d), 15 U.S.C. § 78u(d) ..................................................... 2, 14
   Section 21(d)(3)(A)(i), 15 U.S.C. § 78u(d)(3)(A)(i) ............................. 84
   Section 21(d)(3)(A)(ii), 15 U.S.C. § 78u(d)(3)(A)(ii) .......................... 84
   Section 21(d)(5), 15 U.S.C. § 78u(d)(5) ............................................. 40

Section 21(d)(8)(A), 15 U.S.C. § 78u(d)(8)(A) ................................. 33

Section 21(e), 15 U.S.C. § 78u(e) ...................................................... 2

Section 27, 15 U.S.C. § 78aa .............................................................. 2

Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1, et seq.

Section 206(1), 15 U.S.C. § 80b-6(1) ............................................ 8, 12

Section 206(2), 15 U.S.C. § 80b-6(2) ............................................ 8, 12

Section 206(3), 15 U.S.C. § 80b-6(3) ............................................ 8, 12

Section 206(4), 15 U.S.C. § 80b-6(4) ............................................ 8, 12

Section 209(d), 15 U.S.C. § 80b-9(d) ................................................... 2

Section 214, 15 U.S.C. § 80b-14 ........................................................... 2

28 U.S.C. § 1291 ................................................................................. 2

28 U.S.C. § 2462 .................................................................. 13, 39, 40

William M. (Mac) Thornberry National Defense
   Authorization Act for Fiscal Year 2021,
   Pub. L. No. 116-283, 134 Stat. 3388 ...................................... *passim*

## RULES AND REGULATIONS

2d Cir. I.O.P. 32.1.1(a) .................................................................... 78

2d Cir. Local R. 32.1 ....................................................................... 78

D. Conn. L. Civ. R. 5(e)(3) ............................................................... 23

Fed. R. Civ. P. 26(c)(1)(G) ............................................................... 21

Fed. R. Civ. P. 56 ............................................................................. 23

Rule under the Securities Exchange Act of 1934

Rule 10b-5, 17 C.F.R. § 240.10b-5 .................................................... 8

Rule under the Investment Advisers Act of 1940

Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 ............................................. 8

## OTHER AUTHORITIES

1 DAN B. DOBBS, LAW OF REMEDIES (2d ed. 1993) ............... 44, 66, 82, 84

2 DAN B. DOBBS, LAW OF REMEDIES (2d ed. 1993) .......................... 47, 51

1 J. POMEROY, EQUITY JURISPRUDENCE (4th ed. 1918)...........58, 59, 66-67

2 J. POMEROY, EQUITY JURISPRUDENCE (4th ed. 1918) ......... 81, 82, 83, 84

3 J. POMEROY, EQUITY JURISPRUDENCE (4th ed. 1918) ................... 29, 66

4 J. POMEROY, EQUITY JURISPRUDENCE (4th ed. 1919) ..........................84

8A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE
CIVIL § 2043 (3d ed. & Apr. 2021 Supp.) ......................................... 21

BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................... 58

Internal Revenue Manual § 5.17.2.5.7.2 (Mar. 19, 2018) .................... 57

OXFORD ENGLISH DICTIONARY (3d ed. 2003, updated 2020)
www.oed.com/view/Entry/127754 (last visited Feb. 11, 2022) ..........58

RESTATEMENT (FIRST) OF RESTITUTION AND
UNJUST ENRICHMENT (1937) ............................................................ 82

RESTATEMENT (THIRD) OF RESTITUTION AND
UNJUST ENRICHMENT (2011) .................................................... *passim*

U.S. Const. art. I, § 9 .......................................................................... 39

Nos. 21-1686(L), 21-1712(CON)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————————————

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff – Appellee,

NMR E-TAILING, LLC,

Plaintiff,

v.

SHALINI AHMED, I.I. 1, a minor child, by and through his next friends
IFTIKAR and SHALINI AHMED, his parents, I.I. 2, a minor child, by
and through his next friends IFTIKAR and SHALINI AHMED, his
parents, I.I. 3, a minor child, by and through his next friends IFTIKAR
and SHALINI AHMED, his parents, I-CUBED DOMAINS, LLC,
SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST,
DIYA HOLDINGS, LLC, DIYA REAL HOLDINGS, LLC, IFTIKAR A.
AHMED,

Defendants – Appellants,

IFTIKAR ALI AHMED SOLE PROP,

Defendant,

v.

JED HORWITT,

Receiver – Appellee.

———————————————————————

On Appeal from the United States District Court
for the District of Connecticut

———————————————————————

CONSOLIDATED BRIEF OF THE
SECURITIES AND EXCHANGE COMMISSION, APPELLEE

———————————————————————

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction of this civil enforcement action filed by the Securities and Exchange Commission ("Commission") pursuant to Sections 209(d) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-14, Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  D.1.[1]  The district court entered a "Redetermined Final Amended Judgment" on July 6, 2021.  D.2011.  Mr. Ahmed and the relief defendants filed timely appeals from that judgment on July 9 and 14, 2021.  D.2013; D.2019.  This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1]   "D." refers to entries in the district court's docket in *SEC v. Ahmed*, No. 3:15-cv-00675 (D. Conn.) (Arterton, J.).  "Br." refers to the opening brief of Iftikar Ahmed, "A" refers to the Joint Appendix, and "SPA" refers to the Special Appendix, all of which were filed on November 15, 2021, and "RD Br." refers to the corrected opening brief of Shalini Ahmed and the other relief defendants which was filed on November 17, 2021.

2

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court reasonably denied defendant Iftikar Ahmed, who is a fugitive from justice, access to confidential information and determined that he had not identified excess frozen assets to pay for his counsel in this civil law enforcement action.

2.      Whether the district court reasonably calculated Mr. Ahmed's disgorgement obligation as the amount of net profits from his fraudulent scheme and determined that he had failed to carry his burden to justify an offset.

3.      Whether the district court properly rejected Mr. Ahmed's objections and followed this Court's remand instructions to recalculate his disgorgement obligation under the ten-year statute of limitations recently enacted by Congress.

4.      Whether the district court reasonably ordered Mr. Ahmed to pay prejudgment interest for the period preceding the asset freeze and to surrender actual gains that accrued during the freeze.

5.      Whether the district court reasonably concluded that the relief defendants held specific family assets as Mr. Ahmed's nominees

and, in the alternative, that they shared joint control of the assets with Mr. Ahmed.

## COUNTERSTATEMENT OF THE CASE

Defendant Iftikar Ahmed, now a fugitive from justice, stole roughly $65 million through a brazen securities fraud that he perpetrated over ten years through his role as an investment adviser with a venture capital firm. To secrete the fraud proceeds, he commingled them in family bank accounts and then transferred millions of dollars from those accounts into the names of his wife and children and certain entities held for their benefit. The Commission brought this civil law enforcement action to put a stop to Mr. Ahmed's fraud and to seek the disgorgement and the return of his illegal profits to his victims. The district court reasonably tailored the action to permit Mr. Ahmed's remote participation while still protecting his former firm's confidential information and also reasonably exercised its equitable discretion to order remedies designed to restore the status quo while ensuring fair treatment of his wife and children. The district court's judgment should be affirmed.

4

### A.    Statement of the Facts

Mr. Ahmed and his wife, relief defendant Shalini Ahmed, each received an MBA from Harvard Business School.  D.33 ¶12; D.888-7 at 20.  They married in 2003 and have three children, all still minors, who lived with them at their home in Greenwich, Connecticut, which they bought in 2007 for $9.625 million in cash.  D.888-7 at 27-31, 151 & Ex. 41; PI Tr. 340.  Ms. Ahmed worked as a research analyst at Goldman Sachs from 2004 until 2011, when she was let go as part of a general downsizing.  D.888-7 at 20-23; PI Tr. 357; D.69 at 3.  In 2004 Mr. Ahmed started working with Oak Management Corporation ("Oak"), a venture capital firm where he was a manager of various entities that served as general partners of certain of Oak's investment funds.  D.8 ¶1-3; D.33 ¶12.  In that capacity, his responsibilities included identifying, recommending, and negotiating the terms of investments on behalf of Oak's funds.  D.8 ¶3.  It is undisputed in this appeal that Mr. Ahmed was an investment adviser to Oak's funds (SPA55-57), and that he was thus under a fiduciary duty to act with the utmost good faith and with full and fair disclosure of all material facts when dealing with

5

the funds.  *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).

On April 2, 2015, Mr. Ahmed was arrested on criminal charges of insider trading unrelated to the Commission's allegations in this action. D.8 ¶15; D.888-7 at 141, 150.  He and his wife both signed a $9 million bond on their home as security for his release.  2/18/2016 Tr. 27-29.  The next month, however, Mr. Ahmed fled the country, apparently to India, in violation of his conditions of release.  D.97-1; D.113 at 2-3 & n.1; D.211.[2]

Following Mr. Ahmed's arrest, Oak undertook an internal review of transactions in which he had been involved and eventually terminated him.  D.8 ¶6; D.31 ¶2.  This internal review uncovered that Mr. Ahmed had misappropriated approximately $65 million from Oak and its investors between 2005 and 2015.  D.8 ¶6; D.31 ¶3.  That

---

[2]    Mr. Ahmed and a co-defendant were later indicted by a grand jury, and the co-defendant was tried alone and convicted on certain counts.  *See United States v. Kanodia*, 943 F.3d 499 (1st Cir. 2019).  The Commission filed a parallel civil action against Mr. Ahmed, and the district court entered a consent judgment settling the case.  *See SEC v. Kanodia*, No. 1:15-cv-13042, D.198 (D. Mass. July 8, 2019).  The forfeiture of the bond on the Ahmeds' home is the subject of an appeal now pending in the First Circuit (Nos. 21-1193, 21-1194).

6

fraud—which is the subject of the Commission's action and is undisputed in this appeal—involved Mr. Ahmed's use of fabricated documents and other misrepresentations to induce Oak and the companies in which Oak's funds invested into making payments that, unbeknownst to them, went directly into accounts controlled by Mr. Ahmed. *See generally* D.8; D.31.

The last of Mr. Ahmed's fraudulent transactions is illustrative: In December 2014, Mr. Ahmed proposed that one of Oak's investment funds purchase the shares of an entity, designated as "Company B" for confidentiality reasons, for $20 million. D.8 ¶¶8-10. After Oak approved Mr. Ahmed's investment proposal, he instructed that the $20 million be sent via two wire transfers—one transfer of $2 million to an account for the seller, and a second transfer of $18 million to an account purportedly held by another entity to which the seller owed an obligation. *Id.* ¶¶11-13. Oak then wired the payments as Mr. Ahmed had instructed. *Id.* ¶12. Oak discovered after his arrest that Mr. Ahmed had altered documents to hide the fact that the true purchase price was $2 million, not $20 million, and that the account that received the second transfer of $18 million was held in Mr. Ahmed's name. *Id.*

7

¶15.  Mr. Ahmed transferred roughly $18 million to a joint account held in the names of his wife and himself and then wrote an $18 million check from the joint account to Ms. Ahmed, which she deposited in a separate account in her name.  D.68 ¶22.  Mr. Ahmed's other fraudulent transactions similarly used false representations to induce Oak and the companies in which it invested to direct monies into accounts he secretly controlled.

### B.    Procedural History

#### 1.    The Commission's action and the district court's preliminary injunction

On May 6, 2015, the Commission filed a complaint alleging that Mr. Ahmed had violated antifraud provisions of the federal securities laws.  D.1.[3]  According to the Commission's allegations, Mr. Ahmed perpetrated a $65 million fraud on Oak and the companies in which Oak's funds invested by misrepresenting the price of the investments he recommended, by using false invoices purportedly representing costs associated with those investments, and by failing to disclose his own

---

[3]    The Commission's amended complaint alleges that Mr. Ahmed violated Section 10(b) of the Exchange Act and Rule 10b-5; Section 17(a) of the Securities Act; Sections 206(1) and 206(2), 206(3), and 206(4) of the Advisers Act and Rule 206(4)-8.  D.33 ¶¶137-51.

self-interested role in certain transactions.  *See generally* D.33.  The

Commission moved for a temporary restraining order freezing assets,

which the district court granted the next day, and for a preliminary

injunction continuing the freeze.  D.2; D.9.  Prior to fleeing the country,

Mr. Ahmed agreed to continue the freeze as to all of his assets pending

a preliminary injunction hearing.  D.22.  On June 12, 2015, the

Commission filed an amended complaint that named several relief

defendants who had received proceeds of Mr. Ahmed's fraud without

any legitimate claim of ownership, including Ms. Ahmed, the Ahmeds'

three children, and certain entities held in the Ahmeds' names or for

their benefit (collectively, the "relief defendants").  D.33.

