# 21-1686(L)

## 21-1712 (CON)

### United States Court of Appeals
### for the Second Circuit

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

NMR E-TAILING, LLC,

*Plaintiff*,

– v. –

IFTIKAR AHMED, I-CUBED DOMAINS, LLC, SHALINI AHMED, SHALINI AHMED 2014 GRANTOR RETAINED ANNUITY TRUST, DIYA HOLDINGS, LLC, DIYA REAL HOLDINGS, LLC, I.I. 1, A MINOR CHILD, BY AND THROUGH HIS NEXT FRIENDS IFTIKAR AND SHALINI AHMED, HIS PARENTS, I.I. 2, A MINOR CHILD, BY AND THROUGH HIS NEXT FRIENDS IFTIKAR AND SHALINI AHMED, HIS PARENTS, I.I. 3, A MINOR CHILD, BY AND THROUGH HIS NEXT FRIENDS IFTIKAR AND SHALINI AHMED, HIS PARENTS,

*Defendants-Appellants*,

IFTIKAR ALI AHMED SOLE PROP,

*Defendant*,

– v. –

JED HORWITT,

*Receiver-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## REPLY BRIEF OF RELIEF DEFENDANTS

Adam G. Unikowsky
Zachary C. Schauf
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000

*Attorneys for Defendants-Appellants Shalini Ahmed; I-Cubed Domains, LLC; Shalini Ahmed 2014 Grantor Retained Annuity Trust; DIYA Holdings, LLC; DIYA Real Holdings, LLC; I.I. 1, A minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents; I.I. 2, A minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents; I.I. 3, A minor child, by and through his next friends Iftikar and Shalini Ahmed, his parents*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .................................................................................1

ARGUMENT ........................................................................................2

I.    The District Court Erred In Holding That Relief Defendants Are Nominees. ...........................................................................................2

    A.    The "Nominee" Doctrine Turns on Control and Benefit. .....................2

    B.    The District Court's "Nominee" Analysis Contains Procedural and Substantive Errors. ...................................................................3

        1.    The District Court Improperly Flipped the Burden of Proof. .................................................................................4

        2.    The District Court Applied The Wrong Substantive Standard. ...........................................................................6

    C.    This Court Should Remand With Respect to Jointly Owned Assets ...................................................................................15

    D.    *Cavanagh* Does Not Permit Relief Defendant Liability. ....................15

II.    The District Court Erred In Its Interest Award ...........................................20

    A.    For the Pre-Freeze Period, the SEC Applied the Wrong Standard For Selecting an Interest Rate. ............................................21

    B.    The District Court Erred in Switching Methodologies Post-Freeze. ....................................................................................23

        1.    The Prejudgment Interest Order Conflicts with Traditional Equitable Principles. ...............................................23

        2.    The Prejudgment Interest Order Conflicts with This Court's Case Law ...................................................................28

    C.    Post-Judgment Interest Should Start on December 14, 2018. ............30

CONCLUSION .....................................................................................31

i

# TABLE OF AUTHORITIES

CASES

*Crescent City National Bank v. Case*, 99 U.S. 628 (1879)........................................2

*Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)................................17

*Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002)...............................................................................................................17

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).................................................................................................17

*Higgins v. Smith*, 308 U.S. 473 (1940) ......................................................................3

*Liu v. SEC*, 140 S. Ct. 1936 (2020)............................................ 1-2, 3, 16, 19, 22, 24

*New York Marine & General Insurance Co. v. Tradeline (L.L.C.)*, 266 F.3d 112 (2d Cir. 2001) ...................................................................................22

*SEC v. Camarco*, No. 19-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021) ......................................................................................................16, 20

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) .......................................................15

*SEC v. Haligiannis*, 608 F. Supp. 2d 444 (S.D.N.Y. 2009).......................................3

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) .....................28

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013)........................................................29

*In re Vebeliunas*, 332 F.3d 85 (2d Cir. 2003).......................................................9, 10

STATUTES

28 U.S.C. § 1961 ........................................................................................................21

OTHER AUTHORITIES

1 Dan B. Dobbs, *Law of Remedies* (2d ed. 1993)....................................................18

*Restatement (Third) of Restitution* § 51 (2011) ................................................24, 25

ii

## INTRODUCTION

The SEC obtained a judgment against Iftikar Ahmed ("Iftikar").  It now seeks to collect that judgment from Relief Defendants.  Relief Defendants did nothing wrong.  Yet the SEC insists that because Relief Defendants previously received certain misappropriated assets from Iftikar, the SEC may collect a money judgment from Relief Defendants' assets—even assets untraceable to the fraud.  Bedrock equitable principles establish that the SEC's claim fails.

The SEC offers two theories to defend the judgment, but neither works.  The first—on which the district court relied—is the "nominee" doctrine.  But under that doctrine, a creditor must show that the wrongdoer *continues to control* the assets after transfer and *benefits* from them.  Here, the record simply showed that Iftikar transferred assets—not that he continued to control or benefit from them post-transfer.  Indeed, the district court declared Relief Defendants "nominees" of assets Iftikar plainly did *not* control or benefit from, such as Shalini Ahmed ("Shalini")'s jewelry, assets in a spendthrift irrevocable trust with an independent trustee (the "Family Trust"), and Uniform Transfer to Minors Accounts ("UTMAs") established under state law for the sole benefit and ownership of Iftikar's children.