　　To prepare for the preliminary injunction hearing, the

Commission conducted expedited discovery that focused, in Mr.

Ahmed's absence, on whether assets held by the relief defendants

legitimately belonged to them and thus should be excluded from the

asset freeze pending trial.  When asked by the Commission what assets

belonged to her personally, Ms. Ahmed testified that she did not know

what assets belonged to her and that she would have to ask her counsel

to find out.  D.888-7 at 57-58.  Ms. Ahmed also admitted under oath

that she had no memory of receiving millions of dollars of checks from her husband, shown to her as deposition exhibits, and admitted that she had provided no goods or services in exchange. D.888-7 at 60-79.

For example, Ms. Ahmed testified that she had no memory of the $18 million check from her husband just six months earlier, even though she identified her signature as endorsing the check, and even though her 2014 joint tax return reported total income of only about $2.2 million:

> Q:    Why did Ahmed Iftikar write you an $18 million check on January 12th, 2015?
>
> A:    I don't know.
>
> Q:    Did you know that he wrote you an $18 million check on January 12th, 2015?
>
> A:    My signature is on the check, yes.
>
> Q:    But do you have a recollection of receiving this check?
>
> A:    I don't remember.
>
> Q:    Are there other times in your life that you have received checks totaling $18 million or anywhere close to that?
>
> A:    No.
>
> Q:    Did you give your husband anything in exchange for this $18 million?
>
> A:    Not that I can remember.

10

Q:     Okay.  And was this approximately six months ago or so?

A:     January 12th, 2015?  Yeah.

Q:     So as you sit here today, you have no recollection about why you received this $18 million?

A:     I don't remember.

Q:     Do you recall what you used this $18 million for?

A:     It looks like it went into a Fidelity account that was in my name.

Q:     And do you recall putting this check into the Fidelity account or – or is it simply just what the document indicates?

A:     It's what the document indicates.  I don't remember.

Q:     So you don't remember depositing an $18 million check into your Fidelity account?

A:     No.  And you also have to remember, I am the mom of three little boys and I'm all over with them.  I have a very busy schedule.  So, no, I don't remember.

D.888-7 at 78-79, 165-69.  As the Commission's evidence demonstrated, the funds for that $18 million check came from the fraudulent Company B transaction and were deposited in an account in Ms. Ahmed's name that she used in April 2015, just weeks after her husband's arrest, to purchase a condominium that was placed in the name of one of the relief defendants.  D.68 ¶¶22, 40-44.

After a two-day hearing, the district court granted a preliminary injunction that froze the Ahmed family assets up to $118 million, in anticipation of a potential judgment against Mr. Ahmed for that amount. SPA1-23. The court also granted generous carve-outs for the living and legal expenses of Ms. Ahmed and the children. D.165; D.195. The relief defendants challenged the breadth of the asset freeze on appeal, but this Court sustained the freeze, reasoning that the particular assets in dispute had been funded with the proceeds of Mr. Ahmed's fraud and that the relief defendants had failed to identify any other assets that legitimately belonged to them. *See SEC v. I-Cubed Domains, LLC*, 664 F. App'x 53, 55-56 (2d Cir. 2016) (summary order).

### 2. The district court's rulings as to summary judgment and remedies

In March 2018, the district court granted summary judgment in favor of the Commission, finding Mr. Ahmed liable for all fraudulent transactions alleged in the complaint, under Sections 206(1)-(4) of the Advisers Act, Section 10(b) of the Exchange Act, and Section 17(a)(1) of the Securities Act. SPA24-92. About six months later, the court granted the Commission's motion for remedies and judgment and awarded $41,920,639 in disgorgement, a civil penalty of $21 million,

12

plus prejudgment interest prior to the asset freeze and interest and gains accrued during the asset freeze. SPA93-124. The disgorgement award was less than Mr. Ahmed's total net profits because of the intervening decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), which held that the five-year statute of limitations in 28 U.S.C. § 2462 governs such disgorgement. SPA101-04.

The district court entered a final judgment (SPA139-46) and an amended final judgment (SPA164-72) in late 2018, the latter of which clarified that the court was preserving the Commission's alternative claim of traditional relief-defendant liability (SPA171-72). The district court also appointed a post-judgment receiver to manage the frozen assets and propose a liquidation plan (SPA173-89). Mr. Ahmed and the relief defendants appealed to this Court, but this Court stayed the appeals (Order, Docs. 286, 287 in No. 18-2903(L) (2d Cir. Nov. 21, 2019)), and the district court stayed the liquidation of frozen assets (D.1346), after the Supreme Court granted certiorari in *Liu v. SEC* to decide the scope of the Commission's disgorgement remedy. The Supreme Court decided *Liu* in June 2020 and reaffirmed the Commission's ability to seek disgorgement of net profits as an equitable

13

remedy for violations of the federal securities laws. *See Liu v. SEC*, 140 S. Ct. 1936 (2020).

After this Court lifted it stay, Congress enacted the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (the "NDAA"), on January 1, 2021. Section 6501(a) of the NDAA amended Section 21(d) of the Exchange Act to provide a ten-year statute of limitations for disgorgement of profits for scienter-based violations in the Commission's enforcement actions, and Section 6501(b) stated that these amendments "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act." SPA252-53. On the Commission's motion, this Court granted a limited remand to the district court with instructions to re-determine Mr. Ahmed's disgorgement obligation consistent with Section 6501 of the NDAA. Order, Docs. 533, 534, 535 in No. 18-2903(L) (2d Cir. Mar. 11, 2021). The district court recalculated Mr. Ahmed's disgorgement obligation under the NDAA as $64,171,646.14 plus $9,755,798.34 in prejudgment interest. SPA237-50. The court entered a re-determined

14

judgment on July 6, 2021 (SPA251), and Mr. Ahmed and the relief defendants timely filed these appeals.

## STANDARD OF REVIEW

This Court applies the deferential abuse-of-discretion standard on appeal from a district court's application of the fugitive entitlement doctrine, its decisions concerning an asset freeze, and its grant of equitable remedies such as disgorgement and prejudgment interest. *See United States v. Technodyne LLC*, 753 F.3d 368, 378 (2d Cir. 2014) (fugitive disentitlement doctrine); *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) ("*Cavanagh I*") (asset freeze); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-77 (2d Cir. 1996) (disgorgement and prejudgment interest). Under that standard, this Court asks whether the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if it has rendered a decision that cannot be located within the range of permissible decisions." *SEC v. Rajaratnam*, 622 F.3d 159, 171 (2d Cir. 2010) (quotation marks omitted). This Court may "affirm the district court's decision on any ground appearing in the record." *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 49 (2d Cir. 2010).

15

## SUMMARY OF ARGUMENT

The district court's judgment should be affirmed. The court reasonably denied Mr. Ahmed access to Oak's confidential information in recognition that it could not enforce its protective orders against him while he remained a fugitive from justice and in light of his past history of deception. It also reasonably determined that no excess frozen assets were available to pay for his civil counsel. And in any event, Mr. Ahmed has not shown prejudice given that Ms. Ahmed was provided funds to pay for counsel for the relief defendants, was given access to confidential materials subject to protective orders, and was able to fully defend against the merits of the Commission's allegations.

The district court also reasonably calculated Mr. Ahmed's obligation to disgorge the net profits from his fraud. The court appropriately calculated his net profits from the so-called "Company C" transactions by taking the difference between his costs in acquiring Company C shares and his receipts when disposing of those shares through sale or redemption. And the court reasonably determined that Mr. Ahmed had not justified an offset in the amount of the contingent "carried interest" (akin to a future bonus) that he forfeited upon his

16

termination by Oak.  Moreover, the district court properly followed this Court's instructions on limited remand to recalculate Mr. Ahmed's disgorgement obligation in light of the ten-year statute of limitations recently enacted by Congress.  Mr. Ahmed's objections are mostly barred by the law of the case and have no merit in any event.  In particular, Mr. Ahmed's expanded disgorgement obligation is equitable, not penal, and therefore is permitted under the Ex Post Facto Clause.

The district court reasonably awarded prejudgment interest for the period leading up to the asset freeze and directed Mr. Ahmed to surrender actual gains that accrued on the assets during the freeze. Neither he nor the relief defendants have shown that prejudgment interest at the IRS underpayment rate during the pre-freeze period was unwarranted on the facts of this case.  They also have not shown that the award of actual gains from the period of the freeze was improper, in light of the fact that no prejudgment interest was awarded during the freeze and the traditional equitable practice of awarding actual gains as a measure of use value when incident to restitution via money judgment.  And their objections to post-judgment interest are premature.

17

Finally, the district court reasonably concluded that Ms. Ahmed and the other relief defendants held specific family assets as Mr. Ahmed's nominees and, in the alternative, that they shared joint control of the assets with Mr. Ahmed. The district court correctly articulated and applied the nominee doctrine, and its request that the relief defendants put forward any legitimate claim to the frozen assets did not effectively shift the burden of proof. The court's consideration of Mr. Ahmed's contributions to the frozen assets was entirely appropriate under the pragmatic approach that this Court has taken to the nominee doctrine. Moreover, the district court's finding that the relief defendants at best shared joint control of the assets with Mr. Ahmed provides an alternative basis for affirmance.

If this Court determines that the district court's remedies cannot stand, then the Commission should be permitted to pursue alternative theories of recovery on remand. Those theories include relief-defendant liability, which finds continued grounding in the traditional equitable principles that the Supreme Court recently emphasized in the *Liu* decision.

18

# ARGUMENT

**I. The district court reasonably limited discovery because it could not enforce protective orders against Mr. Ahmed, a fugitive from justice, and reasonably denied his request for the release of frozen family assets to pay for civil counsel.**

On appeal, Mr. Ahmed challenges the district court's grant of summary judgment on the fraud allegations against him in this civil law enforcement action because the litigation purportedly was rendered a "hollow exercise" by the court's limitations on his access to discovery and its refusal to release frozen family assets to pay for his counsel. Br.53-66. But he fails to identify any error in the district court's factual finding that he "chose to flee the United States shortly after this case was filed, in violation of his conditions of release in a criminal matter." D.835 at 26; *accord* D.286 at 1. It was this critical fact that justified the district court's limits on discovery under the fugitive disentitlement doctrine, because the court could not enforce its protective orders against Mr. Ahmed so long as he remained in India. And it was his own failure to substantiate that the freeze was overbroad that doomed his requests for the release of excess frozen funds to pay for civil counsel. Moreover, Mr. Ahmed cannot establish that these rulings caused actual prejudice given that Ms. Ahmed and the other relief defendants, whose

19

interests aligned with his own, were permitted to access discovery, to use frozen funds to pay for counsel, and to litigate the merits of the Commission's action. The grant of summary judgment should be affirmed.

## A.    The fugitive disentitlement doctrine

District courts enjoy broad authority "to exercise appropriate control over the discovery process," *Herbert v. Lando*, 441 U.S. 153, 177 (1979), "including the power to enter protective orders limiting discovery as the interests of justice require," *Degen v. United States*, 517 U.S. 820, 826 (1996). The district court reasonably exercised its discretion to limit Mr. Ahmed's access to discovery of the Commission's investigative file because, as it correctly reasoned, his absence from the country made it impossible to enforce a protective order in the event he misused any confidential information. D.286 at 3; D.826.

On appeal, Mr. Ahmed complains that "the vague interests of third-parties in confidentiality" did not justify this limitation on discovery, particularly since the district court could have imposed non-monetary sanctions if he disobeyed a protective order. Br.62-63. But courts are expressly empowered to issue protective orders to safeguard

20

"confidential … commercial information" of the sort that was intrinsic to the Commission's proof that Mr. Ahmed had abused his fiduciary position to defraud Oak and its funds. Fed. R. Civ. P. 26(c)(1)(G); *see generally* 8A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE CIVIL § 2043 (3d ed. & Apr. 2021 Supp.). Further, the district court was understandably reluctant to rely on non-monetary sanctions as an effective constraint on Mr. Ahmed's overseas behavior, given the court's prior determination in its preliminary injunction ruling that the Commission had shown a likelihood of prevailing on the merits of its fraud allegations against him. *See* SPA19 ¶2. The "interests of justice," *Degen*, 517 U.S. at 826, hardly required entrusting him with Oak's confidential information yet again, so long as he remained outside the court's jurisdiction.