Second, if the Court rejects nominee liability, the SEC asks the Court to remand for a determination of possible liability under the so-called *Cavanagh* doctrine.  But the SEC's theory has no historical underpinning. *Liu v. SEC*, 140 S.

1

Ct. 1936, 1946 (2020) compels the Court to reject the SEC's invitation to depart from traditional equitable principles.

The SEC's unprecedented methodology for computing interest similarly violates *Liu*. The Court should remand for the district court to compute interest according to traditional equitable principles.

## ARGUMENT

## I. The District Court Erred In Holding That Relief Defendants Are Nominees.

The district court held that Relief Defendants are "nominees," such that a judgment against Iftikar could be executed against Relief Defendants' assets. In reaching that conclusion, the district court improperly flipped the burden of proof and applied the wrong substantive standard.

### A. The "Nominee" Doctrine Turns on Control and Benefit.

The "nominee" doctrine applies when a third party holds title to an asset in name only, and the wrongdoer controls that asset for his benefit. The nominee doctrine is akin to veil-piercing: Even though one person is the legal owner of property, another person functions as the *real* owner, exercising control over the asset and enjoying its benefits. *See* Opening Br. 20-21.

The SEC cites two Supreme Court cases recognizing the nominee doctrine. SEC Br. 58. Both cases are consistent with Relief Defendants' characterization of the doctrine. *See Crescent City Nat'l Bank v. Case*, 99 U.S. 628, 632 (1879) ("[I]f,

2

in fact, the transferee is a mere tool or nominee of the transferrer, so that, as between themselves, there has been no real transfer."); *Higgins v. Smith*, 308 U.S. 473, 475 (1940) (a sale is nominal if it was a "transfer by Mr. Smith's left hand … into his right hand" such that "in truth and fact there was no transfer at all.").

The SEC suggests that federal law rather than state law applies, but argues this makes no "practical difference."  SEC Br. 59.  To the extent federal and state law are coextensive, Relief Defendants agree.  But if they conflict, state law controls.  State law governs ownership, and the Court cannot abrogate ownership interests where state law would not permit in the name of "equity."  *SEC v. Haligiannis*, 608 F. Supp. 2d 444, 449 (S.D.N.Y. 2009) ("The Court's equitable authority, however, does not extend to abrogating property rights created by state law and protected by due process; equity follows the law.").

### B. The District Court's "Nominee" Analysis Contains Procedural and Substantive Errors.

The SEC claims the "nominee doctrine provided the best equitable approach to achieve a fair and efficient resolution of this case."  SEC Br. 56.  But the district court did not have the freewheeling discretion to choose the "approach" it deemed "fair and efficient."  It could only apply "longstanding equitable principles."  *Liu*, 140 S. Ct. at 1946.

The district court departed sharply from those principles.  Procedurally, the court erroneously shifted the burden of proof to Relief Defendants.  Substantively,

3

it erroneously believed that Relief Defendants were nominees merely because they *received* assets from Iftikar.

### 1. The District Court Improperly Flipped the Burden of Proof.

The proper allocation of the burden of proof is straightforward. Relief Defendants hold legal title to the disputed assets.[1] The SEC seeks to seize those assets under the "nominee" doctrine to satisfy the judgment against Iftikar. The SEC bears the burden of proof. Hence, if the SEC wishes to seize a particular asset under the "nominee" doctrine, it must prove that the alleged nominee is the nominal owner of that asset. Opening Br. 22-23.

The district court did not follow this methodology. Instead, it placed on Relief Defendants the burden of "demonstrating the SEC's nominee allegations are inaccurate," requiring Relief Defendants to "put forth … convincing evidence rebutting the [SEC's] contention that the assets belong to [Iftikar]." SPA-96, SPA-111. Having incorrectly placed the burden on Relief Defendants, the court then incorrectly conducted an analysis in gross, finding that Relief Defendants were

---

[1] For certain assets, Iftikar and Shalini hold joint title. *See* Section I.C.

In addition, the Family Trust was not named in the complaint as a Relief Defendant (only its beneficiaries, the children, were named), yet the district court nonetheless improperly held that the SEC could seize its assets. Relief Defendants' arguments herein apply equally to the Family Trust.

4

nominees as to almost *every* disputed asset without conducting an asset-by-asset analysis. Opening Br. 25.

The SEC makes several arguments to rehabilitate the district court's faulty methodology. None is satisfactory.

***First***, the SEC quotes the district court's statement that the SEC "put forth evidence that the seized assets belong to Mr. Ahmed." SEC Br. 54 (quoting SPA112). But that statement came immediately after the district court explicitly stated that Relief Defendants bore the burden of proof. SPA112. Moreover, the "evidence" that the SEC "put forth," SPA112, and that the district court relied on, at most showed that Iftikar originally funded the assets, not that he controlled and benefited from them. *See infra* at 10-11.

***Second***, the SEC argues that it "made eminent sense for the district court" to assign Relief Defendants the burden of proof because "it would have been nearly impossible for the Commission to prove the negative assertion that they had *no possible* legitimate claim to any of the frozen assets." SEC Br. 62-63. But Relief Defendants were not asking the SEC to prove any negative assertions. Rather, because Iftikar did not hold legal title to those assets, the SEC was required to prove the *positive* assertion that Iftikar controlled and benefited from the assets. The SEC did not prove this for *any* asset (much less *all*).

5

**Third**, the SEC points to the district court's rejection of Relief Defendants' claims to "legitimate ownership" of the property. SEC Br. 63. In this discussion, however, the court concluded that the assets were funded by Iftikar, not that he controlled them. SPA114-17.