Mr. Ahmed further contends that the district court erred in relying on the fugitive disentitlement doctrine to support its discovery limitations. Br.63-64. He argues that a related criminal prosecution is necessary for the doctrine to apply, but this Court has ruled that "a fugitive from justice need not be a fugitive in a criminal matter to warrant application of the disentitlement doctrine." *Empire Blue Cross*

21

& *Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997)

(dismissing civil appeal based on defendants' efforts to frustrate

collection (citing *Bar-Levy v. U.S. Dep't of Justice, I.N.S.*, 990 F.2d 33,

35 (2d Cir. 1993))); *see Gao v. Gonzales*, 481 F.3d 173, 177-78 (2d Cir.

2007) (dismissing civil appeal based on petitioner's failure to surrender

for deportation).  He also quotes isolated statements from *Degen*

suggestive of his right to contest the allegations against him, but he

ignores that the Court made these statements in the context of rejecting

the wholesale grant of summary judgment in a civil forfeiture suit as a

sanction under the doctrine.  *See* 517 U.S. at 829.  The *Degen* Court

instead emphasized the availability of protective orders and similar

discovery measures as more appropriate alternatives, *id.* at 826, thus

squarely supporting the district court's approach here.

Countering that the district court's approach was unfair, Mr.

Ahmed highlights that he was not permitted to attend the deposition of

Oak's designated witness or to see the unredacted deposition transcript.

Br.55-58.  But the district court referred his motion for that transcript

to a magistrate judge (D.649; D.657), who reviewed the transcript *in

camera* and concluded that the vast majority of the redactions were

entirely justified (D.678 at 2-4).  The magistrate judge also warned Mr.

Ahmed that failure to object to its ruling before the district court could

result in forfeiture.  *Id.* at 4-5.  He never did so, however, and so he has

forfeited any such challenge on appeal.  *See Small v. Sec'y of Dep't of*

*Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

In passing, Mr. Ahmed suggests that the district court's orders

sealing certain documents may have violated the public's right to see

the evidence against him.  *See* Br.65.  But he never engages with the

court's analysis that "'sealing [was] supported by clear and compelling

reasons and [was] narrowly tailored to support those reasons.'"  D.830

at 2 (quoting D. Conn. L. Civ. R. 5(e)(3)); D.954 at 2 (same).  Because

Mr. Ahmed does not develop this argument, it should be deemed

forfeited.  *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013).

Mr. Ahmed labors mightily to contend that the district court's

discovery rulings improperly resulted in an "*ex parte*" proceeding

(Br.64), contrary to the requirements of due process and Rule 56 of the

Federal Rules of Civil Procedure (Br.54-61).  But the district court still

permitted Mr. Ahmed to make filings and to participate in hearings

throughout the litigation, and thus he had a meaningful opportunity to

23

be heard at every stage.  Moreover, it was *Mr. Ahmed's* willful choice to flee to India in violation of his conditions of release, rather than face the allegations against him, that led the district court to adopt appropriate measures to protect Oak's confidential commercial information.  He should not be heard now to complain about the reasonably foreseeable consequences of his own unlawful choices.

## B.    Civil counsel

Mr. Ahmed asserts that had the district court properly accounted for his "carried interest" in certain funds at Oak, purportedly worth $35 million, the court would have concluded that the corpus of frozen assets exceeded the Commission's anticipated judgment, and therefore the excess frozen funds should have been released to him so he could retain civil counsel.  Br.61.  But the district court reasonably determined in both its preliminary injunction ruling (SPA14-15) and its remedies ruling (SPA119-21) that this carried interest should not be counted as securing the anticipated judgment because it was contingent and, ultimately, forfeited by virtue of Mr. Ahmed's misconduct.

As Oak's chief operating officer (Grace Ames) testified at the preliminary injunction hearing, a carried interest "is a sharing of the

24

realized profit of a fund after the investors have received back all of their capital" and is subject to multiple contingencies such as the prior obligation to return each investor's full contribution. PI Tr. 122, 277. As a result, Oak's bookkeeping of these interests reflected an accounting allocation and did not purport to represent cash that was guaranteed to be paid. *Id.* at 123, 277. Ms. Ames further testified that Mr. Ahmed may have forfeited this contingent interest by virtue of his fraudulent conduct. *Id.* at 124. In a separate declaration at the remedies stage, Ms. Ames confirmed that Mr. Ahmed had forfeited this carried interest because Oak had terminated him for "[d]isabling [c]onduct" (fraud) under the terms of the relevant agreements. D.890 ¶¶13-17. Accordingly, she explained, the only distributions to which Mr. Ahmed remained entitled totaled roughly $683,000, which had been suspended at the district court's request. *Id.* ¶20.

The district court's factual findings reasonably credited Ms. Ames' testimony (SPA14-15) and declaration (SPA119-21), and Mr. Ahmed does not contend that the court committed clear error in so doing, *see* Br.43-50, 61. Mr. Ahmed thus cannot show the existence of any excess frozen assets, given that the court reasonably valued the total frozen

assets at approximately $87 million—$2 million less than the anticipated judgment of about $89 million at that point (post-*Kokesh*)—in its final ruling denying the release of funds for his civil counsel. *See* D.829 at 3-4 & n.6.

## C. Prejudice

Mr. Ahmed also has not established that the district court's rulings on discovery and on funds for counsel caused him prejudice, which normally is required to establish a due process violation. *See, e.g.*, *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 149 (2d Cir. 2008). As the district court observed (SPA50), Ms. Ahmed and the other relief defendants, whose interests aligned with his own, were permitted to access discovery, to use frozen funds to pay for counsel (*e.g.*, D.195 ¶1(F)) and an expert (D.387), and to defend against the Commission's allegations on the merits against Mr. Ahmed (*e.g.*, D.618; D.661).

The district court's grant of summary judgment therefore should be affirmed.

26

**II. The district court reasonably awarded disgorgement in the amount of Mr. Ahmed's net profits and determined that he had not met his burden to justify an offset.**

The district court's amended final judgment in 2018 reasonably ordered Mr. Ahmed to disgorge the net profits that he obtained through his fraud (SPA103-04) and appropriately concluded that the "carried interest" that he forfeited to Oak did not warrant an offset (SPA119-21). The district court's award thus accords with the principles that disgorgement "need only be a reasonable approximation of profits causally connected to the violation," and that "any risk of uncertainty" about the amount "fall[s] on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), as amended (Nov. 26, 2013) (quotation marks omitted). This Court recently reaffirmed these principles in the wake of *Liu v. SEC*, 140 S. Ct. 1936 (2020). *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021).

**A. Net profits**

On appeal, Mr. Ahmed challenges the district court's calculation of his net gains from two fraudulent transactions known as the "Company C" transactions, or "C1" and "C2" for short, because they both concerned investments in Company C (a pseudonym) by an Oak fund that Mr.

27

Ahmed recommended as the fund's investment adviser. Br.37-43. The district court's summary-judgment ruling details the undisputed facts of C1 and C2. SPA32-37. For the sake of brevity, the crux of the fraud was that Mr. Ahmed recommended these transactions while concealing that he personally stood to benefit by selling or redeeming interests in Company C that he secretly controlled, with his payment coming from the Oak fund's money. SPA34-37. For both transactions, Mr. Ahmed falsely represented to Oak that he had "no personal investment or any other direct beneficial interest or investment" in Company C. SPA34, 37. Accordingly, the district court calculated Mr. Ahmed's net profits as the difference between the prices at which he originally purchased his Company C shares and the prices at which he sold or redeemed those shares in each transaction. SPA103-04.

Mr. Ahmed argues on appeal that his net profits from both C1 and C2 should be discounted to the extent that the market price of Company C shares may have exceeded his original purchase price, since any profits to that extent were due to market appreciation rather than his unlawful activity. Br.41-43. But this argument relies on the unfounded premise that any profits up to market value were lawful. As the district

28

court observed, he acquired the relevant Company C shares only by subterfuge designed to conceal that he was personally investing in Company C shortly after the Oak fund already had made its own investment. SPA33. Thus, Mr. Ahmed's initial purchase itself breached his fiduciary duty, and any later profits were properly subject to disgorgement as properly belonging to his client. *See* 3 J. POMEROY, EQUITY JURISPRUDENCE § 1075, p.2468 (4th ed. 1918-19) ("POMEROY") (A trustee may "not … acquire any pecuniary gains from his fiduciary position" and "[t]he beneficiary is entitled to claim all advantages actually gained, … [and] all losses in any way happening, from a violation of this duty."). Furthermore, all of Mr. Ahmed's profits were realized when he *again* breached his fiduciary duty by causing the Oak fund to engage in C1 and C2 without disclosing his conflict of interest. None of the authorities cited in his opening brief (Br.39) requires a tighter causal connection. It would hardly "restore[] the status quo," *Liu*, 140 S. Ct. at 1943 (cleaned up), to permit Mr. Ahmed to retain profits that he realized by virtue of his breach of fiduciary duty.[4]

---

[4]     For the same reasons, there was no need for the district court to make a specific finding as to the market value of the Company C shares sold in C2. *See* Br.42-43. The court credited the undisputed statements

29

**B.    Carried interest**

The district court reasonably declined to offset Mr. Ahmed's disgorgement obligation by the value of the carried interest that he forfeited to Oak under the terms of his contractual obligations with Oak and its funds (*see* Section I.B above).  SPA119-21.  On appeal, Mr. Ahmed argues denying this offset to him is improperly punitive under *Liu* because it effectively permits double-recovery to his victims.  Br.44-45 (citing *Liu*, 140 S. Ct. at 1941, 1943).  Not so.

As the district court observed, no double recovery will result "because these forfeited interests are not ill-gotten gains that Oak is recovering from Defendant at all, but rather were sacrificed by Defendant[] upon his termination for 'Disabling Conduct.'"  SPA121.  In other words, the carried interest was entirely contingent and never realized, and so its forfeiture was not the equivalent of a cash payment from Mr. Ahmed to Oak.  To grant Mr. Ahmed an offset here would be

---

of Mr. and Ms. Ahmed that the shares were worth less than $1 million at the time they were sold to the Oak fund for $7.5 million (SPA32 n.6, 37), and the evidence Mr. Ahmed now cites (D.906-25) shows that Oak valued the shares it bought in C2 at $10.1 million in late 2014 before writing them down to $2 million in 2015 and then writing them off entirely in 2016.

the equivalent of permitting a dishonest lawyer who has embezzled from his firm to deduct his anticipated year-end bonus, forfeited by his termination for cause, from his obligation to repay what he stole.

The other precedents cited by Mr. Ahmed (Br.46-50) are likewise distinguishable because those offsets were keyed to monies actually repaid in restitution to or settlement with victims. Indeed, the one precedent described by Mr. Ahmed as most on point (Br.47) simply ordered an evidentiary hearing to determine the value of the carried interest the defendant forfeited. *See SEC v. Penn*, No. 14-CV-581, 2017 WL 5515855, at *3-4 (S.D.N.Y. Aug. 22, 2017). The court later rejected the defendant's expert report as unreliable and denied any offset because the defendant "has not satisfied his burden of proof relative to the value of his forfeited interest." *SEC v. Penn*, No. 14-CV-581, 2018 WL 4378444, at *5 (S.D.N.Y. Sept. 14, 2018). Similarly here, the district court acted well within its discretion in determining that Mr. Ahmed had not met his burden to justify an offset against the Commission's reasonable approximation of his net profits. *See Razmilovic*, 738 F.3d at 31.

31

For the same reasons, the Court also should refuse Mr. Ahmed's suggestion (Br.50-51) to direct the district court to grant further offsets if his victims obtain their own civil judgments against him. The better procedure, in light of Mr. Ahmed's history of deceit, would be to permit him to petition the district court for offsets only once he has actually made payments to his victims under such judgments.

Moreover, the Court also should reject Mr. Ahmed's contention (Br.66) that any adjustment to the disgorgement award would require a re-determination of the civil penalty against him. This Court recently rejected a nearly identical contention because the two remedies are analytically distinct. *See SEC v. de Maison*, No. 18-2564(L), 2021 WL 5936385, at \*2-4 (2d Cir. Dec. 16, 2021) (summary order). A change to one thus does not automatically warrant vacatur of the other.