**Fourth**, the SEC quibbles with Relief Defendants' case law showing that asset-by-asset findings are necessary to establish nominee status. SEC Br. 64-65. But the SEC ignores the fundamental point. The "nominee" doctrine is *inherently* asset-specific. A person is a nominee *of an asset* if the wrongdoer controls *that specific asset*. It is impossible for the SEC to show that Relief Defendants are nominees of a particular asset without specific proof that Iftikar controls that asset.

## 2. The District Court Applied The Wrong Substantive Standard.

In addition to flipping the burden of proof, the district court got the substantive standard for "nominee" liability wrong. Repeatedly, the district court concluded that Iftikar was the original source of funds and inferred, without more, that Relief Defendants were nominees. That was wrong. The court was required to find that Iftikar *controlled* and *benefited* from the assets, not merely that he gifted assets to Relief Defendants. Opening Br. 28-32.

The district court's erroneous legal standard yielded the absurd conclusion that Shalini was the nominal owner of her own jewelry and handbags. Opening Br. 21. Revealingly, the SEC does not defend these conclusions. Regarding the jewelry,

6

the SEC attests that Shalini used "funds from an account where fraud proceeds had been commingled," citing its own brief below.  SEC Br. 70.  This assertion (which is disputed and on which the district court made no findings) refers to a different theory that the jewelry was purchased by assets *traceable to the fraud*—an argument that the SEC did not make and that the district court declined to address, SPA-115.  Regarding the handbags, the SEC says the issue is moot because the Receiver recently released them, finding them insufficiently valuable.  SEC Br. 71; Dkt. #2022 at 6.  The issue is not moot as to one handbag,[2] and in any event, the SEC's argument misses the point.  The court's treatment of the handbags illustrates that it applied the wrong standard for *all* the assets.

Likewise, the district court concluded that the Family Trust, which was established for the sole benefit of the minor children and has an independent third-party trustee, could be pierced.  Opening Br. 8.  And it reached the same conclusion with respect to the UTMAs, established under state law for the children's benefit.  *Id.  Zero* evidence establishes that Iftikar controlled and benefited from these assets.

The SEC falls short with its scattershot of arguments trying to defend the district court.

---

[2] *Compare* Dkt. #919-1, item #45 (13 handbags frozen) *with* Dkt. #2022-2 (12 handbags unfrozen).

7

*First*, the SEC contends that Relief Defendants waived the argument that Iftikar gifted the assets.  SEC Br. 55.  The SEC is wrong.

Below, Relief Defendants argued that "to prove nominee status, the SEC must prove that an asset is dominated and controlled by the primary defendant."  Dkt. #905 at 16 (cleaned up).  "It is simply not enough for the SEC to say that, in any given case, a defendant transferred an asset to a relief defendant."  *Id.*  "The SEC has failed to introduce evidence that Mr. Ahmed 'dominated and controlled' any specific asset … that a Relief Defendant is holding as his nominee."  *Id.*  "Nor has it shown that Mr. Ahmed enjoyed any monetary benefit from assets that were titled to the Relief Defendants, such as the UTMA trusts created for the sole benefit of their children."  *Id.*  That is exactly what Relief Defendants argue on appeal.

The SEC complains that Relief Defendants' district court brief did not use the word "gift."  SEC Br. 55.  But Relief Defendants argued that Iftikar transferred assets to his children and other Relief Defendants, and no longer controlled those assets.  This means the exact same thing as saying he gifted the assets to his children and other Relief Defendants.  "Gift" is just a shorthand for "transfer of assets in which the giver relinquished control."  Relief Defendants waived nothing.[3]

---

[3] Shalini's deposition testimony about *why* she was given some jewelry (in which she largely asserted privilege or lack of memory), SEC Br. 70 n.19, did not waive Relief Defendants' overarching argument that Iftikar no longer controlled Relief Defendants' assets.

8

**Second**, the SEC declares that "the nominee doctrine does not draw a strict dichotomy between Mr. Ahmed's contributions to the frozen family assets and his control of those assets." SEC Br. 67. The SEC cites one case in support of that proposition: *In re Vebeliunas*, 332 F.3d 85 (2d Cir. 2003). But *Vebeliunas* supports Relief Defendants.

In *Vebeliunas*, a creditor argued that a debtor was the equitable owner of property, such that a trust holding that property should be pierced. This Court disagreed. The Court explained that to veil-pierce, the plaintiff must prove that "the owner exercised such control that the corporation has become a mere instrumentality of the owner." *Id.* at 91. "[T]he element of control may be predicated upon the concept of equitable ownership." *Id.* at 92. "Pursuant to this approach, an individual who exercises considerable authority over the corporation to the point of completely disregarding the corporate form and acting as though its assets are his alone to manage and distribute may be deemed the equitable owner of the corporation and its assets." *Id.* (cleaned up). The Court explained that although the debtor *benefited* from the property, the veil could not be pierced because he did not *control* it. *Id.* at 92-93.

Here, the case for finding Iftikar the "equitable owner" of Relief Defendants' assets is far weaker than in *Vebeliunas*. There is no evidence that Iftikar "act[ed] as

though the assets are his alone to manage and distribute." *Id.* at 92 (cleaned up). Hence, under *Vebeliunas*, the Court may not disregard Relief Defendants' legal title.