The district court's award of disgorgement in the 2018 amended final judgment therefore should be affirmed.

**III. The district court properly rejected Mr. Ahmed's objections and followed this Court's instructions to recalculate his disgorgement obligation under the ten-year statute of limitations recently enacted by Congress.**

On remand, the district court followed this Court's instructions to re-determine Mr. Ahmed's "disgorgement obligation consistent with §

32

6501 of the National Defense Authorization Act." Order, Doc. 533 in No. 18-2903(L) (2d Cir. Mar. 11, 2021). The district court reasoned that this case was on appeal before this Court when Congress enacted the NDAA on January 1, 2021, and thus the action was "pending" within the meaning of Section 6501(b)'s directive that the new disgorgement provisions shall apply to "any action or proceeding that is pending on" the date of enactment. SPA242 (quotation marks omitted). The court further observed that Mr. Ahmed had acted with scienter with respect to each act of fraud and determined, accordingly, that the new ten-year statute of limitations added by Section 6501(a) governed his disgorgement obligation. SPA243 (citing 15 U.S.C. § 78u(d)(8)(A)). The district court's reasoning was plainly correct and should be affirmed.

On appeal, Mr. Ahmed raises four main objections to the district court's re-determination of disgorgement under the NDAA. Br.20-37. But Mr. Ahmed and the relief defendants raised these objections when they opposed the Commission's motion in this Court for a limited remand to recalculate disgorgement based on the NDAA. *See* Doc. 486 in No. 18-2903(L) (Jan. 25, 2021). Any of the first three of those objections (concerning the cross-appeal rule, the bar on re-opening a

33

final judgment, and the presumption against retroactivity) would have precluded remand if accepted, and therefore this Court necessarily rejected them when it granted the motion for remand:

> It is further ORDERED that the motion for a limited remand is GRANTED and the appeals are REMANDED to the district court for a determination of Appellant's disgorgement obligation consistent with § 6501 of the National Defense Authorization Act, and, if appropriate, entry of an amended judgment.

Order, Doc. 533 in No. 18-2903(L) (2d Cir. Mar. 11, 2021). This mandatory language left the district court with no discretion *not* to apply the NDAA, and that court explained that it was addressing the applicability of the NDAA only "[i]n an abundance of caution." SPA242 n.2. Mr. Ahmed's first three objections are therefore barred by the law of the case, since they were decided—and rejected—by necessary implication in the remand order. *See Choi v. Tower Research Capital LLC*, 2 F.4th 10, 21 (2d Cir. 2021). In any event, all four of his objections lack merit for the reasons that follow.

## A. The cross-appeal rule

*First*, Mr. Ahmed objects that the district court lacked jurisdiction to recalculate disgorgement because the Commission did not file a cross-appeal from the amended final judgment. Br.20-25. But there was no

basis for the Commission to take a cross-appeal from the district court's disgorgement award, since the Commission had prevailed in that ruling within the constraints then permitted by *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). Moreover, the NDAA was enacted nearly two years after the deadline to file a cross-appeal from the amended final judgment. The decisions cited by appellants addressed attacks by an appellee against a district court's judgment based on the facts and law *as of the time* judgment was entered. None rejected an appellee's request to honor a statute enacted by Congress *after* judgment was entered and while the appeal was pending. That proposed result would irrationally impede Congress by hinging the application of new statutes on whether an appellee filed a notice of cross-appeal *before* the statute's enactment. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995) ("[E]ach court, at every level, must decide according to existing laws." (quotation marks omitted)).

Mr. Ahmed further argues that the cross-appeal requirement was "jurisdictional" based on this Court's decision in *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014). But *Swatch Group* simply described as "jurisdictional" the appellee's failure to

35

designate in its notice of cross-appeal the district court order dismissing its counter-claim. That is a far cry from suggesting that an appellate court lacks authority to apply an intervening statute duly enacted by Congress. As the district court observed (SPA243), this Court has held that "the requirement of a cross-appeal is a rule of practice which is not jurisdictional and in appropriate circumstances may be disregarded." *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir. 1998) (collecting cases). While Mr. Ahmed cites some later decisions that distinguished *Finkielstain* on its facts (Br.24), none of those decisions rejected *Finkielstain*'s characterization of the cross-appeal requirement as a rule of practice that may be disregarded. Accordingly, the district court properly exercised its discretion to disregard the cross-appeal rule here based on its factual findings that the Commission had no notice of any grounds for cross-appeal and that no prejudice would result to Mr. Ahmed from applying the NDAA after full briefing. SPA244.

## B. The *Plaut* decision

*Second*, Mr. Ahmed asserts that recalculating disgorgement in light of the NDAA entailed the unconstitutional application of a new statute to re-open a final judgment. Br.25-30. But there is no final

36

judgment here. The leading decision discussed by Mr. Ahmed (and by the district court, *see* SPA244) makes clear that the relevant test of finality is "a distinction between judgments from which all appeals have been foregone or completed, and judgments that remain on appeal (or subject to being appealed)." *Plaut*, 514 U.S. at 227. *See also id.* at 226 ("When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly."). The original disgorgement calculation was one component of the amended final judgment against Mr. Ahmed that "remain[ed] on appeal" when the NDAA was enacted, *id.* at 227, and therefore it was not (and is not) yet final under *Plaut*.

## C. Retroactivity

*Third*, Mr. Ahmed urges that the NDAA does not clearly require retroactive application and that such application would impermissibly re-open a time-barred claim. Br.30-35. But NDAA Section 6501(b) expressly states that the amendments in Section 6501(a) "shall apply with respect to any action or proceeding that is pending" as of the date of enactment. SPA253. The Supreme Court has stated that such

37

"pending" language constitutes an "explicit retroactivity command," and Mr. Ahmed cites no decision describing such language as insufficient. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 255-56 & n.8 (1994) (stating that the language "all proceedings *pending on* or commenced after the date of enactment" amounted to an "explicit retroactivity command" (emphasis added)). *See also Martin v. Hadix*, 527 U.S. 343, 354 (1999) (describing the sentence, "'[t]he new provisions shall apply to all proceedings pending on or commenced after the date of enactment'" as "unambiguously address[ing] the temporal reach of the statute" (quoting *Landgraf*, 511 U.S. at 260)).

Nor has Mr. Ahmed identified any impermissible retroactive effect that would result from application of the NDAA. Section 6501(b) does not revive a "time-barred" cause of action but rather expands the scope of the Commission's disgorgement remedy in actions, like this one, that are still "pending." The Commission brought this action seeking *all* of Mr. Ahmed's ill-gotten gains[5] and obtained a corresponding asset freeze

---

[5]     The Commission's complaint asked the district court to enter a final judgment "[d]irecting the Defendant and the Relief Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains." D.1 at

in 2015, at a time when none of this Court's precedents applied *any* statute of limitations to the Commission's disgorgement remedy. As described earlier (in the Counterstatement of the Case), it was the Supreme Court's decision in *Kokesh* that changed the status quo by applying the 5-year statute of limitations in 28 U.S.C. § 2462 to disgorgement. But the Commission's action was already well underway by then, and the asset freeze has remained in place to this day. Appellants cannot plausibly contend that they developed any settled expectation as a result of *Kokesh* with respect to assets that remained frozen throughout the period between the *Kokesh* decision and Congress's abrogation of *Kokesh* in the NDAA.

## D.    The Ex Post Facto Clause

*Fourth*, Mr. Ahmed contends that application of the NDAA's expanded statute of limitations to his disgorgement award would violate the Constitution's Ex Post Facto Clause. Br.35-37 (quoting U.S. Const. art. I, § 9). He essentially argues that because that Clause forbids the retroactive application of penal statutes, and because

---

24; *accord* D.33 at 43 (amended complaint); D.208 at 54 (second amended complaint).

*Kokesh* held that disgorgement in that case operated as a "penalty" under 28 U.S.C. § 2462, the Ex Post Facto Clause therefore must forbid the retroactive application of the NDAA to expand the disgorgement award here. But the Supreme Court more recently explained that "the *Kokesh* Court evaluated a version of the SEC's disgorgement remedy that seemed to exceed the bounds of traditional equitable principles" and so *Kokesh* "has no bearing" on the Commission's ability to conform future disgorgement requests to those principles. *Liu*, 140 S. Ct. at 1946. Thus, an expanded disgorgement award that conforms to traditional equitable principles does not count as "penal" under the Ex Post Facto Clause. And Mr. Ahmed has identified no such defect in the district court's re-determination of disgorgement.[6]

Mr. Ahmed further asserts that Congress must have enacted the NDAA with a punitive purpose, contrary to the Ex Post Facto Clause,

---

[6] To be clear, the Commission's position is that NDAA Section 6501 extends the statute of limitations for disgorgement from five to ten years in all pending Commission enforcement actions that allege scienter-based violations. The Commission takes no position here with respect to how the NDAA may or may not modify the Commission's pre-existing disgorgement authority under Exchange Act Section 21(d)(5) as interpreted in *Liu*.

40

because its longer statute of limitations applies only to violations committed with scienter.  Br.36.  But Congress could have had any number of rational, non-punitive reasons for cabining the new statute of limitations to scienter-based violations.  The element of scienter might, for example, serve as a proxy for fraud violations, which can be harder for victims to detect and report to the Commission because of their deceptive nature.  *See Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010) ("[I]n the case of fraud, … a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded.").  This is far from the clear level of proof necessary to establish that the NDAA operates as a penal statute.  *See Smith v. Doe*, 538 U.S. 84, 93 (2003); *SEC v. Kellen*, No. CV 20-3861, 2021 WL 4907238, *3-5 (C.D. Cal. Sept. 14, 2021) (rejecting *ex post facto* challenge to retroactive application of the NDAA).

The district court's re-determined award of disgorgement under the NDAA therefore should be affirmed.

**IV.    The district court reasonably ordered Mr. Ahmed to pay prejudgment interest for the period preceding the asset freeze and to surrender actual gains that accrued during the freeze.**

The district court reasonably exercised its broad discretion to order Mr. Ahmed to pay prejudgment interest for the period preceding the asset freeze (that is, from the dates of his misconduct until May 7, 2015, (*see* D.9), and to surrender actual gains that accrued on the assets during the freeze.  On appeal, the relief defendants argue that the district court exceeded its equitable authority on both counts and should have clarified when post-judgment interest begins.  RD Br.44-60; *see* Br.51-53.  But these arguments lack merit.

**A.    Prejudgment interest**

The district court reasonably awarded prejudgment interest at the IRS underpayment rate, compounded quarterly, both in its remedies ruling (SPA104-06) and in its decision on remand (SPA246-47).  There, the court relied on this Court's precedent in *First Jersey*, 101 F.3d at 1476, and on the numerous district court decisions that have continued to follow *First Jersey* following *Liu v. SEC*, 140 S. Ct. 1936 (2020).  SPA104-06, 246-47.  This award of prejudgment interest lay well within

42

the district court's "broad discretion." *First Jersey*, 101 F.3d at 1476 (quotation marks omitted).

Prejudgment interest is awarded as a "measure of use value" (or time value) incident to disgorgement. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 53(1) (2011) ("RESTATEMENT OF RESTITUTION"); *see Miller v. Robertson*, 266 U.S. 243, 257-58 (1924). Such an award thus "prevents a defendant from obtaining the benefit of "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Rinfret*, No. 19-cv-6037, 2020 WL 6559411, at *6 (S.D.N.Y. Nov. 9, 2020) (Nathan, J.) (quotation marks omitted). In this context, an award at the IRS underpayment rate "probably is too low," particularly during a period of high market returns. *SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009) (Easterbrook, J.). Moreover, both this Court and district courts in this circuit have continued to authorize awards of prejudgment interest following *Liu*. *See Fowler*, 6 F.4th at 267; *SEC v. Rust*, No. 16 Civ. 3573, 2021 WL 2850615, at *3 (S.D.N.Y. July 8, 2021) (IRS underpayment rate); *SEC v. Westport Capital Mkts., LLC*, No. 3:17-cv-02064, 2021 WL 2801626, at *9 (D. Conn. July 6, 2021) (same); *Rinfret*, 2020 WL 6559411, at *6 (same).