The SEC points to language in *Vebeliunas* stating that the debtor's wife was the equitable owner of the trust. SEC Br. 60. In context, however, the Court was saying that, in view of the wife's role, the trust could *not* be pierced, so that the wife *and* the trust could "assert[] claims of ownership." 332 F.3d at 93. *Vebeliunas* did not hold that legal title to an asset could be ignored, and a veil could be pierced, merely because the asset originated from a donor.

Nor does any other case. Thousands of cases recite and apply the standard for veil piercing and "nominee" status—which both turn on *controlling* and *benefitting from* assets. Yet the SEC cites *no case ever* finding that a veil can be pierced, or that someone is a "nominee," merely because assets originated elsewhere.

**Third**, the SEC offers five bullet-pointed facts cited by the district court intended to show that Relief Defendants are nominees. SEC Br. 69; *see* SPA112-14. These facts do not support the SEC's "nominee" argument.

- The first and second facts—that Iftikar earned almost all of the family's income—establish that assets originated with Iftikar, not that he controlled them.

- The third and fifth facts establish Shalini's lack of memory of certain transfers, Iftikar's assertion of Fifth Amendment privilege in response

10

to broad areas of questioning, and Shalini's assertion of marital privilege regarding private conversations with her husband. This evidence—really an absence of evidence—sheds no light on Iftikar's post-transfer control of the assets.

- The fourth fact states that "Mr. Ahmed placed assets into [Shalini's] name as a contingency plan should anything happen to him." SEC Br. 69. This only supports Relief Defendants' position that the assets genuinely belonged to Shalini.

These facts do not establish a "sham transfer." SEC Br. 70. Indeed, the transfers are not suspicious in the slightest. Iftikar gave assets to his wife. He put assets into trusts and UTMAs for the benefit of his children. People regularly do those things. This does not show that Relief Defendants are nominees.

**Fourth,** the SEC lists several facts that it raised in its brief below purporting to show that Iftikar controlled Relief Defendants' assets. SEC Br. 72-73. But Relief Defendants disputed these facts, and the district court did not resolve the parties' disputes or rely on these facts. Instead, the court focused exclusively on the fact that Iftikar originally funded the assets (again, applying the wrong standard).

Even taken on its own terms, the SEC's evidence falls far short of what would be needed to prove nominee status.

11

- On the **apartments**, the SEC alleges that Iftikar wrote information on purchase documents and participated in the rental of one of the apartments. SEC Br. 72. But Shalini conducted walkthroughs of the properties, interfaced with the real estate brokers, and evaluated their investment potential. Dkt. #906-2 at 2-3. Moreover, the rental proceeds were deposited by Shalini into her accounts, and Iftikar never touched this money. Dkt. #905 at 12. The mere fact that a husband helps his wife at a closing of property she purchases does not transform him into the real owner.

- On the **trusts**, it is undisputed that state law prohibited Iftikar from ever accessing or benefiting from the money in the trusts. Opening Br. 8, 29, 36. The SEC refers to an email in which Iftikar sent a termination notice to an investment manager for *all* of the manager's services (including services associated with the trusts as well as other services), copying Shalini and the trustee. SEC Br. 72. This single email, the circumstances of which are not in the record, does not show that Iftikar controlled or benefited from these assets.

- On the **children's assets**, the SEC refers to a document in which Iftikar requested that money be transferred from one bank to a different bank. SEC Br. 72. This document does not undermine Relief Defendants'

12

position.  In Connecticut, funds in an UTMA belong to the children, with custodians safeguarding the funds.  Opening Br. 37-38.  Iftikar's request for transfer of funds, with Shalini and trustee copied on the email, was consistent with their role as custodians.  Iftikar never benefited from those funds.

- The SEC cites evidence that Iftikar transferred holdings in **DIYA Holdings, LLC and DIYA Real Holdings, LLC** following his arrest in an unrelated matter.  SEC Br. 72; *see* Dkt. #888 at 37.  To be clear, Iftikar previously had a mere 1% ownership interest, which is now 0%.  Dkt. #888 at 37.  This does not show that Iftikar is the de facto owner of 100% of these entities.

- Finally, the SEC points to Iftikar's signing of an SEC stipulation that assets would be frozen.  SEC Br. 72-73.  This argument is unfair.  In 2015, the SEC demanded an immediate asset freeze unless Iftikar stipulated to a temporary freeze.  So Iftikar signed on behalf of himself and one of the eight Relief Defendant-Appellants.  Dkt. #22 at 5.  The other seven Relief Defendant-Appellants, including Shalini, had not even been served with the complaint at that point and were not parties to the stipulation.  These events cannot be reasonably interpreted as a

13

concession, seven years later, that all eight Relief Defendants are nominees.

Taking a step back, the SEC's discussion also highlights the need for an asset-by-asset analysis. For instance, the SEC argues that Shalini was a nominee of the apartments because Iftikar allegedly was "intimately involved" with their purchase. SEC Br. 72. To the extent this evidence even had relevance, it was to whether Shalini was a nominee *of the apartments*. It sheds no light on whether (say) the veil of the *Family Trust* could be pierced. The district court had no basis for finding that Iftikar controlled *all* of the disputed assets while citing *no* asset-specific evidence.