43

The Commission does not understand the relief defendants as arguing on appeal that *Liu* categorically forecloses any award of prejudgment interest on disgorgement. That proposition would contradict this Court's precedents as well as the historical sources on equity jurisprudence that the Supreme Court consulted in *Liu*.[7]

Instead, the relief defendants argue that the district court abused its discretion by adopting the IRS underpayment rate, compounded quarterly, because that rate purportedly will result in over-compensation of Mr. Ahmed's victims. RD Br.47 (citing *Liu*, 140 S. Ct. at 1943, 1948). But neither the relief defendants nor Mr. Ahmed have offered any factual predicate for this argument. For example, they have not put forward any evidence that the investment return from the Oak funds that Mr. Ahmed defrauded was less than the IRS underpayment rate, or that general market returns were less than that rate during the time period(s) in question. *Cf. Koenig*, 557 F.3d at 745. While certainly

---

[7]    *See, e.g.*, *SEC v. Cavanagh*, 445 F.3d 105, 120 (2d Cir. 2006) (citing *Garth v. Cotton*, 27 Eng. Rep. 1182, 1196, 1 Ves. Sen. 524, 546 (Lord Chancellor's Court 1753)); *Davitt v. O'Connor¸*73 F.2d 43, 48 (2d Cir. 1934) (per curiam) (awarding prejudgment interest on an accounting); 1 DAN B. DOBBS, LAW OF REMEDIES § 3.6(2), p.344 (2d ed. 1993) ("DOBBS"); RESTATEMENT OF RESTITUTION § 53 & cmt. e.

it was within the court's discretion to select their proposed alternative—the one-year Treasury Bill rate (RD Br.46)—nothing in this record dictated that result. Their fears of overcompensation are also premature, since the precise returns to Mr. Ahmed's victims will not be known until the district court adopts a plan for distributing the Commission's monetary recovery. At that time, Mr. Ahmed and the relief defendants can seek this Court's review.

The relief defendants also argue that the district court failed to consider that they acted innocently. RD Br.45-46. But the two cases they cite address a *primary defendant's* good faith. *See Morales v. Freund*, 163 F.3d 763, 767 (2d Cir. 1999); *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 834 (2d Cir. 1992). Mr. Ahmed is the only primary defendant in this action, and his egregious fraud was not somehow negated by placing the proceeds under the names of innocent nominees.

## B. Actual gains and use value

In its remedies ruling, the district court reasonably determined that any frozen assets used to satisfy Mr. Ahmed's disgorgement obligation should be turned over together with "interest and gains

45

accrued during the pendency of the asset freeze." SPA106. The district court reasoned that it would not order prejudgment interest during the period of the freeze because Mr. Ahmed had not enjoyed access to these assets while frozen, but at the same time it would be inequitable to permit him as the wrongdoer to benefit from the asset freeze (necessitated by his misconduct) by pocketing the returns that accumulated during the freeze. *Id.* (citing *Razmilovic*, 738 F.3d at 36-38, *and SEC v. Tavella*, 77 F. Supp. 3d 353, 361 (S.D.N.Y. 2015)); SPA147-51 (similar).

The district court's award of actual gains finds grounding in traditional equitable precedents addressing "use value" or time value, as an incident to restitution. The equitable remedy of "accounting" or "accounting for profits," which the *Liu* Court described as "a remedy closely resembling disgorgement," 140 S. Ct. at 1940 n.1, was one form of restitution via money judgment, *see* RESTATEMENT OF RESTITUTION § 51 & cmt. e. For restitution via money judgment, equity provided the plaintiff with a choice between estimated and actual use value if the latter was known, particularly in cases of actual fraud. *See id.* § 53 cmt. b & ill. 2 ("[A] wrongdoer is typically liable for use value or for the

46

resulting profit, whichever is greater."); *see* 2 DOBBS § 9.3(4), p.601 ("Presumably, the plaintiff would always be entitled to the greater sum when the defendant is guilty of intentional fraud … ."). *See also* RESTATEMENT OF RESTITUTION § 53(3) & cmt. d ("A conscious wrongdoer or a defaulting fiduciary is liable for proceeds and consequential gains that are not unduly remote … ."). This is not to suggest that the district court was *required* to award actual gains as a measure of use value during the freeze, but rather to confirm that its choice lay well within the range of appropriate discretion.

On appeal, the relief defendants rely on the equitable remedy of constructive trust to assert that the district court should have traced the frozen assets back to Mr. Ahmed's fraud proceeds in order to justify the award of actual gains. RD. Br.48-49 (principally citing RESTATEMENT OF RESTITUTION § 55(1)). But they never address the equitable remedy of accounting, which the Restatement discusses in a separate section on restitution via money judgment, RESTATEMENT OF RESTITUTION § 51 & cmt. e, and which the *Liu* Court determined was the proper analog for disgorgement, as already discussed. And they

47

offer no reason to believe that the tracing requirement for constructive trust should apply to accounting.

The relief defendants' reliance on this Court's decision in *SEC v. Manor Nursing Centers, Inc.*, is similarly misplaced. *See* RD Br.51-54 (discussing 458 F.2d 1082 (2d Cir. 1972)). The *Manor Nursing* decision reversed an award of "profits and income earned on the proceeds" of a fraudulent securities offering and instead directed an award of prejudgment interest at a fixed rate. 458 F.2d at 1104-05. This Court reasoned that such an award of profits would transform disgorgement into a penalty because it exceeded what investors could have recovered in a private action and also would have "arbitrarily requir[ed] those appellants who invested wisely to refund substantially more than other appellants." *Id.*

In this context, the relief defendants assert that *Manor Nursing* categorically precludes a district court from taking actual gains as the measure of the use value of fraud proceeds. RD Br.53. But the *Manor Nursing* decision did not purport to measure the use value of fraud proceeds during an asset freeze when no prejudgment interest has been charged, nor did it address the traditional equitable principles just

48

discussed. They further assert that an award of actual gains would result in over-compensation of Mr. Ahmed's victims, citing both *Manor Nursing* and *Liu*. RD Br.53-54. But, once again, they offer no reason to believe that the investment return from the Oak funds that Mr. Ahmed defrauded was less than the actual gains on the frozen assets.

As the district court observed (SPA105-06, 147-51), the more analogous authority is this Court's decision in *Razmilovic*, 738 F.3d 14. That decision reversed an award of prejudgment interest on frozen assets for the period of the freeze, reasoning that the defendant already had "been denied the use of those assets" and any accrued interest "presumably" would be turned over to the government, which would "deprive him twice of interest on the portion of the disgorgement award that is satisfied by the frozen assets." *Id*. at 36-37. The Court observed that the award of prejudgment interest could stand if the government decided to use frozen assets to satisfy the defendant's liability in a parallel criminal prosecution rather than in the Commission's action. *Id.* at 37-38. But "a judgment granting prejudgment interest on the entire forfeiture amount would preclude the application of the [frozen assets] to this civil judgment." *Id.* at 38.

49

The district court reasonably read *Razmilovic* as precluding
prejudgment interest for the period during the asset freeze, since Mr.
Ahmed was denied the use of the assets during the freeze. SPA148.
The court also properly followed this Court's statement in *Razmilovic*
that any interest accrued during the freeze "presumably" would be
turned over, by awarding actual gains that accrued during the freeze
here. SPA148-50. The relief defendants attempt to distinguish
*Razmilovic* as "a case about double counting" (RD Br.55), but they fail
to articulate a satisfactory explanation for this Court's observation that
the accrued interest "presumably" would be turned over. They cite a
stray sentence from the defendant's appellate brief that, they believe,
would have supported a tracing analysis (*see id.*), but in that event, one
might expect the *Razmilovic* Court to have said it was relying on
tracing principles or the constructive-trust remedy. It did not.

A better means of harmonizing *Razmilovic* and *Manor Nursing*
would be to observe that traditional equitable principles permitted
courts to adjust the calculation of use value to reflect the degree to
which actual gains were too remote from the fraud proceeds because, for
example, such gains were more directly attributable to the defendant's

50

intervening efforts.  *See* 2 DOBBS § 9.3(4), pp.601-02 (distinguishing

profits in operating a business from rents and interest for measuring

use value); RESTATEMENT OF RESTITUTION § 53(3) (instructing that

actual gains should be awarded unless "unduly remote").  Seen in this

light, the *Manor Nursing* defendants' actual gains were products of

their intervening decision about how to invest the fraud proceeds, 458

F.2d at 1104-05, whereas the asset freeze in *Razmilovic* (and here as

well) necessarily precluded any intervening action by the defendant

during the period of the freeze.  Whatever investment decisions Mr.

Ahmed and the relief defendants may have made before the freeze here

(*see* RD Br.50), the record is clear that they were not permitted to make

any such decisions while the freeze was in effect.[8]

The district court's award of actual gains that accrued during the

freeze was therefore an appropriate exercise of its discretion under

*Razmilovic*.  Even were this Court to find error in the award of actual

---

[8]     The district court did grant Mr. Ahmed's motion, with the consent
of the Commission, to liquidate certain appreciated frozen assets and
transfer the proceeds to a less volatile investment.  D.389; D.398.  This
motion and order underscore that Mr. Ahmed could not make any
unilateral decisions concerning the frozen assets.

gains, it should order prejudgment interest to prevent the inequitable result of leaving Mr. Ahmed better off, and his victims worse off, than if the assets had never been frozen at all.

In addition, the relief defendants' concern that the receiver might "cherry-pick[]" the most highly appreciated frozen assets to satisfy Mr. Ahmed's disgorgement obligation (RD Br.49-51) has been rendered moot by the district court's more recent adoption of the receiver's proposed "extrapolated method" for calculating actual gains during the freeze. D.2147 at 25-26, 28 ¶7. In other words, the receiver will determine the percentage by which the frozen assets, taken as a whole, appreciated during the freeze and then apply that rate to calculate use value during the freeze for the disgorgement awards in the amended final judgment in 2018 and the re-determined judgment in 2021. *Id.* at 24. Anticipating this decision by the district court, the relief defendants complain that "equity did not recognize any such averaging-out approach." RD Br.50. But this issue falls outside the scope of the orders under review here. New appeals already have been filed from the more recent liquidation order (Nos. 22-135 and 22-184), and there is no reason to believe the issue will escape judicial review.

52

### C.   Post-judgment interest

The relief defendants also criticize the district court's judgments for their silence as to the precise time period(s) for calculating actual gains, which, they believe, could result in overlap or double-counting with post-judgment interest.  RD Br.57-60.  But they have never sought such clarification from the district court, and their argument here thus asks for an advisory ruling on a hypothetical problem.  The Court should decline the invitation.  The relief defendants may seek review once the district court has adopted precise calculations or, at the very latest, when the receivership is wound down.  In any event, the Commission's position is that the calculation of actual gains should run only to the date of the original judgment on September 27, 2018, for the disgorgement award in that judgment and only to the date of the re-determined judgment on July 6, 2021, for the additional disgorgement awarded under the NDAA.  Statutory post-judgment interest should begin on those dates for those respective amounts, and thus no double-counting should occur.

The district court's awards of prejudgment interest and actual gains therefore should be affirmed.

**V.    The district court reasonably concluded that Ms. Ahmed and the other relief defendants held frozen assets as Mr. Ahmed's nominees and, in the alternative, that they shared joint control of the frozen assets with Mr. Ahmed.**

The district court reasonably determined that the $85 million of frozen assets claimed by Ms. Ahmed and the other relief defendants may be collected by the Commission to satisfy its judgment against Mr. Ahmed because the relief defendants held those assets merely as his nominees.  SPA109-19.  The court observed that the Commission had "put forth evidence that the seized assets belong to Mr. Ahmed and were placed in the names of Relief Defendants as nominees only, in an effort to protect and hide the fraudulently obtained assets."  SPA112.

After crediting the Commission's evidence of nominee ownership, the district court analyzed and rejected the relief defendants' claims to legitimate ownership of the frozen assets, reasoning that their claims incorrectly focused on whether the assets were tainted rather than on whether the assets actually belonged to them rather than to Mr. Ahmed.  SPA114-16.  Further, the district court refused to accept Ms. Ahmed's assertion that she had acquired legitimate ownership of the claimed assets by managing and contributing to them during her marriage.  SPA117-19.  The court reasoned in the alternative that even

54

assets jointly controlled by both spouses could be collected to satisfy the judgment. *Id.* That reasoning is sound and should be affirmed.