\*     \*     \*

The SEC's case rests on the intuition that a wrongdoer should not be able to escape liability by giving assets to his wife and children. The intuition is sound—and the law has therefore recognized powerful tools to permit recovery of assets in this situation, such as the doctrines of fraudulent conveyance and constructive trust. Opening Br. 32-34. But the SEC declined to rely on these doctrines and instead elected to use this case as a vehicle to expand the "nominee" doctrine beyond what equity has ever permitted. *Id.* That legal theory does not work. The SEC did not prove that Relief Defendants were nominal owners of any assets, so the judgment should be reversed. Opening Br. 35-39.

14

**C. This Court Should Remand With Respect to Jointly Owned Assets.**

Most of the disputed assets were owned solely by Relief Defendants, but a small number were jointly owned by Shalini and Iftikar.

The SEC asks the Court to affirm with respect to those assets, pointing to language in the district court's order indicating that jointly *controlled* assets could satisfy the judgment. SEC Br. 73-75.[4] The Court should instead vacate with respect to those assets. The district court's discussion addresses the legal significance of Shalini's management of these assets—not the legal significance of joint title. Opening Br. 44.[5] On remand, the district court may consider the effect of Shalini's recent decision to file for divorce.

**D. *Cavanagh* does not permit Relief Defendant liability.**

The SEC contends that *SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) provides a possible alternative basis for the district court to find Relief Defendants liable. The SEC interprets *Cavanagh* to hold that the SEC may seize Relief Defendants' assets if it proves that Relief Defendants "received ill-gotten funds" and do not "have a legitimate claim to those funds." *Id.* at 136. In the SEC's view, the

---

[4] To the extent the SEC suggests that joint ownership is a sufficient basis to affirm the *entire* judgment, the SEC is clearly wrong. At most, joint ownership might be a basis to affirm *with respect to the jointly owned assets*—not the assets solely owned by Relief Defendants.

[5] Relief Defendants raised their joint-ownership argument below. Dkt. #905 at 16-17 & nn.19-20.

SEC need not prove that Relief Defendants committed *any* wrongdoing or that the assets the SEC seeks to collect are traceable to the fraud. According to the SEC, if Relief Defendants previously received ill-gotten funds, the SEC may seize Relief Defendants' *untainted* assets to satisfy the judgment against Iftikar. SEC Br. 75-85. This includes, for instance, millions in the Family Trust that Iftikar earned legitimately. Dkt. #930-1 at 2.

The Court should reject this argument because it conflicts with traditional equitable principles. *Liu* held that disgorgement is subject to "limitations … that equity typically imposes." 140 S. Ct. at 1947 (quotation marks omitted). Courts of equity permitted recovery of an innocent transferee's assets if the assets were traceable to the fraud. But they did not permit recovery of an innocent transferee's assets based on the *Cavanagh* test. Opening Br. 32-34.

The SEC characterizes its position as "traditional," SEC Br. 76, but no Supreme Court or precedential Second Circuit decision has ever endorsed the SEC's approach.[6] *Cavanagh* was a case about asset freezes that said nothing about *either* traditional equitable principles *or* collecting judgments from third parties. Opening

---

[6] The SEC's unpublished out-of-circuit caselaw (SEC Br. 76) is of little persuasive value, especially given that the unpublished Tenth Circuit decision is accompanied by a dissent persuasively advocating for Relief Defendants' position here. *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, *21-28 (10th Cir. Dec. 16, 2021) (Bacharach, J., dissenting).

Br. 39-41. Nor does *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) assist the SEC. *Deckert* authorized a suit against a "third party" that had "assets in its possession belonging to" a vendor that the vendor sought to reclaim, such as a "trust of common stocks." *Id.* at 284-85. That is a typical suit for equitable relief to turn over specific traceable assets in a third party's possession. It does not endorse the SEC's novel view that the innocent recipient of misappropriated assets can be liable for a judgment from her general assets. The Supreme Court has subsequently made clear that *Deckert* does not authorize relief unavailable in traditional courts of equity. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 323 (1999).

The SEC combs through traditional equitable sources attempting to glean some justification for its approach, but comes up empty. The SEC cites Pomeroy and other treatises for the proposition that a court of equity will "wrest property fraudulently acquired" from a wrongdoer. SEC Br. 81-82 (quoting 2 *Pomeroy* § 918, p. 1918). That simply restates the familiar proposition that a court of equity could require a third party to turn over the *misappropriated assets themselves*, not a money judgment. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002) ("[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.").

17

The SEC then points to the "accounting" remedy. SEC Br. 83-84. But that remedy "reaches monies owed by a fiduciary or other wrongdoer." *See* 1 Dan B. Dobbs, *Law of Remedies* § 4.3(5), p. 608 (2d ed. 1993). It has nothing to do with whether the SEC may undo a transfer to an innocent third party.

The constructive trust remedy, not the accounting remedy, is designed for that purpose. "[T]he constructive trust is not limited to cases in which the defendant is a wrongdoer," so "it may be applied to require restitution from transferees who are not bona fide purchasers of the assets." *Id.* at 599. Dobbs gives the example of the defendant who fraudulently obtains property and gives it to his uncle—a close match to the facts of this case. *Id.*

But the constructive trust remedy differs from the accounting remedy in a crucial respect: a court may only order a defendant to turn over the misappropriated asset *itself*, as well as certain gains *traceable* to that asset. Unlike an accounting, a constructive trust cannot yield a money judgment that can be collected from any of the defendant's assets. *See id.* § 4.3(2), p. 592-93.