On appeal, the relief defendants do not take issue with the district court's factual findings. They argue, for the first time on appeal, that they received the frozen assets as legitimate "gifts" from Mr. Ahmed. RD Br.19, 29-31. But they forfeited that argument because they never raised it before the district court (D.862-1; D.919-1), even when directed by that court to assert any legitimate claim to the frozen assets (D.842 at 3). *See infra* Section B. Moreover, Ms. Ahmed disclaimed that certain assets (including jewelry) were gifted to her. *See infra* footnote 19. The relief defendants should not be permitted to argue on appeal that the district court erred because it did not accept an argument that they never fairly presented. *See Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994).

The relief defendants further argue that the district court erred as a matter of law (i) by not properly articulating the nominee doctrine, (ii) by directing them to assert any legitimate claim to the frozen assets, and (iii) by relying on the fact that funds for the assets originated with Mr. Ahmed, rather than inquiring whether he controlled the assets. RD

Br.18-32.  None of these arguments withstands close examination.  The district court reasonably exercised its broad discretion to determine that the nominee doctrine provided the best equitable approach to achieve a fair and efficient resolution of this case, given that Mr. Ahmed was the only wrongdoer charged here, Ms. Ahmed claimed from the outset not to know which assets belonged to her or what monies had been transferred to her, and both Mr. and Ms. Ahmed refused to testify about transfers of assets within the Ahmed family household.

## A.    The district court correctly articulated the standard for determining nominee ownership.

To determine the true ownership of assets held in the name(s) of the relief defendants, the district court properly considered:

> [1] a defendant's control over the asset, [2] the length of time the asset had been held, [3] whether the defendant had an interest in and benefitted from the asset, [4] whether the defendant had transferred assets from his name into the asset, [5] whether he or she contributed to acquire the asset initially, and [6] whether the defendant ever withdrew any funds from the asset.

SPA111-12 (quotation marks omitted).  In adopting this pragmatic approach, the district court acted consistently with the views of several

56

other district courts within this circuit, as well as with the Internal

Revenue Manual.[9]

It is well settled in multiple contexts that an actual owner of

assets cannot escape accountability incident to those assets through the

purported transfer of the assets to nominees.  Nominee ownership may

arise when securities are registered other than in the name of the

beneficial owner, usually for the legitimate purpose of facilitating

transfer, but sometimes to evade the federal disclosure requirements for

beneficial owners.  *See SEC v. First City Fin. Corp.*, 890 F.2d 1215,

1217-18 & n.2 (D.C. Cir. 1989).  And in the banking context, as early as

1878 the Supreme Court cited favorably the British rule that the

---

[9]     *See SEC v. McGinn, Smith & Co.*, 98 F. Supp. 3d 506, 522
(N.D.N.Y. 2010), *aff'd sub nom. SEC v. Smith*, 646 F. App'x 42 (2d Cir.
2016) (summary order); *United States v. Evseroff*, No. 00-CV-06029,
2012 WL 1514860, at *10 (E.D.N.Y. Apr. 30, 2012), *aff'd on other
grounds*, 528 F. App'x 75 (2d Cir. 2013) (summary order); *McMahon v.
United States*, No. 3:09-cv-00046, 2010 WL 4430512, at *4 (D. Conn.
Oct. 29, 2010); *LiButti v. United States*, 968 F. Supp. 71, 76 (N.D.N.Y.
1997), *aff'd in part, rev'd in part on other grounds*, 178 F.3d 114 (2d Cir.
1999); Internal Revenue Manual § 5.17.2.5.7.2 ¶3 (Mar. 19, 2018) ("No
one factor determines whether a nominee situation is present, but a
number of factors taken together may.").  *See also United States v.
Nassar*, 699 F. App'x 46, 47 (2d Cir. 2017) (summary order) (approving
district court's use of six-factor nominee test to determine beneficial
ownership).

shareholder of a bank could not avoid liability for the bank's insolvency by transferring title of the shares "if, in fact, the transferee is a mere tool or nominee of the transferrer [sic], so that, as between themselves, there has been no real transfer." *Nat'l Bank v. Case*, 99 U.S. 628, 632 (1879). Many decisions similarly address nominee ownership in the taxation context. *See, e.g.*, *Higgins v. Smith*, 308 U.S. 473, 475 (1940) ("[T]he jury was instructed to find whether these sales … were to be regarded as simply 'a transfer by Mr. Smith's left hand, being his individual hand, into his right hand, being his corporate hand, so that in truth and fact there was no transfer at all.'").[10]

The doctrine of nominee ownership traces its origins to the ancient maxim that "equity looks to the intent rather than to the form." 1 POMEROY § 363, p.674. In other words, "it is only by looking at the intent rather than at the form, that equity is able to treat that as done

---

[10]  *See also Nominee*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others."); *Nominee*, OXFORD ENGLISH DICTIONARY (3d ed. 2003, updated 2020) (citing examples dating from 1869 forward for usage of the word "nominee" as meaning "[a] person or group of people in whose name (rather than that of the real owner) a stock, bond, etc., is registered"), www.oed.com/view/Entry/127754 (last visited Feb. 11, 2022).

which in good conscience ought to be done." *Id.* § 378, p.703 (emphasis
omitted). The determination of nominee ownership therefore looks
beyond the formalism of a purported transfer of ownership when the
badges of a *bona fide* transfer are lacking.

The relief defendants do not dispute the provenance of the
nominee doctrine. They do contend that nominee ownership should
turn on state law. RD Br.20-21. Although state law may provide a
helpful starting point for understanding the property interests at stake,
the relief defendants never explain why the authority of federal courts
to provide full equitable relief under the federal securities laws should
vary depending on the decisional law of state courts.[11] Nor do they
identify what practical difference state law would make in this case. As
a result, the point appears to be academic.[12]

---

[11]    *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383
(1996) (Congress gave federal courts "exclusive jurisdiction" to enforce
the Exchange Act to "achieve greater uniformity of construction and
more effective and expert application of that law." (quotation marks
omitted)); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501
U.S. 350, 357-61 (1991) (recognizing the need for uniform rules under
the federal securities laws).

[12]    The Commission maintained before the district court, and
continues to maintain in this appeal, that the Commission is a unique
creditor with the ability to invoke the full scope of a federal district

The relief defendants also argue that the "critical issue" for determining nominee ownership is whether the purported transferor retained "plenary control" of the transferred asset. RD Br. 21, 28 (quotation marks omitted). But "[c]ourts have recognized that the element of control may be predicated upon the concept of equitable ownership." *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 91-92 (2d Cir. 2003) ("*Vebeliunas*"). Indeed, this Court in *Vebeliunas* relied on the wife's independent contribution of assets derived from her inheritance to help establish her legitimate "equitable ownership" and thus her "control" of trust property for the purpose of avoiding veil-piercing to satisfy her husband's liabilities. *Id.* at 92. This Court has thus taken a pragmatic approach to "control" when assessing nominee ownership, consistent with the district court's approach here.

## B. The district court reasonably asked the relief defendants to put forward any legitimate claim they had to the frozen family assets.

The district court reasonably asked the relief defendants to assert any legitimate claim they had to the frozen assets (D.842 at 3) and even

court's equitable powers, without regard to exemptions and other limitations under state law. D.888 at 10-11, 23 n.21 (collecting cases).

released $60,000 in frozen funds so they could hire an expert to help

them do so (D.353).[13]  On appeal, the relief defendants contend that this

approach effectively assigned them the burden to disprove the

Commission's nominee allegations, thereby relieving the Commission of

its burden of persuasion.  RD Br.21-27.  But that is incorrect.

As explained earlier, the district court addressed the relief

defendants' claims of legitimate ownership only *after* crediting the

Commission's voluminous "evidence that the seized assets belong to Mr.

Ahmed and were placed in the names of Relief Defendants as nominees

only, in an effort to protect and hide the fraudulently obtained assets."

SPA112.  *Compare* SPA112-13 (crediting Commission's evidence), *with*

---

[13]     By way of background, after the district court granted summary judgment to the Commission on its claims against Mr. Ahmed, the court directed the relief defendants to "provide a list identifying all assets they claim belong to them, and the reasons why they claim such ownership," in anticipation of the Commission filing a remedies motion. D.842 at 3.  The relief defendants filed such a list, D.862-1, and updated the list in response to the remedies motion, D.919-1.  Both documents asserted that the family assets in question legitimately belonged to the relief defendants for one or more of four reasons, each of which the district court rejected, as discussed in the main text.  Separately, the relief defendants argued in opposition to the remedies motion that the Commission had failed to carry its burden of proof and to acknowledge Ms. Ahmed's contributions to the marriage.  D.905 at 14-20.

SPA114-19 (rejecting claims of legitimate ownership).  Far from relying on bare allegations (RD Br.24), the Commission devoted over 20 pages of its remedies motion (D.888 at 17-38) and dozens of filed exhibits (D.888-1 to D.888-44) to substantiate its nominee allegations.  The district court acted well within its broad discretion to credit the Commission's evidence, thereby overcoming whatever presumption of legitimate ownership may have attached to the fact that the relief defendants held legal title (RD Br.22-23).  When viewed in this context, the court's passing statements about the relief defendants' need to "prove" or "offer[]" evidence to rebut the Commission's allegations and establish legitimate ownership (SPA95-96, 111-12), did not assign them the ultimate burden of persuasion.[14]

It made eminent sense for the district court to ask the relief defendants to assert their legitimate claims of ownership.  They

---

[14]  The relief defendants also take issue (RD Br. 30 n.7) with the district court's observation that Ms. Ahmed had failed to enumerate all of the frozen assets as belonging to her in her interrogatory responses (SPA113).  The district court did so, however, not as reflecting a wholesale concession on Ms. Ahmed's part, as she now suggests, but rather as bearing on the credibility of her eleventh-hour claim to own nearly all the frozen assets.

62

naturally had easier access to evidence of any such claims (much like

the wife's inheritance in *Vebeliunas*, *see* 332 F.3d at 91-92), and it would

have been nearly impossible for the Commission to prove the negative

assertion that they had *no possible* legitimate claim to any of the frozen

assets. *See Nat'l Commc'ns Ass'n v. AT&T Corp.*, 238 F.3d 124, 130-31

(2d Cir. 2001). In a similar vein, this Court recently recognized that a

principal defendant bore the burden to identify legitimate business

expenses to be deducted from his disgorgement calculation. *See Fowler*,

6 F.4th at 267. Other courts of appeals have likewise required relief

defendants to demonstrate claims of legitimate ownership.[15]

Nor have the relief defendants shown that the district court erred

by not making individualized findings of nominee ownership for each of

---

[15]    *See, e.g.*, *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187,
192 n.5 (4th Cir. 2002) ("We have no doubt that the district court will
provide the Relief Defendants with an opportunity to demonstrate the
existence of a legally and factually valid ownership interest to some or
all of the assets prior to ordering disgorgement."); *SEC v. Colello*, 139
F.3d 674, 677-78 (9th Cir. 1998) (rejecting relief defendant's argument
that the district court improperly placed the burden on him to show
that he had "a legitimate claim to the funds" and affirming summary
judgment because he "refused to give information necessary to
determine whether he still possessed any of the funds or whether he
had a legitimate claim to them").

the frozen assets. *See* RD Br.25. The relief defendants never submitted

evidence of legitimate ownership of each asset and instead listed four

generic rationales for claiming ownership: that the assets were (i)

acquired more than five years prior to the Commission's complaint, (ii)

purchased with untainted funds, (iii) funded in whole or part from

untainted funds, or (iv) received as gifts from nonparties. D.862-1;

D.919-1. Notably, they did not claim that any of the frozen assets were

gifted from Mr. Ahmed, as they now argue to this Court (RD Br.29-31).

In response, the district court appropriately addressed and rejected

each of the four asserted rationales. The court rejected the first three

reasons for failure to show that the assets were "purchased or funded

with *their* untainted funds, as opposed to Mr. Ahmed's" and likewise

rejected the fourth reason for failure to offer "evidence that these

[assets] were indeed gifts received from someone other than Mr.

Ahmed." SPA116-17. The district court further made factual findings

of Mr. Ahmed's contributions to several frozen assets that the relief

defendants highlighted in their briefing below. SPA114-17.