This rule make sense. For *wrongdoers* who misappropriated assets, equity courts permitted judgments to be collected from any of the wrongdoers' assets via an accounting, even if the wrongdoers had dissipated the actual misappropriated assets. For *innocent third parties*, equity courts sometimes would require turnover of tainted property that had been transferred to the third parties. But for equity

courts, forcing innocent third parties to turn over *untainted* assets—merely because the third parties had, at some previous point, received tainted assets—was a bridge too far.

The SEC's position would effectively eliminate the constructive trust remedy. The *Cavanagh* doctrine is, in effect, constructive trust without the traceability requirement. Opening Br. 42-43. The SEC's position would also effectively eliminate the fraudulent conveyance doctrine. The *Cavanagh* doctrine is, in effect, fraudulent conveyance without the fraud requirement. *Id.* The Court should not depart so dramatically from traditional practice.

The SEC seeks to rescue its position by relying on the recently-enacted NDAA. SEC Br. 84-85. The SEC does not contend that the NDAA changed prior law but that it "implicitly endorsed the concept of relief-defendant liability" by authorizing the Commission to recover "unjust enrichment" from a third party. *Id.* That argument fails because "unjust enrichment" is a traditional term used by courts of equity. Indeed, in *Liu*, the Court referred to "unjust enrichment" and "disgorgement" interchangeably. 140 S. Ct. at 1941, 1943. Congress's use of "unjust enrichment" shows its intent to *ratify* traditional equitable doctrines, not to rewrite them.

If, post-*Liu*, *Cavanagh* is available to obtain money judgments, a remand would be necessary for further district court findings—as the SEC concedes. SEC

19

Br. 85.  In particular, even under *Cavanagh*, any particular Relief Defendant could only disgorge assets up to the amount of misappropriated assets it previously received—an issue on which there are no findings.  *See Camarco*, 2021 WL 5985058, at *18-20 (reversing disgorgement award against relief defendant that exceeded amount of ill-gotten gains relief defendant received).  Those findings would have to be made under the legal standard applicable to final judgments, which is more rigorous than the standard for asset freezes.  Opening Br. 40; Dkt. #905 at 13-14.

Finally, to the extent the SEC now requests the opportunity to trace Relief Defendants' assets to the fraud (SEC Br. 85)—a non-*Cavanagh* theory of liability— the Court should deny that request.  Below, the SEC represented, and the district court acknowledged, that the SEC's sole alternative theory of liability was *Cavanagh*.  SPA-162.  The SEC should not be permitted to inject new theories seven years into this litigation.  It has had abundant opportunity to take discovery and develop its arguments.  It failed to even *attempt* to prove traceability below and should be bound by its arguments in the district court.

## II.    The District Court Erred In Its Interest Award.

The district court's computation of interest was both convoluted and unprecedented.  For the prejudgment period, it applied two different methodologies. For the period before the court's asset freeze, the court awarded prejudgment interest

20

at a fixed rate, while for the post-freeze period, it awarded a subset of actual interest and gains on the frozen assets, calculated according to a complex methodology that has never been used in any previous case. The judgment is ambiguous on the award of post-judgment interest, but the SEC advocates an equally unprecedented approach of dividing the post-judgment period into two periods with separate methodologies for both periods.

The Court should vacate the judgment and direct the district court to apply the standard method of computing interest. For the period before the December 14, 2018 judgment date, prejudgment interest, if any, should be computed at a fixed compensatory interest rate. After that judgment date, the court should award postjudgment interest at the statutory rate in 28 U.S.C. § 1961.

### A. For the pre-freeze period, the SEC applied the wrong standard for selecting an interest rate.

The district court should not have awarded any prejudgment interest because Relief Defendants were innocent third parties. Opening Br. 46. Contrary to the SEC's argument, Relief Defendants' position does not negate Iftikar's fraud (SEC Br. 45). Instead, it merely recognizes that the equities change when the SEC sues a third party who did nothing wrong.

If any prejudgment interest was warranted, the district court erred in applying the IRS underpayment rate during the pre-freeze period. The district court reasoned that this rate was appropriate because it "reflects what it would have cost to borrow

21

the money from the government and therefore approximates one of the benefits the defendant derived from the fraud." SPA-247 (quotation marks omitted). But *Liu* repudiates that reasoning. Under *Liu*, disgorgement is not intended to "depriv[e] wrongdoers of profits" by "deny[ing] them the fruits of their ill-gotten gains." 140 S. Ct. at 1948. Instead, the wrongdoer should pay no more than "a fair compensation to the person wronged"— the wronged *investor*, not the government. *Id.* at 1943, 1948 (quotation marks omitted); *see* Opening Br. 47.

Hence, because "[i]nterest is intended to make the injured person whole," it "generally should be measured by interest on short-term, risk-free obligations," such as "United States Treasury Bills." *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F. 3d 112, 131 (2d Cir. 2001) (internal quotation marks omitted).

The SEC does not dispute that the district court's legal standard conflicts with *Liu*. Instead, the SEC asserts that there is insufficient evidence in the record concerning Oak's investment returns during the relevant period. SEC Br. 44. This does not justify affirmance. Relief Defendants preserved their argument that interest should be calculated based on the standard in *New York Marine*, rather than the IRS rate. Dkt. #1938 at 8. Because the district court applied the wrong standard, the judgment should be vacated for the district court to apply the right standard. On remand, Relief Defendants will submit evidence that Oak's combined rate of return on its investments was nominal.