Moreover, neither of the two decisions cited by the relief

defendants on appeal (RD Br.25) held that individualized findings were

64

required. One decision simply sustained the district court's discretion to release certain frozen assets not under the defendant's control. *See SEC v. Black*, 163 F.3d 188, 196-97 (3d Cir. 1998). The other decision rejected the theory of reverse veil piercing, and the concurring opinion's discussion of individualized findings under the nominee theory was dicta. *See Comm'r of Envt'l Prot. v. State Five Indus. Park, Inc.*, 37 A.3d 724, 742-43 (Conn. 2012) (Zarella, J., concurring).

The district court therefore committed no error in directing the relief defendants to substantiate their claims of legitimate ownership of the frozen family assets, while still holding the Commission to its burden of persuasion on its nominee allegations.

## C. The district court's nominee analysis reasonably considered Mr. Ahmed's contributions to the frozen assets as reflecting his control of those assets.

The relief defendants also fault the district court's nominee analysis for relying on Mr. Ahmed's contributions to the frozen assets, rather than inquiring whether he controlled the assets. RD Br.28-32. Here, they disclaim any reliance on Ms. Ahmed's contributions[16] and

---

[16] The district court analyzed the respective contributions of Mr. Ahmed and Ms. Ahmed (SPA114-19) in response to the relief defendants' argument that "Ms. Ahmed's contributions to the marriage

instead argue that the Commission's evidence of Mr. Ahmed's contributions failed to demonstrate that he retained sufficient control of the assets to relegate the relief defendants from valid title-holders to mere nominees. RD Br.28, 32 n.8.[17] The argument lacks merit.

Contrary to the relief defendants' reliance on legal title, traditional equitable doctrines like nominee ownership "sidestepp[ed] title problems" by refraining from deciding legal title and instead "acted *in personam*" on the defendant to treat disputed property as belonging to the person who was, "in the eyes of equity, the true 'owner.'" 1 DOBBS § 4.3(1), p.587; *see id.* §4.7(1), pp.659-60 (discussing the distinction between legal and equitable title); 3 POMEROY §§ 1044-47 (same). As already noted, the nominee doctrine in particular relies on the maxim

---

… give her a bona fide ownership interest in virtually all disputed assets" (D.905 at 18 (heading B, formatting removed)). If the relief defendants believed the district court misunderstood their argument, they easily could have pointed this out when they later moved for clarification. *See* D.983.

[17] The relief defendants state in nearly the same breath that the Commission conceded that they held title to the disputed assets (RD Br.32 n.8) and also that the Commission *did* assert that Mr. Ahmed held title to certain disputed assets (RD Br.36 n.10). In any event, the point was not essential to the nominee analysis.

that "equity looks to the intent, rather than to the form." 1 POMEROY § 363, p.674.

Moreover, the nominee doctrine does not draw a strict dichotomy between Mr. Ahmed's contributions to the frozen family assets and his control of those assets. As explained earlier, the district court's articulation of the doctrine included not only "[1] a defendant's control over the asset," but also "[4] whether the defendant had transferred assets from his name into the asset," and "[5] whether he or she contributed to acquire the asset initially … ." SPA111-12. Likewise, this Court in *Vebeliunas* "recognized that the element of control may be predicated upon the concept of equitable ownership," and concluded that the wife's contribution to the trust using assets derived from her inheritance gave her the requisite equitable ownership to establish her control. 332 F.3d at 91-92. Although the creditors in that case argued that her husband (the debtor) should be treated as the equitable owner because he continued to receive benefits from the trust property (such as rental proceeds), this Court disagreed because "spouses routinely share financial assets, such as streams of income." *Id.* at 92.

67

The relief defendants therefore have it exactly backward when they read *Vebeliunas* as holding that the sharing of assets between spouses is insufficient to displace legal title.  RD Br.31-32, 37.  In that decision, this Court did not consider how the trust documents were written, let alone suggest that those formalities were determinative. Rather, the Court's focus on the wife's legitimate contributions to the trust property in *Vebeliunas* confirms that the district court properly relied on the Commission's unrebutted evidence of Mr. Ahmed's contributions to the frozen assets as reflecting his control of those assets.  *See* SPA114-19.[18]

Furthermore, the district court considered the evidence of Mr. Ahmed's contributions not in isolation, as the relief defendants seem to suggest, but in the context of the Commission's additional evidence of the following facts:

---

[18]    The relief defendants do not contest the district court's factual findings as to Mr. Ahmed's contributions, and so the Commission will not belabor the point by reciting the relevant evidence here.  For further detail, the Commission respectfully refers the Court to its briefs and exhibits below, *see* D.888; D.888-1 through D.888-44; D.921, as well as this Court's discussion of certain assets in the initial appeal, *see I-Cubed Domains*, 664 F. App'x at 55-56.

- for the years 2004 through 2014, 98.8 percent of "non-suspect" funds received by the Ahmed household came from Mr. Ahmed's aggregate income of roughly $63 million, according to the relief defendants' own expert (D.888 at 25-26);

- the frozen assets released for the relief defendants' living expenses and attorney's fees during the litigation exceeded the legitimate salary of $1.2 million that Ms. Ahmed previously earned from Goldman (*id.* at 26 & n.26);

- Ms. Ahmed claimed in her initial deposition to be unable to identify which assets personally belonged to her, to have no memory of receiving more than $25 million in checks personally written to her from Mr. Ahmed, and to have no knowledge concerning the funds sitting in accounts under the names of her children (*id.* at 28-30 & n.29);

- Ms. Ahmed admitted that Mr. Ahmed placed assets into her name as a contingency plan should anything happen to him (*id.* at 30-31); and

- Mr. Ahmed invoked his Fifth Amendment privilege against self-incrimination, and Ms. Ahmed likewise invoked a purported spousal privilege, in refusing to answer any questions about transfers of assets from Mr. Ahmed into the names of Ms. Ahmed and their children (*id.* at 31).

*See* SPA112-14.

The relief defendants further assert that analyzing the Ahmed family assets in this fashion threatens to unwind all gift-giving. RD Br.30-31. Even if their gift theory were not forfeited, that is not so.

69

Under the nominee doctrine, courts retain equitable discretion to ascertain, based on all the attendant facts and circumstances, whether a particular "gift" should be left undisturbed or should be unwound because in reality it was only a sham "transfer by [the defendant's] left hand . . . into his right hand." *Higgins*, 308 U.S. at 475 (cleaned up).

In particular, the relief defendants dispute the treatment of certain jewelry and handbags in Ms. Ahmed's possession, contending essentially that she *must have* legitimately owned them as "gifts" from her husband. RD Br.30-31. But the unrebutted evidence showed that Mr. Ahmed purchased a Harry Winston diamond ring and earrings for approximately $790,000 just months before his arrest, using funds from an account where fraud proceeds had been commingled. D.888 at 34-35. Ms. Ahmed can hardly complain that the district court should have discounted the jewelry's illicit origin merely because she received and then wore it for a few months.[19] *See, e.g.*, *SEC v. George¸* 426 F.3d 786,

---

[19]     Ms. Ahmed initially testified that she could not explain who purchased or how much was spent on the jewelry. D.888 at 35; D.888-7 at 50:23-52:20. After the preliminary injunction appeal, she testified that all jewelry given her by Mr. Ahmed was in exchange for services she performed for him, and not gifts, but refused to elaborate citing the

70

791, 798 (6th Cir. 2005) (requiring relief-defendant spouse to disgorge value of diamond engagement ring derived from fraud proceeds).

The designer handbags (worth about $20,000) arguably presented a closer call. *Compare* D.919-1 (asserting that the handbags were bought with untainted funds), *with* SPA115-16 (rejecting that rationale). But, with the support of the receiver and the Commission, the district court recently released the handbags to Ms. Ahmed, together with the Ahmed family's cars and home furnishings, to avoid any untoward hardship. D.2147 at 28 ¶8 (releasing items listed at D.2134-1, Ex.B). That issue is therefore moot.

The relief defendants further suggest that Mr. Ahmed must have surrendered all control over the frozen family assets after having funded them, by virtue of the transfer of legal title. *See, e.g.*, RD Br.19 ("[S]omeone who receives money as a gift and then controls that money is not a nominee."). Not only is that approach inconsistent with *Vebeliunas*, but it overlooks the obvious fact that none of the disputed assets ever left the Ahmed family household. Indeed, the Commission

---

purported marital communications privilege. *See* D.888-10 at 399:19-24. She appears to have abandoned the latter position on this appeal.

presented ample evidence that Mr. Ahmed retained control of the

disputed family assets in the time leading up to his escape to India:

- Mr. Ahmed remained intimately involved with the purchases of both Park Avenue apartments, thus handwriting information on the purchase documents and negotiating the rental of the first such apartment (D.888 at 33);

- Mr. Ahmed likewise remained closely involved with the management of the accounts in the names of the trusts and his children, by hiring and firing managers for the accounts and directing the execution of transfer paperwork (*id.* at 35-36; D.921 at 8);

- Mr. Ahmed transferred his interest in DIYA Holdings, LLC and DIYA Real Holdings, LLC to Ms. Ahmed following his arrest for insider trading (D.888 at 37); and

- Mr. Ahmed sought to have insurance coverage for the jewelry separated from his personal insurance policy following his arrest (*id.*).

Moreover, in one of his last acts before fleeing to India, Mr. Ahmed

signed a stipulation that continued the district court's emergency asset

freeze of $55 million of the Ahmed family assets, not only on his own

behalf but also for the two relief defendants named in the Commission's

initial complaint.  D.22 at 5; *see* D.9 at 4 ($55 million).  No other

signature appears, not even that of Ms. Ahmed.  The most natural

conclusion is that Mr. Ahmed retained real control over the Ahmed

family assets right up until the last possible minute when he fled the

country. The district court's nominee determination should be affirmed.

**D. The district court correctly determined that joint spousal control of the frozen assets provided an alternative basis for permitting the Commission to collect those assets in full.**

The relief defendants contend that the district court "did not

squarely resolve," and therefore remand is needed to address, whether

the Commission can collect the full amount or only Mr. Ahmed's

"equitable share" of any assets jointly controlled by Mr. Ahmed and the

relief defendants, particularly Ms. Ahmed. RD Br.44. In fact, the

district court resolved that issue in the Commission's favor:

> Further, assuming Ms. Ahmed managed assets which were
> not fraudulently obtained, those jointly controlled assets can
> nevertheless be used to satisfy Defendant's judgment. *See,
> e.g.*, *SEC v. Smith*, 646 F. App'x 42, 43 (2d Cir. 2016)
> (rejecting the relief defendant's argument that the district
> court erred in applying all assets in a jointly controlled
> account – held only in the name of relief defendant – to
> satisfy final judgment against defendant); *Sarasota CCM,
> Inc. v. Golf Mktg., LLC*, 94 Conn. App. 34, 38, 891 A.2d 72,
> 74 (2006) (recognizing that Connecticut's "legislature's intent
> [is] to allow a judgment creditor to execute against all forms
> of a judgment debtor's assets" and therefore a creditor is
> "entitled to reach any property in which the judgment debtor
> had a cognizable interest" including the full amount of funds
> held in a joint account.).

73

SPA118-19; *see* SPA118 n.22 (similar).  According to this order, the Commission may fully collect any jointly controlled assets to satisfy the judgment.

The relief defendants cannot reasonably complain the district court should have devoted greater detail to addressing their objection that only Mr. Ahmed's "equitable share" of each jointly controlled asset could be used to satisfy the judgment.  They raised this objection below only in a footnote (D.905 at 17 n.20), and thus the district court was free to disregard it.  *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 76 (2d Cir. 2019); *United States v. Mendlowitz*, No. 17 Cr. 248, 2019 WL 1017533, at *7 n.11 (S.D.N.Y. Mar. 2, 2019).  Moreover, they may not raise an appellate argument for the first time in their reply brief.  *See ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 97 n.12 (2d Cir. 2007).  The district court's decision as to jointly controlled assets thus provides an alternative ground for affirmance.

Even if the relief defendants' objection were preserved, judicial economy would warrant resolving it now rather than on remand, since they concede that the dispute concerns "the applicable legal rule."  RD Br.44.  In that vein, their objection below rested entirely on two state

74

court decisions (D.905 at 17 n.20) that were abrogated by a later decision of the Supreme Court of Connecticut.  *See Fleet Bank Conn., N.A. v. Carillo*, 691 A.2d 1068, 1073 (Conn. 1997).  And as the district court observed (SPA118), this Court rejected a similar argument by a spousal relief defendant that she should be permitted to retain half of the account for which she and her husband were found to be joint owners.  *SEC v. Smith*, 646 F. App'x 42, 43 (2d Cir. 2016) (summary order).  The district court's ruling that all jointly controlled family assets are fully available for collection should therefore be affirmed.