The SEC also states that Relief Defendants' argument is "premature, since the precise returns to Mr. Ahmed's victims will not be known until the district court adopts a plan for distributing the Commission's monetary recovery." SEC Br. 45. This argument is meritless. The district court has reached a final decision on the fixed prejudgment interest rate for the pre-freeze period. Relief Defendants' appeal of that decision is ripe.

### B. The district court erred in switching methodologies post-freeze.

For the post-freeze period, the district court switched methodologies. Instead of using a fixed rate, it pegged prejudgment interest to the "actual … gains" during the freeze on "assets used to satisfy th[e] disgorgement amount." SPA-151. That methodology was wrong. The court should have used a fixed rate for the full prejudgment period and not awarded actual gains.

#### 1. *The Prejudgment Interest Order Conflicts with Traditional Equitable Principles.*

The asset freeze consisted of an undifferentiated mass of assets significantly exceeding the disgorgement judgment. Some was traceable to misappropriated funds. Some was earned legitimately by Iftikar, a successful venture-capital investor. Some was earned by Shalini. Some was earned outside the statute of limitations. Yet the district court ruled that Relief Defendants must disgorge the actual interest and gains on the portion of those frozen assets used to satisfy the disgorgement judgment. Because Relief Defendants' pre-freeze investments grew

23

significantly during the freeze, the result was an order requiring Relief Defendants to turn over millions of dollars more than if the court had chosen a fixed rate.

The district court's methodology violated bedrock equitable principles. Equity courts awarded actual gains only if those gains were *attributable to the actual misappropriated assets*. Equity courts did not permit freezing an undifferentiated mass of assets, some of which was earned legitimately, and awarding the actual gains on those assets. Opening Br. 49-50. Such an order not only is without basis in traditional equitable principles, but violates *Liu*'s command that a wrongdoer "should not be punished by pay[ing] more than a fair compensation to the person wronged." 140 S. Ct. at 1943, 1947 (internal quotation marks omitted).

The SEC's efforts to ground the district court's order in traditional equitable principles (SEC Br. 46-48) are not successful. The SEC begins by citing *Restatement (Third) of Restitution* § 53, cmt. b & illus. 2 (2011). Comment b recites the familiar principle that a recipient is liable for gains "in respect of assets for which the recipient is liable to the claimant in restitution." Illustration 2 states that if a wrongdoer fraudulently acquires title to land and rents out that land, the wrongdoer may be liable for the actual rents earned on that land. This is the paradigmatic example of requiring disgorgement of gains *attributable to the misappropriated assets*.

24

The SEC then cites comment d of Section 53. That comment states that a wrongdoer may be required to disgorge consequential gains that "result from a profitable investment, use, or other disposition of the claimant's property." *Id.* § 53, cmt. d. This comment applies only to conscious wrongdoers, not innocent recipients like Relief Defendants. *Id.* § 50(5). Moreover, it refers to restitution only of gains that result from "use … *of the claimant's property*," not of gains on undifferentiated assets that were frozen mid-litigation. *Id.* § 53, cmt. d.

The SEC also relies on Section 51(5), which describes the remedy of an "accounting," which is a "form of restitution via money judgment." SEC Br. 46; *see Restatement (Third) of Restitution* § 51 & cmt. e. But as described above, an "accounting" cannot be used to extract assets from innocent third parties. *Supra*, at 18.

Even if an "accounting" could be used for this purpose, the district court's remedy was not an "accounting." Section 51 explains that a court conducting an "accounting" may award a money judgment for certain gains attributable to the misappropriated assets. The judgment may be *collected* from any of the defendant's assets, but it is *calculated* by determining the gains attributable to the misappropriated assets. *See Restatement (Third) of Restitution* § 51, illus. 1. A court may not freeze the defendant's assets (both tainted and untainted) midway through

25

the litigation and collect whatever gains those frozen assets accrued during the freeze, which is what happened here.

The district court's approach creates a practical problem. The size of the judgment will turn on which assets are used to satisfy the disgorgement portion of the judgment. The court could inflate the judgment by cherry-picking the assets that had grown the most and allocating them to the disgorgement judgment, while allocating less successful investments to the civil penalty (for which the district court awarded no prejudgment interest). Opening Br. 50-51.

Relief Defendants' brief predicted that the district court might "avoid[] this cherry-picking problem by applying some kind of averaging-out approach." Opening Br. 50. That outcome materialized. In a recent post-judgment order, the district court "invent[ed] an accounting methodology out of thin air without any traditional equitable guideposts." Opening Br. 50-51. Specifically, it adopted an "extrapolated calculation" which would "determine the appreciation percentage realized by the entire Receivership Estate during the asset freeze and then apply that rate to the two distinct disgorgement awards." Dkt. #2147 at 24 (quoting Liquidation Plan). The court cited no prior case ever adopting such a methodology, and none exists.

The SEC says this Court should not consider Relief Defendants' objections to that methodology until the Court adjudicates an appeal of the post-judgment order.

SEC Br. 52.  But the district court explicitly stated it was clarifying the judgment already on appeal, rather than entering a new appealable order.  Dkt. #2147 at 24, 26.  More fundamentally, even setting aside Relief Defendants' objections to the particular nuts and bolts of the district court's methodology,[7] the core problem is that the district court should not have invented an unprecedented new methodology for calculating the judgment and departed from the thousands of cases that have calculated prejudgment interest at a fixed rate.