**E.  The Commission should be permitted to pursue alternative theories of recovery.**

If this Court concludes that the district court's rulings based on nominee ownership and joint control cannot stand, then the Commission should be permitted to pursue alternative theories of recovery on remand.  The district court's amended final judgment expressly reserved decision on the Commission's claim of traditional relief-defendant liability (SPA162-63, 171-72), and that court is in the best position to assess the Commission's preservation of any other theories of recovery (*contra* RD Br.32-35).

75

The Commission agrees with the relief defendants (RD Br.39) that judicial economy warrants resolution now, rather than on remand, of the impact of the Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), on traditional relief-defendant liability. Specifically, they argue that this Court's leading case on relief-defendant liability, *Cavanagh I*, 155 F.3d 129, should be limited to its narrowest possible holding both in its own right and in light of *Liu*. RD Br.39-44. But this Court's post-*Liu* decisions have repeatedly sustained its prior case law on disgorgement as consistent with *Liu*. *See Fowler*, 6 F.4th at 267; *de Maison*, 2021 WL 5936385, at \*2. And two other courts of appeals have similarly reaffirmed their prior case law on relief-defendant liability following *Liu*. *See SEC v. Berkeley Healthcare Dynamics, LLC*, No. 20-16754, 2022 WL 42807, at \*2 (9th Cir. Jan. 5, 2022); *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at \*13-17 (10th Cir. Dec. 16, 2021). Accepting the relief defendants' arguments would thus create an unnecessary circuit split. In any event, their arguments have no merit.

### 1. The *Cavanagh I* decision

This Court held in *Cavanagh I* that, to effectuate full equitable relief, courts may order a person not accused of wrongdoing (that is, a

76

relief defendant) to disgorge ill-gotten gains received from a defendant, upon a showing that the person "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." 155 F.3d at 136. Moreover, this Court later examined and sustained *Cavanagh I's* holding as falling well within the scope of the equitable remedies available at chancery and conferred on the federal courts in 1789. *SEC v. Cavanagh*, 445 F.3d 105, 116-20 (2d Cir. 2006) *("Cavanagh II")* (cited in *Liu*, 140 S. Ct. at 1940 n.1). *Cavanagh I*'s holding has thus become authoritative for relief-defendant liability in the two decades since and has been cited nearly two thousand times in decisions, orders, court filings, and secondary sources.[20]

Far from coming "out of nowhere" (RD Br.41), the *Cavanagh I* decision relied on *Colello*, 139 F.3d at 676-77, which in turn relied on *Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940). The Supreme Court held in *Deckert* that an action to recover securities fraud proceeds from a third party "states a cause for equitable relief." *Id.* at 288. There, the wrongdoer was insolvent and the Court permitted equitable

---

[20]    As reflected in a KeyCite search on Westlaw limited to headnotes 11-13, on February 4, 2022.

restitution against innocent third parties (including a trust) to the extent they received fraud proceeds to which they had no claim. *Id.* at 284-90. More than eighty years later, *Deckert* remains good law for the equitable recovery of fraud proceeds from innocent third parties who lack any legitimate claim.

The underlying rationale of *Cavanagh I* thus belies the relief defendants' suggestion (RD Br.39-40) that the decision is better read as strictly limited to the asset-freeze context where it arose. Even if this Court has applied *Cavanagh I* to affirm final disgorgement awards only by summary order (*see id.*), that simply confirms that this Court has consistently understood *Cavanagh I* in the broader sense suggested by *Deckert*, given that a summary order may issue only when "each panel judge believes that no jurisprudential purpose is served by an opinion." 2d Cir. I.O.P. 32.1.1(a). "'[D]enying summary orders precedential effect does not mean that [this Court] considers itself free to rule differently in similar cases.'" *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (quoting Order dated June 26, 2007, adopting 2d Cir. Local R. 32.1).

## 2. The *Liu* decision

Nor does *Liu* require a different result. "It is a longstanding rule" of this Court "that a three-judge panel is bound by a prior panel's decision until it is overruled either by this Court sitting *en banc* or by the Supreme Court." *Dale v. Barr*, 967 F.3d 133, 142 (2d Cir. 2020) (quotation marks omitted). An intervening Supreme Court decision that does not directly address the precise issue may cast sufficient doubt to warrant overruling the prior panel's decision only if it "broke[] the link on which [this Court] premised [the] prior decision or undermined an assumption of that decision." *Guo v. Deutsche Bank Sec. Inc.* (*In re Guo*), 965 F.3d 96, 105 (2d Cir. 2020) (quotation marks omitted). The relief defendants offer no reason to believe that *Liu* meets that demanding standard. *See* RD Br.41-44.

The Supreme Court held in *Liu* that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is [a] ... permissible" form of "equitable relief" in Commission enforcement actions. 140 S. Ct. at 1940. The Court canvassed the remedies typically available at equity and found that "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and

79

courts using various labels for the remedy." *Id.* at 1942. Those labels

included "restitution" and a "form of equitable restitution" that "closely

resembl[es] disgorgement" called an "accounting" or "accounting for

profits." *Id.* at 1940-43 & n.1 (punctuation omitted). "No matter the

label, this 'profit-based measure of unjust enrichment" reflects the

"foundational principle" that it "'would be inequitable that [a

wrongdoer] should make a profit out of his own wrong.'" *Id.* at 1943

(quoting RESTATEMENT OF RESTITUTION § 51 cmt. a, and *Root v. Railway

Co.*, 105 U.S. 189, 207 (1882)). The *Liu* Court also discussed three

"principles that may guide the lower courts' assessment" of

disgorgement awards—relating to the calculation of net profits, the

imposition of joint-and-several liability, and the return of funds to

victims, *see id.* at 1947-50—none of which is implicated here.

    *Liu* never addressed, let alone questioned, relief-defendant

liability or the *Deckert* decision that provided the foundation for

*Cavanagh I.* To the contrary, retaining *Cavanagh I* reinforces *Liu*,

since permitting the relief defendants to "now claim valid ownership of

[fraud] proceeds would allow almost any defendant to circumvent the

SEC's power to recapture fraud proceeds, by the simple procedure of

giving [the proceeds] to friends and relatives, without even their knowledge." *Cavanagh I*, 155 F.3d at 137; *accord George*, 426 F.3d at 798. That result would frustrate the foundational principle of equity, central to *Liu*'s holding, that a wrongdoer should not benefit "by his own wrong." 140 S. Ct. at 1943 (quotation marks omitted); *cf. Salman v. United States*, 137 S. Ct. 420, 429 (2016) (gifts to relatives accrue to personal benefit).

Furthermore, *Cavanagh I* (as well as *Deckert* before it) finds deeper grounding in the traditional equitable principle that a gratuitous transferee could acquire only whatever interest the transferor previously held in the property. 2 POMEROY § 685, p.1379. Thus, Pomeroy embraced an even broader view of disgorgement against innocent recipients of fraud proceeds than is required here:

> A court of equity will wrest property fraudulently acquired, not only from the perpetrator of the fraud, but … from his children and his children's children, or … from any persons amongst whom he may have parceled out the fruits of his fraud.

*id.* § 918, p.1918. As all three historical works on equity jurisprudence cited by *Liu* confirm, equity generally refused to recognize true ownership in an innocent recipient of fraud proceeds, but allowed an

81

affirmative defense in the case of a *bona fide* purchaser who lacked
notice of the wrongdoing and provided valuable consideration. *See* 1
DOBBS § 4.7(1), pp.659-67; 2 POMEROY § 899, p.1869 & § 918, p.1918;
RESTATEMENT OF RESTITUTION §§ 50, 58(2), 66. *See also* RESTATEMENT
(FIRST) OF RESTITUTION § 123 (1937). Contributions to a marriage were
generally insufficient to constitute valuable consideration for a transfer
between spouses, *see* 2 POMEROY § 969, p.2101; *In re Marriage of Allen*,
724 P.2d 651, 659 (Colo. 1986) (en banc) (collecting cases), although a
divorce settlement could be one exception, *see CFTC v. Walsh*, 658 F.3d
194, 197-98 (2d Cir. 2011) (per curiam).

The *Cavanagh I* standard is therefore grounded in traditional
equitable principles and also workable, since what constitutes a
"legitimate claim" will be defined by reference to the affirmative
defenses that equity typically permitted an innocent transferee to
assert. *See* RESTATEMENT OF RESTITUTION § 41 cmt. e (listing three such
defenses). Whether a violator's gift of fraud proceeds to a charitable
organization would entitle that charity to assert such a defense (RD
Br.43) is obviously beyond the facts presented here, but permitting the
charity to keep the gift may well lie within the permissible range of a

82

court's discretion. *See Am. Cancer Soc'y v. Cook*, 675 F3d 524, 529-30 (5th Cir. 2012).

Nor, contrary to the relief defendants (RD Br.42-43), does relief-defendant liability under *Cavanagh I* threaten to "wipe out" other traditional equitable doctrines like fraudulent conveyance (which normally requires intent to defraud) and constructive trust (which normally requires tracing). Fraudulent conveyance retains independent application regardless of whether the diverted assets are fraud proceeds; and equity already presumes an intent to defraud existing creditors simply from the fact of a gratuitous transfer without consideration, *see* 2 POMEROY § 972, p.2108. Constructive trust, moreover, is distinct from the equitable remedy of an "accounting" or an "accounting for profits," and it is the latter remedy that the *Liu* Court described as "closely resembling disgorgement," 140 S. Ct. at 1940 n.1.

Unlike constructive trust, which required tracing as a means of returning specific property (or its substitute) to the rightful owner, an accounting did not involve a *res* or tracing of the victim's property[21] and

---

[21]    Indeed, the accounting remedy was used in equity courts for early cases of securities fraud: "[i]t is settled … that a person who has been induced by the misrepresentations of [prospectus] documents to

instead resulted in a money judgment to be satisfied from the defendant's general assets.  *See* 1 DOBBS § 4.3(1), p.588; 4 POMEROY § 1316, p. 3161 & n.7; RESTATEMENT OF RESTITUTION § 51 cmt. b, § 58 cmt. c.  It is therefore unsurprising that this Court recently reaffirmed that "*Liu* did not disturb this Court's longstanding principle that specific tracing is unnecessary in ordering disgorgement for securities fraud." *de Maison*, 2021 WL 5936385, at *2 (cleaned up).

Moreover, Congress's recent enactment of the NDAA has implicitly endorsed the concept of relief-defendant liability by authorizing the Commission to recover disgorgement not simply from "the person who committed [a] violation" of the federal securities laws (who may be ordered to pay a civil penalty), but more broadly from "the person who received such unjust enrichment as a result of such violation."  Exchange Act Section 21(d)(3)(A)(i) & (ii), 15 U.S.C. § 78u(d)(3)(A)(i) & (ii).  *See Wisconsin Cent. Ltd. v. United States*, 138 S.

---

purchase shares of stock" may "obtain relief against the fraudulent directors personally by means of an equitable suit for an accounting."  2 POMEROY § 881, pp.1825-26.

Ct. 2067, 2071 (2018) ("We usually presume differences in language like this convey differences in meaning." (quotation marks omitted)).

Accordingly, if the district court's remedies ruling cannot stand, then the Commission should be permitted on remand to pursue relief-defendant liability under *Cavanagh I*. The Commission has already traced more than $30 million of frozen family assets to Mr. Ahmed's fraud proceeds. *See I-Cubed Domains*, 664 F. App'x at 55-56. Remand would enable the Commission to perform a more comprehensive tracing analysis based on the voluminous record of this case and also would permit the district court to make appropriate findings as to relief-defendant liability.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

DAN M. BERKOVITZ
General Counsel

JOHN W. AVERY
Deputy Solicitor

/s/ Stephen G. Yoder
STEPHEN G. YODER
Senior Litigation Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-4532 (Yoder)

February 2022

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of this Court's Order dated February 9, 2021 (granting permission to file an oversized, consolidated response brief of no more than 18,000 words), because it contains 17,097 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-Point Century Schoolbook.

/s/ Stephen G. Yoder
STEPHEN G. YODER
Senior Litigation Counsel

Dated: February 14, 2022

# CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2022, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stephen G. Yoder
STEPHEN G. YODER
Senior Litigation Counsel

Dated: February 14, 2022