The district court's decision was anomalous in another respect. The court's decision to switch methodologies mid-case was illogical.  Why would *freezing* the assets be a basis for adopting a new methodology that *increases* the amount Relief Defendants owe?  Freezing assets is a tool used to prevent asset dissipation, not to increase the value of a judgment.  Opening Br. 51.

The SEC responds that the wrongdoer would otherwise "benefit from the asset freeze."  SEC Br. 46.  But Relief Defendants derived no benefit from the freeze. Without the freeze, Relief Defendants could have kept the assets invested where they were and achieved the same gains—or moved the low-performing investments to

---

[7] For example, the district court divided the disgorgement judgment by the total frozen amount to determine the percentage of gains to disgorge.  Relief Defendants believe the district court's assessment of total frozen amount was too low, resulting in a percentage that was too high. Their appeal of the post-judgment order is currently stayed; when it is reactivated, Relief Defendants reserve their right to challenge the post-judgment order on that and other grounds.

better-yield investments and done even better. The freeze merely disabled Relief Defendants from moving or using the assets. It is no basis to *increase* the judgment and *punish* Relief Defendants for their successful pre-freeze investments.

### 2. *The Prejudgment Interest Order Conflicts with This Court's Case Law.*

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), confirms that the district court erred. In *Manor Nursing*, this Court reversed a district court decision directing defendants to transfer "profits and income earned … on such proceeds" of a securities fraud transaction. *Id.* at 1104. It reasoned that ordering disgorgement of proceeds would constitute a "penalty assessment" and "arbitrarily requir[e] those appellants who invested wisely to refund substantially more than others." *Id.* at 1104-05. *Manor Nursing* is materially indistinguishable from this case. Opening Br. 52-54.

The SEC insists that *Manor Nursing* "did not purport to measure the use value of fraud proceeds during an asset freeze when no prejudgment interest has been charged, nor did it address the traditional equitable principles just discussed." SEC Br. 48-49. That effort to distinguish *Manor Nursing* fails. As to the SEC's former point: the fact that the assets were frozen is irrelevant to *Manor Nursing*'s point that awarding actual gains is punitive and arbitrary. As to the latter: traditional equitable principles support *Manor Nursing*, which is in any event binding precedent.

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013), does not support the district court's approach. In *Razmilovic*, the defendant did not dispute that the SEC could seize accrued interest on his frozen assets—likely because (i) the judgment amount exceeded the frozen amount and (ii) it was undisputed that the accrued interest was directly traceable to the misappropriated funds. Opening Br. 54-56. The Second Circuit held that it would be double counting for the SEC to *also* collect prejudgment interest. *Id.* The SEC's effort to transform its loss in *Razmilovic* into a win here fails. Nothing in *Razmilovic* authorizes the SEC to seize gains on frozen assets without any showing that those gains are attributable to the misappropriation.

The SEC attempts to harmonize *Manor Nursing* and *Razmilovic* by arguing that *Manor Nursing* bars disgorgement of gains that were the products of "intervening efforts," while in *Razmilovic*, there were no "intervening efforts" because of the freeze. SEC Br. 50-51. The SEC claims this case is more like *Razmilovic* because the gains did not result from Relief Defendants' "intervening efforts." *Id. Razmilovic* never even hints at this rationale, which makes little sense. As in *Manor Nursing*, the gains in this case were the product of Relief Defendants' investing savvy. Relief Defendants selected the successful investments before the freeze; during the freeze, the assets stayed parked in those investments, and grew in value. The fact that the freeze disabled Relief Defendants from altering those

successful investments is not a logical basis to distinguish this case from *Manor Nursing*.

### C. Post-judgment interest should start on December 14, 2018.

The parties' dispute over post-judgment interest concerns the interpretation of the judgment currently on appeal.  Hence, contrary to the SEC's suggestion (SEC Br. 53), the Court should adjudicate the parties' dispute over post-judgment interest rather than defer it to some future appeal.

The parties mostly agree on post-judgment interest, but differ in two respects. First, the SEC contends that calculation of actual gains should run "only to the date of the original judgment on September 27, 2018."  SEC Br. 53.  But that judgment pertained only to Iftikar. The court did not enter judgment against Relief Defendants until December 14, 2018, so calculation of post-judgment interest should begin on that date.  Opening Br. 59.

Second, the SEC asks to split the judgment in two.  It contends that statutory post-judgment interest should begin for part of the judgment in 2018, and the rest in 2021.  SEC Br. 53.  No case supports this judgment-splitting approach.  As Relief Defendants' opening brief explained, this Court's precedents hold that post-judgment interest starts running on the date of an original judgment, even if it is subsequently amended.  Opening Br. 59 (citing *Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 178 (2d Cir. 2002), and *Greenway v. Buffalo Hilton*

30

*Hotel*, 143 F.3d 47, 55 (2d Cir. 1998)).  The SEC does not cite or distinguish these cases, which foreclose its approach.

## CONCLUSION

The judgment should be reversed.

Dated:  March 16, 2022                    Respectfully Submitted,

                                        */s/* Adam G. Unikowsky
                                        Adam G. Unikowsky
                                        Zachary C. Schauf
                                        JENNER & BLOCK LLP
                                        1099 New York Ave. NW, Suite 900
                                        Washington, DC 20001
                                        (202) 639-6000

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's order because it contains 6,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013, Times New Roman 14-point.

Dated: March 16, 2022           By: /s/ Adam G. Unikowsky
                                Adam G. Unikowsky

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2022, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 16, 2022                     By:  /s/ Adam G. Unikowsky
                                               Adam G. Unikowsky